Nos. 19-55526, 19-55707, 19-55708, 19-55718, 19-55725, 19-55727, 19-55728

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE CENTER,
a California non-profit corporation, et al.,
*Plaintiffs/Appellees/Cross-Appellants*,

v.

BUREAU OF OCEAN ENERGY MANAGEMENT, et al.,
*Defendants/Appellants/Cross-Appellees*,

and

AMERICAN PETROLEUM INSTITUTE, et al.,
*Intervenor-Defendants/Appellants/Cross-Appellees*.

Appeal from the United States District Court
for the Central District of California
Nos. 2:16-cv-08418, 2:16-cv-08473, 2:16-cv-09352 (Hon. Philip S. Gutierrez)

**FEDERAL APPELLANTS' EXCERPTS OF RECORD ON CROSS-APPEAL**

**VOLUME 5**

JEFFREY BOSSERT CLARK
*Assistant Attorney General*
ERIC GRANT
*Deputy Assistant Attorney General*
MICHAEL T. GRAY
JOSEPH H. KIM
JAMES A. MAYSONETT
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0216
james.a.maysonett@usdoj.gov

| | Joint Excerpts of Record for First Cross-Appeal Briefs Table of Contents | | |
|---|---|---|---|
| **Vol.** | **Document** | **Date** | **Pages** |
| **District court documents** | | | |
| 1 | Order Denying DCOR LLC's Motion for Reconsideration, Docket No. 153, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. Apr. 23, 2019) | 4/23/2019 | 1–6 |
| 1 | Judgment, Docket No. 132, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. Dec. 13, 2018) | 12/13/2018 | 7–9 |
| 1 | Order Granting in Part and Denying in Part the Cross-Motions for Summary Judgment, Docket No. 126, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. Nov. 9, 2018) | 11/9/2018 | 10–50 |
| 1 | Transcript of Hearing before Honorable Philip S. Gutierrez, Docket 124, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Nov. 5, 2018) | 11/5/2018 | 51–76 |
| 1 | Order Denying Defendants' Motion to Dismiss, Docket No. 74, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 14, 2017) | 7/14/2017 | 77–91 |
| 1 | Order re: Stipulation to Consolidate, Docket No. 22, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. Feb. 17, 2017). | 2/17/2017 | 92–93 |

i

| Additional district court documents | | | |
|---|---|---|---|
| 2 | People of the State of California's Notice of Appeal, Docket No. 167, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 24, 2019) | 6/24/2019 | 94 |
| 2 | Center for Biological Diversity's Notice of Appeal, Docket No. 168, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 24, 2019) | 6/24/2019 | 95 |
| 2 | Federal Defendants' Notice of Appeal, Docket No. 163, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 21, 2019) | 6/21/2019 | 96–104 |
| 2 | Intervenor-Defendant DCOR, LLC's Notice of Appeal, Docket No. 162, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 20, 2019) | 6/20/2019 | 105–111 |
| 2 | Intervenor-Defendant Exxon Mobil Corporation's Notice of Appeal, Docket No. 161, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 19, 2019) | 6/19/2019 | 112–119 |
| 2 | Environmental Defense Center's Notice of Appeal, Docket No. 160, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 18, 2019) | 6/18/2019 | 120 |
| 2 | Intervenor-Defendant American Petroleum Institute's Notice of Appeal, Docket No. 155, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. May 7, 2019) | 5/7/2019 | 121–128 |

| 2 | DCOR's Motion for Partial Amendment of Judgment or Partial Relief from Order and Supporting Declaration, Docket No. 133, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Jan. 10, 2019) | 1/10/2019 | 129–152 |
|---|---|---|---|
| 2 | Declaration of David Cohen in Support of DCOR LLC's Motion for Partial Amendment of Judgment or Partial Relief from Order, Docket No. 133-1, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Jan. 10, 2019) | 1/10/2019 | 153–156 |
| 2 | Declaration of Alan C. Templeton in Support of DCOR LLC's Motion for Partial Amendment of Judgment of Partial Relief from Order, Docket No. 133-2, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Jan. 10, 2019) | 1/10/2019 | 157–160 |
| 2 | DCOR's Proposed Order on Motion for Partial Amendment of Judgment, Docket No. 133-1, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Jan. 10, 2019) | 1/10/2019 | 161–164 |
| 2 | Environmental Defense Center's Reply in Support of Notice of Motion and Motion for Summary Judgment, Docket No. 111, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (June 13, 2018) | 6/13/2018 | 165–197 |
| 2 | Environmental Defense Center's Memorandum in Opposition to Cross Notice of Motion and Motion for Summary Judgment, Docket No. 112, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (June 13, 2018) | 6/13/2018 | 198–230 |

| 2 | People of the State of California's Memorandum in Opposition to Cross Notice of Motion and Motion for Summary Judgment as to Plaintiffs' Complaints, Docket No. 113, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (June 13, 2018) | 6/13/2018 | 231–258 |
|---|---|---|---|
| 2 | Memorandum in Opposition to Cross Notice of Motion and Motion for Summary Judgment as to Plaintiffs' Complaints and Opposition to Plaintiffs' Motions for Summary Judgment, Docket No. 109, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (June 12, 2018) | 6/12/2018 | 259–291 |
| 2 | Center for Biological Diversity's Reply in Support of Notice of Motion and Motion for Summary Judgment, Docket No. 110, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (June 12, 2018) | 6/12/2018 | 292–324 |
| 2 | Notice of Motion and Motion for Summary Judgment filed by Plaintiff, People of State of California, Docket No. 95, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Feb. 12, 2018) | 2/12/2018 | 325–357 |
| 3 | Notice of Motion and Motion of Summary Judgment filed by Plaintiff, Environmental Defense Center, Docket No. 96, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Feb. 12, 2018) | 2/12/2018 | 358–391 |
| 3 | Notice of Motion and Motion for Summary Judgment filed by Plaintiffs Center For Biological Diversity, Wishtoyo Foundation, Docket No. 97, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Feb. 12, 2018) | 2/12/2018 | 392–427 |

| 3 | Federal Defendants' Answer to Environmental Defense Center's Complaint, Docket No. 87, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. August 28, 2017) | 8/28/2017 | 428–480 |
|---|---|---|---|
| 3 | Federal Defendants' Answer to Center for Biological Diversity's Complaint, Docket No. 88, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. August 28, 2017) | 8/28/2017 | 481–505 |
| 3 | Federal Defendants' Answer to People of the State of California's Complaint, Docket No. 89, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. August 28, 2017) | 8/28/2017 | 506–523 |
| 3 | Defendant-Intervenor DCOR, LLC's Answer to Environmental Defense Center's Complaint, Docket No. 83, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 31, 2017) | 7/31/2017 | 524–538 |
| 3 | Defendant-Intervenor DCOR, LLC's Answer to Center for Biological Diversity's Complaint, Docket No. 84, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 31, 2017) | 7/31/2017 | 539–546 |
| 3 | Defendant-Intervenor DCOR, LLC's Answer to State of California's Complaint, Docket No. 85, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 31, 2017) | 7/31/2017 | 547–553 |
| 3 | Defendant-Intervenor Exxon Mobil Corporation's Answer to Environmental Defense Center's Complaint, Docket No. 77, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 554–615 |

| 4 | Defendant-Intervenor Exxon Mobil Corporation's Answer to Center for Biological Diversity's Complaint, Docket No. 78, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 616–644 |
|---|---|---|---|
| 4 | Defendant-Intervenor Exxon Mobil Corporation's Answer to People of the State of California's Complaint, Docket No. 79, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 645–663 |
| 4 | Defendant-Intervenor American Petroleum Institute's Answer to Environmental Defense Center's Complaint, Docket No. 80, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 664–732 |
| 4 | Defendant-Intervenor American Petroleum Institute's Answer to Center for Biological Diversity's Complaint, Docket No. 81, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 733–760 |
| 4 | Defendant-Intervenor American Petroleum Institute's Answer to People of the State of California's Complaint, Docket No. 82, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 761–781 |
| 4 | Declaration of Alan C. Templeton in Support of DCOR LLC's Consolidated Motion for Leave to Intervene, Docket No. 45-4, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Apr. 25, 2017) | 4/25/2017 | 782–790 |
| 4 | Declaration of David Cohen in Support of DCOR LLC's Consolidated Motion for Leave to Intervene, Docket No. 45-5 (Apr. 25, 2017) | 4/25/2017 | 791–798 |

| 4 | Declaration of Michael Mitchell in Support of Defendants' Motion to Dismiss, Exhibit 1 to Defendants' Motion to Dismiss, Docket No. 43-1, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Apr. 3, 2017) | 4/3/2017 | 799–842 |
|---|---|---|---|
| 5 | Biological Assessment to NMFS, Exhibit 2 to Defendants' Motion to Dismiss, Docket No. 43-2, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Apr. 3, 2017) | 4/3/2017 | 843–903 |
| 5 | Transmittal Letter to NMFS, Exhibit 3 to Defendants' Motion to Dismiss, Docket No. 43-3, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Apr. 3, 2017) | 4/3/2017 | 904–906 |
| 5 | Transmittal Letter to FWS, Exhibit 4 to Defendants' Motion to Dismiss, Docket No. 43-4, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Apr. 3, 2017) | 4/3/2017 | 907–909 |
| 5 | Biological Assessment to FWS, Exhibit 5 to Defendants' Motion to Dismiss, Docket No. 43-5, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Apr. 3, 2017) | 4/3/2017 | 910–1000 |
| 5 | Declaration of Ken Dowd in Support of Exxon Mobil Corporation's Motion for Leave to Intervene, Docket No. 20-3, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Feb. 8, 2017) | 2/8/2017 | 1001–1006 |
| 5 | People of the State of California's Complaint for Declaratory and Injunctive Relief, Docket No. 1, *People of the State of California v. United States Department of the Interior*, No. 2:16-cv-9352 (C.D. Cal. Dec. 19, 2016) | 12/19/2016 | 1007–1032 |

| 5 | Center for Biological Diversity's Complaint for Declaratory and Other Relief, Docket No. 1, *Center for Biological Diversity v. BOEM*, No. 2:16-cv-8473 (C.D. Cal. Nov. 15, 2016) | 11/15/2016 | 1033–1066 |
| 6 | Environmental Defense Center's Complaint for Declaratory and Injunctive Relief, Docket No. 1, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. Nov. 11, 2016) | 11/11/2016 | 1067–1138 |
| **Administrative Record documents** | | | |
| 6 | Letter from Barry A. Thom, NMFS, to Joan R. Barminski (Dec. 4, 2017) (DOI 106301–26) | 12/4/2017 | 1139–1164 |
| 6 | Letter from Collette M. Thogerson, USFWS, to Joan R. Barminski, BOEM (July 28, 2017) (DOI 106294–98) | 7/28/2017 | 1165–1169 |
| 6 | Letter from Douglas P. Boren, BOEM, to Dave Cohen, DCOR, LLC (Jan. 19, 2017) (DOI 52272–73) | 1/19/2017 | 1170–1171 |
| 6 | BOEM & BSEE, Finding of No Significant Impact: Use of Well Stimulation Treatments on the Pacific Outer Continental Shelf (May 2016) (DOI 106901–106908) | 5/27/2016 | 1172–1179 |
| 6 | Press Release, BSEE and BOEM Publish Joint Environmental Assessment on Use of Well Stimulation Treatments in Federal Waters off California (May 27, 2016) (DOI 16576) | 5/27/2016 | 1180 |
| 7 | BOEM & BSEE, Final Programmatic Environmental Assessment of the Use of Well Stimulation Treatments on the Pacific Outer Continental Shelf (May 2016) (DOI 106599–106900) | 5/1/2016 | 1181–1432 |

| 8 | Final Programmatic EA, *continued* | | 1433–1482 |
|---|---|---|---|
| 8 | Recent Studies from BOEM, EPA, SCCWRP and CA SLC Produced-Water Discharge Contamination Studies in Shell Mound and Platform-Associated Fish (Jan. 23, 2014) (DOI 1805–6) | 1/23/2014 | 1483–1484 |
| 8 | Addendum to Fact Sheet, Final National Pollutant Discharge Elimination System General Permit No. CAG280000 for Offshore Oil and Gas Exploration, Development and Production Operations off Southern California (Dec. 17, 2013) (DOI 35131–35201) | 12/17/2013 | 1485–1555 |
| 8 | Letter from Ellen Aronson, BOEM, to Mike Fris, USFWS (Sept. 1, 2011) (DOI 105951–53) | 9/1/2011 | 1556–1558 |
| 8 | California Coastal Commission Consistency Determination Materials (DOI 49357–69) | 12/21/1987 | 1559–1571 |
| 8 | Excerpts from California Coastal Commission Final Staff Recommendation on Consistency Certification (Mar. 12, 1985) (DOI 50433–35) | 3/12/1985 | 1572–1574 |
| 8 | Excerpts from Secretary of Commerce Findings on Consistency Appeal (Feb. 20, 1984) (DOI 51480–83) | 2/20/1984 | 1575–1578 |
| 8 | Historic California Coastal Commission Consistency Determination Materials (DOI 48637–92) | 11/17/1982 | 1579–1634 |
| 8 | Notification of Commission Action on Consistency Review (Jan. 20, 1981) (DOI 48635–36) | 1/20/1981 | 1635–1636 |

| 8 | Historic California Coastal Commission Consistency Determination Materials (DOI 49394–434) | 3/5/1980 | 1637–1677 |
|---|---|---|---|
| **Published documents** | | | |
| 8 | Order No. 3299, Secretary of the Interior (Aug. 29, 2011) | 8/29/2011 | 1678–1679 |
| 9 | National Oceanic and Atmospheric Administration, Coastal Zone Management Act Federal Consistency Regulations, 71 Fed. Reg. 788–831 (Jan. 5, 2006) | 1/5/2006 | 1680–1724 |
| 9 | National Oceanic and Atmospheric Administration, Coastal Zone Management Act Federal Consistency Regulations, 65 Fed. Reg. 77124–77175 (Dec. 8, 2000) | 12/8/2000 | 1725–1777 |
| 9 | Excerpts from Sen. Rep. 101-445 (Aug. 30, 1990): Report of the Senate Committee on Commerce, Science, and Transportation on S. 2782 | 8/30/1990 | 1778–1781 |
| 9 | Excerpts from Committee on Commerce and National Ocean Policy Study, 94th Cong., Legislative History of the Coastal Zone Management Act of 1972, as Amended in 1974 and 1976 (Dec. 1976) | 12/1/1976 | 1782–1938 |
| 10 | Excerpts from Sen. Rep. No. 94-987 (June 24, 1976): Report of the Committee of Conference on S. 586 To Improve Coastal Zone Management in the United States, and for Other Purposes | 6/24/1976 | 1939–1944 |

| 10 | Excerpts from the Congressional Record:  (a) Senate Proceedings of July 16, 1975, (b) House Proceedings of March 11, 1976, (c) Senate Proceedings of June 29, 1976, and (d) House Proceedings of June 30, 1976 | 7/16/1975 | 1945–1959 |
|---|---|---|---|
| 10 | Staff of S. Comm. on Commerce, 93d Cong., Outer Continental Shelf Oil and Gas Leasing Off Southern California: Analysis of Issues, at vii (Comm. Print 1974) | 11/12/1974 | 1960–2018 |
| 10 | Excerpts from the Congressional Record: (a) Senate Proceedings of April 25, 1972, and (b) House Proceedings of August 2, 1972 | 4/25/1972 | 2019–2024 |
| **Other documents** | | | |
| 10 | Trial court docket sheets | | 2025–2062 |

Defendants' Exhibit 2

Biological Assessment to NMFS

# Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

## Biological Assessment
### Endangered and Threatened Species



*Photo Courtesy of Beta Offshore*

Prepared for the National Marine Fisheries Service

In Accordance with Section 7(c) of the Endangered Species Act of 1973,
as Amended

**March 2017**

Ex. 2, Page 1

E.R. 0844

## INTRODUCTION

Leasing, exploration, development and production of offshore oil and gas reserves on the outer continental shelf of the Pacific Coast began in the early 1960's. Initially, the Bureau of Land Management (BLM) was responsible for leasing areas of the outer continental shelf and the U.S. Geological Survey (USGS) provided oversight for exploration, development and production of offshore oil and gas resources. In 1982, the Minerals Management Service (MMS) was created to oversee all outer continental shelf oil and gas leasing, exploration, development and production. In 2010, MMS was renamed the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). The following year, the Office of Natural Resource Revenues (ONRR) was created and BOEMRE was split into two new bureaus: the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE). With this reorganization, BOEM retains the authority for managing and issuing decisions on oil and gas leasing on the outer continental shelf, as well as approval of exploration and development and production plans and issuance of geological and geophysical permits. BSEE retains the authority to review and approve permits for drilling, rights-of-way and pipeline installations, decommissioning of offshore structures as well as day-to-day inspection and enforcement actions associated with offshore oil and gas production.

BOEM and BSEE are independent bureaus but their missions are clearly linked and they share many functions. For example, BOEM currently assists BSEE with environmental reviews and BSEE handles many human resource and administrative functions for BOEM. For this biological assessment, we reflect on past Endangered Species Act (ESA) consultations, identify reasonably foreseeable future BOEM and BSEE actions, and consider the potential effects of these actions on species currently listed by the National Marine Fisheries Service (NMFS) as endangered or threatened.

## OFFSHORE OIL AND GAS DEVELOPMENT IN SOUTHERN CALIFORNIA: ENDANGERED SPECIES ACT CONSULTATION HISTORY

When the ESA was passed in 1973, five oil and gas production platforms were already installed in federal waters offshore Southern California (Hogan, Houchin, Platform A, Platform B, Hillhouse) and two additional platforms had been approved for installation (Platform C and Hondo). BLM's first formal ESA consultation with NMFS was completed in 1978 (NMFS 1978) for lease sale 48. NMFS considered this consultation to be a "threshold examination" and a second consultation between NMFS and USGS was completed the following year (NMFS 1979). The consultation with USGS in 1979 was for all then-existing outer continental shelf oil and gas exploration, development and production activities in the Southern California Bight and future offshore oil and gas activities that may occur under lease sale 48. This ultimately included the installation and operation of nine additional platforms in federal waters (Elly, Ellen, Grace, Henry, Gina, Edith, Eureka, Habitat and Gilda). In 1980, BLM and USGS jointly consulted with NMFS on leasing and exploration activities associated with sale 53 (NMFS 1980) and in 1981, a regional approach to consultation for leasing and exploration in the Southern California Bight was conducted (NMFS 1981).

After it was created in 1982, MMS returned to consulting on individual lease sales (sales 73, 80) and associated exploration activities (NMFS 1983, NMFS 1983a). In addition, MMS formally consulted with NMFS on individual Development and Production Plans (DPPs) submitted to

Ex. 2, Page 3

Case: 19-55526, 12/23/2019, ID: 11541771, DktEntry: 39-5, Page 17 of 236

Case 2:16-cv-08418-PSG-FFM   Document 43-2   Filed 04/03/17   Page 5 of 61   Page ID #:580

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

MMS for approval (NMFS 1984, NMFS 1984a, NMFS 1985, NMFS 1986, NMFS 1986a). Not all of these DPPS were implemented. Those that were implemented resulted in the installation of seven more platforms (Harmony, Heritage, Hermosa, Hidalgo, Harvest, Irene, and Gail).

The last oil and gas platform was installed in southern California in 1989. Since then, MMS/BOEM/BSEE has consulted informally with NMFS for infrastructure repairs and replacements (e.g., pipelines and cables) and prepared biological assessments of potential effects to endangered species for revisions of DPPs that proposed drilling into new oil fields from existing platforms – Rocky Point (MMS 2000) and Tranquillon Ridge (MMS 2008). In both of these examples, NMFS determined that endangered and threatened species were not likely to be adversely affected and formal consultation under ESA was not required (NMFS 2000 and NMFS 2008).

In 2014, BSEE requested formal ESA consultation for proposed conductor installation on Platform Harmony. NMFS acknowledged BSEE's request by citing the intra-service biological opinion that they had prepared for NMFS issuance of an Incidental Take Authorization (IHA) under the Marine Mammal Protection Act for the same activity (NMFS 2014).

<u>Species and Impacting Factors Considered in Past Consultations</u>

All formal ESA consultations with NMFS have considered the effects of offshore oil and gas development on the blue whale (*Balaenoptera musculus*), fin whale (*B. physalus*), sei whale (*B. boralis*), humpback whale (*Megaptera novaeangliae*), sperm whale (*Physeter catodon*), gray whale (*Eschrichtius robustus*), north Pacific right whale (*Eubalaena glacialis*), olive ridley sea turtle (*Lepidochelys olivacea*), green sea turtle (*Chelonia mydas*), loggerhead sea turtle (*Caretta caretta*), and the leatherback sea turtle (*Dermochelys coreacea*).

To be thorough, NMFS occasionally added evaluation of a non-listed species to a formal consultation. Monoplacophoran (*Vema hyalina*), a small deep water mollusk, was never proposed for listing but was included in one opinion (NMFS 1981). The Guadalupe fur seal (*Arctocephalus townsendi*) and northern fur seal (*Callorhinus ursinus*) were first included as candidate species in 1984 (NMFS 1984). The Guadalupe fur seal was subsequently listed as threatened and considered in subsequent opinions whereas the northern fur seal was not listed.

NMFS species listed after all platforms were installed include the steelhead trout (*Oncorhyncus mykiss*), white abalone (*Haliotis sorenseni*), black abalone (*Haliotis cracherodii*), and the green sturgeon (*Acipenser medirostris*). BOEM and BSEE informally consulted with NMFS on these species as new actions were identified. To date, no offshore oil and gas activities have been determined to have a likely adverse effect on these species.

The threat of oil spills, noise associated with drilling and production platforms, crew boats, helicopters, facility abandonment (decommissioning), and collisions between vessels and endangered species, figured prominently in early consultations.

In these earlier consultations, the gray whale was considered to be at greatest risk because virtually the entire population migrated through offshore oil and gas production areas in California twice a year. The north Pacific right whale was considered to be the most vulnerable species because of its extraordinarily small population size but this rarity reduced the likelihood that offshore oil and gas activities in southern California would affect this species. Similarly, all four species of sea turtle were considered rare visitors to southern California, reducing

2

Case: 19-55526, 12/23/2019, ID: 11541771, DktEntry: 39-5, Page 18 of 236

Case 2:16-cv-08418-PSG-FFM   Document 43-2   Filed 04/03/17   Page 6 of 61   Page ID #:581

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

opportunities for interaction with offshore oil and gas activities. The remaining whale populations were considered to be widely dispersed with some individuals visiting southern California on a seasonal basis.

Recommendations in the early consultations focused primarily on gathering information about potential impacts to gray whale migration and staging of oil spill response equipment to reduce potential effects of an oil spill. MMS responded by funding studies of gray whale migration (MMS 1989) and working with industry to stage oil spill response equipment for maximum effectiveness. Construction and operation of offshore oil and gas facilities in California has had no apparent effect on gray whale migration patterns and the gray whale was delisted in 1994.

**RANGE AND SCOPE OF FUTURE BOEM AND BSEE ACTIONS FOR EXISTING OFFSHORE OIL AND GAS FACILITIES IN THE SOUTHERN CALIFORNIA PLANNING AREA**

The range and scope of reasonably foreseeable future BOEM and BSEE (Bureaus) actions has been significantly reduced over the last 30 years. Lease sales and major construction activities identified in existing biological opinions have either been completed or abandoned. There are no plans to conduct new lease sales at this time and no new platforms are expected to be installed in the foreseeable future. Emphasis has shifted from leasing new areas to maximizing the development of oil and gas resources within the range of existing platforms and infrastructure. This programmatic biological assessment describes the current and expected level of activities associated with the continued development and production of oil and gas reserves within the Southern California Planning Area and reexamines potential effects on endangered and threatened species under NMFS jurisdiction.

This assessment is intended to supplement and combine earlier assessments and endangered species consultations for routine oil and gas development activities that are currently underway or are reasonably foreseeable in the Southern California Planning Area. The Bureaus will continue to coordinate with NMFS on future actions as they are considered in the Pacific Region. This on-going coordination may confirm that an action is included within the scope of this programmatic assessment or that additional consultation would be required. For example, decommissioning of offshore facilities is discussed in this document but the Bureaus anticipate that project specific coordination and consultation will be necessary when a detailed decommissioning plan is submitted.

<u>Description of the Southern California Planning Area</u>

The Bureaus' Southern California Planning Area extends from the Monterey/San Luis Obispo County line southward to the Mexican border and includes waters from 3-200 miles from shore. For the purpose of this biological assessment, the Southern California Planning Area is considered the action area for potential effects on endangered and threatened species.

As of March 2017, there are 41 active producing leases in the Southern California Planning Area with 23 Federal platforms and 213 miles of pipelines that transport oil and gas to shore. Since 1963, more than 1,450 exploration and development wells have been drilled in this area with more than 1.3 billion barrels of oil and 1.8 trillion cubic feet of natural gas produced through September 2016. There are now fewer than 400 active development wells at any given time and this number is not expected to change substantially in the foreseeable future. Approximately 260

Ex. 2, Page 5

million barrels of oil and 540 billion cubic feet of natural gas are estimated to remain in oil and gas fields within reach of existing platforms in the Southern California Planning Area.

Oil production rates peaked at more than 200,000 barrels per day in1996 and have declined in subsequent years to a production rate of about 50,000 barrels per day. Since May 2015, oil production has been temporarily reduced to about 17,000 barrels per day as the result of an onshore pipeline failure.

Gas production has followed a similar declining trend with a production rate of about 77 million cubic feet per day. Gas production has also been affected by the 2015 onshore pipeline failure resulting in a temporary rate of about 13 million cubic feet per day.

Overall, offshore oil and gas production in the Southern California Planning Area is expected to continue to decline gradually over time with drilling and production activities continuing as long as oil and gas can be produced in paying quantities.

<u>BOEM/BSEE Actions and Activities</u>

Brief descriptions of bureau actions and associated activities are provided below. They are listed in a roughly chronological order from leasing of the outer continental shelf to decommissioning (removal) of offshore oil and gas facilities including the bureau responsible approving each activity. We do not expect all of these actions and activities to occur in the foreseeable future. We will continue to coordinate and consult with NMFS on future actions that are not considered ripe for consultation at this time.

(1)    LEASE SALES AND ISSUANCE OF LEASES (BOEM)

A primary BOEM function is the sale and issuance of Outer Continental Shelf leases for energy development; however, in the Southern California Planning Area no oil and gas leases have been offered since 1984. From 1984-2008, Congressional and Presidential moratoriums were in effect that prohibited oil and gas lease sales offshore California. Although these moratoriums were either rescinded or allowed to expire, planning areas offshore California are not included in BOEM's 2017-2022 leasing program.

*Projected Activity*. There are no plans to conduct oil and gas lease sales or issue new leases in the Southern California Planning Area and therefore we are not considering future leasing actions in this biological assessment.

(2)    APPROVAL OF OIL AND GAS EXPLORATION PLANS AND GEOLOGICAL AND GEOPHYSICAL PERMITS

<u>Exploration Plans</u>. Upon issuance of a lease, drilling of exploratory wells and associated activities are subject to BOEM-approved exploration plans [30 CFR 550.201]. Since 1963, 295 exploration wells have been drilled in the Southern California Planning area with the last exploratory well completed in 1989 (MMS 1992). These exploratory wells were drilled using jack-up rigs, mobile offshore drilling units (MODUs) or ships. Currently there are no active exploration plans or exploratory drilling activities occurring in the Southern California Planning Area.

<u>Geological and Geophysical Survey Permits</u>. BOEM requires permits for geological and geophysical (G&G) surveys conducted for the purpose of collection of oil, gas or sulphur data on the Outer Continental Shelf whether they be for exploration or scientific research [30 CFR

4

551.4]. G&G surveys are generally exploratory in nature and may include high energy seismic surveys. G&G surveys that precede leasing (or are otherwise off lease) require a permit. G&G activities on an existing lease, to further delineate known oil and gas production fields, for example, are authorized through the lease instrument or exploration plans rather than through permits. In the Southern California Planning Area, the most recent G&G permit was issued by MMS in 1995. In 1999, the California State Lands Commission (CSLC), MMS and NMFS finalized a coordinated process for future review of G&G permit applications in the geographic area extending from the Monterey Bay National Marine Sanctuary south to the Mexican border in State and Federal waters (CSLC and MMS, 1999). This High Energy Seismic Survey (HESS) review process was the result of a two-year consensus-building effort among stakeholders including NMFS. In this process, NMFS was identified as the lead agency for ESA consultations for high energy seismic surveys in recognition of their requirement to issue Incidental Harassment Authorizations (IHAs) under the Marine Mammal Protection Act.

*Projected Activity.* BOEM does not anticipate new exploration plans to be submitted in the absence of leasing program for the Southern California Planning Area, which is not reasonably foreseeable at this time. Likewise, requests for BOEM to permit G&G surveys in the Southern California Planning Area are not anticipated. Accordingly, we are not considering G&G surveys in this biological assessment. Should a G&G permit be requested, we expect to coordinate and cooperate with NMFS as agreed upon in the Pacific Region's HESS process plan.

(3)   APPROVAL OF OIL AND GAS DEVELOPMENT AND PRODUCTION PLANS AND PLAN REVISIONS (BOEM)

Offshore oil and gas development and production activities must be conducted in accordance with plans approved by BOEM [30 CFR 550.201]. The content and level of detail for development and production plans in the Southern California Planning Area have varied over time but all describe proposed infrastructure (e.g., platforms, pipelines and power cables), activities and general strategies for production of oil and gas. A number of day-to-day production and development activities, described below, are components of plans.

Discharges and Emissions. BOEM regulations require operators to submit a copy of their application for a National Pollutant Discharge Elimination System (NPDES) permit from the Environmental Protection Agency (EPA) with their development and production plans [30 CFR 550.248]. BSEE regulations prohibit unauthorized discharges of pollutants into offshore waters [30 CFR 250.300]. Fluid and solid discharges from Federal oil and gas development and production facilities in southern California are authorized by EPA under general NPDES permit CAG 280000. This permit authorizes 22 types of discharges from all Federal offshore platforms in southern California including drilling muds and cuttings; produced water; well treatment, completion and workover fluids (including fluids associated with hydraulic fracturing and acidization); deck drainage; sanitary wastes and domestic wastes; non-contact cooling water; and fire control test water (EPA 2014). In 2013, EPA Region 9 re-evaluated the potential effects of these discharges on ESA listed species and critical habitat for the offshore lease blocks considered active by BOEM. They concluded that readily available evidence supports the conclusion that the discharges would have no effect on endangered or threatened species. They forwarded their conclusion to NMFS and received no comments (EPA 2013).

Ex. 2, Page 7

E.R. 0850

BOEM air emission information requirements for development and production plans are found at 30 CFR 550.249. In the Southern California Planning Area, responsibility for air quality management is delegated by EPA to local air quality control boards that monitor and enforce air quality requirements for offshore oil and gas development and production. BOEM and BSEE work with the local air quality control boards to ensure that their requirements are met.

Support Vessel and Operator Aircraft Activity: Day-to-day offshore oil and gas development and production operations require routine personnel and equipment transfers. Crew and supply boats depart the coast approximately 30 times per day along pre-determined routes from Seal Beach Pier (public pier, Orange County), Terminal Island (Port of Los Angeles), Port Hueneme, Carpinteria Pier (private pier, Santa Barbara County) and Ellwood Pier (private pier, Santa Barbara County) to nearby offshore platforms. Approximately 3-4 helicopter trips per day are used to transport personnel from the Santa Maria Airport to platforms north of Point Conception. Larger pieces of equipment and certain support services (e.g., commercial dive services) are mobilized from the Port of Long Beach, the Port of Los Angeles, Port Hueneme and, to a limited extent, Santa Barbara Harbor.

*Projected Activity.* All major construction activities, under approved development and production plans in the Southern California Planning Area, have either been completed or are no longer being considered. We do not anticipate new development and production plans to be submitted in the absence of a leasing program but existing plans may be revised or supplemented if substantive changes are made. BOEM's regulations at 30 CFR 550.283 provide specific instances where revisions to development and production plans are necessary: 1) Change in the type of drilling, production facility or oil/gas transportation mode; 2) Change in the location of a drilling or production facility; 3) Change in the type of production or significant increase in production volume or oil storage capacity; 4) Increased air emissions exceeding the amount specified in the development and production plan; 5) Significant increase in solid or liquid wastes handled or discharged; 6) Request for new hydrogen sulfide area classification; 7) Change in location of onshore support base from one State to another or expansion of a support base; or, 8) Change in other activity as specified by the Regional Supervisor.

Although we cannot predict what revisions may be requested, we are reviewing the effects of the ongoing discharges, emissions, vessel use, and aircraft use taking place under existing development and production plans in this assessment.

(4)     APPROVAL OF APPLICATIONS FOR PERMIT TO DRILL AND APPLICATIONS FOR PERMIT TO
        MODIFY (BSEE)

General plans for drilling for oil and gas are included in exploration plans and development and production plans approved by BOEM. However, drilling of individual wells must be reviewed and approved by BSEE [30 CFR 250.410]. An Application for Permit to Drill (APD) is used to approve drilling specifications for new wells, new sidetrack wells, and bypasses or deepening of existing wells. Drilling of new wells may also include the installation of conductors which establish a conduit from the deck of the platform to the sea floor.

An Application for Permit to Modify (APM) is required when an approved APD is revised or materially changed [30 CFR 250 subpart D]. Well completion and workover operations, for example, are conducted to establish, maintain or restore production of a well and are generally approved with an APM [30 CFR 250 subparts E and F]. These operations may include hydraulic

6

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

fracture treatments and other well stimulation techniques (e.g., acidization) that are designed to enhance recovery of oil and gas resources. BSEE may also issue well completion or workover field rules to modify specific requirements [30 CFR 250.512 and 30 CFR 250.612].

Well Stimulation Treatments: BSEE may authorize several types of well stimulation treatments through their approval of an APD or APM. These include:

Diagnostic Fracture Injection Tests – A diagnostic fracture injection test is used to estimate key reservoir properties and parameters that are needed to optimize a main fracture job. It is a short duration procedure that involves the injection of typically less than 100 bbl of fracturing fluid at pressures high enough to initiate a fracture. Key parameters are estimated from the fluid volume injected and the pressure dissipation profile. The fluid used in a diagnostic fracture injection test is typically the fluid that would be used in the main fracture treatment but with no proppant[1] added, thus allowing the fracture to close naturally as pressure is released.

Hydraulic Fracturing – Hydraulic fracturing involves the injection of a fracturing fluid at a pressure (as typically determined by a diagnostic fracture injection test) needed to induce fractures within the producing formation. The process generally proceeds in three sequential steps: (1) injection of a fracturing fluid without proppant to create fractures which extend out from the well; (2) injection of a slurry of fracturing fluid and proppant; and (3) injection of breakers, chemicals added to reduce the viscosity of the fracturing fluid. Upon release of pressure, the fracturing fluid is allowed to flow back (the flowback fluid) to the surface platform. Key fluid additives include polymer gels which increase the viscosity of the fluid and allow it to more easily carry proppant into the fractures, crosslinker compounds that help further increase the fluid viscosity, and breaker chemicals which break down the crosslinked polymers and allow them to return more readily to the surface after fracturing is completed. Other important additives may include pH buffers, clay control additives, microbial biocides, and surfactants to aid in fluid recovery. In offshore applications, the base fracturing fluid is filtered seawater.

Acid Fracturing – Acid fracturing is similar to hydraulic fracturing except that instead of using a proppant to keep fractures open, an acid solution is used to etch channels in the rock walls of the fractures, thereby creating pathways for oil and gas to flow to the well. As with a hydraulic fracturing well stimulation treatment, a pad fluid is first injected to induce fractures in the formation. Next, the acid fracturing fluid is injected at pressures above the formation fracture pressure and allowed to etch the fracture walls. The acid fracturing fluid is typically gelled, cross-linked, or emulsified to maintain full contact with the fracture walls. Fifteen percent hydrochloric acid (15% HCl) solutions are typically used in carbonate formations such as limestone and dolomite, while hydrofluoric acid (HF) solutions and HCl/HF mixtures are used in sandstone and Monterey shale formations and in other more heterogeneous geologic formations, typically at levels of 12% and 3%, respectively. The fracturing fluid typically also includes a variety of additives at a combined concentration on the order of 1% or less, such as inhibitors to prevent corrosion of the steel well casing, and sequestering agents to prevent formation of gels or iron precipitation which may clog the pores.

Matrix Acidizing – In matrix acidizing, a non-fracturing treatment, an acid solution, is injected into a formation where it penetrates pores in the rock to dissolve sediments and muds. By

---

[1] A proppant is a solid material, typically sand, treated sand, or man-made ceramic materials, designed to keep an induced fracture open during or following a fracture treatment.

7

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

dissolving these materials, existing channels or pathways are opened and new ones are created, allowing formation fluids (oil, gas, and water) to move more freely to the well. Matrix acidizing also removes formation damage around a wellbore, which also aids oil flow into the well. The acid solution is injected at pressures below the formation fracture pressure and is thus a non-fracturing treatment. Three distinct fluids are commonly used sequentially: (1) an HCl acid preflush fluid; (2) a main acidizing fluid generated from mixing HCL and ammonium bifluoride to produce an HCl/HF mud acid at typically 12% and 3%, respectively (some operations use mud acid while some operations primarily use 15% HCl); and (3) an ammonium chloride overflush fluid. The acidizing fluid also includes a variety of additives at a combined concentration of on the order of 1% or less, similar to those used in acid fracturing.

<u>Installation of Well Conductors</u>: BSEE may authorize installation of conductors with an APD. Conductors are large pipes that carry oil and gas from the sea floor to the deck of an offshore platform. They are inserted through "slots" in the platform structure that guide and support this component of a well. The majority of the conductors are installed when a platform is constructed but some slots may be left empty with a conductor being installed at a later date. Installation of a conductor may require impact, vibratory or rotary methods to drive the conductor into the sea floor thus making this operation analogous to a pile-driving operation.

The dimensions of the conductors, equipment used, specific location and timing are important variables when considering potential sound impacts. Where sound is expected to affect marine mammals an incidental harassment authorization will be required and NMFS will conduct an ESA consultation when specific information for a project becomes available. We expect to cooperate with NMFS in the preparation of ESA consultation documents as conductor installation projects are proposed.

*Projected Activity*. BSEE expects to review and approve approximately 1-2 new and 5-7 sidetrack wells (APDs) and 2-4 well workovers and up to 5 well stimulation treatments (APMs) per year in the Southern California Planning Area. Issuance of APDs for conductors installations are driven by availability of open slots and operator drilling plans. Requests for conductor installations are expected to be sporadic.

Of the more than 1,450 exploration and development wells that have been drilled in Federal waters on the Pacific Outer Continental Shelf between 1982 and 2014, there have been only 21 hydraulically fractured completions, and these were conducted on only 4 of the 23 platforms in the Southern California Planning Area. Three of these were in the Santa Barbara Channel, and the fourth was in the Santa Maria Basin. Only three matrix acidizing treatments, defined as well stimulation treatments, occurring in OCS waters during a similar time frame (between 1985 and 2011) have been identified in records, and these were conducted on only 2 of the 23 platforms.

Given the past occurrence of well stimulation treatments in the Southern California Planning Area and the indicated plans for industry known at this time, we expect up to five well stimulation requests per year. This estimate is conservative in its approach, given that this potentially overestimates the potential for impacts since there is no year on record where five well stimulation treatments were approved. However, given the small number of operating platforms and the current level of oil and gas activities, a higher number of well stimulation treatments proposed in a single year is not reasonably foreseeable.

Ex. 2, Page 10

E.R. 0853

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

(5)    APPROVAL OF PIPELINE INSTALLATIONS AND PIPELINE MODIFICATIONS (BSEE)

Installation, modification or abandonment of offshore oil and gas pipelines requires approval by BSEE [30 CFR 250.1000]. All planned pipelines in the Southern California Planning Area have been installed. BSEE does occasionally receive requests for pipeline repair and/or replacement of existing pipelines.

*Projected Activity.* No pipeline applications are pending or expected at this time, however, we will continue to coordinate and consult with NMFS as pipelines applications are received and when specific information (e.g. location, timing, methods and equipment requirements) for a project proposal becomes available.

(6)    BSEE INSPECTION PROGRAM – HELICOPTER FLIGHTS (BSEE)

BSEE inspectors are on duty every day of the year to ensure compliance with BOEM and BSEE requirements. BSEE maintains a contract for helicopter services for flights from Camarillo Airport to offshore platforms. Average flight usage over the last five years has been 45,000 to 50,000 miles per year. BSEE minimizes flight time by inspecting platforms in proximity to each other or dropping off inspectors at closer platforms before continuing to outlying platforms. Flight time is divided among all the facilities, but flight time to individual facilities can vary greatly depending on activity levels or complexity of the inspection mission and proximity of the platform to Camarillo Airport. Helicopter flight paths are generally over water but can vary dependent on weather conditions. Unless safety (e.g., poor visibility) is an issue, transit flight heights are generally maintained at levels greater than 500 feet. Note that BSEE inspectors may also use operators' crew boats to access the offshore facilities. These boats make regularly scheduled transits to platforms and are addressed under the Support Vessel and Operator Aircraft section above. BSEE inspectors never use an operator's helicopter to access platforms.

*Projected Activity.* The BSEE inspection program is expected to be active as long as oil and gas is produced offshore. Helicopter use is expected to continue at a level comparable to past years – 45,000 to 50,000 miles per year.

(7)    BSEE INITIATED OIL SPILL RESPONSE EQUIPMENT EXERCISES (BSEE)

BSEE is expected to ensure that offshore operators have oil spill response plans and that they are prepared to implement these plans should an oil spill occur. To meet this expectation, BSEE periodically directs operators to deploy industry-owned oil spill response equipment listed in their response plans. For any given exercise, equipment deployed may include oil spill boom, mechanical skimmers, response vessels, oil storage equipment, aircraft and marker buoys as described below:

Oil Spill Boom – Booms are floating, physical barriers to oil, made of plastic, metal, or other materials, which slow the spread of oil and keep it contained. While booms can be seen above the waterline, they may have between 18 and 48 inches of material known as a "skirt" that hangs beneath the surface. The largest sizes of boom are used for offshore responses. Containment boom comes in lengths of 500 feet or more and can be connected together into lengths reaching 1,500 feet. Depending on the cleanup tactic being exercised, boom can be deployed directly from

9

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

a facility by its assigned small boats[2] or by an oil spill removal organization (OSRO) deployed to the scene. For offshore operations boom may be deployed to completely encircle the platform. It may also be deployed in various configurations (i.e., U-shape, V-shape, J-shape) by one to three vessels coordinating their operations to simulate tactics for corralling spilled oil. When boom is deployed in the U-shaped, V-shaped, or J-shaped configurations, it is often done so in conjunction with a deployment of mechanical skimming device(s). For nearshore[3], boom designed for oil diversion or exclusion from sensitive areas can be of various shapes and lengths. Depending on the environmental conditions (i.e., sheltered harbor, fast currents) different boom sizes, means of floatation, and their means of inter-connection will need to be evaluated and selected. Boom deployed in nearshore and on-shore environments generally are moored in place with the use of anchor and weight systems or onshore staking.

Mechanical Skimmers – Skimmers are mechanical devices that remove free floating or corralled oil from the surface of the water. Depending on the specific model these devices can pump anywhere from 100 gallons per minute (gpm) to 1000 gpm. Two general types are commonly used in the Pacific Region. Weir skimmers come in several configurations and essentially work like a dam. The weir is adjusted to a height when deployed where oil floating on the water is drawn over the top of the dam at a collection inlet and store in a compartment connected to a pump inside the skimmer. Oleophilic surface skimmers are constructed with materials that attract oil and repel water. The material is incorporated into belts, disks, mop chains, or brushes which are squeezed or scraped in the skimmer to collect oil into various storage devices. Both types of skimmers can be constructed as a permanent part of a vessel's physical design or to float free from a vessel. For offshore oil cleanup, weir and oleophilic skimmers are generally deployed and maneuvered by vessels through an oil slick to actively collect the oil. For example, a vessel can extend a short length of boom on a fixed arm (side collector) to herd oil to an inlet leading to a skimmer. As the vessel moves forward, oil is forced to accumulate in the apex of the boom where the skimmer is located, thereby concentrating the oil by increasing the amount of oil relative to water at the skimmer. Skimmers can also be deployed at an opening at the apex of two booms being towed between two vessels to recover oil that is forced into the apex. In this configuration, the collected oil is typically pumped to a storage barge or other vessel with containment tanks stationed near the apex.

Response Vessels – Self-propelled vessels stationed specifically at offshore facilities or provided by an oil spill response organization can engage in a variety of spill response activities. They serve as platforms to deploy and maneuver boom and mechanical skimmers, ferry equipment and personnel, conduct spill surveillance, apply dispersants, and to tow temporary oil storage devices and barges. Vessels used for these activities range in size from 12-ft skiffs to 207-ft oil spill response vessels. Some vessels used for spill response can achieve speeds up to 30 knots. They are usually dispatched within the first hour of a deployment exercise and achieve their highest speeds when transiting to the site of the simulated spill. Once on scene, vessels generally transit at very low speeds (0 to 5 kts) to conduct spill response operations.

---

[2] Presently, six of the Federal platforms and four platforms in state waters have boom stored onboard. The remaining facilities rely on boom supplied by an oil spill response organization.
[3] Nearshore, defined for the purposes of this document, is the ocean outside of the surf zone and within 1 mile of shore.

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

Oil Storage Equipment – Towable temporary oil storage devices are designed to hold and transport recovered oil from a spill site. They are made of rubber or polymer-coated fabrics of various weights and designs and have capacities that range from a few gallons to more than 300,000 gallons. There are three types of towable temporary oil storage devices in use today. The first is a towable, rectangular-shaped, pillow tank, similar to those used on land (i.e., emergency potable water storage), but equipped with special tow rigging. The second type is a towable flexible tank, or "bladder," which is long and cylindrical in shape. When full, it is largely submerged and is characterized by flexibility along the length of the device. The third type of device is a towable open tank, an inflatable barge-type vessel with an open-top storage bag suspended inside the main structure. In addition to the temporary oil storage devices, metal or inflatable barges (sometimes called mini-barges) designed for temporary oil storage can be towed or pushed by a vessel during an exercise. These barges generally have a maximum storage capacity of 250 bbls and can be of various lengths.

Aircraft – Helicopters are versatile platforms that can be used for a number of spill response activities. During an exercise, they may be launched from the local Santa Barbara area to demonstrate remote sensing capabilities or simulate dispersant application in a designated offshore area. For the latter activity, helicopters equipped with 32-ft sprayer arms or suspended 250-gal buckets would fly over the exercise area and discharge water to simulate dispersant application. Helicopters may also be deployed in an exercise to drop an incendiary device such as a Heli torch to practice in-situ burn operations. However, it is anticipated that the latter exercise activity would be seldom performed and if conducted, would not involve a device that was actually ignited. Similar to rotary wing assets, fixed wing assets may be deployed in exercises to demonstrate remote sensing and dispersant application activities. For exercises in the Pacific Region, a King Air BE90 aircraft in Concord, CA and a C-130 aircraft in Mesa, AZ could be activated to conduct a coordinated simulated dispersant application operation. In such an exercise, BSEE would request the activation of both assets so that the King Air could provide spotter information to the pilots of the C-130 as the latter aircraft sprayed water in simulated dispersant application runs. This type of coordinated air operations would occur during an actual spill response and BSEE would use an exercise to evaluate the response times and effectiveness of the coordinated operations by the OSRP plan holder. Aerostats are balloon-like systems that are self-contained, compact platforms that can deploy multiple sensor payloads and other devices into the air. They can generally lift payloads less than 50 pounds and up to 500 ft into the air using a winch-controlled launch and recovery system from a vessel or platform. They are used to survey the extent of an oil spill and provide responders with real-time data to better guide operations.

Marker Buoys – Buoys may be used to demarcate the location of the simulated oil slick. They usually have a weighted, cone-shaped buoy body with a vertically extending narrow, fiber glass pole topped with a highly visible flag. Response vessels are to "capture the flag" to show success in a drill.

*Projected Activity*. Based on the number of oil spill response plans currently overseen by BSEE in the Pacific Region, normally three BSEE initiated oil spill exercises involving table-top scenarios and/or equipment deployments are conducted annually. However, more than three exercises may be initiated by BSEE if an owner/operator needs to be retested or if new oil spill response plans are approved in the Region. Equipment deployments during an exercise generally

Ex. 2, Page 13

E.R. 0856

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

occur for a few hours and rarely longer than a day. BSEE will rarely initiate nighttime equipment deployment for safety reasons unless a low visibility response capability of an owner/operator needs to be evaluated. When mechanical skimmers are deployed and operated during an exercise, they are typically done so for approximately ten minutes to ensure that they are working properly. BSEE personnel will observe the operation of these devices and generally will be satisfied with their performance when the skimmers are sufficiently drawing and discharging water from and to the marine environment.

(8)    DECOMMISSIONING (BSEE)

During exploration, development, and production operations. The seafloor around activity sites within a proposed lease sale area becomes the repository of temporary and permanent equipment and structures. The structures are generally grouped into two main categories depending upon their relationship to the platform/facilities. (i.e., piles, jackets, caissons, templates, mooring devises, etc.) or the well (i.e., wellheads, casings, casing stubs, etc.)

All 23 existing offshore platforms and associated pipelines in the Southern California Planning Area will be decommissioned after oil and gas reserves have been produced. BSEE approves permanent plugging of wells, full or partial removal of platforms and pipelines, and site clearance activities [30 CFR Subpart Q]. Offshore operators are required to submit applications for decommissioning to the BSEE Pacific OCS Region at least two years prior to ceasing oil and gas production.

Decommissioning of each platform may take more than a year of deconstruction effort depending on the size of the platform, location and availability of equipment. First, all wells will be permanently abandoned and well conductors and casings severed a minimum of 15 feet below the sea floor. Later, oil and gas processing equipment and deck modules (e.g., living quarters) will be removed and shipped to shore for disposal. The decks and supporting platform jacket (legs and cross members) will then be cut into smaller pieces for removal. A derrick barge with 500 to 2000 ton lift capacity will be required for lifts at the platform site along with one or more 300-400 foot cargo barges to transport recovered materials to shore.

A varied assortment of severing devices and methodologies has been designed to cut structural targets during the course of decommissioning activities. These devices are generally grouped and classified as either non-explosive or explosive, and they can be deployed and operated by divers, ROVs, or from the surface. Which severing tool the operators and contractors use takes into consideration the target size and type, water depth, economics, environmental concerns, tool availability, and weather conditions.

Nonexplosive severing tools are used for a wide array of structure and well decommissioning targets in all water depths. Based on 10 years of historical data (1994-2003) from the Gulf of Mexico, nonexplosive severing is employed exclusively on about 37% of platform removals per year. Common nonexplosive severing tools consist of abrasive cutters, diver cutting (e.g., underwater arc cutters and the oxyacetylene/oxy-hydrogen torches), and diamond wire cutters. Many removals in the Gulf of Mexico use explosive technologies either as a prearranged strategy or as a backup method.

Because of concerns over the use of explosives, current decommissioning cost projections for the Southern California Planning Area consider only the use of nonexplosive severing tools for

Ex. 2, Page 14

E.R. 0857

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

disassembly of platform components; however, the use of explosives cannot be completely ruled out given safety concerns that may arise when considering cuts of this magnitude.

Explosive severance tools can be deployed on almost all structural and well targets in all water depths. Historically, explosive charges are used in about 63% of decommissioning operations in the Gulf of Mexico, often as a backup cutter when other methodologies prove unsuccessful. Explosives work to sever their targets by using (1) mechanical distortion (ripping), (2) high velocity jet cutting, and (3) fracturing or "spalling."

Mechanical distortion is best exhibited with the use of explosives such as standard and configured bulk charges. If the situation calls for minimal distortion and an extremely clean severing, then most contractors rely upon the jet-cutting capabilities of shaped charges. In order to "cut" with these explosives, the specialized charges are designed to use the high-velocity forces released at detonation to transform a metal liner (often copper) into a thin jet that slices through its target. The least used method of explosive severing in the Gulf of Mexico is fracturing which uses a specialized charge to focus pressure waves into the target wall and use refraction forces to spall or fracture the steel on the opposing side.

Offshore oil and gas facilities removed from state waters in California have required both nonexplosive and explosive devices. Devices to be used for the future removal of federal oil and gas facilities in the Southern California Planning Area have yet to be proposed.

Seafloor electrical cables running to shore will be completely removed (pulled onto a vessel) and pipeline segments in less than 200 feet of water will be removed up to the state water boundary. Other sections of pipeline in federal waters will be cleaned and abandoned in place or removed. The fate of pipeline segments in state waters will be determined by the California State Lands Commission.

After all decommissioning work is completed and the structure is salvaged, operators are required to perform site-clearance work to ensure that the sea floor of their lease(s) have been restored to pre-lease conditions. Based upon requirement found in 30CFR subpart Q, operators have the option of either trawling with commercial nets or conducting diver/high resolution sonar surveys of the lease site.

Detailed hypothetical decommissioning scenarios for individual platforms are described in BSEE's "Decommissioning Cost Update for Pacific OCS Region Facilities" (BSEE 2015).

Partial removal of offshore platforms is a possibility. BSEE supports and encourages the reuse of obsolete oil and gas structures as artificial reefs and is a cooperating agency in the implementation of the National Artificial Reef Plan. In California, any proposed reefing is subject to State legislation that would allow this activity. Structure removal permit applications requesting a departure from decommissioning regulations under the Rigs-to-Reefs Policy (BSEE Interim Policy Document 2013-07) undergo technical and environmental reviews. The policy document details the minimum engineering and environmental standards that operators/lessees must meet to be granted approval to deploy a structure as an artificial reef. Conditions of approval are applied as necessary to minimize the potential for adverse effects to sensitive habitat and communities in the vicinity of the structure and proposed artificial reef site. Additionally, structures deployed as artificial reefs must not threaten nearby structures or prevent access to oil and gas, marine minerals or renewable energy resources.

13

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

*Projected Activity.* Currently, no decommissioning applications for the Southern California Planning Area have been submitted. At this time, we are unable to reasonably predict when or where specific decommissioning activities will occur or describe specific activities that have yet to be proposed. This assessment provides a general overview of potential impacts associated with decommissioning. We expect to conduct additional consultations with NMFS after decommissioning applications are received and detailed descriptions of proposed activities are available.

## POTENTIAL EFFECTS, NMFS ENDANGERED SPECIES

Existing offshore oil and gas production activities in the Southern California Planning Area produce anthropogenic sound, discharge liquid waste products (toxicity), create potential risk for collision and may result in accidental oil spills.

<u>Anthropogenic Sound</u>

Concerns about anthropogenic sound in the marine environment have increased in recent decades. Transportation, drilling and production, and decommissioning activities typically produce multi-spectral sound that may be detected by endangered and threatened species. The source level of a sound produced by activities such as these is described as the amount of radiated sound at a particular frequency and distance, usually 1 m from the source, and is commonly expressed in dB re 1 μPa. Much of the following discussion is derived from the detailed review of the sounds produced by offshore activities in Richardson et al. (1995).

*Crew and Supply Boat Noise.* Crew and supply boats are used daily to transport personnel and supplies to platforms offshore southern California. Support vessels for activities in the Santa Barbara Channel and Santa Maria Basin operate out of bases in the Santa Barbara Channel; support vessels traveling to and from the four platforms in San Pedro Bay operate out of Long Beach. Support vessels in the Pacific Region, including both crew and supply boats, have averaged approximately 16 trips per week per platform (Bornholdt and Lear 1995, 1997). However, actual vessel traffic in the Region varies among units; the Point Arguello platforms average as few as 6 supply trips per month, while crew and supply boat trips in the eastern Santa Barbara Channel are much more frequent. Worldwide, vessels are the major contributors to overall background noise in the sea (Richardson et al., 1995). Sound levels and frequency characteristics are roughly related to ship size and speed. The dominant sound source is propeller cavitation, although propeller "singing," propulsion machinery, and other sources (auxiliary, flow noise, wake bubbles) also contribute. Vessel noise is a combination of narrowband tones at specific frequencies and broadband noise. For vessels the approximate size of crew and supply boats, tones dominate up to about 50 Hz. Broadband components may extend up to 100 kHz, but they peak much lower, at 50-150 Hz.

Richardson et al. (1995) give estimated source levels of 156 dB for a 16-m crew boat (with a 90-Hz dominant tone) and 159 dB for a 34-m twin diesel (630 Hz, 1/3 octave). Broadband source levels for small, supply boat-sized ships (55-85 m) are about 170-180 dB. Most of the sound energy produced by vessels of this size is at frequencies below 500 Hz. Many of the larger commercial fishing vessels that operate off southern California fall into this class.

*Aircraft Noise.* Offshore southern California, helicopters are another means of crew transport on and off platforms. OCS helicopter traffic in the Pacific Region operates primarily out of Santa Maria, Lompoc, and Santa Barbara airports. BSEE inspectors use the Camarillo airport as a base

14

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

of operations for their helicopter activities. During the past decade, helicopters have averaged approximately 3 to 5 trips per week per platform (Bornholdt and Lear 1995, 1997). Most of this traffic is to and from platforms in the western Santa Barbara Channel and Santa Maria Basin.

Air-to-water transmission of sound is very complex (Richardson et al., 1995). An understanding of underwater sound from any aircraft depends on 1) the receiver depth, and 2) the altitude, aspect, and strength of the source.

The concept of a one-meter sound source means very little when discussing aircraft sound production, and an altitude of 300 m is the usual reference distance (Richardson et al., 1995). The angle of incidence at the water surface is very important—much incident sound is reflected at angles greater than 13 degrees from the vertical. This 26-degree "cone" of sound is defined physically by Snell's Law and influenced by sea conditions. Water depth and bottom conditions also strongly influence the propagation and levels of underwater sound from passing aircraft; propagation is attenuated in shallow water, especially when the bottom is reflective (Richardson et al., 1995).

The rotors are the primary sources of sound from helicopters (Richardson et al., 1995). The rotation rate and the number of blades determine the fundamental frequencies. Fundamental frequencies are usually below 100 Hz, with most dominant tones below 500Hz. These are primarily harmonics of the main and tail rotor blade rates, although other tones associated with engines and other rotating parts may also be present.

Richardson et al. (1995) present an estimated source level for a Bell 212 helicopter of about 150 dB at altitudes of 150-600 m, with the dominant frequency a 22-Hz tone with harmonics. Elsewhere a source level of 165 dB is presented for broadband helicopter noise (frequencies 45-7070 Hz).

Generally, peak received levels occur as the aircraft passes directly overhead and are directly related to altitude and depth. However, when the aircraft is not passing directly overhead, received levels may be stronger at "midwater" depths. Helicopters tend to radiate more sound forward. Duration is variable. For example, a Bell 214 was audible in air for 4 minutes before passing, for 38 seconds at 3-m depth, and for 11 seconds at 18 m.

*Offshore Drilling and Production Noise.* Richardson et al. (1995) cite a single source of information on the levels of noise produced by platform-based drilling activities. Gales (1982) recorded noise produced by drilling activities on platforms offshore California. The noises produced were so weak that they were nearly undetectable "even alongside the platform" in sea states of Beaufort 3 or better. No source levels were computed, but the strongest received tones were very low frequency, about 5 Hz, at 119-127 dB re 1 μPa. The highest frequencies recorded were at about 1.2 kHz.

Noise produced by production activities on platforms is relatively weak, because a small surface area of a platform is actually in contact with the water and because the machinery is placed on decks well above the water line (Richardson et al., 1995). Gales (1982) measured noise from production activities on platforms offshore California. Sounds recorded from platforms were very low in frequency, about 4.5-38 Hz measured at 9-61 m. Platforms powered by gas turbines produced more tones than platforms with at least partial shore power. Peak recorded sound spectra were between 50-200 or 100-500 Hz.

15

*Conductor Installation Sound ('Pile Driving')*. Sound production and propagation from pile driving operations is highly variable and depends on the hammer type, materials used, depth of the piling operation and the substrate. Sound verification studies performed for a "typical" conductor installation using pile driving techniques at Platform Harmony found that the majority of underwater sound energy was concentrated at frequencies below 2 kHz and that there was a profound surface shadowing effect that reduced sound levels at 25 meters depth by 10-15 dB (MacGillivary and Schlesinger 2014). The near-surface sound pressure levels 160 dB re 1 µPa at distances as close as 300 meters. Data collected during this study were used to update sound propagation models and derive underwater injury protection (exclusion) zones of 9 meters for 190 dB re 1 µPa and 54 meters for 180 dB re 1 µPa. This is just an example; the current practice is to perform site-specific analyses for each project as it is proposed.

*Explosive Sound*. As noted earlier, current decommissioning cost projections for the Southern California Planning Area consider only the use of nonexplosive severing tools for disassembly of platform components; however, the use of explosives cannot be completely ruled out. Sound associated with explosives may result in injury or death of marine biota in close proximity to the detonation of explosives and sound energy from explosions may travel great distances. The magnitude of effect to endangered species will depend on the type/size of explosive charges, mode of detonation, depth of water, geographic location and timing of explosive activities.

Discharge of Liquid Waste Products (Toxicity)

Produced water discharges from offshore oil and gas development activities, including discharges that may contain well stimulation treatment chemicals, may affect listed species through direct contact or ingestion of contaminated food. EPA discharge permits (e.g. NPDES General Permit CAG280000) consider the properties of chemicals that may be discharged and their dilution rates in the open ocean. In some cases, chemical reactions also play a role in measuring potential effects. For example, acids used for well stimulation treatments undergo chemical reactions downhole that return in well flowback as a non-acidic component.

In general, high dilution rates of discharged fluids and the very limited time any individual listed marine mammal and sea turtle may spend near a platform minimize potential direct exposure effects (BSEE/BOEM 2016). Field studies have shown that the concentrations of trace metals and hydrocarbons in the tissues of fishes around production platforms are within background levels (Continental Shelf Associates 1997) limiting potential for exposure by ingestion of contaminated prey. Acute or chronic effects of produced water discharges on benthic organisms and fish species have not been observed and are not expected to affect the available prey base for listed marine mammals or sea turtles.

Collision Hazard

*Crew and Supply Boat Collision.* As noted earlier, crew and supply boats are used daily to transport personnel and supplies to platforms offshore southern California. Support vessels for activities in the Santa Barbara Channel and Santa Maria Basin operate out of bases in the Santa Barbara Channel; support vessels traveling to and from the four platforms in San Pedro Bay operate out of Long Beach. During the past decade, support vessels in the Pacific Region, including both crew and supply boats, have averaged approximately 16 trips per week per platform (Bornholdt and Lear 1995, 1997). However, actual vessel traffic in the Region varies

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

among units, the Point Arguello platforms average as few as 6 supply trips per month, while crew and supply boat trips in the eastern Santa Barbara Channel are more frequent.

The Santa Barbara Channel/Santa Maria Basin Oil Service Vessel Traffic Corridor Program is intended to minimize interactions between oil industry operations and commercial fishing operations as well as reduce potential for wildlife strikes (e.g. migrating gray whales). It was developed cooperatively by the two industries through the Joint Oil/Fisheries Liaison Office. In addition to providing transit corridors in and out of area ports, the program routes support traffic along the Channel seaward of an outer boundary line. East of Gaviota, the outer boundary is defined by the 30-fathom line; west of Gaviota, and north of Point Conception as far as Pedernales Point, it follows the 50-fathom line. In the area west of Gaviota, the 50-fathom line is 4 km (2 nm) or more offshore.

Oil Spills (Indirect Effect)

*Oil Spill Risk Assessment.* For the purposes of this biological assessment, BOEM does not consider oil spills to be a *direct* effect of the action, given they are neither authorized nor intended to occur. BOEM does, however, concur that certain smaller oil spills (50 bbl or less) could be an *indirect* effect of the action, as defined under ESA regulations, given they are caused by the proposed action and are later in time, but still are reasonably certain to occur. This biological assessment therefore provides scenario and other information related to smaller accidental oil spills in Appendix A.

In the case of low-probability catastrophic spills, such as the 2010 Deepwater Horizon blowout and oil spill in the Gulf of Mexico, BOEM does not consider this category of spill to be an effect of the action, as defined under the ESA implementing regulations at 50 CFR §402.02, given (1) it is not an anticipated result of the proposed action and (2) it is not reasonably certain to occur since POCSR fields are mature and the majority of reservoirs have low to no pressure which require artificial lift to access the oil.

In the course of normal, day-to-day platform operations, small accidental discharges of hydrocarbons may be reasonably foreseeable. The largest oil spill in the Pacific Outer Continental Shelf Region (POCSR) occurred in 1969, when a loss of well control occurred on *Platform A*, offshore Santa Barbara, California which spilled an estimated 80,000 barrels (bbl) into the Santa Barbara Channel (Van Horn et al. 1988). The largest oil spill in the POCSR since 1969 was the 164 bbl *Platform Irene* pipeline spill in September 1997. Since 1969, a cumulative total of 919 barrels over a 44-year period has been spilled (Appendix A, Table A-1; TIMS spill volume report run December 29, 2014). Of the 48 oil spills greater than one bbl in the POCSR (1970-2014), only five measured 50 bbl or more in volume (Appendix A, Table A-1) The average oil spill size in the POCSR for all years is 57 bbl (1963-2014). In the "50 to less than 1,000 bbl" spill range the average oil spill size is 103 bbl. In the "1-50 bbl" range the average oil spill size is 7.11 bbl. [4] As shown in Appendix 1, Table A-1, 3.4% (49 of 1435) of the total recorded spills between 1970 and 2014 were greater than one bbl, spilling 827.7 bbl of oil into the ocean.

---

[4] From 1996 to 2010, the overall OCS average spill size in the size range of "50 to less than 1,000 bbl" is 186 bbl (Anderson et al., 2012).

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

Given these data, the analysis presented in Appendix A, and the experience in the Pacific Region over the last 40 years, BOEM estimates the maximum most likely spill volume for the Pacific Region is 200 bbl.

Operators must report any spill that is 1 bbl or greater in the Southern California Planning Area. The development of more stringent regulations, implementation of rigorous inspection programs, imposition of civil and criminal penalties, and changes in equipment and procedures have all contributed to a safer work environment. Most recently, BSEE has promulgated regulations that require offshore operators to develop safety and environmental management systems which are intended to foster a corporate culture of environmentally responsible and safe working conditions.

The current knowledge of the geology and understanding of reservoir characteristics in the Southern California Planning Area is well advanced. Drilling techniques and equipment have improved and drilling into these mature fields is generally considered to be low risk. The Southern California Planning Area has experienced significant changes in the status of the oil and gas fields being developed and produced. Reservoir pressures have dropped to near zero in the majority of the fields now in production. In these cases, secondary[5] or tertiary[6] recovery methods are being used to force oil to the surface. The risk of a loss of well control (a blowout) resulting in a spill is exceedingly small under these conditions.

Table 1. Estimated mean number of spills and spill occurrence probability for the "50 to less than 1,000 bbl" size range using oil spill data from POCSR operations (1963-2011). Anticipated POCSR Production is 0.4073 Bbbl (0.292 [BSEE July 2014] + 0.0957 [Tranquillon Ridge] + 0.0035 [Electra Field] + 0.0161 [Carpinteria State] = 0.4073 Bbbl).

| POCS Spill data (1963-2014) | Spill Rate (2012*) | Estimated Mean Number of spills | Probability of 1 or more spills |
|---|---|---|---|
| Spills ≥ 50 to < 1,000 | | | |
| Platforms & Pipelines | 4.57 | 1.86 | 84.4 % |

Bbbl = billions of barrels          *spill rate calculation methodology: Anderson et. al., 2012

Taking into account these factors, the overall risk of an oil spill occurring has declined over time in the Southern California Planning Area. This said, other factors such as human error or equipment failure play a role in risk of an oil spill and small spills are likely to continue as long as oil is being produced.

BOEM calculated oil spill rates for the Pacific Region using oil spill data (1963-2014; Appendix A; Table A-1) and cumulative production from the Pacific Region. BOEM estimated the number of oil spills and the probability of one or more spills that could occur as a result of ongoing activities in the Southern California Planning Area in the "50 to less than 1000 bbl" size-range using Pacific Region oil spill rates. Oil spill occurrence is calculated as a function of the total amount of oil that could be economically produced in the Southern California Planning Area. We estimate, in the "50 to less than 1,000 bbl" size-range, there will be 1.86 spills with an 84.4%

---

[5] Secondary refers to the reinjection of water or gas produced from the reservoir in order to push oil to the surface.
[6] Tertiary refers to the addition of chemicals designed to increase oil flow within a well.

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

probability of occurrence for the remaining oil that could be economically produced from the Southern California Planning Area (Table 1).

Table 2.    Estimated means and spill occurrence probabilities POCSR analyses using all US OCS Spill Data (1996-2010). Anticipated POCSR production is 0.4073 Bbbl.

| US OCS Spill Data (1996-2010) | Spill Rate (2012*) | Estimated Mean Number of Spills | Probability of 1 or More Spills |
|---|---|---|---|
| Spills ≥ 50 to < 1,000 | | | |
| Platforms & Pipelines | 12.88 | 5.24 | 99.5% |
| Spills ≥ 1000 | | | |
| Platforms | 0.25 | 0.10 | 9.7% |
| Pipelines | 0.88 | 0.36 | 30.1% |
| Total | 1.13 | 0.46 | 36.9% |

Bbbl = billions of barrels.      * Source: Anderson et. al., 2012

For comparison, BOEM calculated oil spill probabilities using oil spill rates derived from all United States Outer Continental Shelf (US OCS) operations (1996-2010) and the total amount of oil that could be economically produced in the Southern California Planning Area (Anderson et. al., 2012). Using spill rates based on all US OCS Operations (1996-2010), the probability of one or more spills occurring in the Pacific Region for the "50 to less than 1,000 bbl" size range is 99.5%. The lower probability (84.4%) of spills in the "50 to less than 1,000 bbl" size range using POCSR oil spill data is reflective of the lower number of oil spills throughout POCSR production history. Using spill rates based on all US OCS operations (1996-2010), the probability of one or more spills occurring in the greater than 1,000 bbl size range is 36.9% (Appendix A, Table A-3). This is a conservative estimate based on overall US OCS operations. For the greater than 1,000 bbl size range, we did not calculate oil spill rates with only POCSR data due to the limited dataset (1 spill > 1,000 bbl occurred in 1969). A spill of this size would be an unlikely event in the POCSR since POCSR fields are mature and the majority of reservoirs have low to no pressure which requires artificial lift to access the oil.

Oil spill probability estimates are conservative given POCSR's:

- oil spill history,
- long established drilling program,
- producing from mature fields with lower pressure,
- no floating drilling rigs,
- no new platforms being installed, and
- all oil is transported via pipelines.

*Oil Spill Trajectory Analysis.* Oil spill trajectory modeling was conducted to determine the movement and fate of spilled oil if a spill occurred in the Southern California Planning Area from existing offshore oil and gas operations. The BOEM examined two available models: BOEM Oil Spill Risk Analysis (OSRA) and National Oceanic & Atmospheric Administration (NOAA) Office of Response & Restoration's General NOAA Operational Modeling Environment (GNOME). GNOME was developed by the Emergency Response Division (ERD) of NOAA's Office of Response and Restoration. This information can be used in conjunction

19

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

with data from the oil spill risk assessment to provide perspective on the potential for exposure to spilled oil.

The OSRA model calculates numerous trajectories for hypothetical oil spills from pre-designated launch points by varying the wind and ocean current fields. Contact was evaluated in a grid encompassing the entire ocean region as well as grids located along the shoreline (Appendix A, Figure A-1; MMS 2000a). Percent contact for a grid section is calculated by OSRA (e.g., Appendix A, Figures A-2 and A-3). The OSRA trajectories are volume-independent and only show where oil would travel given that a spill occurred.

The BOEM ran the GNOME model in three oceanographic regimes (see Appendix A, Section A.5). Releases were modeled for three wind directions correlated with the ocean current flow regimes. The GNOME model takes ocean currents and wind into account. The contacts displayed in Figures A-4 – A-8 are only for a limited set of meteorological conditions (Appendix A, Table A-5) and are not intended to encompass all of the wind conditions that could be present during a spill scenario. GNOME model outputs provide an overall picture of where oil may travel if an oil spill occurred from one of the launch points.

*SOUTHERN CALIFORNIA PLANNING AREA*

Six platforms were chosen as launch points because they are distributed throughout the geographic range of existing offshore operations as follows:

- *Santa Maria Basin* - Platforms Irene and Hidalgo;
- *Santa Barbara Channel* - Platforms Harmony, Hillhouse and a group in the eastern Channel (Gail, Grace, Gilda and Gina); and
- *San Pedro Bay* - Platform Elly.

*Santa Maria Basin*

Platform Irene. The models show that areas of the coastline from the Santa Maria River mouth to Gaviota and the northern Channel Islands were most likely to be affected by an oil spill from Platform Irene. (Appendix A, Figures A-2A-C and A-4 and A-5). The OSRA analysis for Platform Irene displays the highest probability (50-60%) of oil contacting land at Point Arguello and a 10-20% chance of contact at San Miguel Island (Appendix A, Figure A-2A). GNOME modeled spilled oil traveled from Platform Irene to as far north as San Luis Obispo Bay and off the coast of Montana De Oro State Park. The northern-most mainland contact is just south of Pismo Beach at Guadalupe-Nipomo Dunes NWR (Appendix A, Figure A-4).

Platform Hidalgo. The models estimated oil contacting land around Point Arguello and San Miguel Island. The Hidalgo OSRA analysis displays a 20-30% probability of oil contacting Point Arguello and a 10-20% chance of contact at San Miguel Island (Appendix A, Figure A-2B). The GNOME model estimates land fall around Point Conception, Santa Rosa Island and Santa Cruz Island. The GNOME model also estimates oil traveling further north up the coast to Point Sal and toward San Luis Obispo Bay (Appendix A, Figure A-5).

*Santa Barbara Channel*

Platform Harmony: The models show that areas of coastline from Vandenberg Air Force Base to Santa Barbara County and northern coastlines of the Channel Islands are most likely to be affected by an oil spill from Platform Harmony. Platform Harmony OSRA analysis displays a

20

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

20-30% chance of oil contacting the mainland Gaviota coast and San Miguel Island and a 10-20% chance of oil contacting Santa Rosa and Santa Cruz Islands (Appendix A, Figure A-2C), while the GNOME model runs estimate oil landing as far north as Point San Luis (Appendix A, Figure A-6).

Platform Hillhouse:The OSRA model estimates a 30-40% probability of oil contacting mainland Santa Barbara and a 10-20% probability that oil will travel along the mainland as far north as the Gaviota coast and as far south as Ventura as well as out toward Anacapa Island (Appendix A, Figure A-3A), while the GNOME estimates oil traveling as far west as Santa Barbara and Point Conception (Appendix A, Figure A-7).

*Eastern Santa Barbara Channel*

Platforms Grace, Gail, Gina, Gilda (modeling within a similar area): A spill modeled in OSRA from Platform Grace displays a 40-50% probability that oil will contact the east end of Anacapa Island and a 30-40% probability that it will contact the entire island. There is a 20-30% probability of contacting Port Hueneme and Santa Cruz Island and a 10-20% probability of contacting the mainland as far north as Goleta and as far south as Point Mugu (Appendix A, Figure A-3B). The GNOME model for Platform Gail estimates landfall from mainland Santa Barbara to south of Ventura Harbor in Oxnard and out to Anacapa Island (Appendix A, Figure A-8).

*San Pedro Basin*

Platform Elly: The OSRA model output estimates spilled oil to primarily stay within the San Pedro Bay and travel south along the mainland to Oceanside (Appendix A, Fig A-3C). The OSRA analysis for the Beta Unit, Platform Elly, displays a 40-50% probability of oil contacting the mainland from Huntington Beach to Newport Beach and a 10-20% probability of oil traveling as far north as Alamitos Bay and as far south as Oceanside. No trajectory runs were conducted using GNOME because GNOME, as configured for this study, was limited to the geographic area of the Santa Barbara Channel and just north of Point Conception.

Oil Spill Response. BSEE regulations at 30 CFR Part 254 require that each OCS facility have a comprehensive Oil Spill Response Plan (OSRP). Response plans consist of an emergency response action plan and supporting information that includes an equipment inventory, contractual agreements with subcontractors and oil spill response cooperatives, worst-case discharge scenario, dispersant use plan, in-situ burning plan and details on training and drills. The Coast Guard is the lead response agency for oil spills in the coastal zone and coordinates the response using a Unified Command (UC), consisting of the affected state and the Responsible Party (i.e., the entity responsible for spilling and/or remediating the oil) in implementing the Incident Command System (ICS) if an oil spill occurs. Oil spill drills, either agency-lead or self-lead by a lessee/operator/contractor, also use the UC/ICS. California's Office of Spill Prevention and Response (OSPR) assumes the role of the State on-scene coordinator and plays a significant role in managing wildlife operations in the Southern California Planning Area as the state's Natural Resource Agency.

BSEE requires companies that operate in the OCS to have the means to respond to a worst-case discharge from their facilities. Many companies meet this requirement by becoming members of Oil Spill Removal Organizations (OSRO). Since 1970, oil companies operating in the Santa

21

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

Barbara Channel and Santa Maria Basin have funded and operated a non-profit OSRO called Clean Seas (www.cleanseas.com). Clean Seas acts as a resource to its member companies by providing an inventory of state-of-the-art oil spill response equipment, trained personnel, training and expertise in planning and executing response techniques. Clean Seas personnel and equipment are on standby, ready to respond to an oil spill, 24 hours a day.

The Marine Spill Response Corporation (MSRC) is the other U.S. Coast Guard-classified OSRO based in Long Beach (www.msrc.org). MSRC is a nation-wide OSRO with multiple responder-class oil spill response vessels and oil spill response barges. They are also equipped to respond to an oil spill 24 hours a day.

Clean Seas and MSRC are both equipped and prepared to respond to oil spill threats to sensitive shoreline areas through the detailed and up-to-date information on sensitive areas and response strategies from the Los Angeles/Long Beach Area Contingency Plan (https://www.wildlife.ca.gov/OSPR/Preparedness/LA-LB-Spill-Contingency-Plan) and the California OSPR (https://www.wildlife.ca.gov/OSPR).

All the OSROs in the Pacific Region are able to respond to oil spills using a variety of "tools in the tool box." These tools include mechanical recovery systems (e.g., booms, skimmers, storage devices, etc.), dispersants and, rarely, if ever, in-situ burning. Most oil recovery or remediation tools fall into these categories. In the event of a spill, as noted above, the US Coast Guard, California's Office of Oil Spill Prevention and Response and the Responsible Party will form the Unified Command and begin to make decisions as to how best respond to the spill in the most efficient manner, using the available tools. Dispersants and in-situ burning are used only after members of the Unified Command as well as trustee agencies are consulted. Neither of these tools have ever been used in the Pacific Region, although the OSROs are prepared to do so.

Fate and Effects of Oil. When an oil spill occurs, many factors determine whether that oil spill will cause significant, long lasting biological effects; comparatively little damage or no damage; or some intermediate degree of effect. Among these factors are the type, rate, and volume of oil spilled, geographic location, and the weather and oceanographic and meteorological conditions at the time of the spill. These parameters determine the quantity of oil that is dispersed into the water column; the degree of weathering, evaporation, and dispersion of the oil before it contacts a shoreline; the actual amount, concentration, and composition of the oil at the time of shoreline or habitat contact; and a measure of the toxicity of the oil. Additionally, the level of oil spill preparedness, rapidity of response, and the cleanup methods used can also greatly influence the overall impact levels of an oil spill.

In the event of an accidental oil spill, a slick forms and part of the slick begins evaporating while the action of breaking waves forms oil droplets that are dispersed into the water column. Oil in the Southern California Planning Area ranges from very heavy (API 12) to very light (API 39). Light oil has a rapid evaporation rate and is soluble in water. Light crude oils can lose up to 75% of their initial volume within a few days of a spill (NRC 2003). In contrast, heavy oil (API <22) has a negligible evaporation rate and solubility in water.

Depending on the weight of the oil spilled and the environmental conditions (i.e., sea state) at the time of a spill, six to 60% of oil during an oil spill would sink and be in the water column or on the seafloor in the vicinity of the spill (Arthur D. Little 1984). This is supported by a recent study of natural oil seeps at Coal Oil Point in the Santa Barbara Channel that range in depth from six to

22

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

67 meters offshore of Goleta, CA (Leifer et al. 2006) and are assumed to release 100 bbl/day (Farwell et al. 2009). The distribution of heavy oil in a surface slick in the Santa Barbara Channel is primarily influenced by surface currents and falls out of the slick over a period of 0.4 to 5 days (Leifer et al., 2006).

A 200 bbl spill could oil several kilometers of coastline. The likely result would be patches of light to heavy tarring of the intertidal zone resulting in localized effects to contacted biological communities. The recovery time for these communities would depend on the environment. Within several months, natural processes will remove the oil from the rocks and beaches in these high energy rocky coasts, while low energy lagoons and soft-sediment embayments can retain stranded oil residue for several years.

Oil in the marine environment can, in sufficient concentrations, cause adverse impacts to fishes (NRC 1985; GESAMP 1993). The effects can range from direct mortality to sublethal effects that inhibit growth, longevity, and reproduction. Benthic macrofaunal communities can be heavily affected, as well as intertidal communities that provide food and cover for fishes.

The field observations of an oil spill's effects on the marine environment are taken mostly from very large oil spills that have occurred throughout the world over the past three decades. There is an 84.4-percent probability 1.86 spills in the 50-1,000-bbl size range would occur in the Southern California Planning Area during the remaining production period. Based on the distribution of past spill sizes, it is estimated that such a spill probably would be less than 200 bbl in volume. In perspective, the *Exxon Valdez* spilled about 36,000 tonnes (~270,000 bbl) of crude oil into Prince William Sound and the *Sea Empress* released 72,000 tonnes (~540,000 bbl) of crude oil off southwest Wales. The *American Trader* spilled about 416,000 gallons (~10,000 bbl) of crude oil offshore Huntington Beach, California. Most recently, in September 1997, a rupture in a 20-inch offshore pipeline emanating from Platform Irene resulted in the discharge of at least 6,846 gallons (163 bbl) of crude oil off the Santa Barbara coast. The spill resulted in the fouling of approximately 17 miles of coastline, and caused impacts to a variety of natural resources, including seabirds, sandy and gravel beach habitats, rocky intertidal shoreline habitats, and use of beaches for human recreation.

### NMFS ESA LISTED SPECIES AND CRITICAL HABITAT – Status, effects and determinations

In this section, we consider the current status of NMFS listed species and potential effects of existing offshore oil and gas operations on these species. We also reaffirm or revise our effect determinations for each species based on currently available information.

A summary of our determinations for NMFS ESA listed species is provided in Table 3 and supplemental discussion for each species is provided below.

23

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

Table 3: Summary of Determinations for NMFS ESA Listed Species

| Common Name | Scientific Name | Potential Impacting Factors | Determination for Ongoing Activities | Comments |
|---|---|---|---|---|
| Blue Whale | *Balaenoptera musculus* | Noise, Collision, Oil Spill | Not Likely to Adversely Affect | See discussion below |
| Fin Whale | *Balaenoptera physalus* | Noise, Collision, Oil Spill | Not Likely to Adversely Affect | Little Spatial Overlap |
| Humpback Whale | *Megaptera novaeangliae* | Noise, Collision, Oil Spill | Not Likely to Adversely Affect | See discussion below |
| North Pacific Right Whale | *Eubalaena glacialis* | Noise, Collision, Oil Spill | Not Likely to Adversely Affect | Little or No Spatial Overlap |
| Sei Whale | *Balaenoptera borealis* | Noise, Collision, Oil Spill | Not Likely to Adversely Affect | Little or no Spatial Overlap |
| Sperm Whale | *Physeter catodon* | Noise, Collision, Oil Spill | Not Likely to Adversely Affect | Little or No Spatial Overlap |
| Western Gray Whale | *Eschrichtius robustus* | Noise, Collision, Oil Spill | Not Likely to Adversely Affect | Little or No Spatial or Temporal Overlap |
| Guadalupe Fur Seal | *Arctocephalus townsendi* | Oil spill | Not Likely to Adversely Affect | Little Spatial Overlap |
| Leatherback Sea Turtle | *Dermochelys coriacea* | Collision, Oil Spill | Not Likely to Adversely Affect | Little Spatial or Temporal Overlap |
| Loggerhead Sea Turtle | *Caretta caretta* | Collision, Oil Spill | Not Likely to Adversely Affect | Little or No Spatial Overlap |
| Green Sea turtle | *Chelonia mydas* | Collision, Oil Spill | Not Likely to Adversely Affect | See discussion below |
| Olive Ridley Sea Turtle | *Lepidochelys olivacea* | Collision, Oil Spill | Not Likely to Adversely Affect | Little or No Spatial Overlap |
| Green Sturgeon | *Acipenser medirostris* | Oil spill | Not Likely to Adversely Affect | Little or No Spatial Overlap |
| Steelhead Trout | *Oncorhyncus mykiss* | Oil spill | Not Likely to Adversely Affect | See discussion below |
| White Abalone | *Haliotis sorenseni* | Oil spill | Not Likely to Adversely Affect | See discussion below |
| Black Abalone | *Haliotis cracherodii* | Oil spill | Not Likely to Adversely Affect | See discussion below |

24

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

---

Blue Whale (*Balaenoptera musculus*)

The blue whale was listed as a federal endangered species on June 2, 1970 [35 FR 8495]. Critical habitat has not been designated for this species. The blue whale recovery plan was finalized in 1998, (NMFS, 1998). The primary reason for listing was a severe worldwide population decline due to intensive commercial whaling. The current population worldwide remains unknown; however, the eastern north Pacific population, which frequents the waters off California, has been estimated to be about 1,500 individuals (NMFS 2014a).

All of our formal ESA consultations with NMFS included the blue whale. Consultations prior to 1986 concluded that blue whales were not likely to be affected by offshore oil and gas activities. This was based in part on the observation that blue whales were traveling through the area and not staying for extended periods of time. The abundance of blue whales along the California coast has increased over the last few decades with several hundred animals coming to forage in southern California during summer and fall of each year. Most of this stock is believed to migrate south to spend winter and spring in high productivity areas off Baja California and on the Costa Rica Dome (NMFS 2014a).

The seasonal increase in blue whale abundance in southern California is concurrent with existing offshore oil gas operations suggesting that the sound produced from these facilities has not impeded use of the area. There have been no incidents of blue whales being struck by industry support vessels and observations of blue whales along established vessel corridors between shore bases and offshore facilities are rare. Consultations with NMFS in 2000 and 2008 (NMFS 2000, NMFS 2008) concluded that "large whales, particularly blue and humpback whales, may be temporarily displaced from their foraging grounds due to the presence of oil spill response vessels and aircraft during oil spill cleanup." However, "the chance of a spill is remote, thus making impacts discountable and that the effect of a spill, should one occur, is minor and that no take should occur, thus the impacts on individuals is insignificant." The risk of an oil spill has not changed since 2008. The chance of a spill is still remote and spill volume will likely be less than 200 barrels. We have therefore determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect the blue whale.

Fin Whale (*Balaenoptera physalus*)

The fin whale was listed as a federal endangered species on June 2, 1970 [35 FR 8495]. Critical habitat has not been designated for this species. The most recent fin whale recovery plan was published in 2010 (NMFS, 2010). The primary reason for listing was a severe worldwide population decline due to intensive commercial whaling. The minimum population estimate for the California/Oregon/Washington stock of fin whales is about 2,600 individuals (NMFS 2014a). Past consultations with NMFS concluded that few fin whales are found in areas of the Southern California Planning area where oil and gas are being produced and, therefore, activities associated with offshore oil and gas production would not likely affect fin whales.

Fin whales are sighted in the Santa Barbara Channel, although they generally occur farther offshore and in waters south of the northern Channel Island chain (Leatherwood et al. 1987; Bonnell and Dailey, 1993). Given this species' relative rarity in areas of existing offshore oil and gas production, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not

25

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

likely to adversely affect fin whales. This determination is consistent with our most recent consultations with NMFS (NMFS 2000, NMFS 2008a)."

Humpback Whale (*Megaptera novangliae*)

The humpback whale was listed as a federal endangered species on June 2, 1970 [35 FR 8495]. Critical habitat has not been designated for this species. The humpback whale recovery plan was published in 1991 (NMFS, 1991). The primary reason for listing was a severe worldwide population decline due to intensive commercial whaling. Like blue whales, humpback whales have increased in abundance over the last several decades with several hundred animals coming to forage in southern California each year (NMFS 2014a). Worldwide, humpback whale populations appear to be increasing and NMFS initiated a status review for the species in 2009 [74 FR 40568]. In 2016, NMFS identified 14 distinct population segments (DPS) for the humpback whale [81 FR 62260]. Each segment's endangered species status was reevaluated and some segments were delisted. Humpback whales found in the Southern California Planning Area may be part of either the Mexico DPS (listed as threatened) or the Central America DPS (listed as endangered).

The seasonal increase in humpback whale abundance in southern California is concurrent with existing offshore oil gas operations suggesting that the sound produced from these facilities has not impeded use of the area. There have been no incidents of humpback whales being struck by industry support vessels. Consultations with NMFS in 2000 and 2008 (NMFS 2000, NMFS 2008a) concluded that "large whales, particularly blue and humpback whales, may be temporarily displaced from their foraging grounds due to the presence of oil spill response vessels and aircraft during oil spill cleanup." However, "the chance of a spill is remote, thus making impacts discountable and that the effect of a spill, should one occur, is minor and that no take should occur, thus the impacts on individuals [are] insignificant." The risk of an oil spill has not changed since 2008. The chance of a spill is still remote and spill volume will likely be less than 200 barrels. We have therefore determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect the humpback whale.

North Pacific Right Whale (*Balaena japonica*)

In 2008, NMFS reclassified the northern right whale as two separate endangered species – the North Pacific right whale and the North Atlantic right whale [73 FR 12024]. The north Pacific right whale (referred as *Eubalaena glacialis* in early opinions) was considered in all past NMFS biological opinions. These opinions concluded that although any effect to a few individual Pacific right whales could jeopardize the species, no historically important habitat existed off California and Pacific right whales were never abundant off the west coast. The North Pacific right whale continues to be one of the rarest species in the world with the majority of sightings occurring in the Bering Sea and adjacent areas of the Aleutian Islands (NMFS 2013). The eastern population of Pacific Right whales is estimated to consist of 30 individuals (NMFS 2014b). Given this species scarcity in California, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect the north Pacific right whale. This determination is consistent with our most recent consultations with NMFS (NMFS 2000, NMFS 2008a).

26

### Sei Whale (*Balaenoptera borealis*)

The Sei whale was considered in all past biological opinions prepared by NMFS. This species is rarely seen in California. Only 9 confirmed sightings of sei whales were made in California, Oregon and Washington during extensive ship and aerial surveys conducted between 1991 and 2008 (NMFS 2014). Given this species relative scarcity in California, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect the Sei whale. This determination is consistent with our most recent consultations with NMFS (NMFS 2000, NMFS 2008a).

### Sperm Whale (*Physeter catodon*)

The sperm whale was considered in all past biological opinions prepared by NMFS. This species is widely distributed and may be found year round in California (NMFS 2014). Sperm whales are often associated with deep water areas well offshore of the coast and are rarely observed in the vicinity of existing oil and gas facilities. Given this species relative scarcity in vicinity of southern California oil and gas activities, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect the sperm whale. This determination is consistent with our most recent consultations with NMFS (NMFS 2000, NMFS 2008a).

### Gray Whale, Western North Pacific Distinct Population Segment (*Eschrichtius robustus*)

The western North Pacific population of gray whales continued to be considered endangered after the eastern North Pacific population was de-listed in 1994 [59 FR 31094]. The western North Pacific population is found along the coasts of Russia and China but recent photo identification and satellite telemetry work has confirmed that a few animals photographed/tagged in western North Pacific joined members of the eastern North Pacific population on their migration to breeding lagoons in Mexico [79 FR 58914]. NMFS maintains that the western North Pacific population is genetically distinct and has begun to include the western North Pacific population in consultations for the Pacific coast of the United States. Visually, it is impossible to differentiate between western and eastern whales but western North Pacific Gray whales are expected to be rare visitors to the Southern California Planning Area. We have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect western North Pacific gray whales.

### Guadalupe Fur Seal (*Arctocephalus townsendi*)

Past consultations concluded that the Guadalupe fur seal was not likely to be adversely affected because the low probability of an oil spill and the fact that the majority of the population was well outside the project area. Prior to 19th century harvest, this species ranged from Monterey Bay California to the Revillagigedo Islands, Mexico (NMFS 2014a). Since being listed in 1985 [50 FR 51252], Guadalupe fur seals have significantly increased in number but they continue to breed and pup mainly on Guadalupe Island, Mexico. In recent years several Guadalupe fur seals have been consistently observed at San Miguel Island. In 1997 a pup was observed at San Miguel Island but no other pups were observed until 2008. In several of the years since 2008, one to two pups have been observed (Delong pers. com. 2012). Given this species relative

27

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

scarcity in southern California, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect the Guadalupe fur seal. This determination is consistent with our most recent consultations with NMFS (NMFS 2000, NMFS 2008a).

<u>Leatherback Sea Turtle (*Dermochelys coreacea*)</u>

In all past biological opinions, the leatherback sea turtle was considered a rare visitor to southern California and effects were considered minimal. The leatherback sea turtle was listed on June 2, 1970 [35 FR 8495]. The recovery plan for the Pacific populations of leatherback sea turtles was issued in 1998 (NMFS and FWS 1998). Leatherbacks may be the most common species of sea turtle in the Southern California Planning Area but they continue to be rarely seen. NMFS's 2008 biological opinion for offshore oil and gas activities concluded that no adverse impacts on leatherbacks were expected (NMFS 2008a). Circumstances have not changed since 2008. We have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect the leatherback sea turtle.

Designated critical habitat for leatherback sea turtles was revised in 2012 to include the waters offshore Washington state and portions of the Oregon and California coast [77 FR 4170]. These areas were recognized for their importance as leatherback foraging habitat. In California, critical habitat extends from Point Arena to Point Arguello, overlapping the northern edge of the Southern California Planning Area. Occurrence of prey species, primarily scyphomedusae (jellyfish), is the only primary constituent element identified for leatherback critical habitat. In the critical habitat rule, NMFS identified oil spill response (e.g. use of dispersants) as an activity that may impact prey availability in critical habitat areas. We do not expect oil spills from offshore facilities in the Southern California Planning Area to affect prey availability for leatherback sea turtles. Continuation of existing oil and gas development and production activities in the Southern California Planning Area is not expected to result in the destruction or adverse modification of designated critical habitat for leatherback sea turtles.

<u>Loggerhead Sea Turtle (*Caretta caretta*)</u>

The loggerhead sea turtle was considered in all past biological opinions prepared by NMFS. In all cases, loggerhead sea turtles were considered a rare visitor to southern California and any effects to the species were considered minimal. The worldwide range of this species was originally listed as threatened in 1978 [43 FR 32800]. In 2011, NMFS split the listing designation into nine distinct population segment [76 FR 58868]. Loggerhead sea turtles that may be found in southern California are presumed to be members of the North Pacific Ocean distinct population segment which is now listed as endangered. Within the North Pacific, loggerhead sea turtle nesting has only been documented in Japan with juveniles and adults traveling around the Pacific, north of the equator, to forage [76 FR 58868]. Important foraging areas have been identified off the coast of Baja Sur, Mexico but none are apparent in southern California although loggerheads may move up the Pacific coast during El Nino events following pelagic red crabs, a preferred prey species [76 FR 58868]. Given this species relative scarcity in southern California, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not

Ex. 2, Page 30

E.R. 0873

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

likely to adversely affect the loggerhead sea turtle. This determination is consistent with our most recent consultations with NMFS (NMFS 2000, NMFS 2008a).

Green Sea Turtle (*Chelonia mydas*)

The green sea turtle was considered in all past biological opinions prepared by NMFS. In all cases, green sea turtles were considered a rare visitor to southern California and any effects to the species were considered minimal. The worldwide range of this species was listed as threatened on July 28, 1978 with the exception of Florida and Mexican Pacific coast breeding populations which were listed as endangered [43 FR 32800].

In recent years, San Diego Bay has been identified as a foraging area for green sea turtles (NMFS 2007a) and a few green sea turtles are regularly seen in Orange County near the San Gabriel River. Turtles foraging in San Diego Bay likely benefited from warm water effluent associated with the South Bay Power Plant. This plant ceased operation on January 1, 2011 and was decommissioned. None of the existing offshore oil and gas activities are in the vicinity of San Diego Bay and there are no known interactions between sea turtles and existing operations in the Orange County area. We have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect green sea turtles. This determination is consistent with our most recent consultations with NMFS (NMFS 2000, NMFS 2008a).

Olive (a.k.a. Pacific) Ridley Sea Turtle (*Lepidochelys olivacea*)

The olive ridley sea turtle was considered in all past biological opinions prepared by NMFS. In all cases, they were considered a rare visitor to southern California and any effects to the species were considered minimal. The olive ridley is currently one of the most abundant species of sea turtles in the world although breeding populations on the Pacific coast of Mexico continue to be listed as endangered (NMFS and FWS 2007b). California appears to be at the extreme northern range for the species but individuals have been documented as far north as Alaska. Given this species relative scarcity in California, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect the olive Ridley sea turtle. This determination is consistent with our most recent consultations with NMFS (NMFS 2000, NMFS 2008a).

Green Sturgeon (*Acipenser medirostris*)

The southern distinct population segment of the North American green sturgeon was listed as threatened in 2006. Specifically, the southern distinct population segment includes "all spawning populations of green sturgeon south of the Eel River (exclusive), principally including the Sacramento River green sturgeon spawning population" [71 FR 17757]. Critical habitat for the southern distinct population segment was finalized in 2009 and includes coastal marine areas (to a depth of 60 fathoms) and specified riverine, estuarine and marsh areas from Monterey Bay, California, north to the Canadian border [74 FR 52300]. Between the Mexican border and Monterey Bay, green sturgeon from the southern distinct population segment may be present but this has not been confirmed (NMFS 2009b). Acoustically tagged fish from the southern distinct population segment have not been detected south of Monterey Bay but a total of 4 green sturgeon, of unidentified origin, have been reported through fishing interactions in southern

29

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

California, with the first sighting recorded in 1941 and the last sighting recorded in 1993 (NMFS 2009b).

In 2010, NMFS published a "4d" rule exempting some forms of take for green sturgeon [75 FR 30714]. NMFS concluded that the southern distinct population segment of the green sturgeon is at risk of extinction primarily because of "elimination of freshwater spawning habitat, degradation of freshwater and estuarine habitat quality, water diversions, fishing, and other causes". Given the relative scarcity of green sturgeon in the southern California, the lack of any apparent threats to green sturgeon from existing offshore oil and gas development and production activities, and the lack of any effects on designated critical habitat for the species, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect the southern distinct population segment of the green sturgeon. Continuation of existing oil and gas development and production activities in the Southern California Planning Area will not result in the destruction or adverse modification of designated critical habitat for green sturgeon.

Steelhead Trout (*Oncorhyncus mykiss*)

The Southern California Evolutionarily Significant Unit (ESU) of west coast steelhead as was listed as endangered and the South-Central California Coast ESU as threatened on October 17, 1997 [63 FR 32996]. Critical habitat for this species was designated in September 2005 [70 FR 52488].

We have examined NMFS's 5-year review of for southern California coast steelhead (NMFS 2011b). Total abundance of steelhead in the South-Central Coast ESU is extremely low and declining. Risk factors for this ESU are fresh water habitat deterioration due to sedimentation, and flooding related to land management practices and potential genetic interaction with hatchery rainbow trout. In recent consultations, NMFS (NMFS 2000, NMFS 2008a) concluded offshore oil and gas activities may affect but would not likely adversely affect steelhead trout because they are found in low numbers within the Southern California Planning Area and that the likelihood of contact with a small accidental oil spill is very low. Circumstances have not changed since 2008. We have determined that that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect steelhead trout.

Critical habitat for steelhead trout includes coastal watersheds that are not affected by existing offshore oil and gas development and production activities in the Southern California Planning Area.

White Abalone (*Haliotis sorenseni*)

The white abalone was listed by NMFS as an endangered species June 28, 2001, after a comprehensive status review of the species was completed [66 FR 29054]. A final recovery plan for the species was published on October 10, 2008 (NMFS 2008a). No critical habitat has been designated for this species due to concerns that identifying critical habitat areas would increase the threat of poaching [66 FR 29048]. In the final listing rule, oil and gas development was identified as having potential for affecting white abalone habitat [66 FR 29046]. The basis of this concern was related to the potential for future leasing that could result in additional oil and gas development and exploration activities between Point Conception and the Mexican border.

30

Ex. 2, Page 32

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

Future leasing and expansion of existing offshore oil and gas facilities is not being considered for this programmatic consultation. The white abalone is also an exclusively sub-tidal species and is not considered particularly vulnerable to oil spills. Considering this information, we have determined that the continuation of existing offshore oil and gas development and production activities in the Southern California Planning Area may affect but is not likely to adversely affect the white abalone. This determination is consistent with our most recent consultation with NMFS (NMFS 2008a).

<u>Black Abalone (*Haliotis cracherodii*)</u>

The black abalone was listed as a federal endangered species on January 14, 2009 [74 FR 1937]. Critical habitat for this species was designated on October 27, 2011 [76 FR 2011] and includes several sections of coastline adjacent to the Southern California Planning Area. At the time the black abalone was listed, significant declines in the population were attributed to commercial/recreational harvest and disease. Ongoing concerns identified in the final rule included accidentally spilled oil from offshore drilling platforms [74 FR 1937].

MMS specifically considered effects of offshore oil and gas development on black abalone and consulted with NMFS when this species was listed in 2009 (NMFS 2009a). Oil spills were the only potential risk to the species identified. Given that the risk of an oil spill was low, an oil spill that may occur would likely be small, and the probability of an oil spill contacting the mainland or Channel Islands was low, NMFS concluded that offshore drilling and production activities may affect but would not likely adversely affect black abalone (NMFS 2009a).

We have also reviewed the critical habitat rule that NMFS published in 2011[76 FR 2011]. Mineral and petroleum exploration and extraction is listed as an activity that may affect primary constituent elements (PCEs) of the designated critical habitat. Specifically, the rule cites the possibility of increased sedimentation of rocky substrate related to construction activities, the potential for a negligible effect of drilling muds on settlement of abalone larvae on coralline algae, and the possibility that oil spills could affect water quality. Neither BOEM nor BSEE have authority or jurisdiction over shoreline construction activities; regardless, new construction or expansion of onshore facilities to support Pacific OCS oil and gas activities is not reasonably foreseeable at this time as the platforms and activities have been in place for decades. Drilling mud discharges are regulated by EPA, in any case there would never be any drilling mud discharges in the vicinity of black abalone habitat. Small oil spills may temporarily affect water quality but the effects of a spill to this PCE would likely be undetectable within hours or days based on normal tidal flushing and the continuous deposition of oil from natural sources that is common along the southern California coast (Lorenson *et.al.* 2009).

Effects to critical habitat from oil spill response efforts and issuance of NPDES permits were also highlighted in the critical habitat rule for black abalone. The rule identifies USCG as the agency responsible for ESA consultations related to oil spill response and EPA as the agency responsible for ESA consultations related to NPDES permitted activities.

Upon consideration of our consultation with NMFS in 2009 and our review of the critical habitat rule published in 2011, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area may affect but is not likely to adversely affect the black abalone. Continuation of existing activities will not result in the destruction or adverse modification of designated critical habitat for this species.

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

CONCLUSION

Upon review of the most recent information on the status of NMFS threatened/endangered species and Bureau activities, BOEM and BSEE conclude that NMFS listed species are not likely to be adversely affected by ongoing offshore oil and gas development activities at existing facilities in the Southern California Planning Area. The Bureaus are committed to continued coordination with NMFS on future activities and additional consultation as the need arises.

Ex. 2, Page 34

E.R. 0877

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

## Literature Cited

Bonnell, M.L., and M.D. Dailey. 1993. Marine mammals. In: Ecology of the Southern California Bight: A Synthesis and Interpretation, M.D. Dailey, D.J. Reish, and J.W. Anderson (eds.). Berkeley, CA: University of California Press. pp. 604-681.

Bornholdt, M.A., and E.M. Lear (comp.). 1995. Outer Continental Shelf Natural Gas and Oil Program: Cumulative Effects 1987-1991. U.S. Department of the Interior, Minerals Management Service, Herndon, VA. OCS Report MMS 95-0007.

Bornholdt, M.A., and E.M. Lear (comp.). 1997. Outer Continental Shelf Oil and Natural Gas Program: Cumulative Effects 1992-1994. U.S. Department of the Interior, Minerals Management Service, Herndon, VA. OCS Report MMS 97-0027.

Bureau of Safety and Environmental Enforcement (BSEE). 2015. Decommissioning Cost Update for Pacific OCS Region Facilities. Conducted by TSB Offshore, Inc. Project No. 139681.

BSEE and Bureau of Ocean Energy Management (BOEM). 2016. Programmatic Environmental Assessment of the Use of Well Stimulation Treatments on the Pacific Outer Continental Shelf. Prepared by Argonne National Laboratory. May 2016.

California State Lands Commission (CSLC) and Minerals Management Service (MMS). 1999. High Energy Seismic Survey Review Process and Interim Operational Guidelines for Marine Surveys Offshore Southern California. February 1999.

Environmental Protection Agency (EPA). 2013. Addendum to Fact Sheet: Final National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAG280000 for Offshore Oil and Gas Exploration, Development and Production Operations off Southern California. December 17, 2013.

EPA. 2014. General NPDES Permit Number CAG280000. Authorization to Discharge under the National Pollutant Discharge Elimination System for Oil and Gas Exploration, Development and Production Facilities. Effective March 1, 2014 and expires February 28, 2019.

Farwell, C., C. M. Reddy, E. Peacock, R. K. Nelson, L. Washburn, D. L. Valentine 2009. Weathering and the Fallout Plume of Heavy Oil from Strong Petroleum Seeps Near Coal Oil Point, CA. Environmental Science & Technology 43(10): 3542-3548.Ford, R.G. 1997. Final Report, Bird Injury Assessment for the Torch/Platform Irene Pipeline Oil Spill, September 1997. Prepared for the Office of Spill Prevention and Response, California Department of Fish and Game. July 1998.

Gales, R.S. 1982. Effects of noise of offshore oil and gas operations on marine mammals: An introductory assessment. Vols. I and II. Technical Report 844. Prepared for USDOI/MMS. Naval Ocean Systems Center, San Diego, CA.

Leatherwood, S., B.S. Stewart, and P.A. Folkins. 1987. Cetaceans of the Channel Islands National Marine Sanctuary. NOAA, Channel Islands National Marine Sanctuary and NMFS. 66 pp.

Leifer, I., B. Luyendyk, K. Broderick. 2006. Tracking an oil slick from multiple natural sources, Coal Oil Point, California. Marine and Petroleum Geology. 23(5): 621-630.

33

Case: 19-55526, 12/23/2019, ID: 11541771, DktEntry: 39-5, Page 49 of 236

Case 2:16-cv-08418-PSG-FFM   Document 43-2   Filed 04/03/17   Page 37 of 61   Page ID
#:612

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

Lorenson *et. al.* 2009. Natural Offshore Seepage and Related Tar Ball Accumulation on the California Coastline; Santa Barbara Channel and the Southern Santa Maria Basin; Source Identification and Inventory. U.S. Geological Survey Open-File Report 209-1225 and MMS Report 2009-030. 116 pp.

MacGillivray, A., and A. Schlesinger. 2014. Harmony Platform 2014 Conductor Driving Acoustic Monitoring: Final Report. JASCO Document 00964, Version 3.0. Technical report by JASCO Applied Sciences Ltd. for ExxonMobil Production Company.

Minerals Management Service (MMS). 1989. Gray Whale Monitoring Study. OCS Report MMS 88-0075. August 1989.

MMS. 1992. Exploratory Wells Drilled, Pacific Outer Continental Shelf. Report compiled by Michael Lee, Minerals Management Service Office of Field Operations. August 21, 1992.

MMS. 2000. Biological Evaluation of Threatened and Endangered Species: Proposed Oil and Gas Development Activities in the Rocky Point Unit off Point Conception, California. July 2000.

MMS. 2000a. Oil-Spill Risk Analysis: Pacific Pouter Continental Shelf Program. OCS Report MMS 2000-57. August 2000.

MMS. 2008. Revisions to the Point Pedernales Field Development and Production Plan Addition of Tranquillon Ridge Field: Biological Evaluation of Threatened and Endangered Species. June 2008.

National Marine Fisheries Service (NMFS). 1978. Biological Opinion Issued by the National Marine Fisheries Service (Washington D.C.) to the Bureau of Land Management for Proposed Outer Continental Shelf Lease/Sale No. 48. Received August 22, 1978.

NMFS. 1979. Biological Opinion Issued by the National Marine Fisheries Service (Washington D.C.) to the United States Geological Survey for Development of Outer Continental Shelf Oil and Gas Reserves in the Southern California Bight. Dated September 25, 1979.

NMFS. 1980. Biological Opinion Issued by the National Marine Fisheries Service (Washington D.C.) to the Bureau of Land Management and the U.S. Geological Survey for Lease Sale and Exploration Activities Associated with Lease Sale 53 in Waters Off Central and Northern California. September 18, 1980.

NMFS. 1981. Biological Opinion Issued by the National Marine Fisheries Service (Washington D.C.) to the Bureau of Land Management and the U.S. Geological Survey for Operations Pertaining to Oil and Gas Leasing and Exploration in the Area Offshore from Point Conception, California to the U.S./Mexico Border. May 8, 1981.

NMFS. 1983. Biological Opinion Issued by the National Marine Fisheries Service (Washington D.C.) to the Minerals Management Service for Outer Continental Shelf Oil and Gas Leasing and Exploration Activities Associated with Proposed Lease Sale 73. August 9, 1983.

NMFS. 1983a. Biological Opinion Issued by the National Marine Fisheries Service (Washington D.C.) to the Minerals Management Service for Outer Continental Shelf Oil and Gas Leasing and Exploration Activities Associated with Proposed Lease Sale 80. October 4, 1983.

34

Case: 19-55526, 12/23/2019, ID: 11541771, DktEntry: 39-5, Page 50 of 236

Case 2:16-cv-08418-PSG-FFM   Document 43-2   Filed 04/03/17   Page 38 of 61   Page ID #:613

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

NMFS. 1984. Biological Opinion Issued by the National Marine Fisheries Service (Washington D.C.) to the Minerals Management Service for Outer Continental Shelf Oil and Gas Development and Production Activities in the Santa Ynez Unit Offshore California. March 7, 1984.

NMFS. 1984a. Biological Opinion Issued by the National Marine Fisheries Service (Washington D.C.) to the Minerals Management Service for Operations Pertaining to the Development and Production of Oil and Gas Offshore California between Point Arguello and Point Conception. May 31, 1984.

NMFS. 1985. Biological Opinion Issued by the National Marine Fisheries Service (Washington D.C.) to the Minerals Management Service for Outer Continental Shelf Oil and Gas Development and Production Activities in the Central Santa Maria Basin Offshore Pedernales, Santa Barbara County, California. June 21, 1985.

NMFS. 1986. Biological Opinion Issued by the National Marine Fisheries Service (Washington D.C.) to the Minerals Management Service for Outer Continental Shelf Oil and Gas Development and Production Activities at Platform Gail in the Santa Barbara Channel, Offshore California. June 9, 1986.

NMFS. 1986a. Biological Opinion Issued by the National Marine Fisheries Service (Washington D.C.) to the Minerals Management Service for Outer Continental Shelf Oil and Gas Development and Production Activities in the Northern Santa Maria Basin Offshore San Luis Obispo and Santa Barbara Counties, California. September 30, 1986.

NMFS. 1991. Recovery Plan for the Humpback Whale (*Megaptera novaeangliae*). Prepared by Humpback Whale Recovery Team for National Marine Fisheries Service, Silver Spring, MD. 105 pp.

NMFS. 1998. Recovery Plan for the Blue Whale (*Balaenoptera musculus*). Prepared by Reeves R.R., P.J. Clapham, R.L. Brownell, Jr., and G.K. Silber for the National Marine Fisheries Service, Silver Spring, MD. 42 pp.

NMFS. 2000. Letter from Southwest Region Regional Administrator of the National Marine Fisheries Service to the Pacific Region Regional Director Minerals Management Service, Review of Rocky Point Biological Evaluation. November 14, 2000.

NMFS. 2008. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Letter from Southwest Region Regional Administrator of the National Marine Fisheries Service to the Pacific Regional Chief of Environmental Evaluation Minerals Management Service. Review of Tranquillon Ridge Biological Evaluation. September 10, 2008.

NMFS. 2008b. Final White Abalone Recovery Plan. Office of Protected Resources, National Marine Fisheries Service. October 10, 2008.

NMFS. 2009a. Letter from the Regional Administrator of the National Marine Fisheries Service, Southwest Region, to Chief of Environmental Evaluation, Pacific OCS Region, Minerals Management Service. Concurrence that the Development and Production of Oil and Gas in the Santa Maria Basin Offshore of Point Pedernales, Santa Barbara County, May Affect but is Not Likely to Adversely Affect the Black Abalone. March 19, 2009.

Ex. 2, Page 37

E.R. 0880

Biological Assessment
Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

NMFS. 2009a. Designation of Critical Habitat for the threatened Southern Distinct Population Segment of North American Green Sturgeon, Final Biological Report, October 2009.

NMFS. 2010. Final Recovery Plan for the Fin Whale (*Balaenoptera physalus*). Office of Protected Resources, National Marine Fisheries Service. July 30, 2010.

NMFS. 2011b. National Marine Fisheries Service Southwest Region, 5-year Review: Summary and Evaluation of the Southern California Coast Steelhead Distinct Population Segment. November 11, 2011.

NMFS. 2013. Final Recovery Plan for the North Pacific Right Whale (*Eubalaena japonica*). National Marine Fisheries Service. June 3, 2013.

NMFS. 2014. Biological Opinion for the Bureau of Safety and Environmental Enforcement's Approval of ExxonMobil Corporation's Applications for Permits to Drill for Conductor Pipe Installation Activities at the Harmony Platform in the Santa Barbara Channel off the Coast of California. October 6, 2014.

NMFS. 2014a. U.S. Pacific Marine Mammal Stock Assessments, 2013. NOAA Technical Memorandum NMFS-SWFC-532. August 2014.

NMFS.2014b. Alaska Marine Mammal Stock Assessments, 2013. NOAA Technical Memorandum NMFS-AFSC-277. July 2014.

NMFS and U.S. Fish and Wildlife Service (FWS). 2007. Leatherback Turtle (*Dermochelys coreacea*) 5-Year Review: Summary and Evaluation. Office of Protected Species. Silver Spring Maryland and U.S. Fish and Wildlife Service, Southeast Region, Jacksonville, Florida. August 2007.

NMFS and FWS. 2007a. Green Sea Turtle (Chelonia mydas) 5-Year Review: Summary and Evaluation. Office of Protected Species. Silver Spring Maryland and U.S. Fish and Wildlife Service, Southeast Region, Jacksonville, Florida.. August 2007.

NMFS and FWS. 2007b. Olive Ridley Turtle (*Lepidochelys olivacea*) 5-Year Review: Summary and Evaluation. Office of Protected Species. Silver Spring Maryland and U.S. Fish and Wildlife Service, Southeast Region, Jacksonville, Florida.. August 2007.

National Research Council (NRC). 2003. Oil in the sea III: Inputs, fates, and effects (Committee on Oil in the Sea: J.N. Coleman, J. Baker, C. Cooper, M. Fingas, G. Hunt, K. Kvenvolden, J. McDowell, J. Michel, K. Michel, J. Phinney, N. Rabalais, L. Roesner, and R.B. Spies). Washington, DC: National Academy Press. 265 pp.

Richardson, W.J., C.R. Greene, Jr., C.I. Malme, and D.H. Thompson. 1995. Marine mammals and Noise. Academic Press, Inc., San Diego, CA. 576 pp.

Ex. 2, Page 38

E.R. 0881

**Appendix A Oil Spill Risk Assessment**

Ex. 2, Page 40

## Appendix A

### Pacific Outer Continental Shelf Region Programmatic Oil Spill Risk Analysis

This appendix covers oil spill risk, fate of oil, trajectory analysis, and response. Also included is a technical description of current oil spill models.

### A.1    Oil Spill Risk Assessment

In the course of normal, day-to-day platform operations, accidental discharges of hydrocarbons may occur. Such accidents are typically limited to discharges of quantities of less than one barrel (bbl) of crude oil. Table A-1 lists the hydrocarbon spills that occurred in the Pacific Outer Continental Shelf Region (POCSR) from 1963 through 2015. During that period, 1,450 oil spills were recorded. The total volume of oil spilled in the Pacific Region is dominated by the 1969 Santa Barbara spill. Since 1969, spills have ranged in size from less than one bbl to 164 bbl, for a total of 920 bbl and an average oil spill size of 0.64 bbl. Of the 49 oil spills greater than one bbl in the Pacific Region (1970 – 2015), five measured 50 bbl or more in volume (Table A-1); the largest of these was the 164 bbl Platform Irene pipeline spill in September 1997. If the 1969 oil spill is included (1963 – 2015) the average oil spill size is 57 bbl. The average oil spill size in the Pacific Region for oil spills in the "50 to less than 1,000 bbl" range is 103 bbl and the average oil spill size for oil spills in the 1 – 50 bbl range is 7.11 bbl. [1] As shown in Table A-1, 3.4 % of the total recorded spills between 1970 and 2015 (49 of 1450) were greater than one bbl, spilling 919.7 bbl of oil into the ocean. Given these data and the experience in the Pacific Region over the last 40 years, BOEM estimates the most likely spill volume for spills in the 50 to less than 1,000 bbl range to be less than 200 bbl.

BOEM calculated oil spill rates for the Pacific Region using oil spill data (1963 – 2015, Table A-1) and cumulative production from the Pacific Region. BOEM estimated the number of oil spills and the probability of one or more spills that could occur as a result of ongoing activities in the Southern California Planning Area in the "50 to less than 1000 bbl" size range using Pacific Region oil spill rates (Table A-2). Oil spill occurrence is calculated as a function of the volume of oil handled or the amount of oil that could be exposed. Oil exposed is defined as the volume of oil produced or transported within a given area. Therefore, the total amount of oil that could be economically produced in the Southern California Planning Area was used as this exposure variable. In the "50 to less than 1,000 bbl" size range we estimate there will be 1.69 spills with a 81.5 % probability of an oil spill occurring (Table A-2). Note that the 80,000 bbl 1969 spill was not included in this calculation since it does not fall within the 50 to1000 bbl size range.

For comparison, we calculated oil spill probabilities using oil spill rates derived from all United States Outer Continental Shelf (US OCS) operations (1996-2010) and the total amount of oil that could be economically produced in the Southern California Planning Area (Anderson et. al., 2012). Using spill rates based on all US OCS Operations (1996-2010), the probability of one or more spills occurring in the Pacific Region for the "50 to less than 1,000 bbl" size range is 98.9 %. The lower probability (81.5 %) of spills in the "50 to less than 1,000 bbl" size range using POCSR oil spill data is reflective of the lower number of oil spills throughout POCSR production history. Using spill rates based on all US OCS operations (1996-2010), the probability of one or more spills occurring in the greater than 1,000 bbl size range is 34.7 % (Table A-3). This is a conservative estimate based on overall US OCS operations. For the greater than 1,000 bbl size range, we did not calculate oil spill rates with only POCSR data due to the limited dataset (1 spill > 1,000 bbl occurred in 1969). A spill of this size would be an unlikely event in the POCSR.

---

[1] From 1996 to 2010, the overall OCS average spill size in the size range of "50 to less than 1,000 bbl" is 186 bbl (Anderson et al., 2012).

**Table A-1.** Crude, diesel, or other hydrocarbon spills recorded in the POCSR, 1963 through 2015. [volume in barrels (bbl)].

| YEAR | Less than or equal to 1 BBL | | Greater than 1 BBL and less than 50 | | Equal to or More than 50 BBL | | Total | | Cumulative Since 1969 |
|---|---|---|---|---|---|---|---|---|---|
| | NO. | VOLUME | NO. | VOLUME | NO. | VOLUME | NO. | VOLUME | VOLUME |
| 1963 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1964 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1965 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1966 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1967 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1968 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1969 | 0 | 0.00 | 0 | 0.00 | 2 | 80900.00 | 2 | 80,900.00 | |
| 1970 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0.00 |
| 1971 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0.00 |
| 1972 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0.00 |
| 1973 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0.00 |
| 1974 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0.00 |
| 1975 | 1 | 0.10 | 0 | 0.00 | 0 | 0.00 | 1 | 0.10 | 0.10 |
| 1976 | 3 | 1.10 | 1 | 2.00 | 0 | 0.00 | 4 | 3.10 | 3.20 |
| 1977 | 11 | 2.20 | 1 | 4.00 | 0 | 0.00 | 12 | 6.20 | 9.40 |
| 1978 | 4 | 1.20 | 0 | 0.00 | 0 | 0.00 | 4 | 1.20 | 10.60 |
| 1979 | 5 | 1.70 | 1 | 2.00 | 0 | 0.00 | 6 | 3.70 | 14.30 |
| 1980 | 11 | 4.90 | 2 | 7.00 | 0 | 0.00 | 13 | 11.90 | 26.20 |
| 1981 | 21 | 6.00 | 10 | 75.00 | 0 | 0.00 | 31 | 81.00 | 107.20 |
| 1982 | 24 | 3.20 | 1 | 3.00 | 0 | 0.00 | 25 | 6.20 | 113.40 |
| 1983 | 56 | 7.70 | 3 | 6.00 | 0 | 0.00 | 59 | 13.70 | 127.10 |
| 1984 | 65 | 4.70 | 3 | 36.00 | 0 | 0.00 | 68 | 40.70 | 167.80 |
| 1985 | 55 | 9.30 | 3 | 9.00 | 0 | 0.00 | 58 | 18.30 | 186.10 |
| 1986 | 39 | 5.50 | 3 | 12.00 | 0 | 0.00 | 42 | 17.50 | 203.60 |
| 1987 | 67 | 7.50 | 2 | 11.00 | 0 | 0.00 | 69 | 18.50 | 222.10 |
| 1988 | 47 | 3.70 | 1 | 2.00 | 0 | 0.00 | 48 | 5.70 | 227.80 |
| 1989 | 69 | 4.10 | 3 | 8.33 | 0 | 0.00 | 72 | 12.43 | 240.23 |
| 1990*[1] | 43 | 2.70 | 0 | 0.00 | 1 | 101.00 | 44 | 103.70 | 343.93 |
| 1991*[2] | 51 | 2.80 | 1 | 13.00 | 1 | 50.00 | 53 | 65.80 | 409.73 |
| 1992 | 39 | 1.20 | 0 | 0.00 | 0 | 0.00 | 39 | 1.20 | 410.93 |
| 1993 | 32 | 0.76 | 0 | 0.00 | 0 | 0.00 | 32 | 0.76 | 411.69 |
| 1994*[3] | 18 | 0.40 | 2 | 33.00 | 1 | 50.00 | 21 | 83.40 | 495.09 |
| 1995 | 25 | 0.90 | 1 | 1.43 | 0 | 0.00 | 26 | 2.33 | 497.42 |
| 1996*[4] | 39 | 0.90 | 1 | 5.00 | 1 | 150.00 | 41 | 155.90 | 653.32 |
| 1997*[5] | 20 | 1.50 | 0 | 0.00 | 1 | 164.00 | 21 | 165.50 | 818.82 |
| 1998 | 29 | 1.00 | 0 | 0.00 | 0 | 0.00 | 29 | 1.00 | 819.82 |
| 1999 | 26 | 1.35 | 1 | 10.00 | 0 | 0.00 | 27 | 11.35 | 831.17 |
| 2000 | 36 | 1.00 | 0 | 0.00 | 0 | 0.00 | 36 | 1.00 | 832.17 |
| 2001 | 48 | 1.70 | 0 | 0.00 | 0 | 0.00 | 48 | 1.70 | 833.87 |
| 2002 | 55 | 1.30 | 1 | 9.00 | 0 | 0.00 | 56 | 10.30 | 844.17 |
| 2003 | 56 | 1.37 | 0 | 0.00 | 0 | 0.00 | 56 | 1.37 | 845.54 |
| 2004 | 36 | 1.00 | 0 | 0.00 | 0 | 0.00 | 36 | 1.00 | 846.54 |
| 2005 | 46 | 2.60 | 0 | 0.00 | 0 | 0.00 | 46 | 2.60 | 849.14 |
| 2006 | 46 | 1.99 | 0 | 0.00 | 0 | 0.00 | 46 | 1.99 | 851.13 |
| 2007 | 45 | 1.19 | 1 | 1.19 | 0 | 0.00 | 46 | 2.38 | 853.51 |
| 2008 | 45 | 1.20 | 1 | 27.00 | 0 | 0.00 | 46 | 28.20 | 881.71 |
| 2009 | 36 | 1.10 | 0 | 0.00 | 0 | 0.00 | 36 | 1.10 | 882.81 |
| 2010*[6] | 33 | 0.63 | 0 | 0.00 | 0 | 0.00 | 33 | 0.63 | 883.44 |
| 2011 | 38 | 0.02 | 0 | 0.00 | 0 | 0.00 | 38 | 0.02 | 883.46 |
| 2012*[7] | 30 | 0.08 | 1 | 35.70 | 0 | 0.00 | 31 | 35.78 | 919.24 |
| 2013 | 26 | 0.03 | 0 | 0.00 | 0 | 0.00 | 26 | 0.03 | 919.27 |
| 2014 | 10 | 0.48 | 0 | 0.00 | 0 | 0.00 | 10 | 0.48 | 919.75 |
| 2015 | 13 | 0.11 | 0 | 0.00 | 0 | 0.00 | 13 | 0.11 | 919.86 |
| TOTALS | 1399 | 92.21 | 44 | 312.65 | 7 | 81415.00 | 1450 | 81,819.86 | 919.75 |

*[1] Mineral oil mud released due to incorrectly positioned standpipe and closed valves
*[2] Pipeline riser ruptured when snagged by grappling hook used by workboat to retrieve lost anchor
*[3] Process upset resulting in overflow of oil/water emulsion from tanks into disposal tube
*[4] Equipment failure and error allowing emulsion to flow through flare boom
*[5] Pipeline break in the flange metal in state waters due to welding flaws
*[6] Since January 2010 spills recorded in Technical Information Management System in .01 gallons
*[7] Includes Platform Houchin 35 bbl spill (per USCG) from burst plate

Oil spill probability estimates are conservative given POCSR's:

- oil spill history,
- long established drilling program,
- producing from mature fields with lower pressure,
- no floating drilling rigs,
- no new platforms being installed, and
- all oil is transported via pipelines.

**Table A-2**     Estimated mean number of spills and spill occurrence probability for the "50 to less than 1,000 bbl" size range using oil spill data from POCSR operations (1963 – 2011). Anticipated POCSR Production is 0.3373 Bbbl (0.262 [BSEE August 2016] + 0.0957 [Tranquillon Ridge] + 0.0035 [Electra Field] + 0.0161 [Carpinteria State] = 0.3373 Bbbl).

| POCS Spill data (1963 – 2014) | Spill Rate (2012*) | Estimated Mean Number of spills | Probability of 1 or more spills |
|---|---|---|---|
| Spills ≥ 50 to < 1,000 | | | |
| Platforms & Pipelines | 4.47 | 1.69 | 81.5 % |

Bbbl = billions of barrels        *spill rate calculation methodology: Anderson et. al., 2012

Formulae used in the Oil Spill Occurrence and Probability Calculations:
Spill rate $\lambda$ = number of spills per Bbbl
Estimated Mean Number of Spills = spill rate $\lambda$ x volume handled t (Bbbl) = $\lambda$ t
Probability [n spills over future exposure t ] = $[(\lambda t)^n e^{-\lambda t}] / n!$
Probability of Zero Spills = $[(\lambda t)^0 e^{-\lambda t}] / 0! = [1 \times e^{-\lambda t}] / 1 = 1 / e^{\lambda t}$
Probability of One or More Spills = 1-Probability[ zero spills] = $1 - 1 / e^{\lambda t}$

**Table A-3**     Estimated means and spill occurrence probabilities POCSR analyses using all US OCS Spill Data (1996 – 2010). Anticipated POCSR production is 0.3373 Bbbl.

| US OCS Spill Data (1996 – 2010) | Spill Rate (2012*) | Estimated Mean Number of Spills | Probability of 1 or More Spills |
|---|---|---|---|
| Spills ≥ 50 to < 1,000 | | | |
| Platforms & Pipelines | 12.88 | 4.86 | 99.2 % |
| Spills ≥ 1000 | | | |
| Platforms | 0.25 | 0.09 | 9.0 % |
| Pipelines | 0.88 | 0.33 | 28.3 % |
| Total | 1.13 | 0.43 | 34.7 % |

Bbbl = billions of barrels.      * Source: Anderson et. al., 2012

Oil spill Assessment 1970s and 1980s

The 1975 Environmental Impact Statement (EIS) for Oil Development in the Santa Barbara Channel estimated 1 to 2 billion barrels (Bbbl) of oil would be produced (USGS, 1975). To date the Southern California Planning area has produced 1.3 Bbbl of oil with a remaining production estimate of 0.3373 Bbbl. Therefore, the production estimates for the region are within what was

estimated in the 1975 EIS. This section reviews, by geographic location, the oil spill assessments completed in the 1970s and 1980s environmental documents.

*Santa Maria Basin:*

- 1985 Santa Maria Basin EIS/EIR analyzed oil spills ranging from 10 to 100,000 bbl (ADL, 1985). (Platforms covered: Irene)
- Spills since 1969:
  - Platform Irene – 1997 – 164 bbl pipeline spill

*Santa Barbara Channel:*

- USGS 1975 EIS: estimated a 70 % chance that there would be at least one platform spill of 1,000 bbl, and if a large platform spill occurred, there was an 80 % chance the spill would exceed 2,380 bbl (USGS, 1975). (Platforms covered: Hogan, Houchin, Hillhouse, A, B, C, Henry, Grace, Habitat)
- 1980 Environmental Impact Report – Environmental Assessment (EIR-EA) for the Platform Gina and Gilda development: estimated that an average rate of operational platform spills is 1 spill per production platform per 10.6 years (Dames and Moore, 1980). Thus, it was estimated that Platform Gilda would have 1.9 spills over the 20 year production lifetime. (Platforms covered: Gina, Gilda)
- 1986 Platform Gail Environmental Assessment (EA): cumulative oil spill analysis estimated that during 32 years of production in the Southern California Planning Area there would be 14.5 spills $\geq$ 1,000 bbl and 6.6 spills $\geq$ 10,000bbl (MMS, 1986). (Platforms covered: Gail)
- 1984 Santa Ynez Unit Environmental Impact Report/Environmental Impact Statement (EIR/EIS): examined spills ranging from 10 bbl to more than 500,000 bbl and categorized a platform blowout as spilling between 1,000 and 500,000 bbl (SAI, 1984). (Platforms covered: Hondo, Harmony, Heritage[2])
- 1984 Point Arguello EIR/EIS estimated that a cumulative total of 144,000 bbl of oil would be expected to be spilled over a 30-year project lifetime (ADL, 1984, Appendix H). (Platforms covered: Hidalgo, Harvest, Hermosa)
- Spills since 1969, $\geq$ 50 bbl:
  - Platform Habitat: 1990 – 100 bbl of drilling mud with mineral oil
  - Platform Gina: 1991 – 50 bbl of oil from a broken pipeline
  - Platform Hogan: 1994 – 50 bbl of oil
  - Platform Heritage: 1996 – 150 bbl of oil

*San Pedro Bay:*

- 1978 Beta Unit EIR-EA analyzed the following spills: 5000-bbl platform spill, 50-bbl pipeline spill, 50-bbl Long Beach Harbor spill, and a catastrophic 80,000-bbl platform spill (SLC, PLB, USGS, 1978). (Platforms covered: Elly, Ellen, Eureka, Edith)

<u>Worst Case Discharge</u>

Pacific OCS Region operators are required to submit oil spill response plans (OSRPs) which show the worst case volume of oil that could be spilled from three sources associated with

---

[2] A fourth platform was also covered by this document, but never installed. The platform has since been removed from the current Development and Production Plan for the Santa Ynez Unit.

offshore operations: vessels, tanks, and piping on board platforms, pipelines, and loss of well control events (Table A-4; 30 CFR 254; 30 CFR 550). The intent of this conservative requirement is to ensure that each operator has adequate spill response capabilities to respond to the largest conceivable oil spill from their facilities. If surface intervention is unsuccessful, an operator needs to mobilize a drilling rig to the Southern California Planning Area and drill a relief well. The largest worst case discharge volume is calculated as the release of stored oil on a platform, oil in the associated pipeline, plus the total flow released from a loss of well control up to the drilling of a relief well. The worst case discharge volumes vary widely across facilities. A continuous spill event (i.e., from a loss of well control) is more difficult to quantify but unlikely to occur given the reservoir pressures in the POCSR (13 of the 23 platforms have no pressure; Table A-4).

*Worst Case Discharge Scenario, Largest Volume in POCSR*

Platform Heritage, Santa Ynez Unit, located approximately 8 miles offshore Gaviota, California, has the largest worst case discharge estimate for a loss of well control (blowout) with an estimated maximum daily flow rate of 33,986 barrels. It is estimated to take 17 days to stop the flow using surface capping equipment, for a total discharge volume of 577,762 bbl. If surface intervention is not achieved, the estimated maximum time it would take to mobilize a rig and drill a relief well would be 170 days, with a total discharge volume of 5,777,620 bbl. This catastrophic event is unlikely to occur.

Summary of Oil Spill Risk Assessment

- The maximum most likely oil spill volume is estimated to be 200 bbl.
- The probability of an oil spill occurring in the 50 to less than 1,000 bbl range is 81.5 %.
- Projected oil production in the Southern California Planning Area is within what was analyzed in the environmental documents from the 1970s and 1980s.
- A large catastrophic event is unlikely to occur.

## A.2    Fate of Oil

In the event of an accidental oil spill, a slick forms and part of the slick begins evaporating while the action of breaking waves forms oil droplets that are dispersed into the water column. Oil in the Southern California Planning Area ranges from very heavy (API 12) to very light (API 39). Light oil has a rapid evaporation rate and is soluble in water. Light crude oils can lose up to 75 % of their initial volume within a few days of a spill (NRC, 2003). In contrast, heavy oil (API <22) has a negligible evaporation rate and solubility in water.

Depending on the weight of the oil spilled and the environmental conditions (i.e., sea state) at the time of a spill, six to 60 % of oil during an oil spill would sink and be in the water column or on the seafloor in the vicinity of the spill (ADL, 1984). This is supported by a recent study of natural oil seeps at Coal Oil Point in the Santa Barbara Channel that range in depth from six to 67 meters offshore of Goleta, CA (Leifer et al., 2006) and are assumed to release 100 bbl/day (Farwell et al., 2009). The distribution of heavy oil in a surface slick in the Santa Barbara Channel is primarily influenced by surface currents and falls out of the slick over a period of 0.4 to 5 days (Leifer et al., 2006).

**Table A-4.** Worst Case Discharges Identified in OSRPs in the POCSR.

| Facility | Pipeline (bbl) | Storage[3] (bbl) | Drilling (bbl/day) | Reference |
|---|---|---|---|---|
| Hogan | Pipeline to Shore = 41 (oil + water) Inter-Platform (Houchin) = 49 | 324 | 0 | Pacific Operators Offshore OSRP 2012 |
| Houchin | See Information for Hogan | 324 | 0 | Pacific Operators Offshore OSRP 2012 |
| Elly | 16" Pipeline Elly to Beta Pump Station = 3,111 | 8,925 | 0 (no drilling) | Beta Unit Complex OSRP 2012 |
| Ellen | No Pipeline, transfers through Elly = 0 | 1840 | 45 | Beta Unit Complex OSRP 2012 |
| Eureka | Pipeline = 1,026 | 4,232 | 105 | Beta Unit Complex OSRP 2012 |
| Gail | Pipelines at Gail = 168 | 2,068 | 650 | Santa Clara Unit OSRP 2012 |
| Grace | Pipelines at Grace and Grace to Shore = 292 | 1,557 | 110 | Santa Clara Unit OSRP 2012 |
| Hermosa | Pipeline Hermosa to Shore = 2,502 | 3,760 | 0 | Plains Exploration and Production Company OSRP 2012 |
| Hidalgo | Pipeline Hidalgo to Hermosa = 489 | 2,478 | 0 | Plains Exploration and Production Company OSRP 2012 |
| Harvest | Pipeline Harvest to Hermosa = 221 | 3,820 | 0 | Plains Exploration and Production Company OSRP 2012 |
| Irene | Pipeline Irene to Shore = 1,124 | 1,064 | 750 | Plains Exploration and Production Company OSRP 2012 |
| Gilda | Pipeline Gilda to Shore = 1,994 | 857 | 200 | DCOR OSRP 2012 |
| Gina | Pipeline Gina to Shore = 546 | 223 | 0 | DCOR OSRP 2012 |
| "C" | Pipeline C to B = 11 | 306 | 2 | DCOR OSRP 2012 |
| "B" | Pipeline B to A = 92 | 646 | 0 | DCOR OSRP 2012 |
| "A" | Pipeline A to Shore = 3,685 | 589 | 0 | DCOR OSRP 2012 |
| Hillhouse | Pipeline Hillhouse to A = 57 | 1,534 | 0 | DCOR OSRP 2012 |
| Henry | Pipeline Henry to Hillhouse = 3 | 118 | 0 | DCOR OSRP 2012 |
| Edith | Pipeline Edith to Elly = 122 | 2,352 | 0 | DCOR OSRP 2012 |
| Habitat | No Pipeline, gas production | 385 | 0 | DCOR OSRP 2012 |
| Harmony | Pipeline Harmony to Shore = 6,210 | 2,607 | < 2,000 | ExxonMobil OSRP 2014 |
| Heritage | Pipeline Heritage to Harmony = 731 | 2,684 | 33,986 | ExxonMobil OSRP 2014 |
| Hondo | Pipeline Hondo to Harmony = 560 | 3,811 | < 2,000 | ExxonMobil OSRP 2014 |

---

[3] Vessels, piping, tanks

### A.3    Oil Spill Response

BSEE regulations at 30 CFR Part 254 require that each OCS facility have a comprehensive OSRP. Response plans consist of an emergency response action plan and supporting information that includes an equipment inventory, contractual agreements with subcontractors and oil spill response cooperatives, worst-case discharge scenario, dispersant use plan, in-situ burning plan and details on training and drills. The Coast Guard is the lead response agency for oil spills in the coastal zone and coordinate the response using a Unified Command (UC), consisting of the affected state and the Responsible Party (i.e., the company responsible for spilling the oil) in implementing the Incident Command System (ICS) if an oil spill occurs. Oil spill drills, either agency-lead or self-lead by a company, also use the UC/ICS. California's Department of Fish and Wildlife's Office of Spill Prevention and Response (OSPR) assumes the role of the State on-scene coordinator and plays a significant role in managing wildlife operations in the Southern California Planning Area as the state's Natural Resource Agency.

BSEE requires companies that operate in the OCS to have the means to respond to a worst-case discharge from their facilities. Many companies meet this requirement by becoming members of Oil Spill Removal Organizations (OSRO). Since 1970, oil companies operating in the Santa Barbara Channel and Santa Maria Basin have funded and operated a non-profit OSRO called Clean Seas ([www.cleanseas.com](www.cleanseas.com)). Clean Seas acts as a resource to its member companies by providing an inventory of state-of-the-art oil spill response equipment, trained personnel, training and expertise in planning and executing response techniques. Clean Seas personnel and equipment are on standby, ready to respond to an oil spill, 24 hours a day.

The Marine Spill Response Corporation (MSRC) is the other U.S. Coast Guard-classified OSRO based in Long Beach ([www.msrc.org](www.msrc.org)). MSRC is a nation-wide OSRO with multiple responder-class oil spill response vessels and oil spill response barges. They are also equipped to respond to an oil spill 24 hours a day.

Clean Seas and MSRC are both equipped and prepared to respond to oil spill threats to sensitive shoreline areas through the detailed and up-to-date information on sensitive areas and response strategies from the Los Angeles/Long Beach Area Contingency Plan ([https://www.wildlife.ca.gov/OSPR/Preparedness/LA-LB-Spill-Contingency-Plan](https://www.wildlife.ca.gov/OSPR/Preparedness/LA-LB-Spill-Contingency-Plan)) and the California OSPR ([https://www.wildlife.ca.gov/OSPR](https://www.wildlife.ca.gov/OSPR)).

### A.4    Oil Spill Trajectory Analysis

Oil spill trajectory modeling was conducted to determine the movement and fate of spilled oil if a spill occurred in the Southern California Planning Area from existing offshore oil and gas operations. The BOEM examined two available models: BOEM Oil Spill Risk Analysis (OSRA) and National Oceanic & Atmospheric Administration (NOAA) Office of Response & Restoration's General NOAA Operational Modeling Environment (GNOME). GNOME was developed by the Emergency Response Division (ERD) of NOAA's Office of Response and Restoration. This information can be used in conjunction with data from the oil spill risk assessment to provide perspective on the potential for exposure to spilled oil.

The OSRA model calculates numerous trajectories for hypothetical oil spills from pre-designated launch points by varying the wind and ocean current fields. Contact was evaluated in a grid encompassing the entire ocean region as well as grids located along the shoreline (Figure A-1; MMS 2000). Percent contact for a grid section is calculated by OSRA (e.g., Figures A-2 and A-

3). The OSRA trajectories are volume-independent and only show where oil would travel given that a spill occurred.



**Figure A-1.**    Pacific OSRA Resource Grid. The centers of this grid are used as the data locations for the probability contour plots.

The BOEM ran the GNOME model in three oceanographic regimes (see Section A.5). Releases were modeled for three wind directions correlated with the ocean current flow regimes. The GNOME model takes ocean currents and wind into account. The contacts displayed in Figures A-4 – 8 are only for a limited set of meteorological conditions (Table A-5) and are not intended to encompass all of the meteorological conditions that could be present during a spill scenario. GNOME model outputs provide an overall picture of where oil may travel if an oil spill occurred from one of the launch points.

**Table A-5.**    Parameters utilized in GNOME model runs.

| Current Regime | Wind Conditions | Timeframe |
|:---:|:---:|:---:|
| Upwelling | 8 m/s NW | 10 days |
| Convergent | 7 m/s NW | 10 days |
| Relaxation | 4 m/s NW 4 m/s SW 0 m/s | 10 days |

The GNOME analysis provides a slightly different picture of possible oil spill trajectories by including variables that account for the fate of the volume of oil released including weathering of released materials, specific ocean current regimes, and meteorological conditions. A volume of oil is assumed for GNOME model runs. As discussed in section A.1, the volume is 200 bbl for

A-8





**Figure A-2.** Ten day annual average oil spill analysis for Platform Irene (A), Hidalgo (B) and Harmony (C). Percent probability that oil will contact certain land and ocean locations.

Ex. 2, Page 49

E.R. 0892







**Figure A-3.** Ten day annual average oil spill analysis for Platform Hillhouse (A), Grace (B) and Elly (C). Percent probability that oil will contact certain land and ocean locations.

Ex. C, Page 50

E.R. 0893











**Figure A-4.**
**Platform Irene**
<u>Northwest wind</u>: In the three oceanographic regimes, it takes one day for oil to land at Point Arguello. During the upwelling and convergent regimes oil lands at San Miguel island in 3-4 days, Santa Rosa in 4-5 days, and Santa Cruz Island in 4-9 days.

<u>Southwest and neutral wind</u>: In the relaxation regime it takes 1-2 days for oil to land at Purisima Point and 3-6 days for oil to land at Point Sal.

A-11

Ex. 2, Page 51

E.R. 0894











**Figure A-5.**
**Platform Hidalgo**

<u>Northwest wind</u>: Under upwelling and convergent regimes oil lands on San Miguel Island in 3 days and Santa Rosa Island in 3-4 days. Upwelling carries oil to Santa Cruz Island in 5 days. Convergent ocean currents carry oil to just north of Point Conception in 3 days. The relaxation regime carries oil to Pt. Arguello in 2 days, San Miguel Island in 6 days, Purisima Point in 7 days and Santa Rosa Island in 9 days.

<u>Southwest and neutral wind</u>: In the relaxation regime with neutral wind it takes 8 days for oil to land at Pt. Sal. In the relaxation regime with southwest wind, oil lands at Point Arguello in 1 day, Purisima Point in 2 days, Point Sal in 3 days and Pismo Beach in 7 days.











**Figure A-6.**
**Platform Harmony**

<u>Northwest wind</u>: Under upwelling and convergent regimes oil lands on Santa Cruz and Santa Rosa Islands in 2 days. The upwelling regime also carries oil to Anacapa Island in 5 days. Under the relaxation regime oil lands on Santa Rosa Island in 3 days and San Miguel and Santa Cruz Islands in 4 days.

<u>Southwest wind</u>: Under the relaxation regime, oil lands at Point Conception in 1 day, Point Arguello in 2 days, Purisima Point in 6 days, and Point Sal in 7 days.

<u>Neutral wind</u>: Under the relaxation regime, oil lands on San Miguel Island in 5 days, Santa Rosa Island in 6 days and Santa Cruz Island in 10 days. Oil also travels in the ocean up the coast to Point Sal, but does not land on the mainland.

Ex. 2, Page 53











**Figure A-7.**
**Platform Hillhouse**

<u>Northwest wind</u>: Under the upwelling regime, oil lands on the mainland in Oxnard in 2 days and the majority of oil travels out of the model domain. In the convergent regime, oil lands on the mainland (Montecito and Carpinteria) in 3 days, Ventura Harbor in 4 days, Santa Cruz Island in 5 days, and Anacapa Island in 7 days. In the relaxation regime, oil lands on Carpinteria in 2 days, Santa Barbara in 3 days, Santa Cruz Island in 4 days and Anacapa Island in 8 days.

<u>Southwest wind</u>: Under the relaxation regime oil reaches Montecito in 1 day.

<u>Neutral wind</u>: Under the relaxation regime oil reaches Santa Barbara in 1 day and Point Conception in 7 days and continues out in the ocean past Point Purisima Point.

Ex. 2, Page 54

A-14

E.R. 0897











**Figure A-8.**
**Eastern Channel Group-Platforms Gail, Grace, Gina, Gilda**

Northwest wind: Under all three regimes the majority of oil travels out of the model domain. Under the upwelling regime, oil may land at Anacapa Island after 9 days. Under the convergent regime oil lands just south of Ventura Harbor in 1 day. In the relaxation regime oil lands south of Ventura Harbor in 4 days and on Anacapa Island in 8 days.

Southwest wind: Under the relaxation regime oil lands on Carpinteria and Ventura Harbor in 1 day.

Neutral wind: Under the relaxation regime oil lands on Carpinteria in 2 days, Santa Barbara in 4 days, and travels through the Santa Barbara Channel to just north of Point Conception.

the Pacific Region (see also Figures A-3 – A-8). Unlike OSRA, GNOME provides an estimated amount of oil that may contact the shoreline during the model run.

Although the GNOME results differ slightly from the OSRA model calculations, both analyses provide insights that help present a more complete picture of what may occur if oil is spilled. Together, these analyses represent the best available information on possible oil spill trajectories in the Southern California Planning Area. A detailed description of both models is provided at the end of this technical appendix in section A.5.

Trajectory Analysis and Comparison to 1970s and 80s

Six platforms were chosen as launch points because they are distributed throughout the geographic range of existing offshore operations as follows:

- *Santa Maria Basin* – Platforms Irene and Hidalgo;
- *Santa Barbara Channel* – Platforms Harmony, Hillhouse and a group in the eastern Channel (Gail, Grace, Gilda and Gina); and
- *San Pedro Bay* – Platform Elly.

The model outputs were then compared to the oil spill trajectories analyzed in the 1970s and 1980s environmental documents.

*Santa Maria Basin*

Platform Irene. In the Arthur D. Little (1985) EIR/EIS, model outputs focused on the probability of oil contacting a section of shoreline extending north of the Santa Maria River mouth, south and west to Santa Barbara, as well as San Miguel, Santa Rosa, and Santa Cruz islands (northern Channel Islands, not including Anacapa Island). These trajectories are essentially the same as those estimated using the current oil spill models. All of the models estimate that areas of the coastline from the Santa Maria River mouth to Gaviota and the northern Channel Islands were most likely to be affected by an oil spill from Platform Irene. (Figures A-2A and A-4). The OSRA analysis for Platform Irene displays the highest probability (50 – 60 %) of oil contacting land at Point Arguello and a 10 – 20 % chance of contact at San Miguel Island (Figure A-2A). GNOME models spilled oil traveling from Platform Irene to as far north as San Luis Obispo Bay and off the coast of Montana De Oro State Park. The northern-most mainland contact is just south of Pismo Beach at Guadalupe-Nipomo Dunes National Wildlife Refuge (Figure 4).

Platform Hidalgo. In the Arthur D. Little (1984) EIR/EIS, the trajectories estimated for oil spills launched near Platform Hidalgo are similar to those estimated using current oil spill models. All models estimated oil to contact land around Point Arguello and San Miguel Island. The Hidalgo OSRA analysis displays a 20 – 30 % probability of oil contacting Point Arguello and a 10 – 20 % chance of contact at San Miguel Island (Figure A-2B). The 1984 model and GNOME models also estimate land fall around Point Conception, Santa Rosa Island and Santa Cruz Island. The GNOME model estimates oil traveling further north up the coast to Point Sal and toward San Luis Obispo Bay (Figure 5).

*Santa Barbara Channel*

Platform Harmony. In the Science Applications, Inc. (1984) EIS/R, the trajectories estimated for oil spills launched near Platform Harmony are similar to those estimated using current oil spill models. All models agree that areas of coastline from Vandenberg Air Force Base to Santa Barbara County and northern coastlines of the Channel Islands are most likely to be affected by

Ex. 2, Page 56

E.R. 0899

an oil spill from Platform Harmony. The primary differences are that the GNOME model runs estimate oil landing as far north as Point San Luis (Figure A-6) and the 1984 model analyses estimate oil landing as far south as San Nicolas and San Clemente Islands. Platform Harmony OSRA analysis displays a 20 – 30 % chance of oil contacting the mainland Gaviota coast and San Miguel Island and a 10 – 20 % chance of oil contacting Santa Rosa and Santa Cruz Islands (Figure A-2C).

Platform Hillhouse. The USGS (1975) EIS for the Santa Barbara Channel estimated oil spilled in this area to make contact with land around Carpinteria, Anacapa Island and travel down coast to Ventura. This is very similar to the OSRA model estimation, where there is a 30 – 40 % probability of oil contacting mainland Santa Barbara and a 10 – 20 % probability that oil will travel along the mainland as far north as the Gaviota coast and as far south as Ventura as well as out toward Anacapa Island (Figure A-3A). GNOME models oil traveling as far west as Santa Barbara and Point Conception (Figure 7).

*Eastern Santa Barbara Channel*
Platforms Grace, Gail, Gina, Gilda (modeling within a similar area). The USGS (1975) EIS for the Santa Barbara Channel indicated that oil in this area would contact land in Ventura, Port Hueneme, Anacapa Island, and possibly Point Mugu. The Dames & Moore, (1980) EIR-EA for Gina-Gilda described land contact would occur in the immediate vicinity of Port Hueneme and would range from the eastern Santa Barbara Channel to as far west as Santa Barbara. Oil would also likely contact the eastern shorelines of the northern Channel Islands. The 1986 Platform Gail EA also estimates this area of contact (MMS, 1986). This is similar to the GNOME model for Platform Gail that estimates landfall from mainland Santa Barbara to south of Ventura Harbor in Oxnard and out to Anacapa Island (Figure 8). A spill modeled in OSRA from Platform Grace displays a 40 – 50 % probability that oil will contact the east end of Anacapa Island and a 30 – 40 % probability that it will contact the entire island. There is a 20 – 30 % probability of contacting Port Hueneme and Santa Cruz Island and a 10 – 20 % probability of contacting the mainland as far north as Goleta and as far south as Point Mugu (Figure A-3B).

*San Pedro Basin*
Platform Elly. The 1978 Beta EIR\EA indicated that oil spilled from the Beta Unit, near the Ports of Los Angeles and Long Beach, would contact land from Alamitos Bay to Huntington Beach (SLC, PLB, USGS, 1978). They indicated that a catastrophic spill would contact the shoreline both up and down coast of the study area, but do not provide a specific area. This is similar to the OSRA model output that estimates spilled oil to primarily stay within the San Pedro Bay and travel south along the mainland to Oceanside (Fig A-3C). The OSRA analysis for the Beta Unit, Platform Elly, displays a 40 – 50 % probability of oil contacting the mainland from Huntington Beach to Newport Beach and a 10 – 20 % probability of oil traveling as far north as Alamitos Bay and as far south as Oceanside. No trajectory runs were conducted using GNOME because GNOME, as configured for this study, was limited to the geographic area of the Santa Barbara Channel and just north of Point Conception.

## A.5    Oil Spill Trajectory Models – Technical Descriptions

*BOEM OSRA Model*

The trajectory simulation portion of the OSRA model consists of many hypothetical oil spill trajectories. The trajectories are the consequence of the integrated action of temporally and spatially varying wind and ocean current fields on the hypothetical oil spills. Collectively, they

represent a statistical set of winds and currents that could occur during the chosen seasonal time of the model run. The analysis uses a combination of observed and theoretically computed ocean currents and winds. Ocean currents were generated by a numerical model and were supplemented with direct observations of currents using surface drifting buoys in the Santa Barbara Channel. The sea surface winds over the study area were derived from an atmospheric model and from measured winds at buoy, platform, island and land-based wind stations. The studies were conducted for four seasons (winter, spring, summer and fall) representing different currents and winds. The seasonally-averaged current fields were provided by Scripps Institution of Oceanography and are based on several years of current meter and free-floating drifter data (MMS, 2000).

The primary OSRA study area grid used for the trajectory analysis consists of a Cartesian grid over the area (123º W to 116.7º W) and (32º N to 36º N) (Figure 1). The land segments were established from the USGS quadrangle maps for the California Coast. The grid cell definitions are 1/8º (0.125º) in longitude and latitude. The grid is not fully rectangular; cells that fell on land, or outside the region where ocean currents were defined were removed. This resolution was selected by the OSRA specialist as an appropriate grid, based on the information at that time. This resource grid was defined to calculate the number of trajectories that entered into each cell during the trajectory movement and "color code" the probability of contact to each grid cell over a 10-day period from a platform launch point. In this analysis, we treated the probability estimates as a point grid at the centers of the grid cells, and then contoured the results. Therefore, the maximum contours do not necessarily surround the launch point, but rather the contours surround the center points of the resource grid. This occurs due to the coarse scale of the grid. The movements of the trajectories are treated as "floating" within this grid, in meters (Figure 1).

OSRA model results display the probabilities (in percent) of oil contacting different locations on land and in the water using the annual average for all four seasons over a 10-day period and creating contours to fit the contacted grid.

*NOAA GNOME Model*

GNOME is a publicly available oil spill trajectory model that simulates oil movement due to winds, currents, tides and spreading (Zelenke et al., 2012). It includes variables that account for weathering of the released materials as well as a separate set of ocean current regimes for the Santa Barbara Channel and Santa Maria Basin. Wind speed and direction as well as variability can be input to the model. This enables the analysis of specific spill situations under given meteorological conditions. However, in order to assess the probabilities of a specific modeled end result, wind distributions and ocean current time dependent distributions would need to be obtained and many modeling runs conducted for the area.

The GNOME model operates by generating "splots" associated with each spill scenario. The fate of the splots is either to remain in the water, to be beached, to be weathered or to travel out of the modeling space (off the map). The movement of the splots is defined by the ocean current "regime" and the wind influences. Ocean currents in GNOME are essentially divided into three regimes for the Santa Barbara Channel and the Santa Maria Basin: upwelling, convergent and relaxation. Each of the three ocean current states includes a counter-clockwise circulation pattern in the Santa Barbara Channel, although it is strongest in the convergent oceanographic regime (Figure A-9).



**Figure A-9**. Santa Barbara Channel oceanographic regimes (NOAA 2015, Dever 2004).

Upwelling. The upwelling state is named for the upwelling of cold (approximately 11 °C) subsurface waters near Point Conception that often accompanies this state. The upwelling state occurs primarily in spring, although it has also been observed in other seasons. In terms of the conceptual models of the momentum balance, the upwelling state occurs when strong (>10 m/s), persistent (several days or more), upwelling favorable (equatorward) winds overwhelm any poleward, along-shelf pressure gradient.

Convergent. The convergent state is named for the convergence of southward flow west of Point Arguello with westward flow south of Point Conception. The convergent state occurs primarily in summer, although it has also been observed in other seasons. The convergent state tends to occur when upwelling favorable winds and a strong poleward, along-shelf pressure gradient exist. The most characteristic feature of the resulting flow field is a strong counter-clockwise recirculation in the western Santa Barbara Channel with about equal strength in the northern and southern limbs of the recirculation.

Relaxation. The relaxation state is named for the time periods when winds off Point Conception "relax" from their usual equatorward direction. The relaxation state occurs primarily in fall and early winter. The relaxation state occurs when poleward, along-shelf pressure gradients overwhelm upwelling-favorable or weak winds. The most characteristic feature of the resulting flow field is a strong westward flow (>50 cm/s) through the Santa Barbara Channel and to the Santa Maria Basin. Flow in the Santa Maria Basin is strongest along the mainland coast.

The BOEM ran the GNOME model in three oceanographic regimes with oil being released continuously over 10 days, for releases at five locations distributed throughout the geographic range of existing offshore oil and gas operations within the Santa Maria Basin and Santa Barbara Channel: Platform Irene, Platform Hidalgo, Platform Harmony, Platform Hillhouse, and Platform Gail. Platform Elly in the Beta unit; San Pedro Bay, was not modeled because it is located outside of the model domain.

## A.6     References

Anderson, C.M., M. Mayes, and R. LaBelle. 2012. Update of Occurrence Rates for Offshore Oil Spills. BOEM 2012-069; BSEE 20112-069.

Arthur D. Little. 1985. Union Oil Project / Exxon Project Shamrock and Central Santa Maria Basin Area Study EIS/EIR, June 24, 1985

Arthur D. Little. 1984. Point Arguello Field and Gaviota Processing Facility Area Study and Chevron/Texaco Development Plans EIR/EIS.

Dames and Moore. 1980. Environmental Impact Report/Environmental Assessment Union Oil Company Platform Gilda and Platform Gina.

Dever, E. P. 2004. Objective maps of near-surface flow states near Point Conception, California. Journal of Physical Oceanography 34: 444-461.

Farwell, C., C. M. Reddy, E. Peacock, R. K. Nelson, L. Washburn, D. L. Valentine 2009. Weathering and the Fallout Plume of Heavy Oil from Strong Petroleum Seeps Near Coal Oil Point, CA. Environmental Science & Technology 43(10): 3542-3548.

Leifer, I., B. Luyendyk, K. Broderick. 2006. Tracking an oil slick from multiple natural sources, Coal Oil Point, California. Marine and Petroleum Geology.  23(5): 621-630.

MMS. 1986. Platform Gail Environmental Assessment: OCS Environmental Assessment, Lease OCS-P 0205, Santa Clara Unit, Chevron USA Inc., June 19, 1986.

MMS. 2000. Oil-Spill Risk Analysis: Pacific Outer Continental Shelf Program. OCS Report MMS 2000-057. August 2000.

NOAA. 2015. GNOME: Santa Barbara Channel User's Guide. Accessed April 30, 2015: http://response.restoration.noaa.gov/sites/default/files/Gnome_SantaBarbara_UG.pdf

National Research Council (NRC). 2003. Oil in the sea III: Inputs, fates, and effects (Committee on Oil in the Sea: J.N. Coleman, J. Baker, C. Cooper, M. Fingas, G. Hunt, K. Kvenvolden, J. McDowell, J. Michel, K. Michel, J. Phinney, N. Rabalais, L. Roesner, and R.B. Spies). Washington, DC: National Academy Press. 265 pp.

Science Applications, Inc. 1984. Final Environmental Impact Statement/Report for Santa Ynez Unit/Las Flores Canyon Development and Production Plan Proposed by Exxon Company U.S.A. Prepared for U.S. Minerals Management Service, California State Lands Commission, and County of Santa Barbara.

State Lands Commission, Port of Long Beach, and the United States Geological Survey (SLC, PLB, and USGS). 1978. EIR-EA Shell OCS Beta Unit Development. Volumes I-IV.

USGS. 1975. Final EIS Oil and Gas Development in the Santa Barbara Channel Outer Continental Shelf Off California. Vol 1, 2, 3

Zelenke, B., C. O'Connor, C. Barker, C.J. Beegle-Krause, and L. Eclipse (Eds.). (2012). General NOAA Operational Modeling Environment (GNOME) Technical Documentation. U.S. Dept. of Commerce, NOAA Technical Memorandum NOS OR&R 40. Seattle, WA: Emergency Response Division, NOAA. 105 pp. http://response.restoration.noaa.gov/gnome_manual

Defendants' Exhibit 3

Transmittal letter to NMFS



# United States Department of the Interior

BUREAU OF OCEAN ENERGY MANAGEMENT

Pacific OCS Region
760 Paseo Camarillo, Suite 102
Camarillo, CA 93010-6064

MAR 2 7 2017

Ms. Penny Ruvelas
Protected Resources Division
National Marine Fisheries Service
501 West Ocean Blvd., Suite 4200
Long Beach, CA 98002-4213

Dear Ms. Ruvelas:

The Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE) submit the attached Biological Assessment for the purpose of consultation under Section 7 of the Endangered Species Act (ESA). We re-initiated this consultation process by letter dated September 1, 2011.

The Bureaus jointly manage offshore energy development on the United States Outer Continental Shelf. Oil and gas development and production operations in our Southern California Planning Area were initiated more than fifty years ago and continue to this day. In this planning area, we formally consulted with the National Marine Fisheries Service (NMFS) on each offshore lease sale we conducted and on each development and production plan submitted for our review and approval. We have also informally consulted on actions related to day-to-day management actions we have taken to support existing oil and gas production operations. The attached assessment represents our latest comprehensive review of present and future offshore oil and gas activities in the Southern California Planning Area and the potential effects of these activities on species that are listed as endangered or threatened by NMFS.

Routine activities considered in this Biological Assessment include our review of development and production plans, applications for permits to drill or modify wells, oil spill response exercises and implementation of our inspection program. We also consider intermittent and less predictable actions including approval of infrastructure repairs (e.g., pipeline repair), structural improvements (e.g., conductor installations) and geological and geophysical surveys that may require additional consultation when detailed proposals are submitted. Finally, we discuss future actions including approval of decommissioning of offshore facilities that will likely require further consultation with NMFS as decommissioning applications are developed.

Based on the analysis in the enclosed Biological Assessment, we find that the proposed activities may affect, but are not likely to adversely affect the following species and any designated critical habitat: Blue Whale, Fin Whale, Humpback Whale, North Pacific Right Whale, Sei Whale, Sperm Whale, Western Gray Whale, Guadalupe Fur Seal, Leatherback Sea Turtle, Loggerhead Sea Turtle, Green Sea Turtle, Olive Ridley Sea Turtle, Green Sturgeon, Steelhead Trout, White Abalone, and Black Abalone. We seek your concurrence on these findings.

Ex. 3, Page 1

For intermittent activities that lack specific detail sufficient for ESA consultation at this time, as described in the Biological Assessment, we will continue to consult as necessary when information becomes available.

Finally, for future decommissioning of offshore facilities, we ask that you consider this biological assessment as an incremental step assessment for the purposes of ESA consultation.

Thank you for your consideration. If you have any questions about the Biological Assessment or our findings, please contact Greg Sanders at greg.sanders@boem.gov, or 805-384-6396.

Sincerely,

Joan R. Barminski

Enclosure: Biological Assessment

Ex. 3, Page 2

E.R. 0906

Defendants' Exhibit 4

Transmittal letter to FWS



# United States Department of the Interior

## BUREAU OF OCEAN ENERGY MANAGEMENT

Pacific OCS Region
760 Paseo Camarillo, Suite 102
Camarillo, CA 93010-6064

Memorandum                                     MAR 2 7 2017

To:        Steve Henry, Field Supervisor, U.S. Fish and Wildlife Service, Ventura Fish and
           Wildlife Office, Ventura, California

From:      Joan R. Barminski, Regional Director, Bureau of Ocean Energy Management,
           Pacific Region, Camarillo, California

Subject:   Consultation under Section 7 of the Endangered Species Act, Outer Continental
           Shelf Oil and Gas Development and Production Activities in the Southern
           California Planning Area, Santa Barbara, Ventura, and Los Angeles Counties,
           California

The Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and
Environmental Enforcement (BSEE) submit the attached Biological Assessment for the purpose
of consultation under Section 7 of the Endangered Species Act (ESA). We re-initiated this
consultation process by Memorandum dated September 1, 2011.

The Bureaus jointly manage offshore energy development on the United States Outer
Continental Shelf. Oil and gas development and production operations in our Southern
California Planning Area were initiated more than fifty years ago and continue to this day. In
this planning area, we formally consulted with the U.S. Fish and Wildlife Service (FWS) on each
offshore lease sale we conducted and on each development and production plan submitted for
our review and approval. We have also informally consulted on actions related to day-to-day
management actions we have taken to support existing oil and gas production operations. The
attached assessment represents our latest comprehensive review of present and future offshore oil
and gas activities in the Southern California Planning Area and the potential effects of these
activities on species that are listed as endangered or threatened by FWS.

Routine activities considered in this biological assessment include our review of development
and production plans, applications for permits to drill or modify wells, oil spill response
exercises and implementation of our inspection program. We also consider intermittent and less
predictable actions including approval of infrastructure repairs (e.g., pipeline repair), structural
improvements (e.g., conductor installations) and geological and geophysical surveys that may
require additional consultation when detailed proposals are submitted. Finally, we discuss future
actions including approval of decommissioning of offshore facilities that will likely require
further consultation with FWS as decommissioning applications are developed.

Ex. 4, Page 1

Based on the analysis in the enclosed Biological Assessment, the Bureaus have determined that the activities may affect, but are not likely to adversely affect, Light-footed Ridgway's Rail (*Rallus obsoletus levipes*), Tidewater Goby (*Eucyclogobius newberryi*), Salt Marsh Bird's-Beak (*Cordylanthus maritimus* ssp. *maritimus*), Marbled Murrelet (*Brachyramphus marmoratus*), and California Red-legged Frog (*Rana aurora draytonii*). We seek your concurrence on our determination of not likely to adversely affect these species and their designated critical habitat.

Additionally, we find that the activities may affect, and are likely to adversely affect, the California Least Tern (*Sterna antillarum browni*), Southern Sea Otter (*Enhydra lutris nereis*), and Western Snowy Plover (*Charadrius nivosus nivosus*) and its critical habitat. We seek formal consultation regarding these species.

Finally, for future decommissioning of offshore facilities, we ask that you consider this Biological Assessment as an incremental step assessment for the purposes of ESA consultation.

Thank you for your consideration. If you have any questions or require any additional information, please contact David Pereksta of my staff at david.pereksta@boem.gov or (805) 384-6389.

Attachment: Biological Assessment

Defendants' Exhibit 5

Biological Assessment to FWS

# Offshore Oil and Gas Development and Production Activities in the Southern California Planning Area

# Biological Assessment
# U.S. Fish and Wildlife Service Regulated Endangered and Threatened Species






Prepared for the U.S. Fish and Wildlife Service

In Accordance with Section 7(c) of the Endangered Species Act of 1973,
as Amended

**March 2017**

Ex. 5, Page 1

## 1. INTRODUCTION

Leasing, exploration, development and production of offshore oil and gas reserves on the outer continental shelf of the Pacific Coast began in the early 1960's. Initially, the Bureau of Land Management (BLM) was responsible for leasing areas of the outer continental shelf and the U.S. Geological Survey (USGS) provided oversight for exploration, development and production of offshore oil and gas resources. In 1982, the Minerals Management Service (MMS) was created to oversee all outer continental shelf oil and gas leasing, exploration, development and production. In 2010, MMS was renamed the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE) and the Office of Natural Resource Revenues (ONRR) was spun off from BOEMRE that year. The following year, the Office of Natural Resource Revenues (ONRR) was created and BOEMRE was split into two new bureaus: the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE). With this reorganization, BOEM retains the authority for managing and issuing decisions on oil and gas leasing on the outer continental shelf, as well as approving exploration and development and production plans, and issuance of geological and geophysical permits. BSEE retains the authority to review and approve permits for drilling, rights-of-way and pipeline installations, decommissioning of offshore structures as well as day-to-day inspection and enforcement actions associated with offshore oil and gas production.

BOEM and BSEE are independent bureaus but their missions are clearly linked and they share many functions. For example, BOEM currently assists BSEE with environmental reviews and BSEE handles many human resource and administrative functions for BOEM. For this biological assessment, we reflect on past Endangered Species Act (ESA) consultations, identify reasonably foreseeable future BOEM and BSEE actions, and consider the potential effects of these actions on species currently listed by the U.S. Fish and Wildlife Service (USFWS) as endangered or threatened.

## 2. RANGE AND SCOPE OF FUTURE BOEM AND BSEE ACTIONS FOR OFFSHORE OIL AND GAS IN THE SOUTHERN CALIFORNIA PLANNING AREA

The range and scope of reasonably foreseeable future BOEM and BSEE (Bureaus) actions has been significantly reduced over the last 30 years. Lease sales and major construction activities identified in existing biological opinions have either been completed or abandoned. There are no plans to conduct new lease sales at this time and no new platforms are expected to be installed in the foreseeable future. Emphasis has shifted from leasing new areas to maximizing the development of oil and gas resources within the range of existing platforms and infrastructure. This programmatic biological assessment describes the current and expected level of activities associated with the continued development and production of oil and gas reserves within the Southern California Planning Area and reexamines potential effects on endangered and threatened species under USFWS jurisdiction.

This assessment is intended to supplement and combine earlier assessments and endangered species consultations for routine oil and gas development activities that are currently underway or are reasonably foreseeable in the Southern California Planning Area. The Bureaus will continue to coordinate with USFWS on future actions as they are considered in the Pacific Region. This on-going coordination may confirm that an action is included within the scope of this programmatic assessment or that additional consultation would be required. For example, decommissioning of offshore facilities is discussed in this document but the Bureaus anticipate

that project specific coordination and consultation will be necessary when a detailed decommissioning plan is submitted.

<u>Description of the Southern California Planning Area</u>

The Bureaus' Southern California Planning Area extends from the Monterey/San Luis Obispo County line southward to the Mexican border and includes waters from 3-200 miles from shore. For the purpose of this biological assessment, the Southern California Planning Area is considered the action area for potential effects on endangered and threatened species.

As of March 2017, there are 41 active producing leases in the Southern California Planning Area with 23 Federal platforms and 213 miles of pipelines that transport oil and gas to shore. Since 1963, more than 1,450 exploration and development wells have been drilled in this area with more than 1.3 billion barrels of oil and 1.8 trillion cubic feet of natural gas produced through September 2016. There are now fewer than 400 active development wells at any given time and this number is not expected to change substantially in the foreseeable future. Approximately 260 million barrels of oil and 540 billion cubic feet of natural gas are estimated to remain in oil and gas fields within reach of existing platforms in the Southern California Planning Area.

Oil production rates peaked at more than 200,000 barrels per day in1996 and have declined in subsequent years to a production rate of about 50,000 barrels per day. Since May 2015, oil production has been temporarily reduced to about 17,000 barrels per day as the result of an onshore pipeline failure.

Gas production has followed a similar declining trend with a production rate of about 77 million cubic feet per day. Gas production has also been affected by the 2015 onshore pipeline failure resulting in a temporary rate of about 13 million cubic feet per day.

Overall, offshore oil and gas production in the Southern California Planning Area is expected to continue to decline gradually over time with drilling and production activities continuing as long as oil and gas can be produced in paying quantities.

<u>BOEM/BSEE Actions and Activities</u>

Brief descriptions of bureau actions and associated activities are provided below. They are listed in a roughly chronological order from leasing of the outer continental shelf to decommissioning (removal) of offshore oil and gas facilities including the bureau responsible for approving each activity. We do not expect all of these actions and activities to occur in the foreseeable future. We will continue to coordinate and consult with USFWS on future actions that are not considered ready for consultation at this time.

(1)     Lease Sales and Issuance of Leases (BOEM)

A primary BOEM function is the sale and issuance of Outer Continental Shelf leases for energy development; however, in the Southern California Planning Area no oil and gas leases have been offered since 1984. From 1984-2008, Congressional and Presidential moratoriums were in effect that prohibited oil and gas lease sales offshore California. Although these moratoriums were either rescinded or allowed to expire, planning areas offshore California are not included in BOEM's 2017-2022 leasing program.

*Projected Activity*: There are no plans to conduct oil and gas lease sales or issue new leases in the Southern California Planning Area and therefore we are not considering future leasing actions in this biological assessment.

Ex. 5, Page 3

(2)    APPROVAL OF OIL AND GAS EXPLORATION PLANS AND GEOLOGICAL AND GEOPHYSICAL
        PERMITS

Exploration Plans: Upon issuance of a lease, drilling of exploratory wells and associated
activities are subject to BOEM-approved exploration plans [30 CFR 550.201]. Since 1963, 295
exploration wells have been drilled in the Southern California Planning area with the last
exploratory well completed in 1989 (MMS 1992). These exploratory wells were drilled using
jack-up rigs, mobile offshore drilling units (MODUs) or ships. Currently there are no active
exploration plans or exploratory drilling activities occurring in the Southern California Planning
Area.

Geological and Geophysical Survey Permits: BOEM requires permits for geological and
geophysical (G&G) surveys conducted for the purpose of collection of oil, gas or sulphur data on
the Outer Continental Shelf whether they be for exploration or scientific research [30 CFR
551.4]. G&G surveys are generally exploratory in nature and may include high energy seismic
surveys.  G&G surveys that precede leasing (or are otherwise off lease) require a permit.  G&G
activities on an existing lease, to further delineate known oil and gas production fields, for
example, are authorized through the lease instrument or exploration plans rather than through
permits.

In the Southern California Planning Area, the most recent G&G permit was issued by MMS in
1995. In 1999, the California State Lands Commission, MMS and the National Marine Fisheries
Service (NMFS) finalized a coordinated process for future review of G&G permit applications in
the geographic area extending from the Monterey Bay National Marine Sanctuary south to the
Mexican border in State and Federal waters (California State Lands Commission (CSLC) and
MMS 1999). This High Energy Seismic Survey (HESS) review process was the result of a 2-year
consensus-building effort among stakeholders. In this process, NMFS was identified as the lead
agency for ESA consultations for high energy seismic surveys in recognition of their requirement
to issue Incidental Harassment Authorizations (IHAs) under the Marine Mammal Protection Act.

*Projected Activity*: BOEM does not anticipate new exploration plans to be submitted in the
absence of a leasing program for the Southern California Planning Area, which is not reasonably
foreseeable at this time. Likewise, requests for BOEM to permit G&G surveys in the Southern
California Planning Area are not anticipated. Accordingly, we are not considering G&G surveys
in this biological assessment. Should a G&G permit be requested in the future, we expect to
consult with USFWS at that time, as appropriate.

(3)    APPROVAL OF OIL AND GAS DEVELOPMENT AND PRODUCTION PLANS AND PLAN
        REVISIONS (BOEM)

Offshore oil and gas development and production activities must be conducted in accordance
with plans approved by BOEM [30 CFR 550.201]. The content and level of detail for
development and production plans in the Southern California Planning Area have varied over
time but all describe proposed infrastructure (e.g., platforms, pipelines and power cables),
activities and general strategies for production of oil and gas.  A number of day-to-day
production and development activities, described below, are components of plans.

Discharges and Emissions: BOEM regulations require operators to submit a copy of their
application for a National Pollutant Discharge Elimination System (NPDES) permit from the
Environmental Protection Agency (EPA) with their development and production plans [30 CFR

Ex. 5, Page 4

550.248]. BSEE regulations prohibit unauthorized discharges of pollutants into offshore waters [30 CFR 250.300]. Fluid and solid discharges from Federal oil and gas development and production facilities in southern California are authorized by EPA under general NPDES permit CAG 280000. This permit authorizes 22 types of discharges from all Federal offshore platforms in southern California including drilling muds and cuttings; produced water; well treatment, completion and workover fluids (including fluids associated with hydraulic fracturing and acidization); deck drainage; sanitary wastes and domestic wastes; non-contact cooling water; and fire control test water (EPA 2014). In 2013, EPA Region 9 re-evaluated the potential effects of these discharges on ESA listed species and critical habitat for the offshore lease blocks considered active by BOEM. They concluded that readily available evidence supports the conclusion that the discharges would have no effect on endangered or threatened species. They forwarded their conclusion to NMFS and received no comments (EPA 2013).

BOEM air emission information requirements for development and production plans are found at 30 CFR 550.249. In the Southern California Planning Area, responsibility for air quality management is delegated by EPA to local air quality control boards that monitor and enforce air quality requirements for offshore oil and gas development and production. BOEM and BSEE work with the local air quality control boards to ensure that their requirements are met.

Support Vessel and Operator Aircraft Activity: Day-to-day offshore oil and gas development and production operations require routine personnel and equipment transfers. Crew and supply boats depart the coast approximately 30 times per day along pre-determined routes from Seal Beach Pier (public pier, Orange County), Terminal Island (Port of Los Angeles), Port Hueneme, Carpinteria Pier (private pier, Santa Barbara County) and Ellwood Pier (private pier, Santa Barbara County) to nearby offshore platforms. Approximately 3-4 helicopter trips per day are used to transport personnel from the Santa Maria Airport to platforms north of Point Conception. Larger pieces of equipment and certain support services (e.g., commercial dive services) are mobilized from the Port of Long Beach, the Port of Los Angeles, Port Hueneme and, to a limited extent, Santa Barbara Harbor.

Platform Lighting: All offshore platforms provide lighting of all decks to maintain safe working conditions and support production operations conducted throughout the night. Using composite night satellite imagery, light emittance has been measured at three typical platforms (Grace, Hermosa and Heritage),showing integrated density values ranging from 390 to 806 over a 12 square kilometer area for each platform (Hamer et al. 2014). On a clear night, all California platforms are visible from the nearby coast.

*Projected Activity*: All major construction activities, under approved development and production plans in the Southern California Planning Area, have either been completed or are no longer being considered. We do not anticipate new development and production plans to be submitted in the absence of a leasing program but existing plans may be revised or supplemented if substantive changes are made. BOEM's regulations at 30 CFR 550.283 provide specific instances where revisions to development and production plans are necessary: 1) Change in the type of drilling, production facility or oil/gas transportation mode; 2) Change in the location of a drilling or production facility; 3) Change in the type of production or significant increase in production volume or oil storage capacity; 4) Increased air emissions exceeding the amount specified in the development and production plan; 5) Significant increase in solid or liquid wastes handled or discharged; 6) Request for new hydrogen sulfide area classification; 7)

Ex. 5, Page 5

Change in location of onshore support base from one State to another or expansion of a support base; or, 8) Change in other activity as specified by the Regional Supervisor.

Although we cannot predict what revisions may be requested, we are reviewing the effects of the ongoing discharges, emissions, vessel use, aircraft use, and platform lighting taking place under existing development and production plans in this assessment.

(4)   APPROVAL OF APPLICATIONS FOR PERMIT TO DRILL AND APPLICATIONS FOR PERMIT TO MODIFY (BSEE)

General plans for drilling for oil and gas are included in exploration plans and development and production plans approved by BOEM. However, drilling of individual wells must be reviewed and approved by BSEE [30 CFR 250.410]. An Application for Permit to Drill (APD) is used to approve drilling specifications for new wells, new sidetrack wells, and bypasses or deepening of existing wells. Drilling of new wells may also include the installation of conductors which establish a conduit from the deck of the platform to the sea floor.

An Application for Permit to Modify (APM) is required when an approved APD is revised or materially changed [30 CFR 250 subpart D]. Well completion and workover operations, for example, are conducted to establish, maintain or restore production of a well and are generally approved with an APM [30 CFR 250 subparts E and F]. These operations may include hydraulic fracture treatments and other well stimulation techniques (e.g., acidization) that are designed to enhance recovery of oil and gas resources. BSEE may also issue well completion or workover field rules to modify specific requirements [30 CFR 250.512 and 30 CFR 250.612].

<u>Well Stimulation Treatments</u>: BSEE may authorize several types of well stimulation treatments through their approval of an APD or APM. These include:

Diagnostic Fracture Injection Tests – A diagnostic fracture injection test is used to estimate key reservoir properties and parameters that are needed to optimize a main fracture job. It is a short duration procedure that involves the injection of typically less than 100 bbl of fracturing fluid at pressures high enough to initiate a fracture. Key parameters are estimated from the fluid volume injected and the pressure dissipation profile. The fluid used in a diagnostic fracture injection test is typically the fluid that would be used in the main fracture treatment but with no proppant[1] added, thus allowing the fracture to close naturally as pressure is released.

Hydraulic Fracturing – Hydraulic fracturing involves the injection of a fracturing fluid at a pressure (as typically determined by a diagnostic fracture injection test) needed to induce fractures within the producing formation. The process generally proceeds in three sequential steps: (1) injection of a fracturing fluid without proppant to create fractures which extend out from the well; (2) injection of a slurry of fracturing fluid and proppant; and (3) injection of breakers, chemicals added to reduce the viscosity of the fracturing fluid. Upon release of pressure, the fracturing fluid is allowed to flow back (the flowback fluid) to the surface platform. Key fluid additives include polymer gels which increase the viscosity of the fluid and allow it to more easily carry proppant into the fractures, crosslinker compounds that help further increase the fluid viscosity, and breaker chemicals which break down the crosslinked polymers and allow them to return more readily to the surface after fracturing is completed. Other important

---

[1] A proppant is a solid material, typically sand, treated sand, or man-made ceramic materials, designed to keep an induced fracture open during or following a fracture treatment.

Ex. 5, Page 6

E.R. 0916

additives may include pH buffers, clay control additives, microbial biocides, and surfactants to aid in fluid recovery. In offshore applications, the base fracturing fluid is filtered seawater.

Acid Fracturing – Acid fracturing is similar to hydraulic fracturing except that instead of using a proppant to keep fractures open, an acid solution is used to etch channels in the rock walls of the fractures, thereby creating pathways for oil and gas to flow to the well. As with a hydraulic fracturing well stimulation treatment, a pad fluid is first injected to induce fractures in the formation. Next, the acid fracturing fluid is injected at pressures above the formation fracture pressure and allowed to etch the fracture walls. The acid fracturing fluid is typically gelled, cross-linked, or emulsified to maintain full contact with the fracture walls. Fifteen percent hydrochloric acid (15% HCl) solutions are typically used in carbonate formations such as limestone and dolomite, while hydrofluoric acid (HF) solutions and HCl/HF mixtures are used in sandstone and Monterey shale formations and in other more heterogeneous geologic formations, typically at levels of 12% and 3%, respectively. The fracturing fluid typically also includes a variety of additives at a combined concentration on the order of 1% or less, such as inhibitors to prevent corrosion of the steel well casing, and sequestering agents to prevent formation of gels or iron precipitation which may clog the pores.

Matrix Acidizing – In matrix acidizing, a non-fracturing treatment, an acid solution, is injected into a formation where it penetrates pores in the rock to dissolve sediments and muds. By dissolving these materials, existing channels or pathways are opened and new ones are created, allowing formation fluids (oil, gas, and water) to move more freely to the well. Matrix acidizing also removes formation damage around a wellbore, which also aids oil flow into the well. The acid solution is injected at pressures below the formation fracture pressure and is thus a non-fracturing treatment. Three distinct fluids are commonly used sequentially: (1) an HCl acid preflush fluid; (2) a main acidizing fluid generated from mixing HCL and ammonium bifluoride to produce an HCl/HF mud acid at typically 12% and 3%, respectively (some operations use mud acid while some operations primarily use 15% HCl); and (3) an ammonium chloride overflush fluid. The acidizing fluid also includes a variety of additives at a combined concentration of on the order of 1% or less, similar to those used in acid fracturing.

Installation of Well Conductors: BSEE may authorize installation of conductors with an APD. Conductors are large pipes that carry oil and gas from the sea floor to the deck of an offshore platform. They are inserted through "slots" in the platform structure that guide and support this component of a well. The majority of the conductors are installed when a platform is constructed but some slots may be left empty with a conductor being installed at a later date. Installation of a conductor may require impact, vibratory or rotary methods to drive the conductor into the sea floor thus making this operation analogous to a pile-driving operation.

The dimensions of the conductors, equipment used, specific location and timing are important variables when considering potential sound impacts. Where sound is expected to affect marine mammals an incidental harassment authorization will be required and NMFS will conduct an ESA consultation when specific information for a project becomes available. We expect to cooperate with NMFS in the preparation of ESA consultation documents as conductor installation projects are proposed.

*Projected Activity.* BSEE expects to review and approve approximately 1-2 new and 5-7 sidetrack wells (APDs) and 2-4 well workovers and up to 5 well stimulation treatments (APMs) per year in the Southern California Planning Area. Issuance of APDs for conductors installations

Ex. 5, Page 7

are driven by availability of open slots and operator drilling plans. Requests for conductor installations are expected to be sporadic.

Of the more than 1,450 exploration and development wells that have been drilled in Federal waters on the Pacific Outer Continental Shelf between 1982 and 2014, there have been only 21 hydraulically fractured completions, and these were conducted on only 4 of the 23 platforms in the Southern California Planning Area. Three of these were in the Santa Barbara Channel, and the fourth was in the Santa Maria Basin. Only three matrix acidizing treatments, defined as well stimulation treatments, occurring in OCS waters during a similar time frame (between 1985 and 2011) have been identified in records, and these were conducted on only 2 of the 23 platforms.

Given the past occurrence of well stimulation treatments in the Southern California Planning Area and the indicated plans for industry known at this time, we expect up to five well stimulation requests per year. This estimate is conservative in its approach, given that this potentially overestimates the potential for impacts since there is no year on record where five well stimulation treatments were approved. Given the small number of operating platforms and the current level of oil and gas activities, a higher number of well stimulation treatments proposed in a single year is not reasonably foreseeable.

(5)     APPROVAL OF PIPELINE INSTALLATIONS AND PIPELINE MODIFICATIONS (BSEE)

Installation, modification or abandonment of offshore oil and gas pipelines requires approval by BSEE [30 CFR 250.1000]. All planned pipelines in the Southern California Planning Area have been installed. BSEE does occasionally receive requests for pipeline repair and/or replacement of existing pipelines.

*Projected Activity*: No pipeline applications are pending or expected at this time, however, we expect to coordinate and consult with USFWS as pipeline applications are received and when specific information (e.g., location, timing, methods and equipment requirements) for a project proposal becomes available.

(6)     BSEE INSPECTION PROGRAM – HELICOPTER FLIGHTS (BSEE)

BSEE inspectors are on duty every day of the year to ensure compliance with BOEM and BSEE requirements. BSEE maintains a contract for helicopter services for flights from Camarillo Airport to offshore platforms. Average flight usage over the last 5 years has been 45,000 to 50,000 miles per year. BSEE minimizes flight time by inspecting platforms in proximity to each other or dropping off inspectors at closer platforms before continuing to outlying platforms. Flight time is divided among all the facilities, but flight time to individual facilities can vary greatly depending on activity levels or complexity of the inspection mission and proximity of the platform to Camarillo Airport. Helicopter flight paths are generally over water but can vary dependent on weather conditions. Unless safety (e.g., poor visibility) is an issue, transit flight heights are generally maintained at levels greater than 500 feet. Note that BSEE inspectors may make use of operators' crew boats to access the offshore facilities. These boats make regularly scheduled transits to platforms and are addressed under the Support Vessel and Operator Aircraft activity above. BSEE inspectors never use an operator's helicopter to access platforms.

*Projected Activity*: The BSEE inspection program is expected to be active as long as oil and gas is produced offshore. Helicopter use is expected to continue at a level comparable to past years – 45,000 to 50,000 miles per year.

(7)    BSEE INITIATED OIL SPILL RESPONSE EQUIPMENT EXERCISES (BSEE)

BSEE is expected to ensure that offshore operators have oil spill response plans and that they are prepared to implement these plans should an oil spill occur. To meet this expectation, BSEE periodically directs operators to deploy industry-owned oil spill response equipment listed in their response plans. For any given exercise, equipment deployed may include oil spill boom, mechanical skimmers, response vessels, oil storage equipment, aircraft and marker buoys as described below:

Oil Spill Boom – Booms are floating, physical barriers to oil, made of plastic, metal, or other materials, which slow the spread of oil and keep it contained. While booms can be seen above the waterline, they may have between 18 and 48 inches of material known as a "skirt" that hangs beneath the surface. The largest sizes of boom are used for offshore responses. Containment boom comes in lengths of 500 feet or more and can be connected together into lengths reaching 1,500 feet. Depending on the cleanup tactic being exercised, boom can be deployed directly from a facility by its assigned small boats[2] or by an oil spill removal organization (OSRO) deployed to the scene. For offshore operations boom may be deployed to completely encircle the platform. It may also be deployed in various configurations (i.e., U-shape, V-shape, J-shape) by one to three vessels coordinating their operations to simulate tactics for corralling spilled oil. When boom is deployed in the U-shaped, V-shaped, or J-shaped configurations, it is often done so in conjunction with a deployment of mechanical skimming device(s). For nearshore[3], boom designed for oil diversion or exclusion from sensitive areas can be of various shapes and lengths. Depending on the environmental conditions (i.e., sheltered harbor, fast currents) different boom sizes, means of floatation, and their means of inter-connection will need to be evaluated and selected. Boom deployed in nearshore and on-shore environments generally are moored in place with the use of anchor and weight systems or onshore staking.

Mechanical Skimmers - Skimmers are mechanical devices that remove free floating or corralled oil from the surface of the water. Depending on the specific model these devices can pump anywhere from 100 gallons per minute (gpm) to 1000 gpm. Two general types are commonly used in the Pacific Region. Weir skimmers come in several configurations and essentially work like a dam. The weir is adjusted to a height when deployed where oil floating on the water is drawn over the top of the dam at a collection inlet and store in a compartment connected to a pump inside the skimmer. Oleophilic surface skimmers are constructed with materials that attract oil and repel water. The material is incorporated into belts, disks, mop chains, or brushes which are squeezed or scraped in the skimmer to collect oil into various storage devices. Both types of skimmers can be constructed as a permanent part of a vessel's physical design or to float free from a vessel. For offshore oil cleanup, weir and oleophilic skimmers are generally deployed and maneuvered by vessels through an oil slick to actively collect the oil. For example, a vessel can extend a short length of boom on a fixed arm (side collector) to herd oil to an inlet leading to a skimmer. As the vessel moves forward, oil is forced to accumulate in the apex of the boom where the skimmer is located, thereby concentrating the oil by increasing the amount of oil relative to water at the skimmer. Skimmers can also be deployed at an opening at the apex of two booms being towed between two vessels to recover oil that is forced into the apex. In this

---

[2] Presently, six of the Federal platforms and four platforms in state waters have boom stored onboard. The remaining facilities rely on boom supplied by an oil spill response organization.
[3] Nearshore, defined for the purposes of this document, is the ocean outside of the surf zone and within 1 mile of shore.

8

configuration, the collected oil is typically pumped to a storage barge or other vessel with containment tanks stationed near the apex.

Response Vessels – Self-propelled vessels stationed specifically at offshore facilities or provided by an oil spill response organization can engage in a variety of spill response activities. They serve as platforms to deploy and maneuver boom and mechanical skimmers, ferry equipment and personnel, conduct spill surveillance, apply dispersants, and to tow temporary oil storage devices and barges. Vessels used for these activities range in size from 12-ft skiffs to 207-ft oil spill response vessels. Some vessels used for spill response can achieve speeds up to 30 knots. They are usually dispatched within the first hour of a deployment exercise and achieve their highest speeds when transiting to the site of the simulated spill. Once on scene, vessels generally transit at very low speeds (0 to 5 kts) to conduct spill response operations.

Oil Storage Equipment – Towable temporary oil storage devices are designed to hold and transport recovered oil from a spill site. They are made of rubber or polymer-coated fabrics of various weights and designs and have capacities that range from a few gallons to more than 300,000 gallons. There are three types of towable temporary oil storage devices in use today. The first is a towable, rectangular-shaped, pillow tank, similar to those used on land (i.e., emergency potable water storage), but equipped with special tow rigging. The second type is a towable flexible tank, or "bladder," which is long and cylindrical in shape. When full, it is largely submerged and is characterized by flexibility along the length of the device. The third type of device is a towable open tank, an inflatable barge-type vessel with an open-top storage bag suspended inside the main structure. In addition to the temporary oil storage devices, metal or inflatable barges (sometimes called mini-barges) designed for temporary oil storage can be towed or pushed by a vessel during an exercise. These barges generally have a maximum storage capacity of 250 bbls and can be of various lengths.

Aircraft – Helicopters are versatile platforms that can be used for a number of spill response activities. During an exercise, they may be launched from the local Santa Barbara area to demonstrate remote sensing capabilities or simulate dispersant application in a designated offshore area. For the latter activity, helicopters equipped with 32-ft sprayer arms or suspended 250-gal buckets would fly over the exercise area and discharge water to simulate dispersant application. Helicopters may also be deployed in an exercise to drop an incendiary device such as a Heli torch to practice in-situ burn operations. However, it is anticipated that the latter exercise activity would be seldom performed and if conducted, would not involve a device that was actually ignited. Similar to rotary wing assets, fixed wing assets may be deployed in exercises to demonstrate remote sensing and dispersant application activities. For exercises in the Pacific Region, a King Air BE90 aircraft in Concord, CA and a C-130 aircraft in Mesa, AZ could be activated to conduct a coordinated simulated dispersant application operation. In such an exercise, BSEE would request the activation of both assets so that the King Air could provide spotter information to the pilots of the C-130 as the latter aircraft sprayed water in simulated dispersant application runs. This type of coordinated air operations would occur during an actual spill response and BSEE would use an exercise to evaluate the response times and effectiveness of the coordinated operations by the OSRP plan holder. Aerostats are balloon-like systems that are self-contained, compact platforms that can deploy multiple sensor payloads and other devices into the air. They can generally lift payloads less than 50 pounds and up to 500 ft into the air using a winch-controlled launch and recovery system from a vessel or platform. They are used to

9

Ex. 5, Page 10

survey the extent of an oil spill and provide responders with real-time data to better guide operations.

Marker Buoys – Buoys may be used to demarcate the location of the simulated oil slick. They usually have a weighted, cone-shaped buoy body with a vertically extending narrow, fiber glass pole topped with a highly visible flag. Response vessels are to "capture the flag" to show success in a drill.

*Projected Activity*. Based on the number of oil spill response plans currently overseen by BSEE in the Pacific Region, normally three BSEE initiated oil spill exercises involving table-top scenarios and/or equipment deployments are conducted annually. However, more than three exercises may be initiated by BSEE if an owner/operator needs to be retested or if new oil spill response plans are approved in the Region. Equipment deployments during an exercise generally occur for a few hours and rarely longer than a day. BSEE will rarely initiate nighttime equipment deployment for safety reasons unless a low visibility response capability of an owner/operator needs to be evaluated. When mechanical skimmers are deployed and operated during an exercise, they are typically done so for approximately ten minutes to ensure that they are working properly. BSEE personnel will observe the operation of these devices and generally will be satisfied with their performance when the skimmers are sufficiently drawing and discharging water from and to the marine environment.

(8)   Decommissioning (BSEE)

During exploration, development, and production operations. The seafloor around activity sites within a proposed lease sale area becomes the repository of temporary and permanent equipment and structures. The structures are generally grouped into two main categories depending upon their relationship to the platform/facilities. (i.e., piles, jackets, caissons, templates, mooring devises, etc.) or the well (i.e., wellheads, casings, casing stubs, etc.).

All 23 existing offshore platforms and associated pipelines in the Southern California Planning Area will be decommissioned after oil and gas reserves have been produced. BSEE approves permanent plugging of wells, full or partial removal of platforms and pipelines, and site clearance activities [30 CFR Subpart Q]. Offshore operators are required to submit applications for decommissioning to the BSEE Pacific OCS Region at least 2 years prior to ceasing oil and gas production.

Decommissioning of each platform may take more than a year of deconstruction effort depending on the size of the platform, location and availability of equipment. First, all wells will be permanently abandoned and well conductors and casings severed a minimum of 15 feet below the sea floor. Later, oil and gas processing equipment and deck modules (e.g., living quarters) will be removed and shipped to shore for disposal. The decks and supporting platform jacket (legs and cross members) will then be cut into smaller pieces for removal. A derrick barge with 500 to 2000 ton lift capacity will be required for lifts at the platform site along with one or more 300-400 foot cargo barges to transport recovered materials to shore.

A varied assortment of severing devices and methodologies has been designed to cut structural targets during the course of decommissioning activities. These devices are generally grouped and classified as either non-explosive or explosive, and they can be deployed and operated by divers, ROVs, or from the surface. Which severing tool the operators and contractors use takes into

consideration the target size and type, water depth, economics, environmental concerns, tool availability, and weather conditions.

Nonexplosive severing tools are used for a wide array of structure and well decommissioning targets in all water depths. Based on 10 years of historical data (1994-2003) from the Gulf of Mexico, nonexplosive severing is employed exclusively on about 37% of platform removals per year. Common nonexplosive severing tools consist of abrasive cutters, diver cutting (e.g., underwater arc cutters and the oxyacetylene/oxy-hydrogen torches), and diamond wire cutters. Many removals in the Gulf of Mexico use explosive technologies either as a prearranged strategy or as a backup method.

Because of concerns over the use of explosives, current decommissioning cost projections for the Southern California Planning Area consider only the use of nonexplosive severing tools for disassembly of platform components; however, the use of explosives cannot be completely ruled out given safety concerns that may arise when considering cuts of this magnitude.

Explosive severance tools can be deployed on almost all structural and well targets in all water depths. Historically, explosive charges are used in about 63% of decommissioning operations in the Gulf of Mexico, often as a backup cutter when other methodologies prove unsuccessful. Explosives work to sever their targets by using (1) mechanical distortion (ripping), (2) high velocity jet cutting, and (3) fracturing or "spalling."

Mechanical distortion is best exhibited with the use of explosives such as standard and configured bulk charges. If the situation calls for minimal distortion and an extremely clean severing, then most contractors rely upon the jet-cutting capabilities of shaped charges. In order to "cut" with these explosives, the specialized charges are designed to use the high-velocity forces released at detonation to transform a metal liner (often copper) into a thin jet that slices through its target. The least used method of explosive severing in the Gulf of Mexico is fracturing which uses a specialized charge to focus pressure waves into the target wall and use refraction forces to spall or fracture the steel on the opposing side.

Offshore oil and gas facilities removed from state waters in California have required both nonexplosive and explosive devices. Devices to be used for the future removal of federal oil and gas facilities in the Southern California Planning Area have yet to be proposed.

Seafloor electrical cables running to shore will be completely removed (pulled onto a vessel) and pipeline segments in less than 200 feet of water will be removed up to the state water boundary. Other sections of pipeline in federal waters will be cleaned and abandoned in place or removed. The fate of pipeline segments in state waters will be determined by the California State Lands Commission.

After all decommissioning work is completed and the structure is salvaged, operators are required to perform site-clearance work to ensure that the sea floor of their lease(s) have been restored to pre-lease conditions. Based upon requirement found in 30CFR subpart Q, operators have the option of either trawling with commercial nets or conducting diver/high resolution sonar surveys of the lease site.

Detailed hypothetical decommissioning scenarios for individual platforms are described in BSEE's "Decommissioning Cost Update for Pacific OCS Region Facilities" (BSEE 2015).

Partial removal of offshore platforms is a possibility. BSEE supports and encourages the reuse of obsolete oil and gas structures as artificial reefs and is a cooperating agency in the

implementation of the National Artificial Reef Plan. In California, any proposed reefing is subject to State legislation that would allow this activity. Structure removal permit applications requesting a departure from decommissioning regulations under the Rigs-to-Reefs Policy (BSEE Interim Policy Document 2013-07) undergo technical and environmental reviews. The policy document details the minimum engineering and environmental standards that operators/lessees must meet to be granted approval to deploy a structure as an artificial reef. Conditions of approval are applied as necessary to minimize the potential for adverse effects to sensitive habitat and communities in the vicinity of the structure and proposed artificial reef site. Additionally, structures deployed as artificial reefs must not threaten nearby structures or prevent access to oil and gas, marine minerals or renewable energy resources.

*Projected Activity*: Currently, no decommissioning applications for the Southern California Planning Area have been submitted. At this time, we are unable to reasonably predict when or where specific decommissioning activities will occur or describe specific activities that have yet to be proposed. This assessment provides a general overview of potential impacts associated with decommissioning. We expect to conduct additional consultations with USFWS after decommissioning applications are received and detailed descriptions of proposed activities are available.

## 3. FEDERALLY LISTED SPECIES/CRITICAL HABITAT CONSIDERED

In this section, we consider the current status of FWS listed species and potential effects of existing offshore oil and gas operations on these species. We also reaffirm or revise our effect determinations for each species based on currently available information.

A summary of our determinations for FWS ESA listed species is provided in Table 3 and supplemental discussion for each species is provided below.

Ex. 5, Page 13

E.R. 0923

Table 3: Summary of Determinations for USFWS ESA Listed Species

| Listed Species | Potential Impacting Factors | Determination for Ongoing Activities | Comments |
|---|---|---|---|
| Western Snowy Plover and critical habitat | Oil Spill | Likely to Adversely Affect | |
| California Least Tern | Oil Spill | Likely to Adversely Affect | |
| Light-footed Ridgway's Rail | Oil Spill | Not Likely to Adversely Affect | Low probability of contact |
| Marbled Murrelet | Artificial Light, Noise, Oil Spill | Not Likely to Adversely Affect | Low probability of species occurrence |
| Southern Sea Otter | Noise, Collision, Oil Spill | Likely to Adversely Affect | LAA - Oil Spills only |
| California Red-legged Frog and critical habitat | Effluent Discharge, Oil Spill | Not Likely to Adversely Affect | Low probability of contact |
| Tidewater Goby and critical habitat | Effluent Discharge, Oil Spill | Not Likely to Adversely Affect | Low probability of contact |
| Salt Marsh Bird's-Beak | Oil spill | Not Likely to Adversely Affect | Low probability of contact |

**Delisted Species Since Prior Consultations**

Several species or taxa have been removed from the list of threatened and endangered species that were included in earlier consultations with the USFWS on BOEM's actions. The following species are no longer listed under the ESA and are not subject to consultation requirements pursuant to section 7:

- Aleutian Cackling (Canada) Goose (*Branta hutchinsii* [*canadensis*] *leucopareia*)
- Brown Pelican (*Pelecanus occidentalis*)
- Bald Eagle (*Haliaeetus leucocephalus*)
- American Peregrine Falcon (*Falco peregrinus anatum*)
- Santa Barbara Song Sparrow (*Melospiza melodia graminea*) - extinct
- Island Night Lizard (*Xantusia* [=*Klauberina*] *riversiana*)

**Listed Species not affected by the Proposed Action**

Past consultations included many listed species that were considered but were later determined to not be affected by proposed offshore oil and gas activities. The current status of these species was reexamined, and listed species not considered in past consultations were also evaluated, in this programmatic biological assessment. We have determined that the continuation of existing offshore oil and gas development and production activities in the Southern California Planning Area will have no effect on the following listed species:

**California Condor**. The California Condor (*Gymnogyps californianus*) was listed as endangered on March 11, 1967 (32 FR 4001) and had critical habitat designated on September 22, 1977 (42 FR 47840). All free-ranging California Condors were removed from the wild by 1987 for captive breeding. Since 1992, California Condor chicks have regularly been released to the wild and the

Ex. 5, Page 14

total world population now numbers about 400 birds; 235 of which are free-flying wild birds in California, Arizona, Utah, and Baja California (USFWS 2013a). In California, California Condors now inhabit the mountain ranges that surround the southern part of the San Joaquin Valley. Those that live along the coast in the Big Sur area on the Monterey County coastline have been observed feeding on whales (Order Cetacea), California sea lions (*Zalophus californianus*), and other marine species along the marine coastline (USFWS 2013a). We are not aware of any observations of California Condors feeding along the marine coastline south of Big Sur as most of the birds south of Monterey County are restricted to more inland mountain ranges in San Luis Obispo, Santa Barbara, Ventura, and Los Angeles Counties. Therefore, due to their absence from the marine coastline south of Monterey County, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area will have no effect on the California Condor.

**California Ridgway's Rail**. The California Ridgway's Rail (*Rallus obsoletus obsoletus*) (formerly California Clapper Rail (*Rallus longirostris obsoletus*)) was listed as endangered on October 13, 1970 (35 FR 16047). This taxa was considered in two previous biological opinions (USFWS 1980a, USFWS 1983); both of which noted that this taxa may be vulnerable to an oil spill but recognized that oil spills from activities in the Southern California Planning Area were unlikely to affect occupied habitat. The California Ridgway's Rail is now generally restricted to the San Francisco Bay area and no longer occurs in the vicinity of the Southern California Planning Area. The California Ridgway's Rail was formerly a breeding species in Morro Bay and Elkhorn Slough, but was extirpated from those locations. The last breeding record for Morro Bay was in 1942 with casual visitants seen as late as 1972 (Marantz 1986), and the last Elkhorn Slough record was in 1980 (Roberson 2002). Records of California Ridgway's Rail sightings beyond San Francisco Bay are now sparse (USFWS 2013b). Due to the taxa's current distribution, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area will have no effect on the California Ridgway's Rail.

**California Sea-blite**. The California sea-blite (*Suaeda californica*), a plant found in tidally influenced areas, was listed as endangered on December 15, 1994 (59 FR 64613). A recovery plan was approved on August 27, 2013, and critical habitat has not been designated. Because the California sea-blite occupies such a narrow band in the intertidal zone, it is threatened by any natural processes or human activities that even slightly alter this habitat. Such threats include: increased sedimentation of Morro Bay, the encroachment of sand on the east side of the spit, and dredging projects within the channel of the bay (59 FR 64623).

The California sea-blite historically ranged from the San Francisco Bay estuary to Morro Bay. Today, the only naturally occurring populations are restricted to the coastal marsh habitat of Morro Bay, where it occurs in a very narrow band in the upper intertidal zone (USFWS 2013b) and occurrences at Old, San Geronimo, and Villa Creeks in the Cayucos area just north of Morro Bay (Walgren 2006). The distribution of California sea-blite around Morro Bay was mapped in the early 1990s (59 FR 64623). On the east side of the bay, colonies occur adjacent to the communities of Morro Bay, Baywood Park, and Cuesta by-the-Sea, although it apparently is absent from the more interior portion of the marshlands created by Chorro Creek runoff. On the west side of the bay, it is found along most of the spit, excepting the northern flank adjacent to the mouth of the bay. The California sea-blite's colonial habits make it difficult to estimate the population; however, one estimate places the number of individuals at no more than 500 (59 FR

Ex. 5, Page 15

E.R. 0925

64623). The species occurs north of any of the areas that oil spill modeling projects impacts occurring from an oil spill from offshore oil and gas facilities in the Southern California Planning Area. Therefore, we have determined that the continuation of existing offshore oil and gas development and production in the Southern California Planning Area will have no effect on California sea-blite.

Other listed species considered in past biological opinions that clearly occur outside the Southern California Planning Area and will not be affected by the reasonably foreseeable future proposed actions include the endangered salt marsh harvest mouse (*Reithrodontomys raviventris*), San Francisco garter snake (*Thamnophis sirtalis tetrataenia*), Santa Cruz long-toed salamander (*Ambystoma macrodactylum croceum*), Callippe silverspot butterfly (*Speyeria callippe callippe*), San Bruno Elfin Butterfly (*Callophrys mossii bayensis*), Smith's blue butterfly (*Euphilotes enoptes smithi*), mission blue butterfly (*Icaricia icarioides missionensis*), and Menzie's wallflower (*Erysimum menziesii*).

Other listed species considered in past biological opinions due to the analysis of proposed onshore facilities at that time that no longer need to be considered include the endangered Morro Bay kangaroo rat (*Dipodomys heermanni morroensis*), unarmored threespine stickleback (*Gasterosteus aculeatus williamsoni*), Palos Verdes blue butterfly (*Glaucopsyche lygdamus palosverdesensis*), and El Segundo blue butterfly (*Shijimiaeoides battoides allyni*). No future onshore facilities are expected as a result of the reasonably foreseeable future oil and gas activities on the Pacific OCS.

San Clemente Island endemic species and taxa that were considered in previous biological opinions include the endangered San Clemente Island bush-mallow (*Malacothamnus clementinus*), San Clemente Island larkspur (*Delphinium variegatum* ssp. *kinkiense*), San Clemente Loggerhead Shrike (*Lanius ludovicianus mearnsi*), and San Clemente Bell's (Sage) Sparrow (*Artemisiospiza* [*Amphispiza*] *belli clementae*); and the threatened San Clemente Island lotus (*Acmispon dendroideus* var. *traskiae* [=*Lotus d.* subspecies *traskiae*]), and San Clemente Island Indian paintbrush (*Castilleja grisea*). Based on the GNOME and OSRA oil spill models, it is unlikely that oil from an accidental spill would contact San Clemente Island. In addition, the listed species present on the island would not normally be found in the intertidal zone where contact with oil could occur. Therefore, there will be no effect to the listed species on the island from the proposed activities.

In addition, there are a number of other species that have been listed since the last Southern California Planning Area-wide consultations were done, including a number of Channel Islands endemic species and including the endangered Santa Catalina Island fox (*Urocyon littoralis catalinae*), Catalina Island mountain-mahogany (*Cercocarpus traskiae*), Hoffmann's rock cress (*Arabis hoffmannii*), Hoffmann's slender-flowered gilia (*Gilia tenuiflora* ssp. *hoffmannii*), island barberry (*Berberis pinnata* ssp. *insularis*), island bedstraw (*Galium buxifolium*), island malacothrix (*Malacothrix squalida*), island phacelia (*Phacelia insularis* ssp. *insularis*), San Clemente Island woodland-star (*Lithophragma maximum*), Santa Barbara Island liveforever (*Dudleya traskiae*), Santa Cruz island bush-mallow (*Malacothamnus fasciculatus* var. *nesioticus*), Santa Cruz Island fringepod (*Thysanocarpus conchuliferus*), Santa Cruz Island malacothrix (*Malacothrix indecora*), Santa Cruz Island rockcress (*Sibara filifolia*), Santa Rosa Island manzanita (*Arctostaphylos confertiflora*), and soft-leaved paintbrush (*Castilleja mollis*); and the threatened island rush-rose (*Helianthemum greenei*) and Santa Cruz Island dudleya (*Dudleya nesiotica*). Based on the GNOME and OSRA oil spill models, oil from an accidental

Ex. 5, Page 16

E.R. 0926

spill is not expected to contact San Clemente Island, Santa Catalina Island, or Santa Barbara Island. While some modeled trajectories do predict oil reaching the shores of Santa Cruz Island, Santa Rosa Island, and San Miguel Island the listed species present on those islands are not found in the intertidal zone where contact with oil could occur. Therefore, there will be no effect to these island-endemic listed species from the proposed activities.

**Listed Species that may be affected by the Proposed Action**

**Short-tailed Albatross**. The Short-tailed Albatross (*Phoebastria albatrus*) was listed as endangered on June 2, 1970 (35 FR 8491). It is also a California species of special concern. This species is a large pelagic bird with long narrow wings adapted for soaring just above the water surface. As of 2013, 78 percent of the known breeding population uses a single colony, Tsubamezaki, on Torishima Island off Japan. The remaining population nests on other islands surrounding Japan, primarily the Senkaku Islands. During the non-breeding season, the Short-tailed Albatross regularly ranges along the Pacific Rim from southern Japan to the Gulf of Alaska, primarily along continental shelf margins. It is rare to casual but increasing offshore from British Columbia to southern California (Howell 2012). All recent records along the west coast have been stage 1 immatures (Howell 2012), which travel more broadly throughout the north Pacific than adults (USFWS 2014). Most individuals found off California in recent years have been during the fall and early winter with a few records in late winter and early spring (California Birds Record Committee 2007). The diet of this species is not well studied; however, research suggests at sea during the non-breeding season that squid, crustaceans, and fish are important prey (USFWS 2008).

The global population is currently estimated to be 4,354 birds (USFWS 2014). There have been 40 records of the species off California since 1977 with 36 records between 1998 and 2014. Nine of the 40 records have occurred in the Southern California Planning Area off the coast of San Luis Obispo and Santa Barbara Counties, and around and beyond the Channel Islands. This species is not expected to occur with any regularity in the Southern California Planning Area site due to its rarity and the lack of records in the vicinity of the Project area; therefore, we have determined that the proposed activities are not likely to adversely affect this species and we will not discuss it further in this biological assessment.

**Hawaiian Petrel.** The Hawaiian Petrel (*Pterodroma sandwichensis*) was federally listed as endangered on March 11, 1967 (32 FR 4001). The species breeds on larger islands in the Hawaiian chain where they nest in burrows on vegetated cliffs, volcanic slopes, and lava flows. The global population is comprised of approximately 19,000 individuals which includes an estimated 4,500-5,000 breeding pairs (USFWS 2011; Lebbin et al 2010). The species is absent from Hawaiian waters from November-April when it disperses to the eastern tropical Pacific. Individuals have been recorded off of Oregon and California from April-October (Onley and Scofield 2007) with the California records occurring from April-early Sep. The first of California's 66 accepted records occurred in May 1992. There are 12 records in the vicinity of the Southern California Planning Area; 1 was nearshore and the other 11 were 24-100 miles offshore. Hawaiian Petrels with satellite transmitters have been tracked making regular foraging excursions to areas off northern California (where they are now seen regularly from boats and repositioning cruise ships off northern California in the summer), but there does not appear to be a regular pattern of occurrence off central and southern California. Therefore, it is not expected to occur with any regularity in the Southern California Planning Area and we have determined

Ex. 5, Page 17

E.R. 0927

that the proposed activities are not likely to adversely affect this species and we will not discuss it further in this biological assessment.

**Western Snowy Plover.** The Pacific Coast population of the western snowy plover was listed as threatened on March 5, 1993 (58 FR 12864). The primary reasons for listing this population were loss and degradation of habitat, and human disturbance. A final recovery plan was signed August 13, 2007. Critical habitat for the species was originally designated in 1999 (64 FR 68507), revised in 2005 (70 FR 56970) and revised again in 2012 (77 FR 36728).

The Pacific Coast population of the Western Snowy Plover (*Charadrius nivosus nivosus*) breeds on the Pacific Coast from southern Washington to southern Baja California, Mexico. The bird is found on beaches, open mudflats, salt pans and alkaline flats, and sandy margins of rivers, lakes, and ponds. It nests in depressions in the sand above the drift zone on coastal beaches, sand spits, dune-backed beaches, sparsely vegetated dunes, beaches at creeks and river mouths, and salt pans at lagoons and estuaries. The breeding season extends from early March to late September, with birds at more southerly locations beginning to nest earlier in the season than birds at more northerly locations (64 FR 68507). In most years, the earliest nests on the California coast generally occur during the first to third week of March. Peak nesting in California occurs from mid-April to mid-June, while hatching lasts from early April through mid-August.

Snowy plover chicks are precocial, leaving the nest within hours after hatching to search for food. Adult plovers do not feed their chicks, but lead them to suitable feeding areas. The chicks reach fledging age approximately one month after hatching; however, broods rarely remain in the nesting area throughout this time. Plover broods may travel along the beach as far as 6.4 kilometers (4 miles) from their natal area.

Snowy plovers are primarily visual foragers. They forage for invertebrates across sandy beaches from the swash zone to the macrophyte wrack line of the dry upper beach. They also forage in dry sandy areas above the high tide, on salt flats, and along the edges of salt marshes and salt ponds (58 FR 12864).

In winter, the taxa is found on many of the beaches used for nesting as well as on beaches where they do not nest, in man-made salt ponds, and on estuarine sand and mud flats. The winter range is somewhat broader and may extend to Central America (Page et al. 1995). The majority of birds along the coast winter south of Bodega Bay, California (Page et al. 1986).

This species was formerly found on quiet beaches the length of the state, but it has declined in abundance and become discontinuous in its distribution. Habitat degradation caused by human disturbance, urban development, introduced beachgrass (*Ammophila* spp.), and expanding predator populations have led to declines in nesting areas and the size of breeding and wintering populations (USFWS 2007a). The summer window survey conducted in 2014 found 2,016 birds throughout Washington, Oregon, and California.

In the Southern California Planning Area, Western Snowy Plovers breed or winter along the coasts of San Luis Obispo, Santa Barbara, Ventura, Los Angeles, Orange, and San Diego Counties from San Carpoforo Creek in northern San Luis Obispo County to Border Field State Park in San Diego County. They also occur on several of the Channel Islands including San Miguel, Santa Rosa, Santa Cruz, San Nicolas, and San Clemente Islands. From 2010-2014, an average of 1,100 breeding adults occurred in this area, which is 58 percent of breeding adults in the range of the listed population. Significant breeding areas within this stretch of coast include

Ex. 5, Page 18

E.R. 0928

the Morro Bay Sandspit, Oceano Dunes State Vehicular Recreation Area, the Guadalupe Dunes, Vandenberg Air Force Base beaches, Coal Oil Point, Ventura Beaches (McGrath, Mandalay, and Hollywood), Ormond Beach, Naval Base Ventura County, San Nicolas Island, the Bolsa Chica Ecological Reserve, and Camp Pendleton. The average number of wintering Western Snowy Plovers in this area from 2008/2009-2011/2012 was 2,463; approximately 70 percent of the wintering population along the California coast.

A revised designation of critical habitat for the Western Snowy Plover was published on June 19, 2012. This designation includes 60 units totaling 24,526 acres. Thirty-five of these units occur along the coast of the Southern California Planning Area, comprising 6,117 acres. This acreage is 25 percent of the total critical habitat designation.

**Marbled Murrelet.** The Marbled Murrelet (*Brachyramphus marmoratus marmoratus*) was federally listed as threatened on October 1, 1992 within the states of Washington, Oregon, and California (57 FR 45328). Populations of the species in Alaska and British Columbia were not listed under the ESA. The Marbled Murrelet is a small seabird that spends most of its life in the nearshore marine environment, but nests and roosts inland in low-elevation old growth forests, or other forests with remnant large trees. Critical Habitat for the species was designated on May 24, 1996 (61 FR 26256) and was later revised in a final rule published on October 5, 2011 (76 FR 61599). A final determination published on August 4, 2016 (81 FR 51348) determined that the critical habitat for the Marbled Murrelet, as designated in 1996 and revised in 2011, meets the statutory definition of critical habitat under the ESA. No marine areas were designated as critical habitat and none of the terrestrial units are south of the Santa Cruz Mountains (the southern extent of known breeding along the Pacific coast), which is approximately 100 miles north of the Southern California Planning Area.

While the species does not nest in the vicinity of the project area, individuals from the population nesting in the Santa Cruz Mountains (and perhaps from more northerly populations) do disperse to the coast and offshore waters of San Luis Obispo and Santa Barbara Counties. Marantz (1986) characterized them as a rare transient and winter visitant offshore, but possibly regular in late summer in San Luis Obispo County. Lehman (2014) described the species as a very rare late-summer, fall, and winter visitor along the coast of Santa Barbara County, but somewhat regular in late summer in the Point Sal/north Vandenberg Air Force Base area.

In a study where Marbled Murrelets nesting in the Santa Cruz Mountains were radiomarked (Peery et al. 2008), 3 of 46 birds (7%) radiomarked during the breeding season dispersed considerable distances (138-220 km) to the San Luis Obispo County coast. Nine of the 20 murrelets radiomarked in the postbreeding season dispersed long distances, 8 of which were relocated along the San Luis Obispo County coast after traveling 192-288 km. Their results indicate that the San Luis Obispo coast extending south to Point Sal in Santa Barbara County is an important wintering area for the species in central California (Peery et al. 2008).

A review of records in eBird (February 2015) shows observations along the coast from Arroyo de la Cruz in northern San Luis Obispo County to the Purisima Point area on Vandenberg Air Force Base. Areas with concentrations of Marbled Murrelet observations include San Simeon Bay, offshore of San Simeon State Park, Cayucos, Morro Bay, San Luis Obispo Bay, and off the Santa Maria River mouth. These records show peaks of occurrence along this stretch of coast in mid-January, May-early June, and mid-August-early November. Marbled Murrelets occur less

18

frequently south of Point Conception; however, they are observed occasionally off of Ventura, along the Malibu coastline, and in Santa Monica Bay.

Marbled Murrelets forage at sea by pursuit diving in relatively shallow waters, usually between 20 and 80 meters in depth with the majority of birds found as singles or pairs in a band 300-2,000 meters from shore (Strachan et al. 1995). After the breeding season, some birds disperse and are less concentrated in nearshore coastal waters, as is the case with some other alcids. Ainley et al. (1995) conducted ship-based surveys off central California and detected most Marbled Murrelets with 7 kilometers of shore with the largest number occurring 3-5 kilometers offshore. They observed one individual 24 km offshore near the edge of the continental shelf break.

**California Least Tern.** The California Least Tern was listed as endangered on October 13, 1970 (35 FR 16047). The recovery plan for the species was published in 1980 (USFWS 1980b) and a revised recovery plan was later published in 1985 (USFWS 1985). Critical habitat has not been designated. The primary reasons for listing this species were loss of habitat, human disturbance, and predation. On October 2, 2006, the USFWS announced the completion of a 5-year review of the status of the California Least Tern, wherein they recommended it for downlisting from endangered to threatened (USFWS 2006a). However, a proposed rule to downlist the species has not been published to date so the status of the taxa remains endangered throughout its range.

The California Least Tern is a summer visitor to California that breeds on sandy beaches close to estuaries and embayments discontinuously along the California coast from San Francisco Bay south to San Diego County and south into Baja California. The earliest spring migrants arrive in the San Diego area after the first week in April and reach the greater San Francisco Bay area by late April (Small 1994). Nesting colonies are usually located on open expanses of sand, dirt, or dried mud, typically in areas with sparse or no vegetation. Colonies are also usually in close proximity to a lagoon or estuary where they obtain most of the small fish they consume, although they may also forage up to 3-5 km (2-3 miles) offshore. Nests consist of a shallow scrape in the sand, sometimes surrounded by shell fragments. Eggs (usually two per clutch) are laid from mid-May to early August. Incubation takes 20-28 days, and young fledge in about 20 days (USFWS 1980b). Least terns are fairly faithful to breeding sites and return year after year regardless of past nesting success. In the Southern California Planning Area, California Least Terns breed along the coasts of San Luis Obispo, Santa Barbara, Ventura, Los Angeles, and Orange Counties from Oceano Dunes in San Luis Obispo County to the Tijuana River Estuary in San Diego County. Fall migration begins the last week of July and first week of August (USFWS 2006a) when the subspecies departs for its wintering grounds in Central and South America. Most individuals are gone from southern California by mid-September.

In 1970, when the California Least Tern was listed as endangered by the federal government and California, its population in California was estimated at 600 breeding pairs. Population growth rates have increased, especially since the mid-1980s, when active management was initiated at breeding colonies. Although the increase in the breeding population has not been consistent from year to year, the long-term trends have shown steady population growth. Fluctuations in the California Least Tern population are thought to be attributable to a combination of high levels of predation and low prey availability.

In the general area of the Southern California Planning Area, as many as 26 sites were used for nesting by California Least Terns in 2015. Rangewide survey results from 2015 reported a

19

Ex. 5, Page 20

minimum of 3,737 breeding pairs, maximum of 4,800 breeding pairs, and 4,982 nests in this region, which is approximately 91 percent of the nesting population and effort in California (Frost 2015). Significant breeding areas within this stretch of coastline include Oceano Dunes, Vandenberg Air Force Base, McGrath State Beach, Hollywood Beach, Point Mugu, Venice Beach, Los Angeles Harbor, Seal Beach National Wildlife Refuge (NWR), Bolsa Chica Ecological Reserve, Huntington State Beach, Upper Newport Bay, Camp Pendleton, Batiquitos Lagoon, Mission Bay, Naval Base Coronado, Sweetwater Marsh NWR, and Tijuana River Estuary.

Studies conducted at some of the larger colonies in southern California show that at least 75 percent of all foraging activity during breeding occurs in the ocean (Atwood and Minsky 1983). Approximately 90-95 percent of ocean feeding occurred within 1 mile of shore in water depths of 60 feet or less. California Least Terns were rarely seen foraging at distances between 1-2 miles from shore and were never encountered farther than 2 miles offshore (Atwood and Minsky 1983). However, there is evidence of some migration off California that occurs as far as 20 miles offshore or more based on observations off southern California (Pereksta, pers obs.). Further evidence offshore Mexico possibly corroborates these observations (Howell and Engel 1993; Ryan and Kluza 1999).

**Light-footed Ridgway's Rail.** The Light-footed Ridgway's Rail (*Rallus obsoletus levipes*) (formerly Light-footed Clapper Rail [*Rallus longirostris levipes*]) was listed as endangered on October 13, 1970 (35 FR 8320). A recovery plan was approved in 1979 (USFWS 1979). Critical habitat has not been designated for this subspecies. Habitat loss and degradation were the primary reason for ESA listing.

Light-footed Ridgway's Rails inhabit coastal salt marshes from the Carpinteria Marsh in Santa Barbara County, California, to Bahia de San Quintin, Baja California, Mexico (Zembal 1989, Zembal et al. 1998). The Light-footed Ridgway's Rail is normally found in estuarine habitats, particularly salt marshes with well-developed tidal channels. Dense growths of cordgrass (*Spartina foliosa*) and pickleweed (*Salicornia* sp.) are conspicuous components of rail habitat, and nests are located most frequently in cordgrass. Light-footed Ridgway's Rails construct loose nests of plant stems, either directly on the ground when in pickleweed or somewhat elevated when in cordgrass (USFWS 1979). Although nests are usually located in the higher portions of the marsh, they are buoyant and will float up with the tide. Eggs are laid from mid-March to the end of June, but most are laid from early April to early May. The incubation period is about 23 days, and young can swim soon after hatching.

Although, historically, most of the salt marshes in this region were probably occupied by rails, no more than 24 marshes have been occupied since about 1980 (Zembal and Hoffman 1999). There are currently believed to be approximately 500 pairs left in California, with most found in Upper Newport Bay, Seal Beach, and the Tijuana Marsh. The vast majority (more than 95 percent) of the remaining rails are in Orange and San Diego Counties. In 2013, a total of 525 pairs of Light-footed Ridgway's Rails exhibited breeding behavior in 22 marshes in southern California (Zembal et al 2013). This is the largest statewide breeding population detected since the counts began in 1980, and represents an 18.5 percent increase over the former high count in 2007. It also represents the third successive year of record-breaking high counts. The status of the Light-footed Ridgway's Rail in Mexico is not well documented. Surveys were conducted at several marshes in the 1980s, but a recent abundance estimate is not available (USFWS 2009).

Ex. 5, Page 21

E.R. 0931

In the general area of the Southern California Planning Area that could be impacted by oil spills, there are presently only two marshes that are, or have the potential to be, occupied by Light-footed Ridgway's Rails. These are Carpinteria Marsh in Santa Barbara County and Mugu Lagoon in Ventura County. The next closest occupied location is the Seal Beach NWR in Orange County. These locations represent the northern extent of the subspecies range along the California coast. The Light-footed Ridgway's Rail subpopulation at Mugu Lagoon fluctuated between 3 and 7 pairs for nearly 20 years until recent augmentations with translocated birds from Newport Bay fostered its growth. During the last 5 years (2010-2014) there was an average of 18 pairs and 5 unmated males in Mugu Lagoon on Naval Base Ventura County (Navy In Litt 2015). The increased population at this location appears to have led to an expansion of habitat use within the lagoon. For example, in 2004, a pair of rails was observed attempting to breed in the eastern arm of the lagoon for the first time in many years (Zembal et al 2006). In Santa Barbara County, the taxon was formerly more widespread, but the loss of habitat and other factors restricted it to the Carpinteria Salt Marsh during the latter 1900s (Lehman 2014). Approximately 20 pairs were there in the early 1980s dropping to just one individual by 2004. None were recorded after 2004 until a single individual was heard vocalizing there in 2011.

**Southern Sea Otter.** The southern sea otter (*Enhydra lutris nereis*) was listed as a threatened species on January 14, 1977 (42 FR 2968). The original recovery plan was finalized in 1982 (USFWS 1982). A revised recovery plan was finalized in 2003 (USFWS 2003). No critical habitat has been identified for this species. The primary reasons for listing the southern sea otter were 1) its small population size and limited distribution, and 2) the threat of oil spills, pollution, and competition with humans. A three-year running average of spring survey counts is used as an index for southern sea otter abundance. In 2016, this average was 3,272 sea otters (USGS 2016).

Currently, the range of the mainland population extends from Pigeon Point in the north to Gaviota State Beach in the south (Tinker and Hatfield 2015). In addition, there is a population near San Nicolas Island that is the result of translocations of 139 southern sea otters done by the USFWS between August 1987 and July 1990 to reduce the probability that a single natural or anthropogenic catastrophic event (e.g., large oil spill) would affect a large proportion of the population (USFWS 2000). Although the program succeeded in establishing a small colony of otters in southern California, USFWS formally terminated the program in December 2012 (77 FR 75266) citing overall recovery objectives and the value of allowing natural range expansion of sea otters into southern California.

Sea otters typically inhabit shallow nearshore waters with rocky or sandy bottoms supporting large populations of benthic invertebrates (Riedman 1987). Observed densities are higher over rocky (about 5/km$^2$) than sandy habitat (about 0.8/km$^2$) (Riedman and Estes 1990). In California, otters live in waters less than 18 m deep and rarely move more than 2 km offshore (Riedman 1987).

Sea otter home ranges generally consist of several heavily used areas connected by travel corridors (Riedman and Estes 1990). Males generally have larger home ranges, due in part to seasonal movements they make to either end of the parent range. These migrations coincide with the breeding season (June to November) and the non-breeding season (November to May). During the breeding season, the size of the southernmost group declines dramatically, due to a general northward movement of animals towards the center of the range (Bonnell et al. 1983; Estes and Jameson 1983). This movement of males from the population fronts into the more established areas occupied by females during the summer and fall breeding season is a feature of

21

Ex. 5, Page 22

the sea otter's annual cycle (Bonnell et al. 1983). Recent studies also suggest that resource limitations near the center of the otter's range may be influencing these migration movements (USDOI/MMS 2006). Female otters are more sedentary, but are also known to travel long distances (Riedman and Estes 1990). Sea otters breed and pup throughout the year in all parts of the range, but there appear to be one or more peaks in most areas (Riedman 1987; Rotterman and Simon-Jackson 1988). In California, peak pupping occurs from January through March (Riedman and Estes 1990).

Recent southern sea otter surveys coordinated annually by USGS off the coast of California have shown substantial increases in the otter population. For example, in 1990 the population was 1,680 individuals. The population has steadily climbed since then and the most recent spring survey in May 2016 counted 3,511 sea otters, the highest count on record (Tinker and Hatfield 2016). As individual year counts may be highly influenced by survey conditions, the final revised recovery plan for the southern sea otter recommends using the 3-year running average as the official benchmark of the sea otter population status (USFWS 2003). The current 3-year running average of the mainland range is 3,194; also the highest average on record, which reflects an increasing trend of approximately 3% per year (Tinker and Hatfield 2016).

Range expansion to the south has brought an increasing number of southern sea otters into the Southern California Planning Area. During annual spring surveys conducted since 1983, the population of southern sea otters between Cayucos and Gaviota has grown from a total a total of 117 otters in 1983 to 800 individuals in 2016 (Tinker and Hatfield 2016). While annual numbers have fluctuated over this time, the most recent 5-year mean of otters for that region is 701 individuals. This southern portion of the range comprises approximately 23 percent of the total 2016 population of 3,511 (Tinker and Hatfield 2016). In 2006, the southern-most otter sighting occurred at Tajiguas, Santa Barbara County, just west of Refugio State Beach (Hatfield USGS, pers. comm.). The spring survey in 2015 found a slight range retraction south of Point Conception towards Gaviota State Beach (Tinker and Hatfield 2015). The range had expanded east to the Goleta area in recent years before this shift back to the west.

While the annual spring sea otter counts south of Cayucos have increased from more recent historical counts, there is a recent decreasing 5-year trend of approximately -0.6 percent per year in this region. This decreasing trend is consistent with an increase in shark bite mortality over the last 10 years in this peripheral area of lower population density. Notably, the specific area where the population trend is most negative (from Cayucos to Point Conception) coincides exactly with an area of increased shark bite mortality (Tinker and others 2015). The lack of population growth at the southern periphery over recent years likely explains the cessation of range expansion, as it is growth at the range ends that typically fuels range expansion (Tinker and others 2008; Lafferty and Tinker 2014).

The translocated southern sea otter population at San Nicolas Island has also increased in recent years. Counts throughout the 1990s generally recorded between 11-21 individuals. Over the last fifteen years, that number has steadily increased to a high count of 104 individuals in 2016 (Tinker and Hatfield 2016). The current 3-year average at San Nicolas Island is 78 individuals, which continues a positive trend of approximately 13% per year (Tinker and Hatfield 2016). The overall 5-year trend for southern sea otters (including both the mainland and San Nicolas Island populations) is 3.2% per year.

22

Ex. 5, Page 23

**California Red-Legged Frog (*Rana aurora draytonii*).** The California red-legged frog was federally listed as threatened species on May 23, 1996 (61 FR 25813). A recovery plan for the species was finalized in 2002 (USFWS 2002). Critical habitat was designated in 2006 (71 FR 19244) and revised in 2010 (75 FR 12816). The California red-legged frog has been extirpated from 70 percent of its former range and is threatened in its remaining range by a wide variety of human impacts, including urban encroachment, construction of reservoirs and water diversions, introduction of exotic predators and competitors, livestock grazing, and habitat fragmentation.

The California red-legged frog occupies a fairly distinct habitat, combining both specific aquatic and riparian components (Hayes and Jennings 1988; Jennings 1988). Adults require dense, shrubby or emergent riparian vegetation closely associated with deep (>0.7 m) still or slow moving water (Hayes and Jennings 1988). The largest densities of California red-legged frogs are associated with deep-water pools with dense stands of overhanging willows (*Salix* spp.) and an intermixed fringe of cattails (*Typha latifolia*) (Jennings 1988). Well-vegetated terrestrial areas within the riparian corridor may provide important sheltering habitat during winter. Adult frogs may be found seasonally in the coastal lagoons of the central California coast. They move upstream to freshwater when sand berms are breached by seawater from storms or high tides.

California red-legged frogs breed from November through March, with earlier breeding records occurring in southern localities (Storer 1925). Egg masses that contain about 2,000-5,000 eggs are typically attached to vertical emergent vegetation, such as bulrushes or cattails. California red-legged frogs are often prolific breeders, laying their eggs during or shortly after large rainfall events in late winter and early spring (Hayes and Miyamoto 1984). Eggs hatch in 6-14 days (Jennings 1988). Larvae undergo metamorphosis 3.5 to 7 months after hatching (Storer 1925; Wright and Wright 1949).

Sheltering habitat for the California red-legged frog is potentially all aquatic and riparian areas within the range of the species and includes any landscape features that provide cover and moisture during the dry season within 300 feet of a riparian area. This could include boulders or rocks and organic debris such as downed trees or logs; industrial debris; and agricultural features, such as drains, watering troughs, spring boxes, abandoned sheds, or hay-ricks. Incised stream channels with portions narrower than 18 inches and depths greater than 18 inches may also provide sheltering habitat.

California red-legged frogs are sensitive to high salinity (USFWS 2002). When eggs are exposed to salinity levels greater than 4.5 parts per thousand, 100 percent mortality occurs, and larvae die when exposed to salinities greater than 7.5 parts per thousand (Jennings and Hayes 1990). Nussbaum et al. (1983) stated that early-stage northern red-legged frog (*R. a. aurora*) embryos were tolerant of temperatures only between 48 and 70 degrees Fahrenheit; both the lower and upper lethal temperatures are the most extreme known for any North American ranid frog. Reis (1999) found that water temperature in a coastal marsh was the most important of three variables in differentiating between sites with egg masses and sites without. Salinity was not as critical in differentiating between sites with egg masses and without; however, salinity levels of 6.5 ppt or less was an important predictor for the presence of California red-legged frog tadpoles.

California red-legged frogs are known to occur in 243 streams or drainages in 22 counties, primarily in the central coastal region of California. The term "drainage" is used to describe named streams, creeks, and tributaries from which California red-legged frogs have been observed. A single occurrence of California red-legged frog is sufficient to designate a drainage

as occupied by, or supporting California red-legged frogs. Monterey (32), San Luis Obispo (36), and Santa Barbara (36) counties support the greatest number of currently occupied drainages. Historically the California red-legged frog was known to occur in 46 counties, but is now extirpated from 24 of those counties (a 52-percent reduction in county occurrences).

There are five critical habitat units that include coastal areas that have a boundary with the coastline in the Southern California Planning Area (SLO-2, SLO-3, STB-4, STB-5, STB-6) and include watersheds that flow into the ocean or coastal lagoons. The physical and biological features essential to the conservation of the species (primary constituent elements) that are encompassed within these units include aquatic breeding habitat, aquatic non-breeding habitat, upland habitat, and dispersal habitat. The Piedras Blancas to Cayucos Creek Unit (SLO-2) is comprised of 82,673 acres along the coast in northwestern San Luis Obispo County, the Willow and Toro Creeks to San Luis Obispo Unit (SLO-3) is comprised of 116,517 acres near the coast in central San Luis Obispo County, the Jalama Creek Unit (STB-4) is comprised of 7,685 acres along the coast in southwestern Santa Barbara County south of the City of Lompoc, the Gaviota Creek Unit (STB-5) is comprised of 12,888 acres along the coast in southern Santa Barbara County, and the Arroyo Quemado to Refugio Creek Unit (STB-6) is comprised of 11,985 acres along the coast in southern Santa Barbara County (75 FR 12816).

**Tidewater Goby.** The tidewater goby (*Eucyclogobius newberryi*) was listed by the USFWS as endangered on February 4, 1994 (59 FR 5498). On June 24, 1999, the USFWS published a proposed rule to remove the northern populations of the tidewater goby from the endangered species list; the proposed rule was withdrawn on November 7, 2002. A final recovery plan for the species was completed on December 7, 2005 (USFWS 2005). Critical habitat for this species was designated on November 20, 2000 (65 FR 69693) revised on January 31, 2008 (73 FR 5920), and revised again on February 6, 2013 (78 FR 8746).

The tidewater goby ranges from Del Norte County (near the Oregon border) south to Agua Hedionda Lagoon in northern San Diego County. Most are found very close to the coast, though a few have been found as much as 8 km (5 mi) inland. Primary tidewater goby habitat is found in small, shallow coastal lagoons that are separated from the ocean most of the year by beach barriers. They are typically found in water less than 1 meter (3.3 feet) deep (USFWS 2005). This includes shallow areas of bays and areas near stream mouths in uppermost brackish portions of larger bays. Tidewater gobies are absent from areas where the coastline is steep and streams do not form lagoons or estuaries. Although tidewater gobies can tolerate full seawater, they are most common in waters with salinities of less than 12 parts per thousand. Adults are benthic, and larvae are briefly pelagic (Love 1996). The tidewater goby is threatened primarily by modification and loss of habitat as a result of coastal development, channelization of habitat, diversions of water flows, groundwater overdrafting, and alteration of water flows.

Tidewater goby populations may fluctuate seasonally. They are found in small groups or in aggregations of hundreds. The tidewater goby is typically an annual species, with few individuals living longer than a year. Reproduction in the tidewater goby occurs year-round, although distinct peaks in spawning, often in early spring and late summer, do occur. Females are oviparous and generally produce between about 300 to 500 eggs per clutch, and between 6 to 12 clutches per year. After the male goby has excavated a vertical burrow in coarse sand, a female will lay the eggs on the roof and sides of the burrow, suspending them one at a time. The males guard the eggs until they hatch in 9-10 days (Love 1996).

Ex. 5, Page 25

E.R. 0935

At the time of listing in 1994, tidewater gobies were known to have occurred in at least 87 of California's coastal lagoons, but were considered extirpated in approximately half of these (USFWS 2005). These assessments, however, followed a prolonged period of drought, when conditions in many habitats were at extremely low levels. Subsequent surveys found that populations in several locations had become re-established, or had been overlooked in the initial surveys. Additionally, new populations continue to be discovered, increasing the number of known historic populations to 135 (USFWS 2005). Of these 135 localities, 29 (21%) are believed to be extirpated; therefore, 106 localities are presumed to be currently occupied (USFWS 2007b). Currently, the tidewater goby is found in approximately 64 localities within San Luis Obispo, Santa Barbara, Ventura, Los Angeles, Orange, and San Diego Counties (USFWS 2007b).

Tidewater goby critical habitat units have been designated along the coast adjacent to the Southern California Planning Area including 12 units in San Luis Obispo County, 12 units in Santa Barbara County, 4 in Ventura County, 4 in Los Angeles County, 1 in Orange County, and 1 in San Diego County. While there are no BOEM/BSEE regulated activities in these units, there is a potential for spilled oil to impact these areas under conditions that allow oil to enter any of these coastal lagoons.

The primary constituent elements of critical habitat for the tidewater goby are persistent, shallow, still-to-slow-moving lagoons, estuaries, and coastal streams with salinity up to 12 ppt, which provide adequate space for normal behavior and individual and population growth that contain one or more of the following: (a) Substrates (e.g., sand, silt, mud) suitable for the construction of burrows for reproduction; (b) Submerged and emergent aquatic vegetation that provides protection from predators and high flow events; or (c) Presence of a sandbar(s) across the mouth of a lagoon or estuary during the late spring, summer, and fall that closes or partially closes the lagoon or estuary, thereby providing relatively stable water levels and salinity.

**Salt Marsh Bird's-Beak.** The salt marsh bird's-beak (*Cordylanthus maritimus* ssp. *maritimus*) was listed as endangered on September 28, 1978 (43 FR 44812). A recovery plan for this species was approved in 2013. Critical habitat has not been designated.

Salt marsh bird's-beak is a diffusely branched annual herb in the figwort family (Scrophulariaceae). These plants are hemiparasitic, sometimes obtaining moisture and nutrients from the roots of their host plants, which are usually perennials. This plant is generally restricted to coastal salt marshes where its primary habitat is the upper salt marsh that is inundated by tides on a regular basis, but above areas that receive daily salt flooding. Plants may also occur behind barrier dunes, on dunes, mounds, and occasionally in areas with no tidal influence.

This plant occurs in salt marshes from Morro Bay in San Luis Obispo County south to San Diego County and Northern Baja California, Mexico. This taxa is currently known to persist in seven coastal salt marshes: San Diego County at Tijuana Estuary (separated into Border Field State Park and Tijuana Slough NWR, Naval Radar Receiving Facility (NRRF), and Sweetwater Marsh Unit of San Diego Bay NWR; Orange County at Upper Newport Bay (State) Ecological Reserve; Ventura County at Naval Base Ventura County, Point Mugu; Santa Barbara County at Carpinteria Salt Marsh; and San Luis Obispo County at Morro Bay. All of these sites are adjacent to the Southern California Planning Area. Destruction and modification of the coastal marshes is the primary reason for this plant's decline. Even minor alterations of the marsh that result in permanent changes in the natural tidal dynamics can make previously suitable habitat

Ex. 5, Page 26

E.R. 0936

unsuitable. Changes in tidal inundation have affected plants by: smothering them with increased debris deposited by high tide, encouraging other marsh vegetation which shades out plants, or decreasing germination of seeds by lowering or increasing soil salinity (USFWS 1984).

## 4. Effects Analysis

### 4.1 Artificial Lighting

Nocturnal oceans are flat, dark environments where many seabirds are nocturnally active to avoid avian predators, primarily gulls (Montevecchi 2006). Saleh (2007), Schaar (2002), Anonymous (2002), Harder (2002), and Rich and Longcore (2006) summarize several of the more recent studies on the effects of artificial light on wildlife. These studies suggest that artificial light effects include disorientation, mortality due to collisions with lighted structures, and interruption of natural behaviors. Birds that spend most of their lives at sea are often highly influenced by artificial lighting in coastal areas and dark ocean environments. Intense source points of artificial lighting on the ocean can attract marine birds from very large catchment areas (Rodhouse et al. 2001, Wiese et al. 2001). The species that are potentially the most vulnerable to attraction to artificial lighting in marine environments are nocturnal species that are at risk and endangered and whose populations are small and fragmented (Montevecchi 2006).

Gauthreaux and Belser (2006) suggest that night-migrating birds showed "nonlinear flight" near towers with white and red strobe lights; however, they also stated that the attraction may have been more attributable to the constant tower lighting with the red strobe lights. Poot et al. (2008) found that white and red light interfere with the magnetic compass of migrating birds, where they caused disorientation at low light intensity, compared to a high-intensity green light that caused less disorientation. The researchers concluded that the disorientation is due to the wavelength; green and blue lights have a short wavelength resulting in very little observable impact to birds orientation. In 2007, lights on gas-production platform L15 in the North Sea were replaced with green lighting. Based on comparisons to previous assessments of L15, it was concluded that 2-10 times less birds are negatively impacted (circling around the installation for a prolonged period of time) by the new light source as by the original standard white (tube lights) and orange (sodium high pressure lights) lighting (Van de Laar 2007). In addition, the number of birds actually landing on the platform was decreased. The platform is still visible from a distance with the new lighting and the platform crew has commented that the lighting is less blinding and they have increased contrast vision during crane operations (Poot et al. 2008).

Fledgling storm-petrels, shearwaters, and some alcids are more attracted to artificial lights than are adults. This attraction likely results from disorientation associated with environmental inexperience or possibly from predispositions to find bioluminescent prey at sea (Imber 1975). Some species of petrels and storm-petrels, including several endangered or threatened species, incur considerable fledgling mortality as a result of artificial light attraction (Telfer et al. 1987, Bretagnolle 1990, Whittow 1997, Mougeot and Bretagnolle 2000, Day et al. 2003). The varying age-class attraction suggests that older birds may learn not to approach artificial light sources (Montevecchi 2006).

Migratory periods are critical times for mortality associated with artificial lighting at coastal and offshore sources. High proportions of relatively easily disoriented young-of-the-year are on the wing in the autumn and large numbers of seabirds move across oceans and hemispheres during the spring and fall.

Podolsky (2002) indicates that artificial lighting appears to "confuse" seabirds, particularly during their migration between urbanized nesting sites and their offshore feeding grounds.

Direct effects to seabirds include collisions with lighted structures or the light fixtures (Montevecchi 2006). Mass collisions of birds with lighted structures can result in high levels of mortality. Mass collisions and incidences of hundreds, thousands, and tens of thousands of circling birds have been reported at coastal and offshore artificial light sources (Bourne 1979, Wiese et al. 2001). Seabirds are attracted to the flares of offshore oil and gas platforms and can be killed by intense heat, collisions with structures, and by oil on and around the platforms (Wiese et al. 2001, Burke et al. 2005). Both the intensity and oceanographic novelty of these light sources could have a cumulative effect on the attraction and mortality of seabirds.

Indirect effects associated with artificial lighting are difficult to document. The holding or trapping of migrating birds at intense light sources can deplete their energy reserves, leaving them incapable of making it to nearest landfalls (Montevecchi 2006). Energy depletion in migratory seabirds could have severe consequences for winter survival or reproduction. Lighting could also attract predators (eg., gulls and Peregrine Falcons) to the vicinity of offshore platforms, which in turn could predate upon nocturnal seabirds attracted by artificial lights.

The Pacific OCS platforms are currently and will continue to be lit for compliance with U.S. Coast Guard (USCG) navigational hazard requirements during routine operations. Lighting on the platforms will be sufficient to assure safe operations and to be in compliance with USCG navigation hazard requirements but are not expected to result in significant impacts to the marine wildlife found in the region if the recommended mitigations are implemented. Recent observations from platforms Irene, Hermosa, Gail, Gina, and Edith by Reitherman and Gaede (2010) in the fall of 2010 indicated that bird species observed during 20 night monitoring events showed no signs of being attracted to or confused by the lit platforms they were monitoring. In addition, Reitherman and Gaede did not observe any evidence of birds deviating significantly from there predetermined migratory pathway. It is not known whether or to what extent such attraction disrupts migration or foraging behavior.

Nighttime marine construction is anticipated for some of the proposed actions including the eventual decommissioning of the platforms and therefore lit project vessels are expected to be present at project sites or while transiting between the port and the project sites. USCG-required vessel lighting is expected to be onboard all vessels. The potential effects of lighting on marine wildlife, particularly birds, are expected to be minimal if deck lighting is shielded and directed inward to avoid over-water lighting.

Although lights associated with the offshore oil platforms off southern California do appear to attract seabirds, it is not known whether or to what extent such attraction disrupts migration or foraging behavior. Specifically, although the Point Arguello platforms have been operating for 20 years or longer, there has been no indication that platform lighting has significantly affected any seabird species.

Artificial night lighting on the platforms and project vessels could potentially have an adverse effect on individual sea birds and potentially on populations of several sensitive bird species including the Marbled Murrelet, and State-designated threatened Scripps's Murrelet, and Guadalupe Murrelet. These species are all known to occur in the vicinity of the project area during both the breeding and non-breeding seasons, and are nocturnal foragers known to be attracted to artificial lighting.

27

**4.2 Noise Effects**

**Birds**

Noise created from transiting vessels, helicopters, and other operation-related activities including the eventual decommissioning of the platforms may exceed the threshold of potential effect for most birds, resulting in the potential for a flight response. Known data on sound-only flushes are available in Thiessen and Shaw (1957), Awbrey and Bowles (1990), Brown (1990), and Delaney et al. (1999).

Vessel and helicopter noise at a specific location is transitory; slowly increasing as a vessel approaches, and decreasing as it passes. Because of the transitory nature of this noise and the mobility of marine birds it is unlikely that a marine bird would suffer an injury or death from vessel and helicopter noise. In addition, it is expected that the visual presence of the vessels and helicopters will elicit a response from birds in the area before noise does (USFWS 2006b). Typical medium to large construction equipment (crane, large pumps, and generators) used throughout the offshore facilities would emit approximately 73 to 84 dB at 50 feet, which is near the 90 dB level that resource agencies consider potentially significant for many bird species.

Noise sources associated with the proposed activities in the Southern California Planning Area will include equipment such as vessels, aircraft, winches, generators, cable engines, ROV equipment, jet pumps, hydraulic pile driving equipment, and equipment associated with future decommissioning activities. Noise associated with construction activities on platforms are expected to be temporary and localized and are not expected to interfere with sensitive status bird species above the water surface. Noise resulting from operation of construction equipment below surface will result in an increase in underwater noise levels and these temporary increases could result in significant sound pressure levels.

While little is known regarding the effects of underwater pile driving and other sources of noise in the water column, there is a potential for effects to diving birds from impulsive (hard) underwater sound. Generally, noise produced from activities associated with pile driving might impact only those offshore species of birds that spend large quantities of time underwater, either swimming or plunge diving while foraging for food. Offshore birds that may be classified as underwater swimmers include certain waterfowl (some diving ducks) and seabirds (loons, grebes, shearwaters, cormorants, alcids). Generally, these species are limited to waters of the inner continental shelf. Waterfowl, loons, and grebes are seasonal migrants (winter), whereas cormorants and alcids are resident species with the latter family being found in higher numbers in the winter when individuals from more northern breeding areas migrate south to the Southern California Planning Area.

Monitoring of Marbled Murrelets during pile driving indicates that birds may come within the range of harmful effects of pile driving activity. The range of effects includes physical injury in the form of sublethal injuries, lethal injuries, and auditory effects, as well as non-physical behavioral effects. There is a continuum of injurious effects ranging from injury through death. The USFWS expects that onset of injury is indicated by loss of inner ear hair cells because these effects are the ones that are brought on with the least amount of sound exposure. Currently there are dual criteria for injury identified by the USFWS: 206 dB re 1μPa (peak) and 183 dB re 1μPa2-sec cumulative sound exposure level (SEL). The peak sound pressure level is the instantaneous maximum overpressure or underpressure observed during an event and the sound

exposure level (SEL) is the time-integrated sound pressure squared, expressed in dB re 1μPa2-sec.

Using this as a proxy for Marbled Murrelets, other alcids (e.g., Scripps's Murrelets), and other diving and plunge diving species in the Southern California Planning Area, it is anticipated that few if any diving birds will be injured by pile driving. With anticipated maximum hammer energy of 90 kJ, the corresponding maximum sound pressure throughout the water column is estimated at 202 dB$_{RMS}$ at 1 m from a conductor pipe. For piling driving projects in Washington State, this sound was modeled to attenuate to 190dB$_{RMS}$ at 3.5 m from the pipe, 180dB$_{RMS}$ at 10 m from the pipe and 160dB$_{RMS}$ at 325 m from the pipe (Bakeman et al. 2013). As a result, underwater noise thresholds that could cause an injury to a diving bird will likely only be achieved directly next to the equipment. If sound levels are ramped up gradually, it is anticipated that most birds will leave the project area before underwater noise pressures reach the injury thresholds. In addition, the distance from shore, water depths at the platforms and the ongoing industrial activities are likely to result in fewer diving birds in the vicinity of the platforms. Future platform decommissioning activities may involve underwater explosives that could create noise levels similar to those created by pile driving, but specifics of decommissioning activities have not been identified.

Airborne noise could also affect bird species in the project vicinity. Birds on the water surface, perched on the platform or flying in the vicinity of the platform could be exposed to airborne sounds associated with pile driving that have the potential to cause harassment, depending on their distance from pile-driving activities. If noise levels reach certain thresholds, it is expected that most birds will leave the area before any injury occurs. Based on an analysis conducted by the U.S. Fish and Wildlife Service that assessed the potential for noise effects to Marbled Murrelets in terrestrial habitats, virtually all birds (any species) are harassed by sounds at a level of 82db and are flushed by sounds ≥92dB. In addition, sounds 15dB above the ambient background have been defined as a minimum sound threshold that could result in harassment to birds. A 15 dB increase represents a 34-fold increase of sound energy, and is interpreted by humans as roughly "three times as loud."

In addition to equipment, vessel traffic from the support vessels and crew boats will increase noise levels during project activities. Noise created from transiting vessels may exceed the threshold of potential effect for most birds, resulting in the potential for a flight response. Vessel noise at a specific location is transitory; slowly increasing as a vessel approaches, and decreasing as it passes. Because of the transitory nature of this noise and the mobility of marine birds it is unlikely that a marine bird would suffer an injury or death from vessel noise. In addition, it is expected that the visual presence of the vessels will elicit a response from birds in the area before noise does (USFWS 2006b).

No potential project area would be near any marine bird breeding colonies where nesting birds could suffer greater noise-related effects than those foraging or transiting through any project area near the platforms. Therefore, noise impacts to listed and other special status marine bird species are not expected to be significant.

**Southern Sea Otters**

Although no direct information is available on the potential impacts of exploratory and development drilling operations on southern sea otters, Riedman (1983; 1984) did observe sea otter behavior during underwater playbacks of drillship, semi-submersible, and production

29

platform sounds and reported no changes in behavior or use of the area. Most of the otters observed by Riedman (1983) were at least 400 m from the projector; all observed by Riedman (1984) were at least 1.2 km away. Although sea otters at the surface were probably receiving little or no underwater noise, some otters continued to dive and feed below the surface during the playbacks. At 1.2 km, the received sound levels of the strongest sounds were usually at least 10 dB above the ambient noise level (Malme et al. 1983; 1984). Noise generating activities associated with the proposed action would occur more than 11 km (7 mi) offshore. Southern sea otters, except for juvenile males, rarely move more than 2 km offshore (Riedman 1987; Estes and Jameson 1988; Ralls et al. 1988), and thus could be expected to be at least 9 km away from the nearest noise generating activity. Because of this distance and the evidence from the playback experiments described above, no effects on southern sea otters from these activities are expected. In addition, southern sea otters are a near shore species; therefore, they are not expected to occur in the direct vicinity of the platforms where drilling and pile driving activities may occur.

No systematic studies have been made of the reaction of sea otters to aircraft and helicopters (Richardson et al. 1995). During aerial surveys of the southern sea otter range conducted at an altitude of about 90 m (Bonnell et al. 1983), no reactions to the two-engine survey aircraft were observed. The helicopter trips supporting the Southern California Planning Area will all be out of the Santa Barbara, Lompoc, and Santa Maria airports and are expected to pass to the south of the main southern sea otter range. Helicopter traffic is not expected to affect southern sea otters.

Although southern sea otters will often allow close approaches by boats, they will sometimes avoid heavily disturbed areas (Richardson et al. 1995). Garshelis and Garshelis (1984) reported that sea otters in southern Alaska tend to avoid areas with frequent boat traffic, but will reoccupy those areas in seasons with less traffic. The vessel traffic corridors through the Southern California Planning Area generally pass 4 km or more offshore. No effects on southern sea otters from service vessel traffic are expected.

### 4.3 Produced Water and Effluent Discharges

Produced water, including those containing well stimulation fluid constituents, can be disposed of through reinjection to a reservoir or through permitted discharge to the ocean after treatment. Reinjected waste fluids will not come in into contact with aquatic biota and is not expected to affect marine and coastal wildlife. Therefore, the primary effects to marine and coastal wildlife is the permitted platform discharge of produced water containing well stimulation fluids. Well stimulation fluids can contain biocides, acids, salts, hydrocarbon solvents, and surfactants, and potential effects from their discharge could include exposure to toxic levels of well stimulation chemicals through direct contact or from ingestion of contaminated food. Similarly, matrix acidizing well stimulations may release acids and ammonium compounds, which can be toxic to benthic organisms at high enough doses. However, compliance with the requirements of NPDES General Permit CAG280000 will greatly limit the potential for exposure of marine mammals to toxic concentrations of the well stimulation-related chemicals. Because well stimulation fluids are rapidly diluted in the open ocean, marine wildlife would be expected to experience only very low levels of exposure from the water column. Acids used by some well stimulation treatments undergo chemical reactions downhole and form non-acidic components in the flowback fluids. The acids are also water soluble, so any unreacted acid will be diluted by produced water in the flowback fluids and neutralized by natural seawater buffering following discharge. Thus, well stimulation-related chemicals, including any unreacted acids, are expected to have a negligible impact on marine wildlife.

Ex. 5, Page 31

E.R. 0941

Marine mammals and birds may be indirectly affected if discharges containing well stimulation-related chemicals reduce the abundance of prey species. However, because of the rapid dilution that would occur following permitted discharge, potential impacts on prey populations would be limited in extent and would not be expected to affect overall prey abundance. Thus, food chain uptake is not expected to be a major exposure pathway for marine mammals and birds at offshore facilities where well stimulation treatments are used. As discussed, well stimulation treatments are not expected to cause either an acute or a chronic effect on benthic organisms and fish species. Therefore, well stimulation treatments are not expected to affect the prey base for marine mammals and birds.

The EPA (2013), in its issuance of the final NPDES General Permit CAG280000 for discharges from offshore oil and gas facilities located in Federal waters off the coast of southern California, provided an analysis of the potential effects of regulated discharges on several federally listed marine mammal and bird species. The analysis concluded that no effects are anticipated for the listed marine mammals and birds, primarily because of the very limited time any individuals may spend near a platform.

Among the variety of habitats they are found in, adult California red-legged frogs inhabit brackish coastal lagoons formed seasonally behind sand berms that close the mouths of rivers and streams along the central coast of California. The California red-legged frog also breeds in lagoons where salinity and water temperature levels are within suitable levels for egg and tadpole development. Storms or tides may breach these natural berms, at which point the frogs move upstream to freshwater. Due to NPDES discharge permit requirements and the rapid dilution of the discharges, contaminants from effluent discharges associated with OCS activities including well stimulation-related discharges should not be measurable in the coastal waters and sediments that enter these lagoons. Thus, California red-legged frogs are not likely to be adversely affected by effluent discharges.

Tidewater gobies are found in shallow coastal lagoons, stream mouths, and shallow areas of bays. Due to NPDES discharge permit requirements and the rapid dilution of the discharges from releases near the platforms, contaminants from effluent discharges associated with OCS activities including well stimulation-related discharges should not be measurable in the coastal waters and sediments that enter these lagoons. Thus, tidewater gobies are not likely to be adversely affected by effluent discharges. A variety of accidents could occur during use of well stimulation treatments on the OCS that could potentially affect marine wildlife. These are associated primarily with accidental releases of well stimulation treatment chemicals and fluids, and crude oil. Impacts from an accident depend on the magnitude, frequency, location, and timing of the accident; characteristics of the spilled material; spill-response capabilities and timing; and various meteorological and hydrological factors. Impacts could include decreased health, reproductive fitness, and longevity; increased vulnerability to disease; and increased mortality. A spill could also lead to the localized reduction, disappearance, or contamination of prey species. Most accidental releases limited to well stimulation treatment -related chemicals and produced water would quickly dissipate and would only affect a small amount of habitat and relatively few individuals and only for a short time after the release.

An accident at a platform or a vessel could result in the release of well stimulation treatment chemicals to the ocean surface. Although some well stimulation treatment constituents such as acids or biocides are toxic, a surface spill during shipping of well stimulation treatment chemicals by service vessel or during offloading to a platform is expected to have minimal impact because it is not likely that the entire contents of a shipping container would spill, and because of dilution from

31

Ex. 5, Page 32

seawater in the area of a spill. Impacts from the release of well stimulation treatment constituents from a produced water pipeline would also be minimal due to the rapid dilution that would occur. Any impacts on marine and coastal birds would be temporary, localized, and affect few if any individuals. However, species such as gulls and shearwaters, which are attracted to offshore platforms or often follow vessels, may be more likely to be exposed to an accidental release. These birds may be directly exposed while feeding or resting in spills originating from platforms or service vessels and could incur lethal or sublethal effects.

An accident from a seafloor surface expression from a fracturing well stimulation treatment (which is not reasonably foreseeable for any well stimulation treatment and not a risk in matrix acidizing) would result in only a small release of well stimulation treatment fluids and hydrocarbons. Surface expression would be localized and quickly diluted; therefore, impacts on marine wildlife would be negligible. Marine wildlife that may otherwise be unaffected by an accidental release may be impacted by increased vessel traffic and remediation activities. Vessel noise and other factors related to increased human presence would likely cause changes in marine wildlife behavior and/or distribution.

### 4.4 Oil Spills

**Oil Spill Risk Assessment**

For the purposes of this ESA Section 7 consultation request, BOEM does not consider oil spills to be a *direct* effect of the action, given they are neither authorized nor intended to occur. BOEM does, however, concur that certain smaller oil spills (50 bbl or less) could be an *indirect* effect of the action, as defined under ESA regulations, given they are caused by the proposed action and are later in time, but still are reasonably certain to occur. This biological assessment therefore provides scenario and other information related to smaller accidental oil spills in Appendix A.

In the case of low-probability catastrophic spills, such as the 2010 Deepwater Horizon blowout and oil spill in the Gulf of Mexico, BOEM does not consider this category of spill to be an effect of the action, as defined under the ESA implementing regulations at 50 CFR §402.02, given (1) it is not an anticipated result of the proposed action and (2) it is not reasonably certain to occur since Pacific Outer Continental Shelf Region (POCSR) fields are mature and the majority of reservoirs have low to no pressure which require artificial lift to access the oil.

In the course of normal, day-to-day platform operations, small accidental discharges of hydrocarbons may be reasonably foreseeable. The largest oil spill in the POCSR occurred in 1969, when a loss of well control occurred on *Platform A*, offshore Santa Barbara, California which spilled an estimated 80,000 barrels (bbl) into the Santa Barbara Channel (Van Horn et al. 1988). The largest oil spill in the POCSR since 1969 was the 164 bbl *Platform Irene* pipeline spill in September 1997. Since 1969, a cumulative total of 919 barrels over a 44-year period has been spilled (Appendix A, Table A-1; TIMS spill volume report run December 29, 2014). Of the 48 oil spills greater than one bbl in the POCSR (1970-2014), only five measured 50 bbl or more in volume (Appendix A, Table A-1) The average oil spill size in the POCSR for all years is 57 bbl (1963-2014). In the "50 to less than 1,000 bbl" spill range the average oil spill size is 103 bbl. In the "1-50 bbl" range the average oil spill size is 7.11 bbl. [4] As shown in Appendix 1,

---

[4] From 1996 to 2010, the overall OCS average spill size in the size range of "50 to less than 1,000 bbl" is 186 bbl (Anderson et al., 2012).

Ex. 5, Page 33

Table A-1, 3.4% (49 of 1435) of the total recorded spills between 1970 and 2014 were greater than one bbl, spilling 827.7 bbl of oil into the ocean.

Given these data, the analysis presented in Appendix A, and the experience in the Pacific Region over the last 40 years, BOEM estimates the maximum most likely spill volume for the Pacific Region is 200 bbl.

Operators must report any spill that is 1 bbl or greater in the Southern California Planning Area. The development of more stringent regulations, implementation of rigorous inspection programs, imposition of civil and criminal penalties, and changes in equipment and procedures have all contributed to a safer work environment. Most recently, BSEE has promulgated regulations that require offshore operators to develop safety and environmental management systems which are intended to foster a corporate culture of environmentally responsible and safe working conditions.

The current knowledge of the geology and understanding of reservoir characteristics in the Southern California Planning Area is well advanced. Drilling techniques and equipment have improved and drilling into these mature fields is generally considered to be low risk. The Southern California Planning Area has experienced significant changes in the status of the oil and gas fields being developed and produced. Reservoir pressures have dropped to near zero in the majority of the fields now in production. In these cases, secondary[5] or tertiary[6] recovery methods are being used to force oil to the surface. The risk of a loss of well control (a blowout) resulting in a spill is exceedingly small under these conditions.

**Table 1**  Estimated mean number of spills and spill occurrence probability for the "50 to less than 1,000 bbl" size range using oil spill data from POCSR operations (1963-2011). Anticipated POCSR Production is 0.4073 Bbbl (0.292 [BSEE July 2014] + 0.0957 [Tranquillon Ridge] + 0.0035 [Electra Field] + 0.0161 [Carpinteria State] = 0.4073 Bbbl).

| POCS Spill data (1963-2014) | Spill Rate (2012*) | Estimated Mean Number of spills | Probability of 1 or more spills |
|---|---|---|---|
| Spills ≥ 50 to < 1,000 | | | |
| Platforms & Pipelines | 4.57 | 1.86 | 84.4 % |

Bbbl = billions of barrels      *spill rate calculation methodology: Anderson et. al., 2012

---

[5] Secondary refers to the reinjection of water or gas produced from the reservoir in order to push oil to the surface.
[6] Tertiary refers to the addition of chemicals designed to increase oil flow within a well.

33

E.R. 0944

**Table 2**    Estimated means and spill occurrence probabilities POCSR analyses using all US OCS Spill Data (1996-2010). Anticipated POCSR production is 0.4073 Bbbl.

| US OCS Spill Data (1996-2010) | Spill Rate (2012*) | Estimated Mean Number of Spills | Probability of 1 or More Spills |
|---|---|---|---|
| Spills ≥ 50 to < 1,000 | | | |
| Platforms & Pipelines | 12.88 | 5.24 | 99.5% |
| Spills ≥ 1000 | | | |
| Platforms | 0.25 | 0.10 | 9.7% |
| Pipelines | 0.88 | 0.36 | 30.1% |
| Total | 1.13 | 0.46 | 36.9% |

Bbbl = billions of barrels.        * Source: Anderson et. al., 2012

Taking into account these factors, the overall risk of an oil spill occurring has declined over time in the Southern California Planning Area. This said, other factors such as human error or equipment failure play a role in risk of an oil spill and small spills are likely to continue as long as oil is being produced.

BOEM calculated oil spill rates for the Pacific Region using oil spill data (1963-2014; Appendix A; Table A-1) and cumulative production from the Pacific Region. BOEM estimated the number of oil spills and the probability of one or more spills that could occur as a result of ongoing activities in the Southern California Planning Area in the "50 to less than 1000 bbl" size-range using Pacific Region oil spill rates. Oil spill occurrence is calculated as a function of the total amount of oil that could be economically produced in the Southern California Planning Area. We estimate, in the "50 to less than 1,000 bbl" size-range, there will be 1.86 spills with an 84.4% probability of occurrence for the remaining oil that could be economically produced from the Southern California Planning Area (Table 1).

For comparison, BOEM calculated oil spill probabilities using oil spill rates derived from all United States Outer Continental Shelf (US OCS) operations (1996-2010) and the total amount of oil that could be economically produced in the Southern California Planning Area (Anderson et. al., 2012). Using spill rates based on all US OCS Operations (1996-2010), the probability of one or more spills occurring in the Pacific Region for the "50 to less than 1,000 bbl" size range is 99.5%. The lower probability (84.4%) of spills in the "50 to less than 1,000 bbl" size range using POCSR oil spill data is reflective of the lower number of oil spills throughout POCSR production history. Using spill rates based on all US OCS operations (1996-2010), the probability of one or more spills occurring in the greater than 1,000 bbl size range is 36.9% (Appendix A, Table A-3). This is a conservative estimate based on overall US OCS operations. For the greater than 1,000 bbl size range, we did not calculate oil spill rates with only POCSR data due to the limited dataset (1 spill > 1,000 bbl occurred in 1969). A spill of this size would be an unlikely event in the POCSR since POCSR fields are mature and the majority of reservoirs have low to no pressure which requires artificial lift to access the oil.

Oil spill probability estimates are conservative given POCSR's:

- oil spill history,
- long established drilling program,
- producing from mature fields with lower pressure,
- no floating drilling rigs,
- no new platforms being installed, and
- all oil is transported via pipelines.

**Oil Spill Trajectory Analysis**

Oil spill trajectory modeling was conducted to determine the movement and fate of spilled oil if a spill occurred in the Southern California Planning Area from existing offshore oil and gas operations. The BOEM examined two available models: BOEM Oil Spill Risk Analysis (OSRA) and National Oceanic & Atmospheric Administration (NOAA) Office of Response & Restoration's General NOAA Operational Modeling Environment (GNOME). GNOME was developed by the Emergency Response Division (ERD) of NOAA's Office of Response and Restoration. This information can be used in conjunction with data from the oil spill risk assessment to provide perspective on the potential for exposure to spilled oil.

The OSRA model calculates numerous trajectories for hypothetical oil spills from pre-designated launch points by varying the wind and ocean current fields. Contact was evaluated in a grid encompassing the entire ocean region as well as grids located along the shoreline (Appendix A, Figure A-1; MMS 2000). Percent contact for a grid section is calculated by OSRA (e.g., Appendix A, Figures A-2 and A-3). The OSRA trajectories are volume-independent and only show where oil would travel given that a spill occurred.

The BOEM ran the GNOME model in three oceanographic regimes (see Appendix A, Section A.5). Releases were modeled for three wind directions correlated with the ocean current flow regimes. The GNOME model takes ocean currents and wind into account. The contacts displayed in Figures A-4 – A-8 are only for a limited set of meteorological conditions (Appendix A, Table A-5) and are not intended to encompass all of the wind conditions that could be present during a spill scenario. GNOME model outputs provide an overall picture of where oil may travel if an oil spill occurred from one of the launch points.

<u>Southern California Planning Area</u>

Six platforms were chosen as launch points because they are distributed throughout the geographic range of existing offshore operations as follows:

- *Santa Maria Basin* - Platforms Irene and Hidalgo;
- *Santa Barbara Channel* - Platforms Harmony, Hillhouse and a group in the eastern Channel (Gail, Grace, Gilda and Gina); and
- *San Pedro Bay* - Platform Elly.

*Santa Maria Basin*

<u>Platform Irene</u>. The models show that areas of the coastline from the Santa Maria River mouth to Gaviota and the northern Channel Islands were most likely to be affected by an oil spill from Platform Irene. (Appendix A, Figures A-2A-C and A-4 and A-5). The OSRA analysis for Platform Irene displays the highest probability (50-60%) of oil contacting land at Point Arguello

and a 10-20% chance of contact at San Miguel Island (Appendix A, Figure A-2A). GNOME modeled spilled oil traveled from Platform Irene to as far north as San Luis Obispo Bay and off the coast of Montana De Oro State Park. The northern-most mainland contact is just south of Pismo Beach at Guadalupe-Nipomo Dunes NWR (Appendix A, Figure A-4).

Platform Hidalgo. The models estimated oil contacting land around Point Arguello and San Miguel Island. The Hidalgo OSRA analysis displays a 20-30% probability of oil contacting Point Arguello and a 10-20% chance of contact at San Miguel Island (Appendix A, Figure A-2B). The GNOME model estimates land fall around Point Conception, Santa Rosa Island and Santa Cruz Island. The GNOME model also estimates oil traveling further north up the coast to Point Sal and toward San Luis Obispo Bay (Appendix A, Figure A-5).

*Santa Barbara Channel*

Platform Harmony. The models show that areas of coastline from Vandenberg Air Force Base to Santa Barbara County and northern coastlines of the Channel Islands are most likely to be affected by an oil spill from Platform Harmony. Platform Harmony OSRA analysis displays a 20-30% chance of oil contacting the mainland Gaviota coast and San Miguel Island and a 10-20% chance of oil contacting Santa Rosa and Santa Cruz Islands (Appendix A, Figure A-2C), while the GNOME model runs estimate oil landing as far north as Point San Luis (Appendix A, Figure A-6).

Platform Hillhouse. The OSRA model estimates a 30-40% probability of oil contacting mainland Santa Barbara and a 10-20% probability that oil will travel along the mainland as far north as the Gaviota coast and as far south as Ventura as well as out toward Anacapa Island (Appendix A, Figure A-3A), while the GNOME estimates oil traveling as far west as Santa Barbara and Point Conception (Appendix A, Figure A-7).

*Eastern Santa Barbara Channel*

Platforms Grace, Gail, Gina, Gilda (modeling within a similar area). A spill modeled in OSRA from Platform Grace displays a 40-50% probability that oil will contact the east end of Anacapa Island and a 30-40% probability that it will contact the entire island. There is a 20-30% probability of contacting Port Hueneme and Santa Cruz Island and a 10-20% probability of contacting the mainland as far north as Goleta and as far south as Point Mugu (Appendix A, Figure A-3B). The GNOME model for Platform Gail estimates landfall from mainland Santa Barbara to south of Ventura Harbor in Oxnard and out to Anacapa Island (Appendix A, Figure A-8).

*San Pedro Basin*

Platform Elly. The OSRA model output estimates spilled oil to primarily stay within the San Pedro Bay and travel south along the mainland to Oceanside (Appendix A, Fig A-3C). The OSRA analysis for the Beta Unit, Platform Elly, displays a 40-50% probability of oil contacting the mainland from Huntington Beach to Newport Beach and a 10-20% probability of oil traveling as far north as Alamitos Bay and as far south as Oceanside. No trajectory runs were conducted using GNOME because GNOME, as configured for this study, was limited to the geographic area of the Santa Barbara Channel and just north of Point Conception.

Ex. 5, Page 37

**Oil Spill Response**

BSEE regulations at 30 CFR Part 254 require that each OCS facility have a comprehensive Oil Spill Response Plan (OSRP). Response plans consist of an emergency response action plan and supporting information that includes an equipment inventory, contractual agreements with subcontractors and oil spill response cooperatives, worst-case discharge scenario, dispersant use plan, in-situ burning plan and details on training and drills. The Coast Guard is the lead response agency for oil spills in the coastal zone and coordinates the response using a Unified Command (UC), consisting of the affected state and the Responsible Party (i.e., the entity responsible for spilling and/or remediating the oil) in implementing the Incident Command System (ICS) if an oil spill occurs. Oil spill drills, either agency-lead or self-lead by a lessee/operator/contractor, also use the UC/ICS. California's Office of Spill Prevention and Response (OSPR) assumes the role of the State on-scene coordinator and plays a significant role in managing wildlife operations in the Southern California Planning Area as the state's Natural Resource Agency.

BSEE requires companies that operate in the OCS to have the means to respond to a worst-case discharge from their facilities. Many companies meet this requirement by becoming members of Oil Spill Removal Organizations (OSRO). Since 1970, oil companies operating in the Santa Barbara Channel and Santa Maria Basin have funded and operated a non-profit OSRO called Clean Seas ([www.cleanseas.com](www.cleanseas.com)). Clean Seas acts as a resource to its member companies by providing an inventory of state-of-the-art oil spill response equipment, trained personnel, training and expertise in planning and executing response techniques. Clean Seas personnel and equipment are on standby, ready to respond to an oil spill, 24 hours a day.

The Marine Spill Response Corporation (MSRC) is the other U.S. Coast Guard-classified OSRO based in Long Beach ([www.msrc.org](www.msrc.org)). MSRC is a nation-wide OSRO with multiple responder-class oil spill response vessels and oil spill response barges. They are also equipped to respond to an oil spill 24 hours a day.

Clean Seas and MSRC are both equipped and prepared to respond to oil spill threats to sensitive shoreline areas through the detailed and up-to-date information on sensitive areas and response strategies from the Los Angeles/Long Beach Area Contingency Plan ([https://www.wildlife.ca.gov/OSPR/Preparedness/LA-LB-Spill-Contingency-Plan](https://www.wildlife.ca.gov/OSPR/Preparedness/LA-LB-Spill-Contingency-Plan)) and the California OSPR ([https://www.wildlife.ca.gov/OSPR](https://www.wildlife.ca.gov/OSPR)).

All the OSROs in the Pacific Region are able to respond to oil spills using a variety of "tools in the tool box." These tools include mechanical recovery systems (e.g., booms, skimmers, storage devices, etc.), dispersants and, rarely, if ever, in-situ burning. Most oil recovery or remediation tools fall into these categories. In the event of a spill, as noted above, the US Coast Guard, California's Office of Oil Spill Prevention and Response and the Responsible Party will form the Unified Command and begin to make decisions as to how best respond to the spill in the most efficient manner, using the available tools. Dispersants and in-situ burning are used only after members of the Unified Command as well as trustee agencies are consulted. Neither of these tools have ever been used in the Pacific Region, although the OSROs are prepared to do so.

**Fate and Effects of Oil**

When an oil spill occurs, many factors determine whether that oil spill will cause significant, long lasting biological effects; comparatively little damage or no damage; or some intermediate degree of effect. Among these factors are the type, rate, and volume of oil spilled, geographic

Ex. 5, Page 38

E.R. 0948

location, and the weather and oceanographic and meteorological conditions at the time of the spill. These parameters determine the quantity of oil that is dispersed into the water column; the degree of weathering, evaporation, and dispersion of the oil before it contacts a shoreline; the actual amount, concentration, and composition of the oil at the time of shoreline or habitat contact; and a measure of the toxicity of the oil. Additionally, the level of oil spill preparedness, rapidity of response, and the cleanup methods used can also greatly influence the overall impact levels of an oil spill.

In the event of an accidental oil spill, a slick forms and part of the slick begins evaporating while the action of breaking waves forms oil droplets that are dispersed into the water column. Oil in the Southern California Planning Area ranges from very heavy (API 12) to very light (API 39). Light oil has a rapid evaporation rate and is soluble in water. Light crude oils can lose up to 75% of their initial volume within a few days of a spill (NRC 2003). In contrast, heavy oil (API <22) has a negligible evaporation rate and solubility in water.

Depending on the weight of the oil spilled and the environmental conditions (i.e., sea state) at the time of a spill, six to 60% of oil during an oil spill would sink and be in the water column or on the seafloor in the vicinity of the spill (Arthur D. Little 1984). This is supported by a recent study of natural oil seeps at Coal Oil Point in the Santa Barbara Channel that range in depth from six to 67 meters offshore of Goleta, CA (Leifer et al. 2006) and are assumed to release 100 bbl/day (Farwell et al. 2009). The distribution of heavy oil in a surface slick in the Santa Barbara Channel is primarily influenced by surface currents and falls out of the slick over a period of 0.4 to 5 days (Leifer et al. 2006).

A 200 bbl spill could oil several kilometers of coastline. The likely result would be patches of light to heavy tarring of the intertidal zone resulting in localized effects to contacted biological communities. The recovery time for these communities would depend on the environment. Within several months, natural processes will remove the oil from the rocks and beaches in these high energy rocky coasts, while low energy lagoons and soft-sediment embayments can retain stranded oil residue for several years.

Oil in the marine environment can, in sufficient concentrations, cause adverse impacts to fishes (NRC 1985; GESAMP 1993). The effects can range from direct mortality to sublethal effects that inhibit growth, longevity, and reproduction. Benthic macrofaunal communities can be heavily affected, as well as intertidal communities that provide food and cover for fishes.

The field observations of an oil spill's effects on the marine environment are taken mostly from very large oil spills that have occurred throughout the world over the past three decades. There is an 84.4-percent probability 1.86 spills in the 50-1,000-bbl size range would occur in the Southern California Planning Area during the remaining production period. Based on the distribution of past spill sizes, it is estimated that such a spill probably would be less than 200 bbl in volume. In perspective, the *Exxon Valdez* spilled about 36,000 tonnes (~270,000 bbl) of crude oil into Prince William Sound and the *Sea Empress* released 72,000 tonnes (~540,000 bbl) of crude oil off southwest Wales. The *American Trader* spilled about 416,000 gallons (~10,000 bbl) of crude oil offshore Huntington Beach, California. Most recently, in September 1997, a rupture in a 20-inch offshore pipeline emanating from Platform Irene resulted in the discharge of at least 6,846 gallons (163 bbl) of crude oil off the Santa Barbara coast. The spill resulted in the fouling of approximately 17 miles of coastline, and caused impacts to a variety of natural

38

Ex. 5, Page 39

E.R. 0949

resources, including seabirds, sandy and gravel beach habitats, rocky intertidal shoreline habitats, and use of beaches for human recreation.

**Effects on Southern Sea Otters by Oil Spills**

Southern sea otters, which rely almost entirely on maintaining a layer of warm, dry air in their dense underfur as insulation against the cold, are among the most sensitive marine mammals to the effects of oil contamination (Kooyman et al. 1977; Geraci and St. Aubin 1980; Geraci and Williams 1990; Williams and Davis, 1995). Even a partial fouling of a sea otter's fur, equivalent to about 30 percent of the total body surface, can result in death (Kooyman and Costa 1979). This was clearly demonstrated by the *Exxon Valdez* oil spill (Davis 1990; Ballachey et al. 1994; Lipscomb et al. 1994). Earlier experimental studies had indicated that sea otters would not avoid oil (Barabash-Nikiforov 1947; Kenyon 1969; Williams 1978; Siniff et al. 1982), and many sea otters were fouled by oil during the Alaskan spill. Approximately 360 oiled sea otters were captured and taken to treatment centers over a 4-month period, and more than 1,000 dead sea otters were recovered (Geraci and Williams 1990; Zimmerman et al. 1994). Ballachey et al. (1994) concluded that several thousand sea otters died within months of the spill, and that there was evidence of chronic effects occurring for at least 3 years.

The critical factors involved in sea otter mortality in Alaska, as identified by Williams (1990), were: 1) hypothermia, directly due to the decrease in insulation resulting from fouling of the pelage; 2) pulmonary emphysema, which was thought to be due to the inhalation of toxic fumes and was more or less limited to the first 2 weeks; 3) hypoglycemia, which was possibly due to poor gastrointestinal function; and 4) lesions in other organs (liver, heart, spleen, kidney, brain), which were probably due to ingestion of oil, as well as to stress. Williams felt that stress due to the effects of captivity contributed to tissue damage in otters brought into the treatment centers for cleaning, and that pulmonary emphysema was probably the most serious problem, since it was untreatable.

Potential indirect effects on southern sea otters resulting from an oil spill include a reduction in available food resources due to mortality or unpalatability of prey organisms and the loss of appropriate habitat available to sea otters as kelp forest communities become contaminated (Riedman 1987).

The most likely oil spill scenario for the Southern California Planning Area, based on OCS spill data for California, is that 1.86 spills of a volume ranging between 50 and 1,000 bbl has an 84.4% probability of occurrence during the life of the project (Section 4.4). Based on the distribution of past spill sizes, it is estimated that such spills probably would be less than 200 bbl in volume. The level of impact would depend on the size of the spill, the success of containment efforts, and the length of time for the spill to reach the mainland or island coasts. However, the probability that an oil spill of equal to or greater than 1,000 bbl would occur also exists.

Within the Southern California Planning Area, southern sea otters are regularly found along the entire coast of San Luis Obispo County, along the Santa Barbara County coast line from the Santa Maria River mouth to Gaviota, and around San Nicolas Island. Areas within the modeled oil spill trajectories with higher densities of sea otters include the San Luis Bay vicinity (approx. 3.5-10 otters/500 m of shoreline) and either side of Point Conception (2.3-3.5 otters/500 m of shoreline). All of the models agree that areas of the coastline from the Santa Maria River mouth to Gaviota and the northern Channel Islands were most likely to be affected by an oil spill from Platform Irene. The OSRA analysis for Platform Irene displays the highest probability (50-60%) of oil contacting land at Point Arguello. GNOME modeled spilled oil traveling from Platform

39

Irene to as far north as San Luis Obispo Bay and off the coast of Montana De Oro State Park. The northern-most mainland contact is just south of Pismo Beach at the Guadalupe-Nipomo Dunes NWR.

The OSRA analysis of a hypothetical spill from Platform Hidalgo displays a 20-30% probability of oil contacting Point Arguello. The 1984 model and GNOME models also estimate land fall around Point Conception, Santa Rosa Island and Santa Cruz Island. The GNOME model estimates oil traveling further north up the coast to Point Sal and toward San Luis Obispo Bay.

All models agree that areas of coastline from Vandenberg Air Force Base to Santa Barbara County and northern coastlines of the Channel Islands are most likely to be affected by an oil spill from Platform Harmony. The primary differences are that the GNOME model runs estimate oil landing as far north as Point San Luis and the 1984 model analyses estimate oil landing as far south as San Nicolas and San Clemente Islands. The Platform Harmony OSRA analysis displays a 20-30% chance of oil contacting the mainland Gaviota coast and San Miguel Island.

The OSRA model of a hypothetical spill from Platform Hillhouse projects a 30-40% probability of oil contacting mainland Santa Barbara and a 10-20% probability that oil will travel along the mainland as far north as the Gaviota coast and as far south as Ventura as well as out toward Anacapa Island. GNOME models oil traveling as far west as Santa Barbara and Point Conception.

Thus, there is a reasonable chance that a spill of less than 200 bbls in size would contact the shoreline at the southern end of the present southern sea otter range from San Luis Bay to Goleta and a lower probability of oil contacting San Nicolas Island. Predicting the length of coastline affected by an oil spill that comes ashore is extremely difficult due to the complexity of the process, which depends on factors such as nearshore wind patterns and currents, coastal bathymetry, tidal movements, and turbulent flow processes. There is a reasonable probability of southern sea otter contacts occurring as a result of a spill within the Southern California Planning Area.

Ford and Bonnell (1995), in their analysis of the potential impacts of an *Exxon Valdez*-sized spill on the southern sea otter, concluded that oil spills occurring at the southern end of the otter range present the smallest risk to the population. However, since 1995, southern sea otter range expansion to the south has continued. During annual spring surveys conducted since 1983, the population of southern sea otters between Cayucos and Gaviota has grown from a total a total of 117 otters in 1983 to 800 individuals in 2016 (Tinker and Hatfield 2016). While annual numbers have fluctuated over this time, the most recent 5-year mean of otters for that region is 701 individuals. This southern portion of the range comprises approximately 23 percent of the total 2016 population of 3,511 (Tinker and Hatfield 2016).

If a spill were to occur, the magnitude of expected southern sea otter mortality would vary with a number of factors, including the time of year, volume of oil spilled, wind speed and direction, current speed and direction, distance of the spill from shore, volume of oil contacting the shoreline, condition of the oil contacting the shoreline, the success of containment operations, number of animals contacted, and the effectiveness of otter cleaning and rehabilitation.

In its Final Revised Recovery Plan for the Southern Sea Otter (USFWS 2003), the USFWS makes the assumption that, lacking reliable data on the survivability of oiled sea otters in the wild, all sea otters coming into contact with oil within 21 days of a spill will die.  The USFWS

Ex. 5, Page 41

recognizes that activation of the California Department of Fish and Game's wildlife care facilities and oil spill response protocols would mitigate these impacts to some extent and that this assumption is probably conservative. Rapid and effective oil spill cleanup response would also lessen impacts on sea otters in the spill area. Nevertheless, it is expected that 1.86 spills of a volume ranging between 50 and 1,000 bbl will occur in the Southern California Planning Area during the remaining production period, and it is estimated that these spills will likely be less than 200 bbls in size. Given the likelihood a spill making landfall along the mainland coast, there is a reasonable probability of sea otter contacts occurring as a result of a spill. Although the seasonal nature of sea otter occurrence in the area and the oil spill prevention and response capabilities in place, may act to reduce the number of affected otters, due to the increasing number of sea otters expanding into the project area, moderate impacts to the southern sea otter within the Southern California Planning Area are expected, including mortality of animals.

Oil spills associated with the Southern California Planning Area are likely to result in low to moderate impacts to the southern sea otter, including limited mortality. Impacts to sea otters would be most likely to occur from a rupture of a pipeline, and could affect sea otters in the area from San Luis Bay to Gaviota. These impacts would be more severe if a spill occurred during spring months when seasonal migration brings large rafts of (predominately male) sea otters to the southern extent of their current range, off Point Conception. Additionally, if southward range expansion by the southern sea otter continues, increasing numbers of otters will be expected to occur east of Point Conception to Gaviota that could be affected in the event of an oil spill.

**Effects on Birds by Oil Spills**

Oil spills pose a significant threat to marine and shore birds. The effects of oil on seabirds have been extensively reviewed (e.g., Bourne 1976; Fry 1987; Leighton 1995; Burger and Fry 1983). Because of the migratory nature of many bird species in the region, the significance of any impacts from a spill will depend on the habitats affected, the time of year, species present, and the numbers of birds in the area at the time of the spill.

The immediate danger of oil to most birds is to clog or mat the fine structure of the feathers that are responsible for maintaining water repellency and heat insulation. Oiled birds are subject to hypothermia, loss of buoyancy, impaired ability to fly, and reduction in foraging ability. In addition to coating by oil, birds are also subject to chronic, long-term effects from oil that remains in the environment (Laffon et al. 2006; Alonso-Alvarez and Ferrer 2001). Small amounts of oil on a bird's plumage that were transferred to eggs during incubation have been shown to kill developing embryos (Albers 1978; Szaro et al. 1978). Birds can also accumulate oil in their diet and through preening. Holmes and Cronshaw (1977) and Brown (1982) have reviewed physiological stresses that can result from ingestion. An oil spill that affects important bird habitats (e.g., coastal marshes, intertidal foraging areas), even during periods of low use, may pose long-lasting problems. Birds have been observed to leave an area that has been affected by a spill (Hope et al. 1978; Chapman 1981; Albers, 1984). Albers (1984) suggests that such movements would cause severe impacts during the breeding season.

The endangered Light-footed Ridgway's Rail and California Least Tern, the threatened Western Snowy Plover and its designated critical habitat, and the threatened Marbled Murrelet are all present in the Southern California Planning Area during certain times of year and may suffer mortality or other adverse effects in the event of an oil spill.

**Light-footed Ridgway's Rail**

Light-footed Ridgway's Rails are at risk from an oil spill because they are confined to coastal salt marshes that could be contacted by oil. Individual rails, their eggs, and their nesting and sheltering habitat could suffer the effects of oiling. The oil spill cleanup process, if not conducted in accordance with federal and state regulations, could exacerbate the effects of an oil spill on the Light-footed Ridgway's Rail's habitat.

The Light-footed Ridgway's Rail population has remained relatively small and stable for many years. This taxa is also limited to only a very few marshes, and this, combined with their low population, makes them more vulnerable to an oil spill. For the reasons listed in Section 4.4, there is a 84.4-percent probability 1.86 spills in the 50-1,000-bbl size range would occur in the Southern California Planning Area during the remaining production period. Based on the distribution of past spill sizes, it is estimated that such a spill probably would be less than 200 bbl in volume. An oil spill >1,000-bbl is unlikely in the Southern California Planning Area.

Within the areas modeled in the spill analysis, there are marshes occupied by Light-footed Ridgway's Rails at the Carpinteria Salt Marsh, Mugu Lagoon, Seal Beach, and Newport Back Bay. The populations at the Carpinteria Salt Marsh and Mugu Lagoon are small, but the populations at Seal Beach and Upper Newport Bay are among the largest in California. Based on the OSRA model estimation (see Section 4.4), a hypothetical spill in the Santa Barbara Channel from Platform Hillhouse has a 30-40% probability of oil contacting mainland Santa Barbara and a 10-20% probability that oil will travel along the mainland as far north as the Gaviota coast and as far south as Ventura. A spill of this prediction could impact any birds occurring in the Carpinteria Salt Marsh if oil was to get in the marsh, although the likelihood of impacts there are low because no Light-footed Ridgway's Rails have been detected there since 2011.

Based on the OSRA model estimation (see Section 4.4), a hypothetical spill in the eastern Santa Barbara Channel from Platform Grace has a 10-20% probability of oil contacting the mainland as far south as Point Mugu. If oil was transported into Mugu Lagoon through tidal action, there is a potential that Light-footed Ridgway's Rails there could be adversely affected. With the numbers of Light-footed Ridgway's Rails increasing there in recent years, individuals have spread out and occupied new areas within the marsh including several areas closer to the mouth of the lagoon (Zembal et al. 2006; Pereksta pers. obs. 2015). This increases the possibility of adverse effects occurring if oil made it into the lagoon.

Based on the OSRA model estimation (see Section 4.4), a hypothetical spill in the San Pedro Basin from Platform Elly has a 40-50% probability of oil contacting the mainland from Huntington Beach to Newport Beach and a 10-20% probability of oil travelling as far north as Alamitos Bay and as far south as Oceanside. This area has several marshes occupied by Light-footed Ridgway's Rails including the Seal Beach NWR, Bolsa Chica wetlands, Huntington Beach wetlands, and Upper Newport Bay. The populations at the Seal Beach NWR and Upper Newport Bay are two of the three largest in California. If oil from a spill made it into these coastal wetlands, it could have adverse effects on Light-footed Ridgway's Rails. This taxa is resident so spills at any season could have effects, although a spill during the breeding season (March-August) has the potential to affect more sensitive life stages including eggs and chicks.

Although, a large (>1,000-bbl) oil spill from platforms with the Southern California Planning area is unlikely, based on the distribution of past spill sizes, it is estimated that a spill from the Southern California Planning area would probably be less than 200 bbl in volume (see Section

42

4.4). If a spill of about 200 bbl were to occur and contact any of the salt marshes identified above, impacts to Light-footed Ridgway's Rails could occur. The level of impact would depend on the size of the spill, the success of containment efforts, and the length of time for the spill to reach the wetlands. Although the outcome of containment efforts cannot be predicted, response at the site of a potential spill should be rapid. The nature of the identified wetlands provides opportunities for protecting the areas occupied by the Light-footed Ridgway's Rail. A greater than 1,000-bbl spill is not expected (see Section 4.4), but if one were to occur and reach wetlands occupied by the taxa, containment measures might not be able to prevent some impacts to this taxa.

The salt marshes occupied by Light-footed Ridgway's Rails are more easily protected than the open coast, which reduces the chance that Light-footed Ridgway's Rails could be affected by an offshore oil spill. Given that a spill occurring as a result of the proposed project would probably be less than 200 bbl in volume, the low likelihood that impacts to an occupied salt marsh would occur, and the oil spill prevention and response capabilities in place, impacts to Light-footed Ridgway's Rails from the proposed project are expected to be minor.

**California Least Tern**

The California Least Tern is highly susceptible to oiling because they nest and roost on beaches and mud flats that may be contacted by an oil spill or are in close proximity to the ocean or an estuary. They can experience direct mortality from oiling of birds and eggs, and could also experience loss of prey availability due to contamination. They could also be exposed directly to oil if they were feeding in waters affected by a spill because they dive into the water to catch their fish prey. Lastly, the California Least Tern would be adversely affected if cleanup activities were to occur on nesting beaches.

The most likely oil spill scenario for the Southern California Planning Area, based on OCS spill data for California, is that 1.86 spills of a volume ranging between 50 and 1,000 bbl has an 84.4% probability of occurrence during the life of the project (Section 4.4). Based on the distribution of past spill sizes, it is estimated that such spills probably would be less than 200 bbl in volume. The level of impact would depend on the size and timing of the spill, the success of containment efforts, and the length of time for the spill to reach the mainland coast. Although the outcome of containment efforts cannot be predicted, response at the site of a potential spill should be rapid. If an oil spill were to occur within the Southern California Planning Area, there is a probability of oil contacting California Least Tern breeding colonies when the terns are present in California during their breeding season.

California Least Terns breed along the coasts of San Luis Obispo, Santa Barbara, Ventura, Los Angeles, Orange, and San Diego Counties from Oceano Dunes in San Luis Obispo County to the Tijuana River Estuary in San Diego County. There are 18 breeding localities that are in or directly adjacent to the areas modeled as being impacted by oil spills in the Southern California Planning Area. Based on oil spill models, hypothetical spills from Pacific OCS platforms in the Santa Maria Basin, the Santa Barbara Channel, east Santa Barbara Channel, and San Pedro Basin have the potential to come ashore in areas where California Least Terns are nesting or roosting.

The OSRA analysis for a hypothetical spill from Platform Irene displays the highest probability (50-60%) of oil contacting land at Point Arguello. GNOME modeled spilled oil traveling from Platform Irene to as far north as San Luis Obispo Bay and off the coast of Montana De Oro State Park. The northern-most mainland contact is just south of Pismo Beach at Guadalupe-Nipomo

43

Ex. 5, Page 44

Dunes NWR. California Least Terns are known to nest within this region at the Oceano Dunes State Vehicular Recreation Area (SVRA), Rancho Guadalupe Dunes, and Vandenberg Air Force Base.

The OSRA analysis for a hypothetical spill from Platform Hidalgo displays a 20-30% probability of oil contacting Point Arguello. The 1984 model and GNOME models also estimate land fall around Point Conception. The GNOME model estimates oil traveling further north up the coast to Point Sal and toward San Luis Obispo Bay. California Least Terns are known to nest within this region at the Oceano Dunes SVRA, Rancho Guadalupe Dunes, and Vandenberg Air Force Base.

All models agree that areas of coastline from Vandenberg Air Force Base to Santa Barbara County and northern coastlines of the Channel Islands are most likely to be affected by an oil spill if it should occur from Platform Harmony. The primary differences are that the GNOME model runs estimate oil landing as far north as Point San Luis and the 1984 model analyses estimate oil landing as far south as San Nicolas and San Clemente Islands. The Platform Harmony OSRA analysis displays a 20-30% chance of oil contacting the mainland Gaviota coast. California Least Terns are known to nest within this region at the Oceano Dunes SVRA, Rancho Guadalupe Dunes, and Vandenberg Air Force Base.

The OSRA model of a hypothetical spill from Platform Hillhouse shows a 30-40% probability of oil contacting mainland Santa Barbara and a 10-20% probability that oil will travel along the mainland as far north as the Gaviota coast and as far south as Ventura as well as out toward Anacapa Island (Figure 2A). GNOME models oil traveling as far west as Santa Barbara and Point Conception (Figure 6). California Least Terns are known to nest within this region at the Coal Oil Point, the Santa Clara River mouth, and Hollywood Beach.

The GNOME model of a hypothetical spill from Platform Gail estimates landfall from mainland Santa Barbara to south of Ventura Harbor in Oxnard and out to Anacapa Island. There is a 20-30% probability of oil contacting Port Hueneme and a 10-20% probability of oil contacting the mainland as far north as Goleta and as far south as Point Mugu. California Least Terns are known to nest within this region at the Coal Oil Point, the Santa Clara River mouth, Hollywood Beach, Ormond Beach, and Point Mugu.

The OSRA model of a hypothetical spill from Platform Elly estimates spilled oil to primarily stay within the San Pedro Bay and travel south along the mainland to Oceanside. The OSRA analysis for the Beta Unit, Platform Elly, displays a 40-50% probability of oil contacting the mainland from Huntington Beach to Newport Beach and a 10-20% probability of oil traveling as far north as Alamitos Bay and as far south as Oceanside. No trajectory runs were conducted using GNOME because GNOME, as configured for this study, was limited to the geographic area of the Santa Barbara Channel and just north of Point Conception. California Least Terns are known to nest within this region at the LA Harbor, Seal Beach NWR, Bolsa Chica Ecological Reserve, Huntington State Beach, the Burris Basin, Upper Newport Bay, Camp Pendleton, and Batiquitos Lagoon.

If a spill of about 200 bbl were to occur during the spring or summer and contact the shoreline where California Least Terns are breeding, impacts to terns could occur, including some mortality. The severity of these impacts would depend on the size of the spill, the length of shoreline contacted, and the number of terns present in the area. A minimum of 2,451 pairs and a maximum of 3,324 pairs produced 3,432 nests in 2015 in the regions that could be affected by oil

Ex. 5, Page 45

spills in the Southern California Planning Area. This is 62% of the breeding effort within California (Frost 2015).

**Western Snowy Plover**

The Pacific Coast population of the Western Snowy Plover is vulnerable to oil spills. Western Snowy Plovers forage along the shoreline and in sea wrack (seaweed and other natural wave-cast organic debris) at the high-tide line and are thus at risk of direct exposure to oil during spills. They can experience direct mortality from oiling of birds and eggs, and could also experience loss of prey availability due to contamination. The Western Snowy Plover could also be adversely affected if cleanup activities were to occur on nesting or wintering beaches.

The Western Snowy Plover population has been declining almost since surveys for the taxa were first conducted. Their small population and sandy beach habitat make snowy plovers more vulnerable to an oil spill. The most likely oil spill scenario for the Southern California Planning Area, based on OCS spill data for California, is that 1.86 spills of a volume ranging between 50 and 1,000 bbl has an 84.4% probability of occurrence during the life of the project (Section 4.4). Based on the distribution of past spill sizes, it is estimated that such spills probably would be less than 200 bbl in volume. The level of impact would depend on the size of the spill, the success of containment efforts, and the length of time for the spill to reach the mainland coast. Although the outcome of containment efforts cannot be predicted, response at the site of a potential spill should be rapid. If an oil spill were to occur within the Southern California Planning Area, there is a probability of oil contacting Western Snowy Plover breeding and wintering areas, and areas designated as critical habitat.

Western Snowy Plovers breed and winter along the coasts of San Luis Obispo, Santa Barbara, Ventura, Los Angeles, Orange, and San Diego Counties from Arroyo Laguna Creek in San Luis Obispo County to the Tijuana River Estuary in San Diego County. There are 21 recent breeding localities, 47 wintering localities, and 21 designated critical habitat units that are in or directly adjacent to the areas modeled as being impacted by oil spills in the Southern California Planning Area. Based on oil spill models, spills from Platforms in the Santa Maria Basin, the Santa Barbara Channel, east Santa Barbara Channel, and San Pedro Basin have the potential to come ashore in areas where Western Snowy Plovers are breeding or wintering.

The OSRA analysis of a hypothetical spill from Platform Irene displays the highest probability (50-60%) of oil contacting land at Point Arguello and a 10-20% chance of contact at San Miguel Island. GNOME modeled spilled oil traveling from Platform Irene to as far north as San Luis Obispo Bay and off the coast of Montana De Oro State Park. The northern-most mainland contact is just south of Pismo Beach at Guadalupe-Nipomo Dunes NWR. This area contains 8 Western Snowy Plover breeding sites, 10 wintering sites, and 1 critical habitat unit.

The OSRA analysis of a hypothetical spill from Platform Hidalgo displays a 20-30% probability of oil contacting Point Arguello and a 10-20% chance of contact at San Miguel Island. The 1984 model and GNOME models also estimate land fall around Point Conception, Santa Rosa Island and Santa Cruz Island. The GNOME model estimates oil traveling further north up the coast to Point Sal and toward San Luis Obispo Bay. This area contains 9 Western Snowy Plover breeding sites, 12 wintering sites, and 2 critical habitat units.

All models agree that areas of coastline from Vandenberg Air Force Base to Santa Barbara County and northern coastlines of the Channel Islands are most likely to be affected by a

45

hypothetical oil spill from Platform Harmony. The primary differences are that the GNOME model runs estimate oil landing as far north as Point San Luis and the 1984 model analyses estimate oil landing as far south as San Nicolas and San Clemente Islands. The Platform Harmony OSRA analysis displays a 20-30% chance of oil contacting the mainland Gaviota coast and San Miguel Island and a 10-20% chance of oil contacting Santa Rosa and Santa Cruz Islands. This area contains 4 Western Snowy Plover breeding sites, 9 wintering sites, and 3 critical habitat units.

The OSRA model of a hypothetical spill from Platform Hillhouse shows a 30-40% probability of oil contacting mainland Santa Barbara and a 10-20% probability that oil will travel along the mainland as far north as the Gaviota coast and as far south as Ventura as well as out toward Anacapa Island (Figure 2A). GNOME models oil traveling as far west as Santa Barbara and Point Conception (Figure 6). This area contains 5 Western Snowy Plover breeding sites, 9 wintering sites, and 4 critical habitat units.

The GNOME model of a hypothetical spill from Platform Gail estimates landfall from mainland Santa Barbara to south of Ventura Harbor in Oxnard and out to Anacapa Island. There is a 20-30% probability of oil contacting Port Hueneme and Santa Cruz Island, and a 10-20% probability of oil contacting the mainland as far north as Goleta and as far south as Point Mugu. This area contains 7 Western Snowy Plover breeding sites, 12 wintering sites, and 5 critical habitat units.

The OSRA model of a hypothetical spill from Platform Elly estimates spilled oil to primarily stay within the San Pedro Bay and travel south along the mainland to Oceanside. The OSRA analysis for the Beta Unit, Platform Elly, displays a 40-0% probability of oil contacting the mainland from Huntington Beach to Newport Beach and a 10-20% probability of oil traveling as far north as Alamitos Bay and as far south as Oceanside. No trajectory runs were conducted using GNOME because GNOME, as configured for this study, was limited to the geographic area of the Santa Barbara Channel and just north of Point Conception. This area contains 5 Western Snowy Plover breeding sites, 12 wintering sites, and 8 critical habitat units.

If a spill of about 200 bbl were to contact the shoreline in the vicinity of nesting or wintering Western Snowy Plovers in this area, impacts to plovers and the primary constituent elements of their critical habitat could occur, including some mortality. Effects to Western Snowy Plovers could occur anywhere along the coast between Pismo Beach in San Luis Obispo County and Oceanside in San Diego County, and also on San Miguel Island, Santa Rosa Island, and Santa Cruz Island. Impacts to the nesting populations at these locations could include loss of adults, disruption of nesting activity, and abandonment of nesting beaches. The level of impact would depend on the size of the spill, the success of containment efforts, the length of time for the spill to reach the area, and the length of shoreline contacted. Although the outcome of containment efforts cannot be predicted, response at the site of a potential spill should be rapid. However, there is some risk of contact to the shoreline within a few days. Additionally, impacts to the Western Snowy Plover and its critical habitat could be exacerbated by beach cleanup efforts.

**Marbled Murrelet**

The threatened Marbled Murrelet is exceedingly vulnerable to oil spills due to its predominately at-sea existence. Mortality due to oil pollution is one of the major threats to Marbled Murrelet populations. Mortality from large spills and chronic oil pollution has been occurring for decades, but is poorly documented throughout the species range (Carter and Kuletz 1995). Marbled

Murrelets have been impacted by oil pollution in Prince William Sound, central California, and western Washington (Carter and Kuletz 1995). The Exxon Valdez oil spill in Alaska caused the largest single mortality of murrelets (about 8,400 birds) in the world, most of which were Marbled Murrelets, and contributed to the decline of murrelet populations in Prince William Sound.

An uncontrolled discharge in the project area could impact Marbled Murrelets in nearshore areas, especially if it was from a platform north of Point Conception where areas along the San Luis Obispo and northern Santa Barbara Counties coastlines could be impacted. Although, given the low numbers of Marbled Murrelets observed to occur within the Southern California Planning Area and the seasonal nature of their occurrence, Marbled Murrelets would not be expected to suffer significant mortality due to a spill from the proposed project.

Marbled Murrelets visit the coasts of San Luis Obispo and northern Santa Barbara Counties during the breeding season and winter. They are occasionally seen off the south coast of Santa Barbara County and off Ventura and Los Angeles Counties; however, records here are sparse. The species occurs in areas modeled as being impacted by oil spills in the Southern California Planning Area. Based on oil spill models, spills from Platforms in the Santa Maria Basin and the Santa Barbara Channel have the potential to have at-sea impacts to Marbled Murrelets in areas where they are foraging or spending the winter.

The OSRA analysis of a hypothetical spill from Platform Irene displays the highest probability (50-60%) of oil contacting land at Point Arguello and a 10-20% chance of contact at San Miguel Island. GNOME modeled spilled oil traveling from Platform Irene to as far north as San Luis Obispo Bay and off the coast of Montana De Oro State Park. The northern-most mainland contact is just south of Pismo Beach at Guadalupe-Nipomo Dunes NWR.

The OSRA analysis of a hypothetical spill from Platform Hidalgo displays a 20-30% probability of oil contacting Point Arguello and a 10-20% chance of contact at San Miguel Island. The 1984 model and GNOME models also estimate land fall around Point Conception, Santa Rosa Island and Santa Cruz Island. The GNOME model estimates oil traveling further north up the coast to Point Sal and toward San Luis Obispo Bay.

All models agree that areas of coastline from Vandenberg Air Force Base to Santa Barbara County and northern coastlines of the Channel Islands are most likely to be affected by a hypothetical oil spill from Platform Harmony. The primary differences are that the GNOME model runs estimate oil landing as far north as Point San Luis and the 1984 model analyses estimate oil landing as far south as San Nicolas and San Clemente Islands. The Platform Harmony OSRA analysis displays a 20-30% chance of oil contacting the mainland Gaviota coast and San Miguel Island and a 10-20% chance of oil contacting Santa Rosa and Santa Cruz Islands.

If a spill of about 200 bbl were to occur at sea in the vicinity of foraging or wintering Marbled Murrelets, impacts to the species could occur, including some mortality. Effects to Marbled Murrelets could occur anywhere along the coast between San Luis Bay and Point Conception, and possibly around the western Channel Islands. Impacts could include loss of adults and fledged juveniles. The level of impact would depend on the size of the spill, the success of containment efforts, and the length of time the spill stayed at sea. Although the outcome of containment efforts cannot be predicted, response at the site of a potential spill should be rapid.

Ex. 5, Page 48

E.R. 0958

**Effects on Amphibians by Oil Spills**

Oil may affect amphibians through various pathways, including direct contact, ingestion of contaminated prey, and lingering sublethal impacts due to oil becoming sequestered in sediments and persisting in some cases for years in low energy environments (NRC 1985). The level of impacts and the persistence of the oil in the environment will depend on the volume of oil that reaches the habitat and the amount of mixing and weathering the oil has undergone before reaching the habitat. Breeding habitat in coastal lagoons could be adversely affected and impacts to adults, tadpoles, and egg masses could occur.

**California Red-legged Frog**

Among the variety of habitats they are found in, adult California red-legged frogs inhabit brackish coastal lagoons formed seasonally behind sand berms that close the mouths of rivers and streams along the central coast of California. The California red-legged frog also breeds in lagoons where salinity and water temperature levels are within suitable levels for egg and tadpole development. Storms or tides may breach these natural berms, at which point the frogs move upstream to freshwater. There is some risk that an oil spill might reach the coastal lagoons during a high tide or storm when the sand berms have been breached. California red-legged frogs cannot tolerate salinities in excess of 9 ppt and leave the coastal lagoons when seawater breaches the sand berms. Although no direct oil contact with California red-legged frogs is expected, oil can become sequestered in the sediments and persist until rains flush the sediments from the lagoon. If the sand berms reform and conditions become favorable, some California red-legged frogs may return before the contaminated sediments are flushed into the ocean. The level of toxicity would be dependent on the weathering of the oil and the volume of oil that reaches the lagoon. An at-sea oil spill would not impact upland habitat of California red-legged frogs, which is well upstream of the coast.

There are five critical habitat units that include coastal areas that have a boundary with the coastline in the Southern California Planning Area (SLO-2, SLO-3, STB-4, STB-5, STB-6) and include watersheds that flow into the ocean or coastal lagoons. Three of these (STB-4, STB-5 and STB-6) are in areas that could be impacted by an oil spill within the Southern California Planning Area. The physical and biological features essential to the conservation of the species (primary constituent elements) that are encompassed within these units include aquatic breeding habitat, aquatic non-breeding habitat, upland habitat, and dispersal habitat. At Jalama Creek, about 4.4 miles south of the City of Lompoc, 7,685 acres along the coast were designated, at Gaviota Creek 12,888 acres were designated, and at Arroyo Quemado to Refugio Creek 11,985 acres were designated (75 FR 12816).

The most likely oil spill scenario for the Southern California Planning Area, based on OCS spill data for California, is that 1.86 spills of a volume ranging between 50 and 1,000 bbl has an 84.4% probability of occurrence during the life of the project (Section 4.4). Based on the distribution of past spill sizes, it is estimated that such spills probably would be less than 200 bbl in volume. The level of impact would depend on the size of the spill, the success of containment efforts, and the length of time for the spill to reach the coastal lagoons. Although the outcome of containment efforts cannot be predicted, response at the site of a potential spill should be rapid. The nature of the identified wetlands provides opportunities for protecting the areas occupied by the California red-legged frog. A greater than 1,000-bbl spill is not expected (see Section 4.4),

Ex. 5, Page 49

E.R. 0959

but if one were to occur and reach wetlands occupied by the California red-legged frog, containment measures might not be able to prevent some impacts to this taxa.

If a larger spill did occur, and the sand berms of the coastal lagoons were breached, lethal impacts to California red-legged frogs could occur if individuals were oiled before they could leave the area. Sublethal impacts might occur if the frogs returned before rains flushed the sediments from the lagoons. Oil spill response teams would be expected to boom the mouths of creeks and rivers or enhance the existing berms in the event of a spill thus minimizing the chance of oil reaching the lagoons.

California red-legged frogs are found in several coastal lagoons along the coasts of San Luis Obispo and Santa Barbara Counties south to the vicinity of Goleta, which are part of several core recovery areas for the subspecies (USFWS 2002). Tadpoles have been reported in Jalama and Cañada Honda creeks, and adult California red-legged frogs can be found seasonally in the coastal lagoons of the central California coast. Eggs and tadpoles are found in the coastal lagoons where salinity and water temperatures are suitable. Based on oil spill models, spills from Platforms in the Santa Maria Basin, and Santa Barbara Channel have the potential to come ashore in areas where coastal lagoons are occupied by California red-legged frogs. The OSRA analysis of a hypothetical spill from Platform Irene displays the highest probability (50-60%) of oil contacting land at Point Arguello. GNOME modeled spilled oil traveling from Platform Irene to as far north as San Luis Obispo Bay and off the coast of Montana De Oro State Park. The northern-most mainland contact is just south of Pismo Beach at Guadalupe-Nipomo Dunes NWR.

The OSRA analysis of a hypothetical spill from Platform Hidalgo displays a 20-30% probability of oil contacting Point Arguello. The 1984 model and GNOME models also estimate land fall along the mainland coast around Point Conception. The GNOME model estimates oil traveling further north up the coast to Point Sal and toward San Luis Obispo Bay.

All models agree that areas of coastline from Vandenberg Air Force Base to Santa Barbara County are most likely to be affected by a hypothetical oil spill from Platform Harmony. The primary differences are that the GNOME model runs estimate oil landing as far north as Point San Luis and the 1984 model analyses estimate oil landing as far south as San Nicolas and San Clemente Islands. The Platform Harmony OSRA analysis displays a 20-30% chance of oil contacting the mainland Gaviota coast.

The OSRA model of a hypothetical spill from Platform Hillhouse shows a 30-40% probability of oil contacting mainland Santa Barbara and a 10-20% probability that oil will travel along the mainland as far north as the Gaviota coast and as far south as Ventura as well as out toward Anacapa Island (Figure 2A). GNOME models oil traveling as far west as Santa Barbara and Point Conception (Figure 6).

An oil spill of about 200 bbl that contacted the mainland along the central California coast would be unlikely to result in California red-legged frog mortality or sub-lethal effects. Offshore oil transported to shore through natural wind, wave and tidal processes will not likely flow into lagoons, streams or rivers where suitable fresh water habitat for California red-legged frogs exists. However, the level of impact would depend on the size of the spill, the success of containment efforts, and the length of time for the spill to reach the coastal lagoons. In addition, habitat destruction could result from clean-up efforts. Proper preparation and execution of the oil spill contingency plan should protect these areas during an oil spill response. Based on this

information, effects to the California red-legged frog or its critical habitat from an oil spill in the Southern California Planning Area would be expected to be minor.

**Effects on Fish by Oil Spills**

Research shows that hydrocarbons and other constituents of petroleum spills can, in sufficient concentrations, cause adverse impacts to fish (NRC 1985; GESAMP 1993). The effects can range from mortality to sublethal effects that inhibit growth, longevity, and reproduction. Benthic macrofaunal communities can be heavily impacted, as well as intertidal communities that provide food and cover for fishes. Although fish can accumulate hydrocarbons from contaminated food, there is no evidence of food web magnification in fish. Fish have the capability to metabolize hydrocarbons and can excrete both metabolites and parent hydrocarbons from the gills and the liver. Nevertheless, oil effects in fish can occur in many ways: histological damage, physiological and metabolic perturbations, and altered reproductive potential (NRC 1985). Many of these sublethal effects are symptomatic of stress and may be transient and only slightly debilitating. However, all repair or recovery requires energy, and this may ultimately lead to increased vulnerability to disease or to decreased growth and reproductive success.

The egg, early embryonic, and larval-to-juvenile stages of fish seem to be the most sensitive to oil. Damage may not be realized until the fish fails to hatch, dies upon hatching, or exhibits some abnormality as a larva, such as an inability to swim (Malins and Hodgins 1981). There are several reasons for this vulnerability of early life stages. First, embryos and larvae lack the organs found in adults that can detoxify hydrocarbons. Second, most do not have sufficient mobility to avoid or escape spilled oil. Finally, the egg and larval stages of many species are concentrated at the surface of the water, where they are more likely to be exposed to the most toxic components of an oil slick.

**Tidewater Goby**

Tidewater gobies are found in shallow coastal lagoons, stream mouths, and shallow areas of bays. There is some risk that an oil spill might reach the coastal lagoons during a high tide or storm when the sand berms blocking the stream mouths from the ocean have been breached. Breaches usually occur during the winter and spring months, and tidewater gobies often move upstream out of the lagoons during this period. Although direct oil contact with gobies would be unlikely, oil can become sequestered in the sediments and persist until rains flush the sediments from the lagoon. When the gobies returned, short-term sublethal effects would also be expected, since gobies burrow into and feed in the sediment and rely on macrofaunal and intertidal communities for food and shelter from predators. The level of impacts, however, would be dependent on the volume of oil that reached their habitat and the amount of weathering and mixing the oil had undergone before reaching the habitat.

The most likely oil spill scenario for the Southern California Planning Area, based on OCS spill data for California, is that 1.86 spills of a volume ranging between 50 and 1,000 bbl has an 84.4% probability of occurrence during the life of the project (Section 4.4). Based on the distribution of past spill sizes, it is estimated that such a spill probably would be less than 200 bbl in volume. An oil spill of this size is expected to weather, mix, and break up to the point where only limited tarring would be expected to coastal lagoons along the Southern California Planning Area. The level of impact would depend on the size of the spill, the success of containment efforts, and the length of time for the spill to reach the coastal lagoons.

Ex. 5, Page 51

E.R. 0961

If a larger spill did occur, and the sand berms of the coastal lagoons were breached, short-term sublethal effects to tidewater gobies might occur. However, oil spill response teams would be expected to boom the mouths of creeks and rivers or enhance the existing berms in the event of a spill, thus minimizing the chance of oil reaching the lagoons.

Tidewater gobies are found in a number of coastal lagoons along the coast from San Luis Obispo County to San Diego County, 34 of which are designated as critical habitat for the species from Arroyo de la Cruz in San Luis Obispo County to the San Luis Rey River in San Diego County (78 FR 8745). Based on oil spill models, hypothetical spills from Pacific OCS oil and gas platforms in the Santa Maria Basin, the Santa Barbara Channel, east Santa Barbara Channel, and San Pedro Basin have the potential to come ashore in areas where coastal lagoons are occupied by tidewater gobies.

The OSRA analysis of a hypothetical spill from Platform Irene displays the highest probability (50–60%) of oil contacting land at Point Arguello. GNOME modeled spilled oil traveling from Platform Irene to as far north as San Luis Obispo Bay and off the coast of Montana De Oro State Park. The northern-most mainland contact is just south of Pismo Beach at Guadalupe-Nipomo Dunes NWR. Three occupied tidewater goby critical habitat units occur in the modeled area between San Luis Obispo Creek and the Santa Maria River Mouth.

The OSRA analysis of a hypothetical spill from Platform Hidalgo displays a 20-30% probability of oil contacting Point Arguello. The 1984 model and GNOME models also estimate land fall around Point Conception. The GNOME model estimates oil traveling further north up the coast to Point Sal and toward San Luis Obispo Bay. Three occupied tidewater goby critical habitat units occur in the modeled area between San Luis Obispo Creek and the Santa Maria River Mouth.

All models agree that areas of coastline from Vandenberg Air Force Base to Santa Barbara County and northern coastlines of the Channel Islands are most likely to be affected by a hypothetical oil spill from Platform Harmony. The primary differences are that the GNOME model runs estimate oil landing as far north as Point San Luis and the 1984 model analyses estimate oil landing as far south as San Nicolas and San Clemente Islands. The Platform Harmony OSRA analysis displays a 20-30% chance of oil contacting the mainland Gaviota coast. Nine occupied tidewater goby critical habitat units occur in the modeled area between San Luis Obispo Creek and Arroyo Hondo.

The OSRA model of a hypothetical spill from Platform Hillhouse shows a 30-40% probability of oil contacting mainland Santa Barbara and a 10-20% probability that oil will travel along the mainland as far north as the Gaviota coast and as far south as Ventura as well as out toward Anacapa Island (Figure 2A). GNOME models oil traveling as far west as Santa Barbara and Point Conception (Figure 6). Thirteen occupied tidewater goby critical habitat units occur in the modeled area between Canada de las Agujas and the Santa Clara River Mouth.

The GNOME model of a hypothetical spill from Platform Gail estimates landfall from mainland Santa Barbara to south of Ventura Harbor in Oxnard and out to Anacapa Island. There is a 20-30% probability of oil contacting Port Hueneme and a 10-20% probability of oil contacting the mainland as far north as Goleta and as far south as Point Mugu. Eight occupied tidewater goby critical habitat units occur in the modeled area between Winchester-Bell Canyon and the J Street Drain-Ormond Lagoon.

Ex. 5, Page 52

E.R. 0962

The OSRA model output for a hypothetical spill from Platform Elly estimates spilled oil to primarily stay within the San Pedro Bay and travel south along the mainland to Oceanside. The OSRA analysis for the Beta Unit, Platform Elly, displays a 40-50% probability of oil contacting the mainland from Huntington Beach to Newport Beach and a 10-20% probability of oil traveling as far north as Alamitos Bay and as far south as Oceanside. No trajectory runs were conducted using GNOME because GNOME, as configured for this study, was limited to the geographic area of the Santa Barbara Channel and just north of Point Conception. Two tidewater goby critical habitat units occur in the modeled area including Aliso Creek in Orange County and the San Luis Rey River in San Diego County.

Most goby habitat will be separated from the ocean by sand berms and thus would be protected to some degree. However, tides, heavy surf, or early seasonal rains could breach these barriers. Oil spill response teams would be expected to protect these habitats further with booms and enhancement of the natural berms. During winter months, after rains and storms have breached the natural sand barriers, protection of tidewater goby habitat that is within the contact zone of a spill would rely on the speed and effectiveness of the oil spill response team. A spill of about 200 bbl that hit the mainland coast would in all likelihood contact and impact tidewater goby habitats, possibly resulting in some mortality and likely short-term sub-lethal effects. This would depend on the amount spilled and the weathering of the oil.

However, tidewater gobies along the south-central California coast are quite resilient and have a great ability to disperse and re-colonize areas from which they were previously eliminated. Given the moderate probability that an oil spill would contact the mainland, the oil spill prevention and response capabilities in place, and the ability of tidewater gobies to re-colonize their habitat, effects to tidewater gobies in the Southern California Planning Area are expected to be low.

**Effects on Plants by Oil Spills**

Plant mortality from oil spills can be caused by smothering and toxic reactions to hydrocarbon exposure, especially if oil reaches shore before much of the spill's lighter fractions have evaporated or dissolved. Generally, oiled marsh vegetation dies, but roots and rhizomes survive when oiling is not too severe (Burns and Teal 1971). Research has shown that recovery to pre-oiling conditions usually occurs within a few growing seasons, depending on the magnitude of exposure (Holt et al. 1975; Lytle 1975; Delaune et al. 1979; Alexander and Webb 1987).

**Salt Marsh Bird's-Beak**

The endangered salt marsh bird's-beak grows in the higher reaches of coastal salt marshes to intertidal and brackish areas influenced by freshwater input. Oil spills and oil spill clean-up operations within the Southern California Planning Area, especially within Mugu Lagoon, could have adverse effects on the salt marsh bird's-beak, particularly for seedlings. Spilled oil tends to accumulate near the high tide line, a zone of the marsh where the salt marsh bird's-beak can occur. Oil would very likely result in high mortality of the salt marsh bird's-beak seedlings and juvenile plants during years of seedling regeneration. Oil clean-up operations involving mechanical removal could also cause substantial disturbance of habitat occupied by the salt marsh bird's-beak. The direct effects of oil on mature salt marsh bird's-beak individuals are uncertain but could likely be less than those associated with its clean-up.

Ex. 5, Page 53

E.R. 0963

Historically, salt marsh bird's-beak was widespread in coastal salt marshes from Morro Bay in San Luis Obispo County to San Diego County and northern Baja California. Salt marsh bird's-beak is currently limited to a very few (<10) salt marshes along the coast of California and Baja California, Mexico, which makes this species more vulnerable to an oil spill. Within the area of coastline that could be affected by oil spills from the Southern California Planning Area, these marshes include Carpinteria Salt Marsh in Santa Barbara County, Ormond Beach and Mugu Lagoon in Ventura County, and Upper Newport Bay in Orange County.

Based on the OSRA model estimation (see Section 4.4), a hypothetical spill in the Santa Barbara Channel from Platform Hillhouse has a 30-40% probability of oil contacting mainland Santa Barbara and a 10-20% probability that oil will travel along the mainland as far north as the Gaviota coast and as far south as Ventura. A spill of this prediction could impact any salt marsh bird's-beak plants occurring in the Carpinteria Salt Marsh if oil was to get in the marsh.

Based on the OSRA model estimation (see Section 4.4), a hypothetical spill in the eastern Santa Barbara Channel from Platform Grace has a 10-20% probability of oil contacting the mainland as far south as Point Mugu. If oil was transported into the Ormond Beach wetlands or Mugu Lagoon through tidal action, there is a potential that salt marsh bird's-beak plants there could be adversely affected. The population at Mugu Lagoon is one of the larger left in the range of the taxa so effects here could be significant.

Based on the OSRA model estimation (see Section 4.4), a hypothetical spill in the San Pedro Basin from Platform Elly has a 40-50% probability of oil contacting the mainland from Huntington Beach to Newport Beach and a 10-20% probability of oil travelling as far north as Alamitos Bay and as far south as Oceanside. Upper Newport Bay within this area is occupied by the salt marsh bird's-beak. If oil from a spill made it into these coastal wetlands, it could have adverse effects on the salt marsh bird's-beak.

Although, a large (>1,000-bbl) oil spill from platforms with the Southern California Planning area is unlikely, based on the distribution of past spill sizes, it is estimated that a spill from the Southern California Planning area would probably be less than 200 bbl in volume (see Section 4.4). If a spill of about 200 bbl were to occur and contact any of the salt marshes identified above, impacts to salt marsh bird's-beak could occur. The level of impact would depend on the size of the spill, the success of containment efforts, and the length of time for the spill to reach the wetlands. Although the outcome of containment efforts cannot be predicted, response at the site of a potential spill should be rapid. The nature of the identified wetlands provides opportunities for protecting the areas occupied by the salt marsh bird's-beak. A greater than 1,000-bbl spill is not expected (see Section 4.4), but if one were to occur and reach wetlands occupied by the taxa, containment measures might not be able to prevent some impacts to this taxa.

Given that a spill occurring as a result of the proposed project would probably be less than 200 bbl in volume, the low probability of contact with an occupied marsh, and the oil spill prevention and response capabilities in place, impacts to salt marsh bird's-beak from an oil spill within the Southern California Planning Area are expected to be minor.

### 5. Conclusion and Determination of Effects

In summary, this biological assessment has assessed the potential effects to federally endangered and threatened species that may result from the continued leasing, exploration, development and

Ex. 5, Page 54

production of oil and gas on the United States' outer continental shelf within the Southern California Planning Area as defined by BOEM and BSEE. The following threatened and endangered species, and their critical habitat, may be affected directly or indirectly by the proposed actions:

**Western Snowy Plover**

The Western Snowy Plover and its critical habitat could be affected indirectly by the proposed actions if oil spills were to occur that contacted beaches occupied by the taxa, including those designated as critical habitat. Western Snowy Plovers forage along the shoreline and in sea wrack at the high-tide line and are thus at risk of direct exposure to oil during spills. They could experience direct mortality from oiling of birds and eggs, and could also experience loss of prey availability due to contamination. The Western Snowy Plover would also be adversely affected if cleanup activities were to occur on nesting or wintering beaches.

Their small population and sandy beach habitat make Western Snowy Plovers vulnerable to an oil spill. The level of impact would depend on the size of the spill, the success of containment efforts, and the length of time for the spill to reach the mainland coast. Although the outcome of containment efforts cannot be predicted, response at the site of a potential spill should be rapid. If an oil spill were to occur within the Southern California Planning Area, there is a probability of oil contacting Western Snowy Plover breeding and wintering areas, and areas designated as critical habitat.

If an oil spill were to contact the shoreline in the vicinity of nesting or wintering Western Snowy Plovers in this area, impacts to plovers and the primary constituent elements of their critical habitat could occur, including some mortality. The level of impact would depend on the size of the spill, the success of containment efforts, the length of time for the spill to reach the area, and the length of shoreline contacted. Although the outcome of containment efforts cannot be predicted, response at the site of a potential spill should be rapid. However, there is some risk of contact to the shoreline within a few days. Additionally, impacts to the Western Snowy Plover could be exacerbated by beach cleanup efforts. Therefore, we have determined that the proposed actions may affect and are likely to adversely affect the Western Snowy Plover and its critical habitat.

**California Least Tern**

The California Least Tern is highly susceptible to oiling because they nest and roost on beaches and mud flats that may be contacted by an oil spill or are in close proximity to the ocean or an estuary. They can experience direct mortality from oiling of birds and eggs, and could also experience loss of prey availability due to contamination. They could also be exposed directly to oil if they were feeding in waters affected by a spill because they dive into the water to catch their fish prey. Lastly, the California Least Tern would be adversely affected if cleanup activities were to occur on nesting beaches.

The level of impact would depend on the size and timing of the spill, the success of containment efforts, and the length of time for the spill to reach the mainland coast. Although the outcome of containment efforts cannot be predicted, response at the site of a potential spill should be rapid. If an oil spill were to occur within the Southern California Planning Area, there is a probability of oil contacting California Least Tern breeding colonies when the terns are present in California during their breeding season.

Ex. 5, Page 55

E.R. 0965

If an oil spill was to occur during the spring or summer and contact the shoreline where California Least Terns are breeding, impacts to terns could occur, including some mortality. The severity of these impacts would depend on the size of the spill, the length of shoreline contacted, and the number of terns present in the area. A minimum of 2,451 pairs and a maximum of 3,324 pairs produced 3,432 nests in 2015 in the regions that could be affected by oil spills in the Southern California Planning Area. This is 62% of the breeding effort within California. Therefore, we have determined that the proposed actions may affect and are likely to adversely affect the California Least Tern.

**Light-footed Ridgway's Rail**

The Light-footed Ridgway's Rail could be affected indirectly by the proposed actions if oil spills were to occur and contact any of the coastal salt marshes occupied by the taxa. They could experience direct mortality from oiling of birds and eggs, and could also experience loss of prey availability due to contamination. The oil spill cleanup process, if not conducted in accordance with federal and state regulations, could exacerbate the effects of an oil spill on the rail's habitat. The level of impact would depend on the size of the spill, the success of containment efforts, and the length of time for the spill to reach the wetlands. Although the outcome of containment efforts cannot be predicted, response at the site of a potential spill should be rapid. The nature of the identified wetlands provides opportunities for protecting the areas occupied by the Light-footed Ridgway's Rail. A greater than 1,000-bbl spill is not expected, but if one were to occur and reach wetlands occupied by the taxa, containment measures might not be able to prevent some impacts to this taxa.

The salt marshes occupied by Light-footed Ridgway's Rails are more easily protected than the open coast, which reduces the chance that Light-footed Ridgway's Rails could be affected by an offshore oil spill. Given that a spill occurring as a result of the proposed project would probably be less than 200 bbl in volume, and the low likelihood that impacts to an occupied salt marsh would occur, and the oil spill prevention and response capabilities in place, impacts to Light-footed Ridgway's Rails from the proposed project are expected to be discountable. Therefore, we have determined that the proposed actions may affect, but are not likely to adversely affect the Light-footed Ridgway's Rail.

**Marbled Murrelet**

The Marbled Murrelet is exceedingly vulnerable to oil spills due to its predominately at-sea existence. Mortality due to oil pollution is one of the major threats to Marbled Murrelet populations. An uncontrolled discharge in the project area could impact Marbled Murrelets in nearshore areas, especially if it was from a platform north of Point Conception where areas along the San Luis Obispo and northern Santa Barbara County's coastlines could be impacted.

If an oil spill were to occur at sea in the vicinity of foraging or wintering Marbled Murrelets, impacts to the species could occur, including some mortality. Effects to Marbled Murrelets could occur anywhere along the coast between San Luis Bay and Point Conception, and possibly around the western Channel Islands. Impacts could include loss of adults and fledged juveniles. The level of impact would depend on the size of the spill, the success of containment efforts, and the length of time the spill stayed at sea.

However, given the low numbers of Marbled Murrelets observed to occur within the Southern California Planning Area and the seasonal nature of their occurrence, Marbled Murrelets would

not be expected to suffer significant mortality due to a spill from the proposed project. Therefore, we have determined that oil spills may affect, but are not likely to adversely affect the Marbled Murrelet.

In addition to oil spills, Marbled Murrelets could be affected by artificial lighting and noise, especially underwater noise related to pile driving. Artificial night lighting on the platforms could potentially have an adverse effect on Marbled Murrelets as they are nocturnal foragers known to be attracted to artificial lighting. However, there is limited evidence to date of seabirds being attracted to Pacific OCS platforms or other project lighting in the area and many projects on the Pacific OCS now incorporate minimization measures to reduce effects of work vessel lighting to birds. If sound levels are ramped up gradually, it is anticipated that most birds will leave the project area before underwater noise pressures reach the injury or barotrauma thresholds. In addition, the distance from shore, water depths at the platforms and the ongoing industrial activities are likely to result in fewer Marbled Murrelets in the vicinity of the platforms. Therefore, we have determined that these elements of the proposed actions may affect, but are not likely to adversely affect the Marbled Murrelet.

### Southern sea otter

Southern sea otters are highly susceptible to oil spills and are among the most sensitive marine mammals to the effects of oil contamination. Even a partial fouling of a sea otter's fur, equivalent to about 30 percent of the total body surface, can result in death. Critical factors related to oiling that can result in sea otter mortality include hypothermia, pulmonary emphysema, hypoglycemia, and lesions in other organs. In addition, stress due to the effects of captivity has contributed to tissue damage in sea otters brought into the treatment centers for cleaning. Potential indirect effects on southern sea otters resulting from an oil spill include a reduction in available food resources due to mortality or unpalatability of prey organisms and the loss of appropriate habitat available to sea otters as kelp forest communities become contaminated.

If a spill were to occur, the magnitude of expected southern sea otter mortality would vary with a number of factors, including the time of year, volume of oil spilled, wind speed and direction, current speed and direction, distance of the spill from shore, volume of oil contacting the shoreline, condition of the oil contacting the shoreline, the success of containment operations, number of animals contacted, and the effectiveness of otter cleaning and rehabilitation. Within this area, southern sea otters are regularly found along the entire coast of San Luis Obispo County, along the Santa Barbara County coast line from the Santa Maria River mouth to Gaviota, and around San Nicolas Island. Areas within the modeled oil spill trajectories with higher densities of sea otters include the San Luis Bay vicinity (approx. 3.5-10 otters/500 m of shoreline) and either side of Point Conception (2.3-3.5 otters/500 m of shoreline).

Oil spills associated with the Southern California Planning Area are likely to result in low to moderate impacts to the southern sea otter, including limited mortality. Impacts to sea otters would be most likely to occur from a rupture of a pipeline, and could affect sea otters in the area from San Luis Bay to Gaviota. These impacts would be more severe if a spill occurred during spring months when seasonal migration brings large rafts of (predominately male) sea otters to the southern extent of their current range, off Point Conception. Additionally, if southward range expansion by the southern sea otter continues, increasing numbers of otters will be expected to occur east of Point Conception to Gaviota that could be affected in the event of an oil spill.

56

Ex. 5, Page 57

Given the likelihood a spill making landfall along the mainland coast, there is a reasonable probability of sea otter contacts occurring as a result of a spill. Although the seasonal nature of sea otter occurrence in the area and the oil spill prevention and response capabilities in place, may act to reduce the number of affected otters, due to the increasing number of sea otters expanding into the project area, moderate impacts to the southern sea otter within the Southern California Planning Area are expected, including mortality of animals. Therefore, we have determined that oil spills may affect, and are likely to adversely affect the southern sea otter.

Based on studies summarized above, drilling activities including pile driving, aircraft and helicopter use, and vessel traffic associated with the proposed actions are not expected to have effects on southern sea otters. Therefore, we have determined that these elements of the proposed actions may affect, but are not likely to adversely affect the southern sea otter.

**California red-legged frog and its critical habitat**

Among the variety of habitats they are found in, adult California red-legged frogs inhabit brackish coastal lagoons formed seasonally behind sand berms that close the mouths of rivers and streams along the central coast of California. The California red-legged frog also breeds in lagoons where salinity and water temperature levels are within suitable levels for egg and tadpole development. Storms or tides may breach these natural berms, at which point the frogs move upstream to freshwater. Due to NPDES discharge permit requirements and the rapid dilution of the discharges, contaminants from effluent discharges associated with OCS activities including well stimulation-related discharges should not be measurable in the coastal waters and sediments that enter these lagoons. Thus, California red-legged frogs and their critical habitat are not likely to be adversely affected by effluent discharges.

There is some risk that an oil spill might reach the coastal lagoons during a high tide or storm when the sand berms have been breached. California red-legged frogs cannot tolerate salinities in excess of 9 ppt and leave the coastal lagoons when seawater breaches the sand berms. Although no direct oil contact with California red-legged frogs is expected, oil can become sequestered in the sediments and persist until rains flush the sediments from the lagoon. If the sand berms reform and conditions become favorable, some California red-legged frogs may return before the contaminated sediments are flushed into the ocean. The level of toxicity would be dependent on the weathering of the oil and the volume of oil that reaches the lagoon.

An oil spill that contacted the mainland along the central California coast would be unlikely to result in California red-legged frog mortality or sub-lethal effects. Offshore oil transported to shore through natural wind, wave and tidal processes will not likely flow into lagoons, streams or rivers where suitable fresh water habitat for California red-legged frogs exists. However, the level of impact would depend on the size of the spill, the success of containment efforts, and the length of time for the spill to reach the coastal lagoons. In addition, habitat destruction (including effects to critical habitat) could result from clean-up efforts. Proper preparation and execution of the oil spill contingency plan should protect these areas during an oil spill response. Based on this information, effects to the California red-legged frog or its critical habitat from an oil spill in the Southern California Planning Area are expected to be minor. Therefore, we have determined that the proposed actions may affect, but are not likely to adversely affect the California red-legged frog and its critical habitat.

Ex. 5, Page 58

E.R. 0968

**Tidewater goby and its critical habitat**

Tidewater gobies are found in shallow coastal lagoons, stream mouths, and shallow areas of bays. Due to NPDES discharge permit requirements and the rapid dilution of the discharges, contaminants from effluent discharges associated with OCS activities including well stimulation-related discharges should not be measurable in the coastal waters and sediments that enter these lagoons. Thus, tidewater gobies are not likely to be adversely affected by effluent discharges.

There is some risk that an oil spill might reach the coastal lagoons during a high tide or storm when the sand berms blocking the stream mouths from the ocean have been breached. Breaches usually occur during the winter and spring months, and tidewater gobies often move upstream out of the lagoons during this period. Although direct oil contact with gobies would be unlikely, oil can become sequestered in the sediments and persist until rains flush the sediments from the lagoon. When the gobies returned, short-term sublethal effects would also be expected, since gobies burrow into and feed in the sediment and rely on macrofaunal and intertidal communities for food and shelter from predators. The level of impacts, however, would be dependent on the volume of oil that reached their habitat and the amount of weathering and mixing the oil had undergone before reaching the habitat.

Most goby habitat will be separated from the ocean by sand berms and thus would be protected to some degree. However, tides, heavy surf, or early seasonal rains could breach these barriers. Oil spill response teams would be expected to protect these habitats further with booms and enhancement of the natural berms. During winter months, after rains and storms have breached the natural sand barriers, protection of tidewater goby habitat that is within the contact zone of a spill would rely on the speed and effectiveness of the oil spill response team. A spill of about 200 bbl that hit the mainland coast would in all likelihood contact and impact tidewater goby habitats, possibly resulting in some mortality and likely short-term sub-lethal effects. This would depend on the amount spilled and the weathering of the oil.

Given the moderate probability that an oil spill would contact the mainland, the oil spill prevention and response capabilities in place, and the ability of tidewater gobies to re-colonize their habitat, effects to tidewater gobies and their critical habitat in the Southern California Planning Area are expected to be low. Therefore, we have determined that the proposed actions may affect, but are not likely to adversely affect the tidewater goby and its critical habitat.

**Salt marsh bird's-beak**

Salt marsh bird's-beak grows in the higher reaches of coastal salt marshes to intertidal and brackish areas influenced by freshwater input. Oil spills and oil spill clean-up operations within the Southern California Planning Area, especially within Mugu Lagoon, could have adverse effects on the salt marsh bird's-beak, particularly for seedlings. Spilled oil tends to accumulate near the high tide line, a zone of the marsh where the salt marsh bird's-beak can occur. Oil would very likely result in high mortality of the salt marsh bird's-beak seedlings and juvenile plants during years of seedling regeneration. Oil clean-up operations involving mechanical removal could also cause substantial disturbance of habitat occupied by the salt marsh bird's-beak. The direct effects of oil on mature salt marsh bird's-beak individuals are uncertain but could likely be less than those associated with its clean-up.

If an oil spill were to occur and contact any of the salt marshes occupied by the taxa, impacts to salt marsh bird's-beak could occur. The level of impact would depend on the size of the spill, the

success of containment efforts, and the length of time for the spill to reach the wetlands.
Although the outcome of containment efforts cannot be predicted, response at the site of a
potential spill should be rapid. The nature of the identified wetlands provides opportunities for
protecting the areas occupied by the salt marsh bird's-beak. Given that a spill occurring as a
result of the proposed project would probably be less than 200 bbl in volume, the low probability
of contact with an occupied marsh, and the oil spill prevention and response capabilities in place,
impacts to salt marsh bird's-beak from an oil spill within the Southern California Planning Area
are expected to be minor. Therefore, we have determined that the proposed actions may affect,
but are not likely to adversely affect the salt marsh bird's-beak.

E.R. 0970

## 7. Literature Cited

Ainley, D.G., S.G. Allen, and L.B. Spear. 1995. Offshore occurrence patterns of Marbled Murrelets in central California. In: Ralph, C.J., Hunt, G.L. Jr, Raphael, M.G. & Piatt, J.F. (Eds). Ecology and conservation of the Marbled Murrelet. General technical report PSW-152. Albany, California: USDA Forest Service. pp. 361–369.

Alonso-Alvarez, C., and M. Ferrer. 2001. A biochemical study about fasting, subfeeding and recovery processes in yellow-legged gulls. Physiol Biochem Zool 2001;74: 703–13.

Albers, P.H. 1978. The effects of petroleum on different stages of incubation on bird eggs. Bull. Env. Contam. Toxicol. 19:624-630.

Albers, P.H. 1984. Ecological considerations for the use of dispersants in oil spill response: bird habitats, draft guidelines. A report for the ASTM dispersant use guidelines task force. 14 pp.

Alexander, S.K., and J.W. Webb. 1987. Relationship of *Spartina alterniflora* growth to sediment oil content following an oil spill. *In*: Proceeding, 1987 oil spill conference, April 6-9, 1987, Baltimore, MD. American Petroleum Institute, Washington, D.C. pp. 445-450.

Anderson, C.M., M. Mayes, and R. LaBelle. 2012. Update of Occurrence Rates for Offshore Oil Spills. BOEM 2012-069; BSEE 20112-069.

Anonymous. 2002. Effects of artificial light at night on wildlife. International Dark-Sky Association Information Sheet #187. 3 pp.

Arthur D. Little. 1984. Point Arguello Field and Gaviota Processing Facility Area Study and Chevron/Texaco Development Plans EIR/EIS.

Atwood, J.L. and D.E. Minsky. 1983. Least tern foraging ecology at three major California breeding colonies. Western Birds 14:57-72.

Awbrey, F.T. and A.E. Bowles. 1990. The effects of aircraft noise and sonic booms on raptors: a preliminary model and a synthesis of the literature on disturbance. Noise and Sonic Boom Impact Technology Technical Operating Report 12. Wright-Patterson Air Force Base, Ohio.

Bakeman, M.E., M. Carey, R. Huey, and J. Laughlin. 2013. Transportation Pile Driving Effects on Fish, Birds and Marine Mammals in Washington State. Washington State Department of Transportation. Poster presented at the International Conference on Ecology and Transportation. June 23-27, Scottsdale, Arizona.

Ballachey, B. E., J. L. Bodkin, and A. R. DeGange. 1994. An overview of sea otter studies. Pages 47-59 *in* T. R. Loughlin, (ed.). Marine mammals and the *Exxon Valdez*. Academic Press, San Diego, California.

Barabash-Nikiforov, I.I. 1947. The sea otter (*Enhydra lutris* L.)—Biology and economic problems of breeding. Council of Ministers of the RSFSR, Main Administration of Reserves. Published for NSF, Washington, D.C., by Israel Program for Scientific Translations, Jerusalem. 174 pp.

Bonnell, M.L., M.O. Pierson, and G.D. Farrens. 1983. Pinnipeds and sea otters of central and northern California, 1980-1983: status, abundance, and distribution. Final Report to U.S. Department of the Interior, Minerals Management Service, Pacific OCS Region under Contract 14-12-0001-29090. OCS Study MMS 84-0044. 220 pp.

Ex. 5, Page 61

E.R. 0971

Bornholdt, M.A., and E.M. Lear (comp.). 1995. Outer Continental Shelf Natural Gas and Oil Program: Cumulative Effects 1987-1991. U.S. Department of the Interior, Minerals Management Service, Herndon, VA. OCS Report MMS 95-0007.

Bornholdt, M.A., and E.M. Lear (comp.). 1997. Outer Continental Shelf Oil and Natural Gas Program: Cumulative Effects 1992-1994. U.S. Department of the Interior, Minerals Management Service, Herndon, VA. OCS Report MMS 97-0027.

Bourne, W.R.P. 1976. Seabirds and pollution. In: R. Johnson (ed.). Marine pollution. Academic Press, New York, New York.

Bourne, W. R. P. 1979. Birds and gas flares. Marine Pollution Bulletin 10(5): 124-125.

Bretagnolle, V. 1990. Effect of the moon on the activity of petrels (class Aves) on the Salvage Islands (Portugal). Canadian Journal of Zoology 68:1401-1409.

Brown, R.G.B. 1982. Birds, oil and the Canadian environment. In: J.B. Sprague, J.H. Vandermeulen, and P.G. Wells (eds.). Oil and dispersants in Canadian seas- research appraisal and recommendations. Economic and technical report EPS-3-EC-82-2.

Brown, A.L. 1990. Measuring the effect of aircraft noise on sea birds. Environment International 16:587-592.

Burger, A.E. and D.M. Fry. 1993. Effects of oil pollution on seabirds in the northeast Pacific. Pages 254-263. In: Vermeer, K., Briggs, K.T., Morgan, K.H. & Siegel-Causey, D., editors. The status, ecology, and conservation of marine birds of the North Pacific. Ottawa, Ontario: Canadian Wildlife Service, Special Publication.

Burke, C.M., G.K. Davoren, W.A. Montevecchi, and F.K. Wiese. 2005. Seasonal and spatial trends of marine birds along offshore support vessels transects and at oil platforms on the Grand Banks. Pages 587-614 in S.L. Armsworthy, P.J. Cranford, and K. Lee (eds.), Offshore oil and gas environmental effects monitoring: approaches and technologies. Battelle Press, Columbus, Ohio.

Burns, K. A. and J. M. Teal. 1971. Hydrocarbon incorporation into the salt marsh ecosystem from the West Falmouth oil spill. Woods Hole Oceanographic Institution. Technical Report 71-69.

California Birds Record Committee (Hamilton, R.A., M.A. Patten, and R.A. Erickson, editors). 2007. Rare Birds of California. Western Field Ornithologists. Camarillo, California.

Carter, H.R. and K.J. Kuletz. 1995. Mortality of Marbled Murrelets due to oil pollution in North America. In: Ralph, C.J., Hunt, G.L. Jr, Raphael, M.G. & Piatt, J.F. (Eds). Ecology and conservation of the Marbled Murrelet. General technical report PSW-152. Albany, California: USDA Forest Service. pp. 261–269.

Chapman, B.R. 1981. Effects of IXTOC-1 oil spill on Texas shorebird populations. In: Proceedings, 1981 oil spill conference; prevention, behavior, control, cleanup. API Publ. No. 4334. 742 pp.

Davis, R.W. 1990. Advances in rehabilitating oiled sea otters: the Valdez experience. *In* symposium, "The Effects of Oil on Wildlife," 13th Annual Conference of the International Wildlife Rehabilitation Council, Herndon, Virginia, October 17-18, 1990.

Ex. 5, Page 62

E.R. 0972

Day, R.H., B.A. Cooper, and T.C. Telfer. 2003. Decline of Townsend's (Newell's) shearwaters (*Puffinus auricularis newelli*) on Kauai, Hawaii. Auk 120:669-679.

Delaney, D. K., T.G. Grubb, P. Beier, L.L. Pater and M.H. Reiser. 1999. Effects of helicopter noise on Mexican spotted owls. Journal of Wildlife Management. 63(1):60-76.

Delaune, R.D., W.H. Patrick, and R.J. Burch. 1979. Effect of crude oil on a Louisiana *Spartina alternaflora* salt marsh. Environmental Pollution 20:21-31.

Environmental Protection Agency (EPA). 2014. General NPDES Permit Number CAG280000. Authorization to Discharge under the National Pollutant Discharge Elimination System for Oil and Gas Exploration, Development and Production Facilities. Effective March 1, 2014 and expires February 28, 2019.

EPA. 2013. Addendum to Fact Sheet, Final NPDES Permit No. CAG280000 for Offshore Oil and Gas Exploration, Development and Production Operations off Southern California.

Estes, J.A., and R.J. Jameson. 1983. Summary of available population information on California sea otters. U.S. Dept. of Interior, Minerals Management Service, POCS Technical Paper 83-11.

Estes, J.A., and R.J. Jameson. 1988. A double survey estimate for sighting probability of sea otters in California. Journal of Wildlife Management. 52:70-76.

Farwell, C., C. M. Reddy, E. Peacock, R. K. Nelson, L. Washburn, D. L. Valentine 2009. Weathering and the Fallout Plume of Heavy Oil from Strong Petroleum Seeps Near Coal Oil Point, CA. Environmental Science & Technology 43(10): 3542-3548.

Ford, R.G., and M.L. Bonnell. 1987. Analysis of the risk of oil spills to sea otters - methodology. Technical Support Document 3. Volume II, Final Environmental Impact Statement for Translocation of Southern Sea Otters. U.S. Fish and Wildlife Service, Office of Sea Otter Coordination, Sacramento, California. 44 pp.

Ford, R.G. and M.L. Bonnell. 1995. Potential impacts of oil spills on the southern sea otter population. Final Report prepared for the U. S. Fish and Wildlife Service, Ventura California, by Ecological Consulting, Inc., Portland, Oregon. 42 pp.

Frost, N. 2015. California least tern breeding survey, 2015 season. California Department of Fish and Wildlife, Wildlife Branch, Nongame Wildlife Program Report, 2016-01. Sacramento, CA. 24 pp + Appendices.

Fry, D. M. 1987. Seabird oil toxicity study. Final report Contract 14-112-0001-29112/SBO 408(a). U S. Department of the Interior, Minerals Management Service. Pacific OCS Region, Los Angeles, California

Garshelis, D.L., and J.A. Garshelis. 1984. Movement and management of sea otters in Alaska. Journal of Wildlife Management. 48:665-678.

Gauthreaux, Jr., S. A. and C G. Belser. 2006. The behavioral responses of migrating birds to different lighting systems on tall towers. Pages 67-93. *In*: Rich, C. and T. Longcore (eds.) Ecological Consequences of Artificial Night Lighting. Island Press. Washington, D.C.

Geraci, J.R., and D.J. St. Aubin. 1980. Offshore petroleum resource development and marine mammals: a review and research recommendations. Marine Fisheries Review 42:1-12.

Ex. 5, Page 63

E.R. 0973

Geraci, J.R., and D.J. St. Aubin (eds.). 1990. Sea mammals and oil: confronting the risks. Academic Press, San Diego. 282 pp.

Geraci, J.R., and T.D. Williams. 1990. Physiological and    toxicological effects on sea otters. Pp. 211-221 *in*: J.R. Geraci, and D.J. St. Aubin (eds.), Sea mammals and oil: Confronting the risks. Academic Press, Inc., San Diego.

Group of Experts on the Scientific Aspects of Marine Pollution (GESAMP). 1993. Impact of oil and related chemicals on the marine environment. Reports and Studies No. 50. International Maritime Organization, London, 180+ix pp.

Hamer, T., M. Reed, E. Colclazier, K. Turner and N. Denis. 2014. Nocturnal Surveys for Ashy Storm-Petrels (*Oceanodroma homochroa*) and Scripps's Murrelets (*Synthliboramphus scrippsi*) at Offshore Oil Production Platforms, Southern California. US Dept. of the Interior, Bureau of Ocean Energy Management, Pacific OCS Region, Camarillo, CA. OCS Study BOEM 2014-013. 62 pp.

Harder, B. 2002. Deprived of darkness, the unnatural ecology of artificial light at night. Science News Online, Week of April 20, 2002, Vol. 161, No. 16.

Hayes, M.P., and M.R. Jennings. 1988. Habitat correlates of distribution of the California red-legged frog (*Rana aurora draytonii*) and the foothill yellow-legged frog (*Rana boylii*): implications for management. *In*: Management of amphibians, reptiles, and small mammals in North America. Eds., R.C. Szaro, K.E. Severson and D.R. Patton. Gen. Tech. Rep. RMn166. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO. pp. 144-158.

Hayes, M.P., and M.M. Miyamoto. 1984. Biochemical, behavioral, and body size differences between *Rana aurora aurora* and *Rana aurora draytonii*. Copeia 1018-1022.

Holmes, W.N. and J. Cronshaw. 1977. Biological effects of petroleum on marine birds. In: D.C. Malins (ed.). Effects of petroleum on arctic and subarctic marine environments and organisms. Vol. II, biological effects. Academic Press, New York, New York. 500 pp.

Holt, S., N. Rabalais, S. Cornelius, and J.S. Holland. 1975. Effects of an oil spill on salt marshes at Harbor Island, Texas. I. Biology. Conference on assessment of ecological impacts of oil spills. Institute of Biological Sciences, Washington, D.C. pp. 344-353.

Hope, J.P., J.Y. Monnat, D.J. Cadbury, and T.J. Stowe. 1978. Birds oiled during the *Amoco Cadiz* incident: an interim report. Mar. Poll. Bull. 9:307-310.

Howell, S.N.G. 2012. Petrels, albatrosses & storm-petrels of North America: a photographic guide; In collaboration with J.B. Patteson, K. Sutherland, and D.L. Shearwater. Princeton University Press, Princeton, NJ. 483 pp.

Howell, S.N.G. and S.J. Engel. 1993. Seabird observations off western Mexico. Western Birds 24:167-181.

Imber, M. 1975. Behavior of petrels in relation to the moon and artificial lights. Notornis 22:302-206.

Jennings, M.R. 1988. Natural history and decline of native ranids in California. Proceedings of the conference on California herpetology. eds., H.F. De Lisle, P.R. Brown, B. Kaufman and B.M. McGurty. Southwestern Herpetologists Society.

Ex. 5, Page 64

E.R. 0974

Jennings, M.R. and M.P. Hayes. 1990. Status of the California red-legged frog *Rana aurora draytonii* in the Pescadero Marsh Natural Preserve. Report prepared for the California Department of Parks and Recreation, Sacramento, California. 30 pp. + Tables and Figures.

Kenyon, K.W. 1969. The sea otter in the eastern Pacific Ocean. North American Fauna. No. 68. Bureau of Sport Fisheries and Wildlife. Washington, D.C.: U.S. Government Printing Office. 352 pp.

Kooyman, G.L., and D.P. Costa. 1979. Effects of oiling on temperature regulation in sea otters. Yearly Progress Report. Outer Continental Shelf Energy Assessment Program.

Kooyman, G.L., R.W. Davis, and M.A. Castellini. 1977. Thermal conductance of immersed pinniped and sea otter pelts before and after oiling with Prudhoe Bay crude. Chapter 14 (pp. 151-157) *in*: D.A. Wolfe (ed.), Fate and Effects of Petroleum Hydrocarbons in Marine Organisms and Ecosystems. Pergamon Press, New York.

Laffon, B., Fraga-Iriso, R., Pérez-Cadahía, B., & Méndez, J. 2006. Genotoxicity associated to exposure to Prestige oil during autopsies and cleaning of oil-contaminated birds. Food and Chemical Toxicology, 44(10), 1714-1723.

Lebbin, D., M. Parr, and G. Fenwick. 2010. The American Bird Conservancy Guide to Bird Conservation. Lynx Edicions, Barcelona, and the University of Chicago Press, Chicago and London.

Lehman. 2014. The birds of Santa Barbara County, California (revised). Vertebrate Museum, University of California, Santa Barbara, California. 397 pp.

Leifer, I., B. Luyendyk, K. Broderick. 2006. Tracking an oil slick from multiple natural sources, Coal Oil Point, California. Marine and Petroleum Geology. 23(5): 621-630.

Leighton. F. A. 1995. The toxicity of petroleum oils to birds: an overview. In: Frink L, Ball-Weir K, Smith C, editors. Wildlife and oil spills. Newark, Delaware: Tri-State Bird Rescue and Research Inc; 1995. p. 10–22.

Lipscomb, T. P., R. K. Harris, A. H. Rebar, B. E. Ballachey, and R. J. Haebler. 1994. Pathology of sea otters. Chapter 16 *in* T. R. Loughlin, (ed.). Marine mammals and the *Exxon Valdez*. Academic Press, 395 p., San Diego, California.

Love, M. 1996. Probably more than you want to know about the fishes of the Pacific Coast. Really Big Press, Santa Barbara, California. 381 pp.

Lytle, J.S. 1975. Fate and effects of crude oil on an estuarine pond. Proceedings of the conference on prevention and control of oil pollution, San Francisco. pp. 595-600.

Malins, D.C., and H.O. Hodgins. 1981. Petroleum and Marine Fishes: A Review of Uptake, Disposition, and Effects. Environmental Science and Technology, 15(11):1272-1280.

Malme, C.I., P.R. Miles, C.W. Clark, P. Tyack, and J.E. Bird. 1983. Investigations of the potential effects of underwater noise from petroleum industry activities on migrating gray whale behavior. BBN Rep. No. 5366. Rep. from Bolt, Beranek, and Newman, Inc., Cambridge, Massachusetts, for U.S. Minerals Management Service, Anchorage, Alaska. NTIS PB86-174174.

Ex. 5, Page 65

Malme, C.I., P.R. Miles, C.W. Clark, P. Tyack, and J.E. Bird. 1984. Investigations of the potential effects of underwater noise from petroleum industry activities on migrating gray whale behavior. Phase II: January 1984 migration. BBN Rep. No. 5586. Rep. from Bolt, Beranek, and Newman, Inc., Cambridge, Massachusetts, for U.S. Minerals Management Service, Anchorage, Alaska. NTIS PB86-218377.

Marantz, C. 1986. The Birds of San Luis Obispo, California: Their Status and Distribution. Biological Sciences Department, School of Science and Mathematics, California Polytechnic State University, San Luis Obispo.

Montevecchi, W.A. 2006. Influences of artificial light on marine birds. Pp 94-113. *In*: Rich, C. and T. Longcore (eds.) Ecological Consequences of Artificial Night Lighting. Island Press. Washington, D.C.

Mougeot, F., and V. Bretagnolle. 2000. Predation risk and moonlight avoidance in nocturnal seabirds. Journal of Avian Biology 31:376-386.

National Research Council (NRC). 1985. Oil in the Sea: Inputs, Fates, and Effects. National Academy Press, Washington, DC. 601+xviii pp.

Nussbaum, R. A., Brodie, E. D. Jr., and Storm, R. M. 1983. Amphibians and Reptiles of the Pacific Northwest. University of Idaho Press, Moscow, Idaho.

Onley, D. and P. Scofield. 2007. Albatrosses, petrels, and shearwaters of the world. Princeton University Press. Princeton, New Jersey.

Page, G.W., F.C. Bidstrup, R.J. Ramer, and L.E. Stenzel. 1986. Distribution of wintering snowy plovers in California and adjacent states. Western Birds 17(4):145-170.

Page, G.W., M.A. Stern, and P.W. Paton. 1995. Differences in wintering areas of snowy plovers from inland breeding sites in western North America. The Condor 97:258-262.

Peery, M.Z., L.A. Henkel, B.H. Becker, S.H. Newman, J.T. Harvey, C. Thompson, and S.R. Beissinger. 2008. Effects of rapid flight-feather molt on post-breeding dispersal in a pursuit-diving seabird. Auk 125:113-123.

Podolsky, R., 2002. Artificial lighting and the decline of seabirds. In: Rich, C. and T. Longcore (eds) Ecological Consequences of Artificial Night Lighting. Abstracts from The Urban Wildlands Group and UCLA Conference in Los Angeles, February 23-24, 2002.

Poot, H., B. J. Ens, H. de Vries, M. A. H. Donners, M. R. Wernand, and J. M. Marquenie. 2008. Green Light for Nocturnally Migrating Birds. Ecology and Society 13(2): 47. [online] URL: http://www.ecologyandsociety.org/vol13/iss2/art47/

Ralls, K., T. Eagle, and D.B. Siniff. 1988. Movement patterns and spatial use of California sea otters. Pp. 33-63 *in*: D.B. Siniff and K. Ralls (eds.), Population status of California sea otters. OCS Study MMS 88-0021. Pacific OCS Region, Minerals Management Service, U.S. Department of the Interior. Contract No. 14-12-001-30033.

Reis, D. K. 1999. Habitat characteristics of California red-legged frogs (Rana aurora draytonii); ecological differences between eggs, tadpoles, and adults in a coastal brackish and freshwater system. Master's Theses. San Jose State University. San Jose, California.

Ex. 5, Page 66

E.R. 0976

Reitherman and Gaede. 2010. Summary Observation Log Notes. 20 Night Observations of Bird Presence and Behavior on Five Southern California Offshore Oil Platforms

Rich, C. and T. Longcore, editors. 2006. Ecological Consequences of Artificial Night Lighting. Island Press. Washington, D.C.

Richardson, W.J., C.R. Greene, Jr., C.I. Malme, and D.H. Thompson. 1995. Marine mammals and noise. Academic Press, Inc., San Diego, CA. 576 pp.

Riedman, M.L. 1983. Studies of the effects of experimentally noise associated with oil and gas exploration and development on sea otters in California. Report by Center for Coastal Marine Studies, University of California, Santa Cruz, for U.S. Department of the Interior, Minerals Management Service, Anchorage, Alaska. NTIS B86-218575.

Riedman, M.L. 1984. Effects of sounds associated with petroleum industry activities on the behavior of sea otters in California. Pp. D-1 to D-12 in, C.I. Malme et al., Investigations of the potential effects of underwater noise from petroleum industry activities on migrating gray whale behavior/Phase II: January 1984 migration. BBN Report 5586 from Bolt, Beranek, & Newman, Inc., Cambridge, Massachusetts, for U.S. Department of the Interior, Minerals Management Service, Anchorage, Alaska. NTIS PB86-218377.

Riedman, M.L. 1987. Summary of information on the biology of the southern sea otter. Technical Support Document 1. Vol. II, Final environmental impact statement: Translocation of southern sea otters. Sacramento, CA: U.S. Fish and Wildlife Service. 69 pp.

Riedman, M.L., and J.A. Estes. 1990. The sea otter (*Enhydra lutris*): behavior, ecology, and natural history. Washington, D.C.: U.S. Department of the Interior, Fish and Wildlife Service. Biological Report 90(14). 126 pp.

Roberson, D. 2002. Monterey Birds, second edition. Monterey Peninsula Audubon Society. Carmel, California.

Rodhouse, P.G., M.R. Clarke, and A.W.A. Murray. 1987. Cephalopod prey of the wandering albatross *Diomedea exulans*. Marine Biology 96:1-10.

Rotterman, L.M., and T. Simon-Jackson. 1988. Sea otter, *Enhydra lutris*. *In*: Selected marine mammals of Alaska: Species accounts with research and management recommendations, J.W. Lentfer (ed.). Washington, D.C.: Marine Mammal Commission. pp. 237-275

Ryan, T.P. and D.A. Kluza. 1999. Additional records of the least tern from the west coast of Mexico. Western Birds 30:175-176.

Saleh, T. 2007. Effects of artificial light on wildlife. Wildlife CPR notes. From www.wildlandscpr.org website.

Schaar, T. 2002. Artificial lighting and wildlife-a moth to a flame. International Dark-Sky Association, Information Sheet #182. 2 pp.

Siniff, D.B., T.D. Williams, A.M. Johnson, and D.L. Garshelis. 1982. Experiments on the response of sea otters, Enhydra lutris, to oil contamination. Biol. Conserv. 2:261-272.

Small, A. 1994. California birds: their status and distribution. Ibis Publishing Company. Vista, California.

Ex. 5, Page 67

Storer, T. I. 1925. A synopsis of the amphibia of California. University of California Publications in Zoology 27:1-342.

Strachan, G., M. McAllister, and C. J. Ralph. 1995. Marbled Murrelet at-sea and foraging behavior. Pages 247–253 in Ecology and Conservation of the Marbled Murrelet (C. J. Ralph, G. L. Hunt, Jr., M. G. Raphael, and J. F. Piatt, Eds.). U.S. Department of Agriculture, Forest Service General Technical Report PSW-GTR-152.

Szaro, R.C., P.H. Albers, and N.C. Coon. 1978. Petroleum; effects on mallard eggs hatchability. Journal of Wildlife Management. 42:404-406.

Telfer, T.C., J.L. Sincock, G.V. Byrd, and J.R. Reed. 1987. Attraction of Hawaiian seabirds to lights: conservation efforts and effects of moon phase. Wildlife Society Bulletin 15:406-413.

Thiessen, G. and E. A.G. Shaw. 1957. Acoustic irritation threshold of ring-billed gulls. Journal of the Acoustical Society of America 29:1307-1309.

Tinker, M.T., and B.B. Hatfield. 2015. Southwest U.S. Southern sea otter annual range-wide census results: U.S. Geological Survey data release, http://dx.doi.org/10.5066/F7F47M5C.

Tinker, M.T., and B.B. Hatfield. 2016. California sea otter (Enhydra lutris nereis) census results, spring 2016: U.S. Geological Survey Data Series 1018, 10 p., http://dx.doi.org/10.3133/ds1018.

U.S. Fish and Wildlife Service (USFWS). 1979. Light-footed clapper rail recovery plan. Portland, Oregon.

USFWS. 1980a. Biological Opinion Issued by United States Fish and Wildlife Service (Washington D.C.) to the Bureau of Land Management and the U.S. Geological Survey Regarding Outer Continental Shelf Oil and Gas Leasing and Exploration Offshore Central and Northern California. September 18, 1980.

USFWS. 1980b. California least tern recovery plan. Portland, Oregon. 58 pp.

USFWS. 1982. Southern sea otter recovery plan. Portland, Oregon.

USFWS. 1983. Biological Opinion Issued by United States Fish and Wildlife Service (Washington D.C.) to the Minerals Management Service Regarding Outer Continental Shelf Oil and Gas Leasing and Exploration Offshore Central and Northern California (OCS Sale No. 73). June 8, 1983.

USFWS. 1984. Salt marsh bird's-beak recovery plan (Cordylanthus maritimus subsp. maritimus). Portland, Oregon. 92 pp.

USFWS. 1985. Revised California least tern recovery plan. Portland, Oregon. 100 pp.

USFWS. 2000. Draft Revised Recovery Plan for the Southern Sea Otter (Enhydra lutris). Portland, Oregon. 64 pp. + app.

USFWS. 2002. Final Recovery Plan for the California Red-Legged Frog (Rana aurora draytonii). Portland, Oregon. 64 pp. + app.

USFWS. 2003. Final Revised Recovery Plan for the Southern Sea Otter (Enhydra lutris). Portland, Oregon. 59 pp. + app.

USFWS. 2005. Recovery Plan for the Tidewater Goby (*Eucyclogobius newberryi*). Portland, Oregon. vi + 199 pp.

USFWS. 2006a. Five-year Review of the California Least Tern (*Sternula antillarum browni).* Carlsbad, California.

USFWS. 2006b. Memorandum: Estimating the Effects of Auditory and Visual Disturbance to Northern Spotted Owls and Marbled Murrelets in Northwestern California. Arcata, California.

USFWS. 2007a. Recovery Plan for the Pacific Coast Population of the Western Snowy Plover (*Charadrius alexandrines nivosus*). In two volumes. Sacramento, California. xiv + 751 pp.

USFWS. 2007b. Tidewater goby (*Eucyclogobius newberryi*) 5-Year review: Summary and evaluation. Ventura, California. 50 pp.

USFWS. 2008. Short-tailed Albatross Recovery Plan. Anchorage, Alaska, 105 pp.

USFWS. 2009. Light-footed Clapper Rail (*Rallus longirostris levipes*). 5-Year review: Summary and evaluation. Carlsbad, California.

USFWS. 2011. Hawaiian Dark-rumped petrel (*Pterodroma phaeopygia sandwichensis*) 5-Year review: Summary and evaluation. Honolulu, Hawaii. 16 pp.

USFWS. 2013a. California Condor (*Gymnogyps californianus*) 5-Year review: Summary and evaluation. Pacific Southwest Region. 64 pp.

USFWS. 2013b. Recovery Plan for Tidal March Ecosystems of Northern and Central California. Pacific Southwest Region, Region 8. August 27, 2013.

USFWS. 2014. Short-tailed albatross (*Phoebastria albatrus*) 5-Year review: Summary and evaluation. Anchorage, Alaska. 42 pp.

Van de Laar, F. J. T. 2007. Green light to birds. Investigation into the effect of bird-friendly lighting. Report NAM locatie L15-FA-1. NAM, Assen, the Netherlands.

Van Horn, W., A. Melancon, and J. Sun (eds.). 1988. Outer Continental Shelf Oil and Gas Program: Cumulative Effects. U.S. Department of the Interior, Minerals Management Service, Herndon, VA. OCS Report MMS 88-0005.

Walgren, M. 2006. Restoration efforts augment range extension of a federally-threatened plant, *Suaeda californica* (S. Watson 1874). California Fish and Game 92(1):39-46.

Whittow, G.C. 1997. Wedge-tailed shearwater (Puffinus pacificus). Pages 1-24 in A. Poole and F. Gill (eds.), the birds of North America, No. 305. The Academy of Natural Sciences, Philadelphia, Pennsylvania, and the American Ornithologists Union, Washington, D.C.

Wiese, F.K., W.A. Montevecchi, G.K. Davoren, F. Huettmann, A.W. Diamond, and J. Linke. 2001. Seabirds at risk around offshore oil platforms in the North-west Atlantic. Marine Pollution Bulletin 42:1285-1290.

Williams, T.D. 1978. Chemical immobilization, baseline    hematological parameters, and oil contamination in the sea otter. U.S. Marine Mammal Commission Report No. MMC-77/06. NTIS, Springfield, Virginia.

Ex. 5, Page 69

E.R. 0979

Williams, T.M. 1990. Evaluating the long term effects of crude oil exposure in sea otters: laboratory and field observations. *In* symposium, "The Effects of Oil on Wildlife," 13th Annual Conference of the International Wildlife Rehabilitation Council, Herndon, Virginia, October 17-18, 1990.

Williams, T.M., and R.W. Davis (eds.). 1995. Emergency care and rehabilitation of oiled sea otters: A guide for oil spills involving fur-bearing marine mammals. University of Alaska Press, Fairbanks, Alaska. 279 pp.

Wright, A. H., and A. A. Wright. 1949. Handbook of frogs and toads of the United States and Canada (third edition). Comstock Publishing Company, Ithaca, NY. 640 pp.

Zembal, R., S.M. Hoffman, and J.R. Bradley. 1998. Light-footed clapper rail management and population assessment, 1997. Calif. Dep. Fish and Game, Bird and Mammal Conservation Program Rep. 98-01. 23pp.

Zembal, R., B.W. Massey, and J.M. Fancher. 1989. Movements and activity patterns of the light-footed clapper rail. Journal of Wildlife Management. 53: 39-42.

Zembal, R., and S.M. Hoffman. 1999. Light-footed clapper rail management and study, 1999. Report to U.S. Fish and Wildlife Service and California Department of Fish and Game. 8 pp.

Zembal, R., S. Hoffman, and J. Konecny. 2006. Status and Distribution of the Light-footed Clapper Rail in California, 2006. Submitted to CDFG and FWS by the Clapper Rail Recovery Fund. June 2006.

Zembal, R., S.M. Hoffman, and J. Konecny. 2013. Status and Distribution of the Light-footed Clapper Rail in California, 2013. California Department of Fish and Wildlife, Wildlife Management, Nongame Wildlife Unit Report, 2013-02. Sacramento, CA 24 pp.

Zimmerman, S,T, C.S. Gorbics, and L.F. Lowry. 1994. Response activities. Pp. 23-45, *in*: T.R. Loughlin (ed.), Marine mammals and the *Exxon Valdez*. Academic Press, Inc.: San Diego, CA.

Ex. 5, Page 70

E.R. 0980

## Appendix A

**Pacific Outer Continental Shelf Region Programmatic Oil Spill Risk Analysis**

This appendix covers oil spill risk, fate of oil, trajectory analysis, and response. Also included is a technical description of current oil spill models.

### A.1   Oil Spill Risk Assessment

In the course of normal, day-to-day platform operations, accidental discharges of hydrocarbons may occur. Such accidents are typically limited to discharges of quantities of less than one barrel (bbl) of crude oil. Table A-1 lists the hydrocarbon spills that occurred in the Pacific Outer Continental Shelf Region (POCSR) from 1963 through 2015. During that period, 1,450 oil spills were recorded. The total volume of oil spilled in the Pacific Region is dominated by the 1969 Santa Barbara spill. Since 1969, spills have ranged in size from less than one bbl to 164 bbl, for a total of 920 bbl and an average oil spill size of 0.64 bbl. Of the 49 oil spills greater than one bbl in the Pacific Region (1970 – 2015), five measured 50 bbl or more in volume (Table A-1); the largest of these was the 164 bbl Platform Irene pipeline spill in September 1997. If the 1969 oil spill is included (1963 – 2015) the average oil spill size is 57 bbl. The average oil spill size in the Pacific Region for oil spills in the "50 to less than 1,000 bbl" range is 103 bbl and the average oil spill size for oil spills in the 1 – 50 bbl range is 7.11 bbl. [1] As shown in Table A-1, 3.4 % of the total recorded spills between 1970 and 2015 (49 of 1450) were greater than one bbl, spilling 919.7 bbl of oil into the ocean. Given these data and the experience in the Pacific Region over the last 40 years, BOEM estimates the most likely spill volume for spills in the 50 to less than 1,000 bbl range to be less than 200 bbl.

BOEM calculated oil spill rates for the Pacific Region using oil spill data (1963 – 2015, Table A-1) and cumulative production from the Pacific Region. BOEM estimated the number of oil spills and the probability of one or more spills that could occur as a result of ongoing activities in the Southern California Planning Area in the "50 to less than 1000 bbl" size range using Pacific Region oil spill rates (Table A-2). Oil spill occurrence is calculated as a function of the volume of oil handled or the amount of oil that could be exposed. Oil exposed is defined as the volume of oil produced or transported within a given area. Therefore, the total amount of oil that could be economically produced in the Southern California Planning Area was used as this exposure variable. In the "50 to less than 1,000 bbl" size range we estimate there will be 1.69 spills with a 81.5 % probability of an oil spill occurring (Table A-2). Note that the 80,000 bbl 1969 spill was not included in this calculation since it does not fall within the 50 to1000 bbl size range.

For comparison, we calculated oil spill probabilities using oil spill rates derived from all United States Outer Continental Shelf (US OCS) operations (1996-2010) and the total amount of oil that could be economically produced in the Southern California Planning Area (Anderson et. al., 2012). Using spill rates based on all US OCS Operations (1996-2010), the probability of one or more spills occurring in the Pacific Region for the "50 to less than 1,000 bbl" size range is 98.9 %. The lower probability (81.5 %) of spills in the "50 to less than 1,000 bbl" size range using POCSR oil spill data is reflective of the lower number of oil spills throughout POCSR production history. Using spill rates based on all US OCS operations (1996-2010), the probability of one or more spills occurring in the greater than 1,000 bbl size range is 34.7 % (Table A-3). This is a conservative estimate based on overall US OCS operations. For the greater than 1,000 bbl size range, we did not calculate oil spill rates with only POCSR data due to the limited dataset (1 spill > 1,000 bbl occurred in 1969). A spill of this size would be an unlikely event in the POCSR.

---

[1] From 1996 to 2010, the overall OCS average spill size in the size range of "50 to less than 1,000 bbl" is 186 bbl (Anderson et al., 2012).

**Table A-1.** Crude, diesel, or other hydrocarbon spills recorded in the POCSR, 1963 through 2015. [volume in barrels (bbl)].

| YEAR | Less than or equal to 1 BBL | | Greater than 1 BBL and less than 50 | | Equal to or More than 50 BBL | | Total | | Cumulative Since 1969 |
|---|---|---|---|---|---|---|---|---|---|
| | NO. | VOLUME | NO. | VOLUME | NO. | VOLUME | NO. | VOLUME | VOLUME |
| 1963 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1964 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1965 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1966 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1967 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1968 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | |
| 1969 | 0 | 0.00 | 0 | 0.00 | 2 | 80900.00 | 2 | 80,900.00 | |
| 1970 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0.00 |
| 1971 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0.00 |
| 1972 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0.00 |
| 1973 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0.00 |
| 1974 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0.00 |
| 1975 | 1 | 0.10 | 0 | 0.00 | 0 | 0.00 | 1 | 0.10 | 0.10 |
| 1976 | 3 | 1.10 | 1 | 2.00 | 0 | 0.00 | 4 | 3.10 | 3.20 |
| 1977 | 11 | 2.20 | 1 | 4.00 | 0 | 0.00 | 12 | 6.20 | 9.40 |
| 1978 | 4 | 1.20 | 0 | 0.00 | 0 | 0.00 | 4 | 1.20 | 10.60 |
| 1979 | 5 | 1.70 | 1 | 2.00 | 0 | 0.00 | 6 | 3.70 | 14.30 |
| 1980 | 11 | 4.90 | 2 | 7.00 | 0 | 0.00 | 13 | 11.90 | 26.20 |
| 1981 | 21 | 6.00 | 10 | 75.00 | 0 | 0.00 | 31 | 81.00 | 107.20 |
| 1982 | 24 | 3.20 | 1 | 3.00 | 0 | 0.00 | 25 | 6.20 | 113.40 |
| 1983 | 56 | 7.70 | 3 | 6.00 | 0 | 0.00 | 59 | 13.70 | 127.10 |
| 1984 | 65 | 4.70 | 3 | 36.00 | 0 | 0.00 | 68 | 40.70 | 167.80 |
| 1985 | 55 | 9.30 | 3 | 9.00 | 0 | 0.00 | 58 | 18.30 | 186.10 |
| 1986 | 39 | 5.50 | 3 | 12.00 | 0 | 0.00 | 42 | 17.50 | 203.60 |
| 1987 | 67 | 7.50 | 2 | 11.00 | 0 | 0.00 | 69 | 18.50 | 222.10 |
| 1988 | 47 | 3.70 | 1 | 2.00 | 0 | 0.00 | 48 | 5.70 | 227.80 |
| 1989 | 69 | 4.10 | 3 | 8.33 | 0 | 0.00 | 72 | 12.43 | 240.23 |
| 1990*[1] | 43 | 2.70 | 0 | 0.00 | 1 | 101.00 | 44 | 103.70 | 343.93 |
| 1991*[2] | 51 | 2.80 | 1 | 13.00 | 1 | 50.00 | 53 | 65.80 | 409.73 |
| 1992 | 39 | 1.20 | 0 | 0.00 | 0 | 0.00 | 39 | 1.20 | 410.93 |
| 1993 | 32 | 0.76 | 0 | 0.00 | 0 | 0.00 | 32 | 0.76 | 411.69 |
| 1994*[3] | 18 | 0.40 | 2 | 33.00 | 1 | 50.00 | 21 | 83.40 | 495.09 |
| 1995 | 25 | 0.90 | 1 | 1.43 | 0 | 0.00 | 26 | 2.33 | 497.42 |
| 1996*[4] | 39 | 0.90 | 1 | 5.00 | 1 | 150.00 | 41 | 155.90 | 653.32 |
| 1997*[5] | 20 | 1.50 | 0 | 0.00 | 1 | 164.00 | 21 | 165.50 | 818.82 |
| 1998 | 29 | 1.00 | 0 | 0.00 | 0 | 0.00 | 29 | 1.00 | 819.82 |
| 1999 | 26 | 1.35 | 1 | 10.00 | 0 | 0.00 | 27 | 11.35 | 831.17 |
| 2000 | 36 | 1.00 | 0 | 0.00 | 0 | 0.00 | 36 | 1.00 | 832.17 |
| 2001 | 48 | 1.70 | 0 | 0.00 | 0 | 0.00 | 48 | 1.70 | 833.87 |
| 2002 | 55 | 1.30 | 1 | 9.00 | 0 | 0.00 | 56 | 10.30 | 844.17 |
| 2003 | 56 | 1.37 | 0 | 0.00 | 0 | 0.00 | 56 | 1.37 | 845.54 |
| 2004 | 36 | 1.00 | 0 | 0.00 | 0 | 0.00 | 36 | 1.00 | 846.54 |
| 2005 | 46 | 2.60 | 0 | 0.00 | 0 | 0.00 | 46 | 2.60 | 849.14 |
| 2006 | 46 | 1.99 | 0 | 0.00 | 0 | 0.00 | 46 | 1.99 | 851.13 |
| 2007 | 45 | 1.19 | 1 | 1.19 | 0 | 0.00 | 46 | 2.38 | 853.51 |
| 2008 | 45 | 1.20 | 1 | 27.00 | 0 | 0.00 | 46 | 28.20 | 881.71 |
| 2009 | 36 | 1.10 | 0 | 0.00 | 0 | 0.00 | 36 | 1.10 | 882.81 |
| 2010*[6] | 33 | 0.63 | 0 | 0.00 | 0 | 0.00 | 33 | 0.63 | 883.44 |
| 2011 | 38 | 0.02 | 0 | 0.00 | 0 | 0.00 | 38 | 0.02 | 883.46 |
| 2012*[7] | 30 | 0.08 | 1 | 35.70 | 0 | 0.00 | 31 | 35.78 | 919.24 |
| 2013 | 26 | 0.03 | 0 | 0.00 | 0 | 0.00 | 26 | 0.03 | 919.27 |
| 2014 | 10 | 0.48 | 0 | 0.00 | 0 | 0.00 | 10 | 0.48 | 919.75 |
| 2015 | 13 | 0.11 | 0 | 0.00 | 0 | 0.00 | 13 | 0.11 | 919.86 |
| TOTALS | 1399 | 92.21 | 44 | 312.65 | 7 | 81415.00 | 1450 | 81,819.86 | 919.75 |

*[1] Mineral oil mud released due to incorrectly positioned standpipe and closed valves
*[2] Pipeline riser ruptured when snagged by grappling hook used by workboat to retrieve lost anchor
*[3] Process upset resulting in overflow of oil/water emulsion from tanks into disposal tube
*[4] Equipment failure and error allowing emulsion to flow through flare boom
*[5] Pipeline break in the flange metal in state waters due to welding flaws
*[6] Since January 2010 spills recorded in Technical Information Management System in .01 gallons
*[7] Includes Platform Houchin 35 bbl spill (per USCG) from burst plate

A-2

Ex. 5, Page 72

E.R. 0982

Oil spill probability estimates are conservative given POCSR's:

- oil spill history,
- long established drilling program,
- producing from mature fields with lower pressure,
- no floating drilling rigs,
- no new platforms being installed, and
- all oil is transported via pipelines.

**Table A-2**   Estimated mean number of spills and spill occurrence probability for the "50 to less than 1,000 bbl" size range using oil spill data from POCSR operations (1963 – 2011). Anticipated POCSR Production is 0.3373 Bbbl (0.262 [BSEE August 2016] + 0.0957 [Tranquillon Ridge] + 0.0035 [Electra Field] + 0.0161 [Carpinteria State] = 0.3373 Bbbl).

| POCS Spill data (1963 – 2014) | Spill Rate (2012*) | Estimated Mean Number of spills | Probability of 1 or more spills |
|---|---|---|---|
| Spills ≥ 50 to < 1,000 | | | |
| Platforms & Pipelines | 4.47 | 1.69 | 81.5 % |

Bbbl = billions of barrels        *spill rate calculation methodology: Anderson et. al., 2012

Formulae used in the Oil Spill Occurrence and Probability Calculations:

Spill rate $\lambda$ = number of spills per Bbbl

Estimated Mean Number of Spills = spill rate $\lambda$ x volume handled t (Bbbl) = $\lambda$ t

Probability [n spills over future exposure t ] = $[(\lambda t)^n e^{-\lambda t}] / n!$

Probability of Zero Spills = $[(\lambda t)^0 e^{-\lambda t}] / 0! = [1 \times e^{-\lambda t}] / 1 = 1 / e^{\lambda t}$

Probability of One or More Spills = 1-Probability[ zero spills] = $1 - 1 / e^{\lambda t}$

**Table A-3**   Estimated means and spill occurrence probabilities POCSR analyses using all US OCS Spill Data (1996 – 2010). Anticipated POCSR production is 0.3373 Bbbl.

| US OCS Spill Data (1996 – 2010) | Spill Rate (2012*) | Estimated Mean Number of Spills | Probability of 1 or More Spills |
|---|---|---|---|
| Spills ≥ 50 to < 1,000 | | | |
| Platforms & Pipelines | 12.88 | 4.86 | 99.2 % |
| Spills ≥ 1000 | | | |
| Platforms | 0.25 | 0.09 | 9.0 % |
| Pipelines | 0.88 | 0.33 | 28.3 % |
| Total | 1.13 | 0.43 | 34.7 % |

Bbbl = billions of barrels.        * Source: Anderson et. al., 2012

Oil spill Assessment 1970s and 1980s

The 1975 Environmental Impact Statement (EIS) for Oil Development in the Santa Barbara Channel estimated 1 to 2 billion barrels (Bbbl) of oil would be produced (USGS, 1975). To date the Southern California Planning area has produced 1.3 Bbbl of oil with a remaining production estimate of 0.3373 Bbbl. Therefore, the production estimates for the region are within what was

A-3

estimated in the 1975 EIS. This section reviews, by geographic location, the oil spill assessments completed in the 1970s and 1980s environmental documents.

*Santa Maria Basin:*

- 1985 Santa Maria Basin EIS/EIR analyzed oil spills ranging from 10 to 100,000 bbl (ADL, 1985). (Platforms covered: Irene)
- Spills since 1969:
  - Platform Irene – 1997 – 164 bbl pipeline spill

*Santa Barbara Channel:*

- USGS 1975 EIS: estimated a 70 % chance that there would be at least one platform spill of 1,000 bbl, and if a large platform spill occurred, there was an 80 % chance the spill would exceed 2,380 bbl (USGS, 1975). (Platforms covered: Hogan, Houchin, Hillhouse, A, B, C, Henry, Grace, Habitat)
- 1980 Environmental Impact Report – Environmental Assessment (EIR-EA) for the Platform Gina and Gilda development: estimated that an average rate of operational platform spills is 1 spill per production platform per 10.6 years (Dames and Moore, 1980). Thus, it was estimated that Platform Gilda would have 1.9 spills over the 20 year production lifetime. (Platforms covered: Gina, Gilda)
- 1986 Platform Gail Environmental Assessment (EA): cumulative oil spill analysis estimated that during 32 years of production in the Southern California Planning Area there would be 14.5 spills $\geq$ 1,000 bbl and 6.6 spills $\geq$ 10,000bbl (MMS, 1986). (Platforms covered: Gail)
- 1984 Santa Ynez Unit Environmental Impact Report/Environmental Impact Statement (EIR/EIS): examined spills ranging from 10 bbl to more than 500,000 bbl and categorized a platform blowout as spilling between 1,000 and 500,000 bbl (SAI, 1984). (Platforms covered: Hondo, Harmony, Heritage[2])
- 1984 Point Arguello EIR/EIS estimated that a cumulative total of 144,000 bbl of oil would be expected to be spilled over a 30-year project lifetime (ADL, 1984, Appendix H). (Platforms covered: Hidalgo, Harvest, Hermosa)
- Spills since 1969, $\geq$ 50 bbl:
  - Platform Habitat: 1990 – 100 bbl of drilling mud with mineral oil
  - Platform Gina: 1991 – 50 bbl of oil from a broken pipeline
  - Platform Hogan: 1994 – 50 bbl of oil
  - Platform Heritage: 1996 – 150 bbl of oil

*San Pedro Bay:*

- 1978 Beta Unit EIR-EA analyzed the following spills: 5000-bbl platform spill, 50-bbl pipeline spill, 50-bbl Long Beach Harbor spill, and a catastrophic 80,000-bbl platform spill (SLC, PLB, USGS, 1978). (Platforms covered: Elly, Ellen, Eureka, Edith)

<u>Worst Case Discharge</u>

Pacific OCS Region operators are required to submit oil spill response plans (OSRPs) which show the worst case volume of oil that could be spilled from three sources associated with

---

[2] A fourth platform was also covered by this document, but never installed. The platform has since been removed from the current Development and Production Plan for the Santa Ynez Unit.

A-4

Ex. 5, Page 74

offshore operations: vessels, tanks, and piping on board platforms, pipelines, and loss of well control events (Table A-4; 30 CFR 254; 30 CFR 550). The intent of this conservative requirement is to ensure that each operator has adequate spill response capabilities to respond to the largest conceivable oil spill from their facilities. If surface intervention is unsuccessful, an operator needs to mobilize a drilling rig to the Southern California Planning Area and drill a relief well. The largest worst case discharge volume is calculated as the release of stored oil on a platform, oil in the associated pipeline, plus the total flow released from a loss of well control up to the drilling of a relief well. The worst case discharge volumes vary widely across facilities. A continuous spill event (i.e., from a loss of well control) is more difficult to quantify but unlikely to occur given the reservoir pressures in the POCSR (13 of the 23 platforms have no pressure; Table A-4).

*Worst Case Discharge Scenario, Largest Volume in POCSR*

Platform Heritage, Santa Ynez Unit, located approximately 8 miles offshore Gaviota, California, has the largest worst case discharge estimate for a loss of well control (blowout) with an estimated maximum daily flow rate of 33,986 barrels. It is estimated to take 17 days to stop the flow using surface capping equipment, for a total discharge volume of 577,762 bbl. If surface intervention is not achieved, the estimated maximum time it would take to mobilize a rig and drill a relief well would be 170 days, with a total discharge volume of 5,777,620 bbl. This catastrophic event is unlikely to occur.

Summary of Oil Spill Risk Assessment

- The maximum most likely oil spill volume is estimated to be 200 bbl.
- The probability of an oil spill occurring in the 50 to less than 1,000 bbl range is 81.5 %.
- Projected oil production in the Southern California Planning Area is within what was analyzed in the environmental documents from the 1970s and 1980s.
- A large catastrophic event is unlikely to occur.

## A.2     Fate of Oil

In the event of an accidental oil spill, a slick forms and part of the slick begins evaporating while the action of breaking waves forms oil droplets that are dispersed into the water column. Oil in the Southern California Planning Area ranges from very heavy (API 12) to very light (API 39). Light oil has a rapid evaporation rate and is soluble in water. Light crude oils can lose up to 75 % of their initial volume within a few days of a spill (NRC, 2003). In contrast, heavy oil (API <22) has a negligible evaporation rate and solubility in water.

Depending on the weight of the oil spilled and the environmental conditions (i.e., sea state) at the time of a spill, six to 60 % of oil during an oil spill would sink and be in the water column or on the seafloor in the vicinity of the spill (ADL, 1984). This is supported by a recent study of natural oil seeps at Coal Oil Point in the Santa Barbara Channel that range in depth from six to 67 meters offshore of Goleta, CA (Leifer et al., 2006) and are assumed to release 100 bbl/day (Farwell et al., 2009). The distribution of heavy oil in a surface slick in the Santa Barbara Channel is primarily influenced by surface currents and falls out of the slick over a period of 0.4 to 5 days (Leifer et al., 2006).

**Table A-4.** Worst Case Discharges Identified in OSRPs in the POCSR.

| Facility | Pipeline (bbl) | Storage[3] (bbl) | Drilling (bbl/day) | Reference |
|---|---|---|---|---|
| Hogan | Pipeline to Shore = 41 (oil + water) Inter-Platform (Houchin) = 49 | 324 | 0 | Pacific Operators Offshore OSRP 2012 |
| Houchin | See Information for Hogan | 324 | 0 | Pacific Operators Offshore OSRP 2012 |
| Elly | 16" Pipeline Elly to Beta Pump Station = 3,111 | 8,925 | 0 (no drilling) | Beta Unit Complex OSRP 2012 |
| Ellen | No Pipeline, transfers through Elly = 0 | 1840 | 45 | Beta Unit Complex OSRP 2012 |
| Eureka | Pipeline = 1,026 | 4,232 | 105 | Beta Unit Complex OSRP 2012 |
| Gail | Pipelines at Gail = 168 | 2,068 | 650 | Santa Clara Unit OSRP 2012 |
| Grace | Pipelines at Grace and Grace to Shore = 292 | 1,557 | 110 | Santa Clara Unit OSRP 2012 |
| Hermosa | Pipeline Hermosa to Shore = 2,502 | 3,760 | 0 | Plains Exploration and Production Company OSRP 2012 |
| Hidalgo | Pipeline Hidalgo to Hermosa = 489 | 2,478 | 0 | Plains Exploration and Production Company OSRP 2012 |
| Harvest | Pipeline Harvest to Hermosa = 221 | 3,820 | 0 | Plains Exploration and Production Company OSRP 2012 |
| Irene | Pipeline Irene to Shore = 1,124 | 1,064 | 750 | Plains Exploration and Production Company OSRP 2012 |
| Gilda | Pipeline Gilda to Shore = 1,994 | 857 | 200 | DCOR OSRP 2012 |
| Gina | Pipeline Gina to Shore = 546 | 223 | 0 | DCOR OSRP 2012 |
| "C" | Pipeline C to B = 11 | 306 | 2 | DCOR OSRP 2012 |
| "B" | Pipeline B to A = 92 | 646 | 0 | DCOR OSRP 2012 |
| "A" | Pipeline A to Shore = 3,685 | 589 | 0 | DCOR OSRP 2012 |
| Hillhouse | Pipeline Hillhouse to A = 57 | 1,534 | 0 | DCOR OSRP 2012 |
| Henry | Pipeline Henry to Hillhouse = 3 | 118 | 0 | DCOR OSRP 2012 |
| Edith | Pipeline Edith to Elly = 122 | 2,352 | 0 | DCOR OSRP 2012 |
| Habitat | No Pipeline, gas production | 385 | 0 | DCOR OSRP 2012 |
| Harmony | Pipeline Harmony to Shore = 6,210 | 2,607 | < 2,000 | ExxonMobil OSRP 2014 |
| Heritage | Pipeline Heritage to Harmony = 731 | 2,684 | 33,986 | ExxonMobil OSRP 2014 |
| Hondo | Pipeline Hondo to Harmony = 560 | 3,811 | < 2,000 | ExxonMobil OSRP 2014 |

---

[3] Vessels, piping, tanks

### A.3    Oil Spill Response

BSEE regulations at 30 CFR Part 254 require that each OCS facility have a comprehensive OSRP. Response plans consist of an emergency response action plan and supporting information that includes an equipment inventory, contractual agreements with subcontractors and oil spill response cooperatives, worst-case discharge scenario, dispersant use plan, in-situ burning plan and details on training and drills. The Coast Guard is the lead response agency for oil spills in the coastal zone and coordinate the response using a Unified Command (UC), consisting of the affected state and the Responsible Party (i.e., the company responsible for spilling the oil) in implementing the Incident Command System (ICS) if an oil spill occurs. Oil spill drills, either agency-lead or self-lead by a company, also use the UC/ICS. California's Department of Fish and Wildlife's Office of Spill Prevention and Response (OSPR) assumes the role of the State on-scene coordinator and plays a significant role in managing wildlife operations in the Southern California Planning Area as the state's Natural Resource Agency.

BSEE requires companies that operate in the OCS to have the means to respond to a worst-case discharge from their facilities. Many companies meet this requirement by becoming members of Oil Spill Removal Organizations (OSRO). Since 1970, oil companies operating in the Santa Barbara Channel and Santa Maria Basin have funded and operated a non-profit OSRO called Clean Seas (www.cleanseas.com). Clean Seas acts as a resource to its member companies by providing an inventory of state-of-the-art oil spill response equipment, trained personnel, training and expertise in planning and executing response techniques. Clean Seas personnel and equipment are on standby, ready to respond to an oil spill, 24 hours a day.

The Marine Spill Response Corporation (MSRC) is the other U.S. Coast Guard-classified OSRO based in Long Beach (www.msrc.org). MSRC is a nation-wide OSRO with multiple responder-class oil spill response vessels and oil spill response barges. They are also equipped to respond to an oil spill 24 hours a day.

Clean Seas and MSRC are both equipped and prepared to respond to oil spill threats to sensitive shoreline areas through the detailed and up-to-date information on sensitive areas and response strategies from the Los Angeles/Long Beach Area Contingency Plan (https://www.wildlife.ca.gov/OSPR/Preparedness/LA-LB-Spill-Contingency-Plan) and the California OSPR (https://www.wildlife.ca.gov/OSPR).

### A.4    Oil Spill Trajectory Analysis

Oil spill trajectory modeling was conducted to determine the movement and fate of spilled oil if a spill occurred in the Southern California Planning Area from existing offshore oil and gas operations. The BOEM examined two available models: BOEM Oil Spill Risk Analysis (OSRA) and National Oceanic & Atmospheric Administration (NOAA) Office of Response & Restoration's General NOAA Operational Modeling Environment (GNOME). GNOME was developed by the Emergency Response Division (ERD) of NOAA's Office of Response and Restoration. This information can be used in conjunction with data from the oil spill risk assessment to provide perspective on the potential for exposure to spilled oil.

The OSRA model calculates numerous trajectories for hypothetical oil spills from pre-designated launch points by varying the wind and ocean current fields. Contact was evaluated in a grid encompassing the entire ocean region as well as grids located along the shoreline (Figure A-1; MMS 2000). Percent contact for a grid section is calculated by OSRA (e.g., Figures A-2 and A-

3). The OSRA trajectories are volume-independent and only show where oil would travel given that a spill occurred.



**Figure A-1.** Pacific OSRA Resource Grid. The centers of this grid are used as the data locations for the probability contour plots.

The BOEM ran the GNOME model in three oceanographic regimes (see Section A.5). Releases were modeled for three wind directions correlated with the ocean current flow regimes. The GNOME model takes ocean currents and wind into account. The contacts displayed in Figures A-4 – 8 are only for a limited set of meteorological conditions (Table A-5) and are not intended to encompass all of the meteorological conditions that could be present during a spill scenario. GNOME model outputs provide an overall picture of where oil may travel if an oil spill occurred from one of the launch points.

**Table A-5.** Parameters utilized in GNOME model runs.

| Current Regime | Wind Conditions | Timeframe |
|---|---|---|
| Upwelling | 8 m/s NW | 10 days |
| Convergent | 7 m/s NW | 10 days |
| Relaxation | 4 m/s NW<br>4 m/s SW<br>0 m/s | 10 days |

The GNOME analysis provides a slightly different picture of possible oil spill trajectories by including variables that account for the fate of the volume of oil released including weathering of released materials, specific ocean current regimes, and meteorological conditions. A volume of oil is assumed for GNOME model runs. As discussed in section A.1, the volume is 200 bbl for

A-8

Ex. 5, Page 78

E.R. 0988

Case 2:16-cv-08418-PSG-FFM   Document 43-5   Filed 04/03/17   Page 80 of 91   Page ID #:722





**Figure A-2.** Ten day annual average oil spill analysis for Platform Irene (A), Hidalgo (B) and Harmony (C). Percent probability that oil will contact certain land and ocean locations.

Ex. 5, Page 79







**Figure A-3.** Ten day annual average oil spill analysis for Platform Hillhouse (A), Grace (B) and Elly (C). Percent probability that oil will contact certain land and ocean locations.

Ex. 5, Page 80

E.R. 0990











**Figure A-4.**
**Platform Irene**
<u>Northwest wind</u>: In the three oceanographic regimes, it takes one day for oil to land at Point Arguello. During the upwelling and convergent regimes oil lands at San Miguel island in 3-4 days, Santa Rosa in 4-5 days, and Santa Cruz Island in 4-9 days.

<u>Southwest and neutral wind</u>: In the relaxation regime it takes 1-2 days for oil to land at Purisima Point and 3-6 days for oil to land at Point Sal.

A-11

Ex. 5, Page 81











**Figure A-5.**
**Platform Hidalgo**

<u>Northwest wind</u>: Under upwelling and convergent regimes oil lands on San Miguel Island in 3 days and Santa Rosa Island in 3-4 days. Upwelling carries oil to Santa Cruz Island in 5 days. Convergent ocean currents carry oil to just north of Point Conception in 3 days. The relaxation regime carries oil to Pt. Arguello in 2 days, San Miguel Island in 6 days, Purisima Point in 7 days and Santa Rosa Island in 9 days.

<u>Southwest and neutral wind</u>: In the relaxation regime with neutral wind it takes 8 days for oil to land at Pt. Sal. In the relaxation regime with southwest wind, oil lands at Point Arguello in 1 day, Purisima Point in 2 days, Point Sal in 3 days and Pismo Beach in 7 days.











**Figure A-6.**
**Platform Harmony**

<u>Northwest wind</u>: Under upwelling and convergent regimes oil lands on Santa Cruz and Santa Rosa Islands in 2 days. The upwelling regime also carries oil to Anacapa Island in 5 days. Under the relaxation regime oil lands on Santa Rosa Island in 3 days and San Miguel and Santa Cruz Islands in 4 days.

<u>Southwest wind</u>: Under the relaxation regime, oil lands at Point Conception in 1 day, Point Arguello in 2 days, Purisima Point in 6 days, and Point Sal in 7 days.

<u>Neutral wind</u>: Under the relaxation regime, oil lands on San Miguel Island in 5 days, Santa Rosa Island in 6 days and Santa Cruz Island in 10 days. Oil also travels in the ocean up the coast to Point Sal, but does not land on the mainland.











**Figure A-7.**
**Platform Hillhouse**

<u>Northwest wind</u>: Under the upwelling regime, oil lands on the mainland in Oxnard in 2 days and the majority of oil travels out of the model domain. In the convergent regime, oil lands on the mainland (Montecito and Carpinteria) in 3 days, Ventura Harbor in 4 days, Santa Cruz Island in 5 days, and Anacapa Island in 7 days. In the relaxation regime, oil lands on Carpinteria in 2 days, Santa Barbara in 3 days, Santa Cruz Island in 4 days and Anacapa Island in 8 days.

<u>Southwest wind</u>: Under the relaxation regime oil reaches Montecito in 1 day.

<u>Neutral wind</u>: Under the relaxation regime oil reaches Santa Barbara in 1 day and Point Conception in 7 days and continues out in the ocean past Point Purisima Point.











**Figure A-8.**
**Eastern Channel Group-Platforms Gail, Grace, Gina, Gilda**

Northwest wind: Under all three regimes the majority of oil travels out of the model domain. Under the upwelling regime, oil may land at Anacapa Island after 9 days. Under the convergent regime oil lands just south of Ventura Harbor in 1 day. In the relaxation regime oil lands south of Ventura Harbor in 4 days and on Anacapa Island in 8 days.

Southwest wind: Under the relaxation regime oil lands on Carpinteria and Ventura Harbor in 1 day.

Neutral wind: Under the relaxation regime oil lands on Carpinteria in 2 days, Santa Barbara in 4 days, and travels through the Santa Barbara Channel to just north of Point Conception.

Ex. 5, Page 85

A-15

the Pacific Region (see also Figures A-3 – A-8). Unlike OSRA, GNOME provides an estimated amount of oil that may contact the shoreline during the model run.

Although the GNOME results differ slightly from the OSRA model calculations, both analyses provide insights that help present a more complete picture of what may occur if oil is spilled. Together, these analyses represent the best available information on possible oil spill trajectories in the Southern California Planning Area. A detailed description of both models is provided at the end of this technical appendix in section A.5.

Trajectory Analysis and Comparison to 1970s and 80s

Six platforms were chosen as launch points because they are distributed throughout the geographic range of existing offshore operations as follows:

- *Santa Maria Basin* – Platforms Irene and Hidalgo;
- *Santa Barbara Channel* – Platforms Harmony, Hillhouse and a group in the eastern Channel (Gail, Grace, Gilda and Gina); and
- *San Pedro Bay* – Platform Elly.

The model outputs were then compared to the oil spill trajectories analyzed in the 1970s and 1980s environmental documents.

*Santa Maria Basin*

Platform Irene. In the Arthur D. Little (1985) EIR/EIS, model outputs focused on the probability of oil contacting a section of shoreline extending north of the Santa Maria River mouth, south and west to Santa Barbara, as well as San Miguel, Santa Rosa, and Santa Cruz islands (northern Channel Islands, not including Anacapa Island). These trajectories are essentially the same as those estimated using the current oil spill models. All of the models estimate that areas of the coastline from the Santa Maria River mouth to Gaviota and the northern Channel Islands were most likely to be affected by an oil spill from Platform Irene. (Figures A-2A and A-4). The OSRA analysis for Platform Irene displays the highest probability (50 – 60 %) of oil contacting land at Point Arguello and a 10 – 20 % chance of contact at San Miguel Island (Figure A-2A). GNOME models spilled oil traveling from Platform Irene to as far north as San Luis Obispo Bay and off the coast of Montana De Oro State Park. The northern-most mainland contact is just south of Pismo Beach at Guadalupe-Nipomo Dunes National Wildlife Refuge (Figure 4).

Platform Hidalgo. In the Arthur D. Little (1984) EIR/EIS, the trajectories estimated for oil spills launched near Platform Hidalgo are similar to those estimated using current oil spill models. All models estimated oil to contact land around Point Arguello and San Miguel Island. The Hidalgo OSRA analysis displays a 20 – 30 % probability of oil contacting Point Arguello and a 10 – 20 % chance of contact at San Miguel Island (Figure A-2B). The 1984 model and GNOME models also estimate land fall around Point Conception, Santa Rosa Island and Santa Cruz Island. The GNOME model estimates oil traveling further north up the coast to Point Sal and toward San Luis Obispo Bay (Figure 5).

*Santa Barbara Channel*

Platform Harmony. In the Science Applications, Inc. (1984) EIS/R, the trajectories estimated for oil spills launched near Platform Harmony are similar to those estimated using current oil spill models. All models agree that areas of coastline from Vandenberg Air Force Base to Santa Barbara County and northern coastlines of the Channel Islands are most likely to be affected by

A-16

an oil spill from Platform Harmony. The primary differences are that the GNOME model runs estimate oil landing as far north as Point San Luis (Figure A-6) and the 1984 model analyses estimate oil landing as far south as San Nicolas and San Clemente Islands. Platform Harmony OSRA analysis displays a 20 – 30 % chance of oil contacting the mainland Gaviota coast and San Miguel Island and a 10 – 20 % chance of oil contacting Santa Rosa and Santa Cruz Islands (Figure A-2C).

Platform Hillhouse. The USGS (1975) EIS for the Santa Barbara Channel estimated oil spilled in this area to make contact with land around Carpinteria, Anacapa Island and travel down coast to Ventura. This is very similar to the OSRA model estimation, where there is a 30 – 40 % probability of oil contacting mainland Santa Barbara and a 10 – 20 % probability that oil will travel along the mainland as far north as the Gaviota coast and as far south as Ventura as well as out toward Anacapa Island (Figure A-3A). GNOME models oil traveling as far west as Santa Barbara and Point Conception (Figure 7).

*Eastern Santa Barbara Channel*

Platforms Grace, Gail, Gina, Gilda (modeling within a similar area). The USGS (1975) EIS for the Santa Barbara Channel indicated that oil in this area would contact land in Ventura, Port Hueneme, Anacapa Island, and possibly Point Mugu. The Dames & Moore, (1980) EIR-EA for Gina-Gilda described land contact would occur in the immediate vicinity of Port Hueneme and would range from the eastern Santa Barbara Channel to as far west as Santa Barbara. Oil would also likely contact the eastern shorelines of the northern Channel Islands. The 1986 Platform Gail EA also estimates this area of contact (MMS, 1986). This is similar to the GNOME model for Platform Gail that estimates landfall from mainland Santa Barbara to south of Ventura Harbor in Oxnard and out to Anacapa Island (Figure 8). A spill modeled in OSRA from Platform Grace displays a 40 – 50 % probability that oil will contact the east end of Anacapa Island and a 30 – 40 % probability that it will contact the entire island. There is a 20 – 30 % probability of contacting Port Hueneme and Santa Cruz Island and a 10 – 20 % probability of contacting the mainland as far north as Goleta and as far south as Point Mugu (Figure A-3B).

*San Pedro Basin*

Platform Elly. The 1978 Beta EIR\EA indicated that oil spilled from the Beta Unit, near the Ports of Los Angeles and Long Beach, would contact land from Alamitos Bay to Huntington Beach (SLC, PLB, USGS, 1978). They indicated that a catastrophic spill would contact the shoreline both up and down coast of the study area, but do not provide a specific area. This is similar to the OSRA model output that estimates spilled oil to primarily stay within the San Pedro Bay and travel south along the mainland to Oceanside (Fig A-3C). The OSRA analysis for the Beta Unit, Platform Elly, displays a 40 – 50 % probability of oil contacting the mainland from Huntington Beach to Newport Beach and a 10 – 20 % probability of oil traveling as far north as Alamitos Bay and as far south as Oceanside. No trajectory runs were conducted using GNOME because GNOME, as configured for this study, was limited to the geographic area of the Santa Barbara Channel and just north of Point Conception.

## A.5    Oil Spill Trajectory Models – Technical Descriptions

*BOEM OSRA Model*

The trajectory simulation portion of the OSRA model consists of many hypothetical oil spill trajectories. The trajectories are the consequence of the integrated action of temporally and spatially varying wind and ocean current fields on the hypothetical oil spills. Collectively, they

represent a statistical set of winds and currents that could occur during the chosen seasonal time of the model run. The analysis uses a combination of observed and theoretically computed ocean currents and winds. Ocean currents were generated by a numerical model and were supplemented with direct observations of currents using surface drifting buoys in the Santa Barbara Channel. The sea surface winds over the study area were derived from an atmospheric model and from measured winds at buoy, platform, island and land-based wind stations. The studies were conducted for four seasons (winter, spring, summer and fall) representing different currents and winds. The seasonally-averaged current fields were provided by Scripps Institution of Oceanography and are based on several years of current meter and free-floating drifter data (MMS, 2000).

The primary OSRA study area grid used for the trajectory analysis consists of a Cartesian grid over the area (123° W to 116.7° W) and (32° N to 36° N) (Figure 1). The land segments were established from the USGS quadrangle maps for the California Coast. The grid cell definitions are 1/8° (0.125°) in longitude and latitude. The grid is not fully rectangular; cells that fell on land, or outside the region where ocean currents were defined were removed. This resolution was selected by the OSRA specialist as an appropriate grid, based on the information at that time. This resource grid was defined to calculate the number of trajectories that entered into each cell during the trajectory movement and "color code" the probability of contact to each grid cell over a 10-day period from a platform launch point. In this analysis, we treated the probability estimates as a point grid at the centers of the grid cells, and then contoured the results. Therefore, the maximum contours do not necessarily surround the launch point, but rather the contours surround the center points of the resource grid. This occurs due to the coarse scale of the grid. The movements of the trajectories are treated as "floating" within this grid, in meters (Figure 1).

OSRA model results display the probabilities (in percent) of oil contacting different locations on land and in the water using the annual average for all four seasons over a 10-day period and creating contours to fit the contacted grid.

*NOAA GNOME Model*

GNOME is a publicly available oil spill trajectory model that simulates oil movement due to winds, currents, tides and spreading (Zelenke et al., 2012). It includes variables that account for weathering of the released materials as well as a separate set of ocean current regimes for the Santa Barbara Channel and Santa Maria Basin. Wind speed and direction as well as variability can be input to the model. This enables the analysis of specific spill situations under given meteorological conditions. However, in order to assess the probabilities of a specific modeled end result, wind distributions and ocean current time dependent distributions would need to be obtained and many modeling runs conducted for the area.

The GNOME model operates by generating "splots" associated with each spill scenario. The fate of the splots is either to remain in the water, to be beached, to be weathered or to travel out of the modeling space (off the map). The movement of the splots is defined by the ocean current "regime" and the wind influences. Ocean currents in GNOME are essentially divided into three regimes for the Santa Barbara Channel and the Santa Maria Basin: upwelling, convergent and relaxation. Each of the three ocean current states includes a counter-clockwise circulation pattern in the Santa Barbara Channel, although it is strongest in the convergent oceanographic regime (Figure A-9).

A-18



**Figure A-9**. Santa Barbara Channel oceanographic regimes (NOAA 2015, Dever 2004).

<u>Upwelling</u>. The upwelling state is named for the upwelling of cold (approximately 11 °C) subsurface waters near Point Conception that often accompanies this state. The upwelling state occurs primarily in spring, although it has also been observed in other seasons. In terms of the conceptual models of the momentum balance, the upwelling state occurs when strong (>10 m/s), persistent (several days or more), upwelling favorable (equatorward) winds overwhelm any poleward, along-shelf pressure gradient.

<u>Convergent</u>. The convergent state is named for the convergence of southward flow west of Point Arguello with westward flow south of Point Conception. The convergent state occurs primarily in summer, although it has also been observed in other seasons. The convergent state tends to occur when upwelling favorable winds and a strong poleward, along-shelf pressure gradient exist. The most characteristic feature of the resulting flow field is a strong counter-clockwise recirculation in the western Santa Barbara Channel with about equal strength in the northern and southern limbs of the recirculation.

<u>Relaxation</u>. The relaxation state is named for the time periods when winds off Point Conception "relax" from their usual equatorward direction. The relaxation state occurs primarily in fall and early winter. The relaxation state occurs when poleward, along-shelf pressure gradients overwhelm upwelling-favorable or weak winds. The most characteristic feature of the resulting flow field is a strong westward flow (>50 cm/s) through the Santa Barbara Channel and to the Santa Maria Basin. Flow in the Santa Maria Basin is strongest along the mainland coast.

The BOEM ran the GNOME model in three oceanographic regimes with oil being released continuously over 10 days, for releases at five locations distributed throughout the geographic range of existing offshore oil and gas operations within the Santa Maria Basin and Santa Barbara Channel: Platform Irene, Platform Hidalgo, Platform Harmony, Platform Hillhouse, and Platform Gail. Platform Elly in the Beta unit; San Pedro Bay, was not modeled because it is located outside of the model domain.

## A.6   References

Anderson, C.M., M. Mayes, and R. LaBelle. 2012. Update of Occurrence Rates for Offshore Oil Spills. BOEM 2012-069; BSEE 20112-069.

Arthur D. Little. 1985. Union Oil Project / Exxon Project Shamrock and Central Santa Maria Basin Area Study EIS/EIR, June 24, 1985

Arthur D. Little. 1984. Point Arguello Field and Gaviota Processing Facility Area Study and Chevron/Texaco Development Plans EIR/EIS.

Dames and Moore. 1980. Environmental Impact Report/Environmental Assessment Union Oil Company Platform Gilda and Platform Gina.

Dever, E. P. 2004. Objective maps of near-surface flow states near Point Conception, California. Journal of Physical Oceanography 34: 444-461.

Farwell, C., C. M. Reddy, E. Peacock, R. K. Nelson, L. Washburn, D. L. Valentine 2009. Weathering and the Fallout Plume of Heavy Oil from Strong Petroleum Seeps Near Coal Oil Point, CA. Environmental Science & Technology 43(10): 3542-3548.

Leifer, I., B. Luyendyk, K. Broderick. 2006. Tracking an oil slick from multiple natural sources, Coal Oil Point, California. Marine and Petroleum Geology.  23(5): 621-630.

MMS. 1986. Platform Gail Environmental Assessment: OCS Environmental Assessment, Lease OCS-P 0205, Santa Clara Unit, Chevron USA Inc., June 19, 1986.

MMS. 2000. Oil-Spill Risk Analysis: Pacific Outer Continental Shelf Program. OCS Report MMS 2000-057. August 2000.

NOAA. 2015. GNOME: Santa Barbara Channel User's Guide. Accessed April 30, 2015: http://response.restoration.noaa.gov/sites/default/files/Gnome_SantaBarbara_UG.pdf

National Research Council (NRC). 2003. Oil in the sea III: Inputs, fates, and effects (Committee on Oil in the Sea: J.N. Coleman, J. Baker, C. Cooper, M. Fingas, G. Hunt, K. Kvenvolden, J. McDowell, J. Michel, K. Michel, J. Phinney, N. Rabalais, L. Roesner, and R.B. Spies). Washington, DC: National Academy Press. 265 pp.

Science Applications, Inc. 1984. Final Environmental Impact Statement/Report for Santa Ynez Unit/Las Flores Canyon Development and Production Plan Proposed by Exxon Company U.S.A. Prepared for U.S. Minerals Management Service, California State Lands Commission, and County of Santa Barbara.

State Lands Commission, Port of Long Beach, and the United States Geological Survey (SLC, PLB, and USGS). 1978. EIR-EA Shell OCS Beta Unit Development. Volumes I-IV.

USGS. 1975. Final EIS Oil and Gas Development in the Santa Barbara Channel Outer Continental Shelf Off California. Vol 1, 2, 3

Zelenke, B., C. O'Connor, C. Barker, C.J. Beegle-Krause, and L. Eclipse (Eds.). (2012). General NOAA Operational Modeling Environment (GNOME) Technical Documentation. U.S. Dept. of Commerce, NOAA Technical Memorandum NOS OR&R 40. Seattle, WA: Emergency Response Division, NOAA. 105 pp. http://response.restoration.noaa.gov/gnome_manual

| | |
|---|---|
| 1 | M. RANDALL OPPENHEIMER (S.B. #77649)<br>roppenheimer@omm.com |
| 2 | DAWN SESTITO (S.B. #214011)<br>dsestito@omm.com |
| 3 | O'MELVENY & MYERS LLP<br>400 South Hope Street |
| 4 | Los Angeles, California  90071-2899<br>Telephone:   (213) 430-6000 |
| 5 | Facsimile:   (213) 430-6407 |
| 6 | JONATHAN A. HUNTER (*Pro hac vice forthcoming*)<br>jahunter@liskow.com |
| 7 | STEPHEN W. WIEGAND (*Pro hac vice forthcoming*)<br>swwiegand@liskow.com |
| 8 | CARSON M. HADDOW (*Pro hac vice forthcoming*)<br>chaddow@liskow.com |
| 9 | LISKOW & LEWIS<br>701 Poydras Street, Suite 5000 |
| 10 | New Orleans, Louisiana  70139<br>Telephone: (504) 581-7979 |
| 11 | Facsimile: (504) 556-4108 |
| 12 | *Attorneys for Applicant for Intervention*<br>EXXON MOBIL CORPORATION |
| 13 | |

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| 16 | ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; SANTA BARBARA CHANNELKEEPER, a California non-profit corporation; | Case No.  2:16-cv-08418-PSG-FFMx |
| | | |
| 19 | Plaintiffs, | **DECLARATION OF KEN DOWD IN SUPPORT OF EXXON MOBIL CORPORATION'S MOTION FOR LEAVE TO INTERVENE** |
| 20 | vs. | |
| 21 | BUREAU OF OCEAN ENERGY MANAGEMENT; RICHARD YARDE, Regional Supervisor, Office of Environment, Bureau of Ocean Energy Management; DAVID FISH, Bureau of Safety and Environmental Enforcement; ABIGAIL ROSS HOPPER, Director, Bureau of Ocean Energy Management; BRIAN SALERNO, Director, Bureau of Safety and Environmental Enforcement; BUREAU OF SAFETY AND | Hearing Date:     April 17, 2017<br>Hearing Time:    1:30 pm.<br>Location:           Courtroom 6A<br>Judge:               Hon. Philip S.<br>                        Gutierrez |

1  ENVIRONMENTAL ENFORCEMENT;
2  JOAN BARMINSKI, Pacific Region
   Director, Bureau of Ocean Energy
3  Management; MARK FESMIRE, Acting
4  Pacific Region Director, Bureau of Safety
   and Environmental Enforcement; UNITED
5  STATES DEPARTMENT OF THE
6  INTERIOR; SALLY JEWELL, Secretary of
   the Interior,
7
8              Defendants.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

1    I, Ken Dowd, depose and state as follows:

2         1.      I am over 21 years of age and am competent to make this declaration.

3    The facts set forth in this declaration are based on both my personal knowledge and

4    information gathered in the course of my business activities.

5         2.      I am currently employed by Exxon Mobil Corporation

6    ("ExxonMobil").  I am the Production Manager of the U.S. Production ("USP")

7    division of Exxon Mobil Production Company.  Through my employment, I have

8    acquired knowledge regarding ExxonMobil's operations and interests in oil and gas

9    exploration and production in the Pacific Outer Continental Shelf ("OCS") Region.

10        3.      ExxonMobil is a long-standing and active participant in oil and gas

11   exploration and development activities in the Pacific OCS Region.

12        4.      ExxonMobil operates the Santa Ynez Unit ("SYU") located in the

13   Pacific OCS Region off the coast of California in the Santa Barbara Channel.

14        5.      The SYU was formed in 1970 and currently contains 16 OCS leases:

15   OCS-P-0180, OCS-P-0181, OCS-P-0182, OCS-P-0183, OCS-P-0187, OCS-P-

16   0188, OCS-P-0189, OCS-P-0190, OCS-P-0191, OCS-P-0192, OCS-P-0193, OCS-

17   P-0194, OCS-P-0195, OCS-P-0326, OCS-P-0329, OCS-P-0461. ExxonMobil

18   owns 100% of the interest in each of those 16 leases.

19        6.      Drilling and production operations in the SYU are conducted from

20   three platforms, the Heritage Platform, the Harmony Platform, and the Hondo

21   Platform, each of which is operated by ExxonMobil.

22        7.      The Heritage Platform, which was installed in 1989, is located on

23   Lease OCS-0182 approximately eight miles from shore.

24        8.      The Harmony Platform, which was installed in 1989, is located on

25   lease OCS-P-0190 approximately six miles from shore.

26        9.      The Hondo Platform, which was installed in 1976, is located on Lease

27   OCS-P-0188 approximately five miles from shore.

28        10.     To date, ExxonMobil has made substantial investments in acquiring,

3

DECL. OF KEN DOWD ISO EXXONMOBIL'S
MOTION FOR LEAVE TO INTERVENE
CASE NO. CV-16-8418 PSG(FFMx)

1   exploring, and developing the lease interests that make up the SYU and in installing

2   and operating the Heritage, Harmony, and Hondo Platforms. ExxonMobil's capital

3   expenditures and operating expenses for its SYU Unit operations totaled more than

4   $413 million in 2014 alone.

5       11.   ExxonMobil currently operates over 100 wells in the SYU. Between

6   1981 and 2014, the SYU produced over 663 million oil equivalent barrels (oil and

7   gas). ExxonMobil's SYU produced an average of 27 million cubic feet of natural

8   gas, and 30,000 barrels of oil and condensate per day (gross) in 2014.

9       12.   ExxonMobil seeks approval from the Department of the Interior

10  ("DOI") for its offshore oil and gas exploration plans and development and

11  production plans. ExxonMobil also seeks approval from DOI's Bureau of Safety

12  and Environmental Enforcement ("BSEE") for drilling and well stimulation

13  activities under approved exploration or development plans. These approvals

14  include an Application for Permit to Drill ("APD"), which must be obtained prior to

15  drilling a well, and an Application for Permit to Modify ("APM"), which must be

16  obtained in the event a drilling plan is revised.

17      13.   Oil production at the Heritage, Harmony, and Hondo Platforms is

18  currently suspended due to a third party's May 2015 pipeline rupture in Santa

19  Barbara County, California.  The ruptured pipeline currently serves as the transport

20  route for oil produced at ExxonMobil's SYU Platforms.  ExxonMobil continues to

21  evaluate options for restoring production operations.

22      14.   In order to re-start production, ExxonMobil anticipates that it will

23  require the use of certain acid well stimulation treatments at one or more wells.

24  Moreover, ExxonMobil will require acid well stimulation treatments to drill and

25  complete new wells, and recomplete existing wells, at SYU.

26      15.   Plaintiffs in the above-captioned litigation seek to "[e]njoin Defendants

27  from issuing Permits (to Drill or to Modify) for well stimulation treatments, until

28  and unless Defendants comply with" the National Environmental Policy Act and

4

1   the Endangered Species Act.  Compl. For Declaratory & Injunction Relief, Prayer

2   for Relief ¶¶ C, G, R. Doc. 1.

3          16. ExxonMobil has a significant and direct stake in the pending litigation.

4   Were the Plaintiffs in this litigation to prevail and to obtain the injunctions they

5   have requested, such injunctive relief would have a significant and direct effect on

6   ExxonMobil's property, regulatory, and economic interests in its SYU leases and

7   permits. In particular, the requested relief could restrict ExxonMobil's ability to

8   restart oil production at the Heritage, Harmony, and Hondo Platforms.  It would

9   also severely restrict ExxonMobil's plans to further develop its existing Pacific

10  OCS leases.

11         17. At a minimum, the requested injunction would substantially and

12  indeterminately delay ExxonMobil's oil production activities.  This would result in

13  increased costs in producing crude oil from the SYU, which could potentially

14  impede the development of the SYU and undermine ExxonMobil's lease interests.

15         18. Further, the requested injunction could result in significant sums in

16  wasted investments and lost production opportunities.

17         19. In addition, ExxonMobil currently intends to continue to invest

18  substantially in its SYU leases in the future. In the ordinary course of its operations,

19  ExxonMobil will continue to evaluate and generate new opportunities to develop

20  the SYU leases including but not limited to the drilling of new wells and

21  stimulation of new and existing wells. These activities would require that

22  ExxonMobil obtain additional APDs and APMs.  Any legal action that would result

23  in an injunction prohibiting the issuance of APDs and APMs would directly impact

24  these activities.

25  / / /

26  / / /

27  / / /

28  / / /

5

DECL. OF KEN DOWD ISO EXXONMOBIL'S
MOTION FOR LEAVE TO INTERVENE
CASE NO. CV-16-8418 PSG(FFMx)

E.R. 1005

1       I declare under penalty of perjury that the foregoing is true and correct to the

2  best of my knowledge and belief.

3       Executed on February __7__, 2017 in Spring, Texas.

6     _Kenneth C. Dowd_

7  Ken Dowd

6

DECL. OF KEN DOWD ISO EXXONMOBIL'S
MOTION FOR LEAVE TO INTERVENE
CASE NO. CV-16-8418 PSG(FFMx)

E.R. 1006

1   KAMALA D. HARRIS
    Attorney General of California
2   JAMEE JORDAN PATTERSON
    DAVID A. ZONANA
3   Supervising Deputy Attorneys General
    GEORGE TORGUN, SBN 222085
4   DAVID ALDERSON, SBN 231597
    Deputy Attorneys General
5    1515 Clay Street, 20th Floor
     P.O. Box 70550
6    Oakland, CA 94612-0550
     Telephone: (510) 879-1002
7    Fax: (510) 622-2270
     E-mail: George.Torgun@doj.ca.gov
8
    *Attorneys for Plaintiffs People of the State of*
9   *California, ex rel. Kamala D. Harris, Attorney*
    *General, and California Coastal Commission*
10
                    IN THE UNITED STATES DISTRICT COURT
11
                  FOR THE CENTRAL DISTRICT OF CALIFORNIA
12

13

14  **PEOPLE OF THE STATE OF**
    **CALIFORNIA, ex rel. KAMALA D.**
15  **HARRIS, ATTORNEY GENERAL,**          Case No.
    **and CALIFORNIA COASTAL**
16  **COMMISSION,**                        **COMPLAINT FOR**
                                           **DECLARATORY AND**
17                          Plaintiffs,    **INJUNCTIVE RELIEF**

18          v.                             (Administrative Procedure Act, 5
                                           U.S.C. § 551 *et seq.*; National
19  **UNITED STATES DEPARTMENT**           Environmental Policy Act, 42 U.S.C.
    **OF THE INTERIOR; BUREAU OF**         § 4321 *et seq.*; Coastal Zone
20  **OCEAN ENERGY MANAGEMENT;**           Management Act, 16 U.S.C. § 1451 *et*
    **BUREAU OF SAFETY AND**               *seq.*)
21  **ENVIRONMENTAL**
    **ENFORCEMENT; RICHARD**
22  **YARDE,** Regional Supervisor, Bureau
    of Ocean Energy Management; and
23  **DAVID FISH,** Acting Chief,
    Environmental Compliance Division,
24  Bureau of Safety and Environmental
    Enforcement,
25
                            Defendants.
26

27

28

    COMPLAINT FOR DECLARATORY AND              1
    INJUNCTIVE RELIEF

                                                            E.R. 1007

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiff), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

2.     Defendants' issuance of a Final Programmatic Environmental Assessment and Finding of No Significant Impact on May 27, 2016 are final agency actions and are therefore judicially reviewable within the meaning of the Administrative Procedure Act.  5 U.S.C. §§ 704, 706.

3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because at least one Defendant resides in this District and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.  This case is also related to two previously-filed actions in this District:  *Environmental Defense Center, et al. v. Bureau of Ocean Energy Management*, *et al*., Case No. 2:16-cv-08418 (C.D. Cal., compliant filed Nov. 11, 2016) and *Center for Biological Diversity, et al. v. Bureau of Ocean Energy Management, et al*., Case No. 2:16-cv-08473 (C.D. Cal., compliant filed Nov. 15, 2016).

**INTRODUCTION**

4.     The People of the State of California (the "People") and the California Coastal Commission ("Commission") (collectively, "Plaintiffs") bring this action to challenge the Final Programmatic Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") issued by the United States Department of the Interior, *et al*. ("Defendants") for the Proposed Action: well stimulation treatments ("WSTs"), including hydraulic fracturing and acidizing, at 22 production platforms

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

2

1    on 43 lease areas on the Southern California Outer Continental Shelf ("Pacific

2    OCS").  Despite the substantial record evidence showing the potential for

3    significant environmental effects from offshore WSTs, Defendants improperly

4    concluded that allowing such activities would result in no significant impacts, in

5    violation of the requirements of the National Environmental Policy Act ("NEPA"),

6    42 U.S.C. § 4321 *et seq*.  Defendants also violated NEPA by relying on unfounded

7    assumptions rather than taking a "hard look" at the potential environmental

8    impacts, defining the Final Programmatic EA's statement of purpose and need in

9    unreasonably narrow terms, and failing to consider all reasonable alternatives to the

10   Proposed Action.

11       5.    In addition, Defendants violated the Coastal Zone Management Act

12   ("CZMA"), 16 U.S.C. § 1451 *et seq*., by failing to determine whether the Proposed

13   Action is consistent to the maximum extent practicable with the enforceable

14   policies in California's coastal zone management program.

15       6.    Accordingly, Plaintiffs seek a declaration that Defendants' issuance of

16   the Final Programmatic EA and FONSI violated NEPA.  Plaintiffs also seek a

17   declaration that Defendants violated the CZMA by failing to determine whether the

18   Proposed Action is consistent to the maximum extent practicable with the

19   enforceable policies in California's coastal zone management program.  Plaintiffs

20   seek an injunction requiring Defendants to vacate and set aside their approvals and

21   prohibiting further offshore WSTs on the Pacific OCS unless and until Defendants

22   comply with applicable law.

23                              **PARTIES**

24       7.    Plaintiff, the PEOPLE OF THE STATE OF CALIFORNIA, brings this

25   action by and through Attorney General Kamala D. Harris.  The Attorney General

26   is the chief law enforcement officer of the State and has the authority to file civil

27   actions in order to protect public rights and interests, including actions to prevent

28   the destruction, pollution, or irreparable impairment of the environment or natural

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                          3

1   resources of the State.  Cal. Const., art. V, § 13; Cal. Gov. Code §§ 12600-12612.

2   This challenge is brought pursuant to the Attorney General's independent

3   constitutional, statutory, and common law authority to represent the public interest.

4       8.   The People have an interest in the use and enjoyment of California's

5   coastline and coastal resources, and in preserving and protecting this ecosystem.

6   The People rely on Defendants' compliance with the procedural and substantive

7   requirements of NEPA and the CZMA in order to obtain timely and accurate

8   information about activities that may have significant adverse effects on the coastal

9   zone, and to meaningfully participate in the decision-making process.  Defendants'

10  failure to comply with NEPA and the CZMA adversely affects the People by

11  thwarting public participation and by failing to adequately protect the coastal

12  environment.  The People have suffered legal wrong because of Defendants'

13  actions and have been adversely aggrieved by the approval of the Final

14  Programmatic EA and FONSI and have standing to bring this action.

15      9.   Plaintiff CALIFORNIA COASTAL COMMISSION is a public agency

16  of the State of California.  The Commission was created by the California Coastal

17  Act of 1976, California Public Resources Code section 30000 *et seq*. ("California

18  Coastal Act"), and has the power to sue and be sued.  Cal. Pub. Res. Code §§

19  30300, 30334.  The Commission is designated as the state coastal zone planning

20  and management agency for CZMA purposes and may exercise any and all powers

21  set forth in that statute.  *Id*. § 30330.  The Commission is authorized to review

22  consistency determinations required by the CZMA regarding whether a federal

23  activity is in conformity with the provisions of the California Coastal Act, which is

24  California's federally-approved coastal zone management program.

25      10.  As described below, on March 23, 2016, the Commission submitted

26  detailed comments to Defendants pointing out significant defects in the Draft

27  Programmatic EA that did not fulfill the requirements of NEPA, as well as the need

28  for Defendants to engage in consistency review regarding offshore WSTs, as

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

4

1  required by the CZMA.  The Commission is aggrieved by the actions of Defendants
2  and has standing to bring this action.

3  11.  Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an
4  agency of the United States government and bears responsibility, in whole or in
5  part, for the acts complained of in this Complaint.

6  12.  Defendant BUREAU OF OCEAN ENERGY MANAGEMENT
7  ("BOEM") is an agency of the U.S. Department of the Interior and bears
8  responsibility, in whole or in part, for the acts complained of in this Complaint.
9  BOEM is one of two agencies charged with managing offshore oil and gas
10  resources in federal waters, and is responsible for the review and administration of
11  oil and gas exploration and development plans, as well as environmental reviews of
12  such plans conducted pursuant to NEPA.

13  13.  Defendant BUREAU OF SAFETY AND ENVIRONMENTAL
14  ENFORCEMENT ("BSEE") is an agency of the U.S. Department of the Interior
15  and bears responsibility, in whole or in part, for the acts complained of in this
16  Complaint.  BSEE is one of two agencies charged with managing offshore oil and
17  gas resources in federal waters, and is responsible for permitting offshore drilling
18  operations and ensuring that they comply with safety regulations, inspections,
19  offshore regulatory programs, and oil spill preparedness plan review.

20  14.  Defendant RICHARD YARDE is the Regional Supervisor of the Office
21  of Environment for BOEM, and is sued in his official capacity.  Mr. Yarde has
22  responsibility for implementing and fulfilling BOEM's duties under NEPA and the
23  CZMA and signed the FONSI at issue.

24  15.  Defendant DAVID FISH is the Acting Chief of the Environmental
25  Compliance Division for BSEE, and is sued in his official capacity.  Mr. Fish has
26  responsibility for implementing and fulfilling BSEE's duties under NEPA and the
27  CZMA.

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

5

# STATUTORY BACKGROUND

## I. NATIONAL ENVIRONMENTAL POLICY ACT

16.   NEPA is the "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1. The fundamental purposes of the statute are to ensure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken," and that "public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id*. § 1500.1(b)-(c).

17.   To achieve these purposes, NEPA requires the preparation of a detailed environmental impact statement ("EIS") for any "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As a preliminary step, an agency may first prepare an EA to determine whether the effects of an action may be significant. 40 C.F.R. § 1508.9. If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). However, an EIS must be prepared if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor." *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998).

18.   To determine whether a proposed project may significantly affect the environment, NEPA requires that both the context and the intensity of an action be considered. 40 C.F.R. § 1508.27. In evaluating the context, "[s]ignificance varies with the setting of the proposed action" and includes an examination of "the affected region, the affected interests, and the locality." *Id*. § 1508.27(a). Intensity "refers to the severity of impact," and NEPA's implementing regulations list ten factors to be considered in evaluating intensity, including "[u]nique characteristics of the geographic area such as proximity to … ecologically critical areas," "[t]he

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                              6

degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." *Id*. § 1508.27(b).  The presence of just "one of these factors may be sufficient to require the preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

## II.   COASTAL ZONE MANAGEMENT ACT

19.   The CZMA was enacted in 1972 to provide comprehensive, coordinated planning for the protection of the "coastal zone" (land near the shorelines of coastal states), as well as coastal waters extending seaward to the limits of the United States territorial sea.  As Congress recognized at that time, "[t]he increasing and competing demands upon the lands and waters of our coastal zone…including [the] extraction of mineral resources and fossil fuels…have resulted in the loss of living marine resources, wildlife, nutrient-rich areas, permanent and adverse changes to ecological systems, decreasing open space for public use, and shoreline erosion." 16 U.S.C. § 1451(c).  Accordingly, the primary purposes of the CZMA are "to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations," and "to encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone." *Id*. § 1452.

20.   The CZMA provides states that have an adopted coastal management plan with oversight over activities in federal waters, a process known as "consistency review."  *See* 16 U.S.C. § 1456; 15 C.F.R. Part 930.  In particular, any federal agency activity "within or outside the coastal zone that affects any land or

1  water use or natural resource of the coastal zone shall be carried out in a manner
2  which is consistent to the maximum extent practicable with the enforceable policies
3  of approved State management programs." 16 U.S.C. § 1456(c)(1)(A).  Federal
4  agencies are required to review their activities "in order to develop consistency
5  determinations which indicate whether such activities will be undertaken in a
6  manner consistent to the maximum extent practicable with the enforceable policies
7  of approved management programs." 15 C.F.R. § 930.36(a).  Federal agencies
8  "should consult with State agencies at an early stage in the development of the
9  proposed activity in order to" make a consistency determination. *Id*.  If the federal
10 agency finds that the proposed activity is consistent, the federal agency must submit
11 its determination to the applicable state agency for review. *Id*. § 930.34(a)(1).  The
12 state agency may concur, conditionally concur, or object to the consistency
13 determination. *Id*. §§ 930.4(a), 930.41(a).

14 **III.  OUTER CONTINENTAL SHELF LANDS ACT**

15     21.  The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et*
16 *seq.*, establishes a framework under which Defendants may lease areas of the outer
17 continental shelf for purposes of exploring and developing oil and gas deposits.
18 *See also* 30 C.F.R. Parts 250, 550.  The outer continental shelf is located three
19 nautical miles from the state's coastline and extends seaward to the limits of federal
20 jurisdiction. 43 U.S.C. § 1331(a).  Pursuant to amendments enacted in 1978,
21 OCSLA requires that oil exploration and production be balanced "with protection
22 of the human, marine, and coastal environments." *Id*. § 1802(2).  OCSLA also
23 requires that Defendants cooperate with affected states "[i]n the enforcement of
24 safety, environmental, and conservation laws and regulations," and provide states
25 with the "opportunity to review and comment on decisions relating to [OCS]
26 activities, in order to anticipate, ameliorate, and plan for the impacts of such
27 activities." *Id*. §§ 1334(a), 1802(5).

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                    8

22.   In the development of an offshore oil well, there are four separate stages required by OCSLA:  "(1) formulation of a five year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; (4) development and production."  *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984).  Of particular relevance here are the requirements of the fourth stage for the development and production of an offshore oil well.

23.   The fourth stage involves the filing and review of a development and production plan ("DPP").  43 U.S.C. § 1351(a).  The DPP must include a description of the specific work to be performed; all facilities and operations located on the OCS directly related to the proposed development; the environmental safeguards that will be implemented; safety standards; an expected rate of development and production; and a time schedule for performance.  *Id*. § 1351(c). The DPP must also include, among other information, detailed descriptions of the types, quantity, and composition of wastes that will be generated by development and production activities; how such wastes will be disposed of; and mitigation measures designed to avoid or minimize the take of listed species and marine mammals.  30 C.F.R. §§ 550.241-550.254.

24.   OCSLA mandates that Defendants periodically review DPPs based on changes in available information or other onshore or offshore conditions that impact development and production.  43 U.S.C. § 1351(h)(3).  A lessee is required to revise its DPP in several circumstances, including when it changes the type of production; significantly increases the volume of production or storage capacity; increases emissions of an air pollutant to exceed the amount specified in the approved plan; or significantly increases the amount of solid or liquid wastes to be handled or discharged.  30 C.F.R. § 550.283(a).  A lessee must also supplement a DPP if it proposes to conduct activities that require approval of a license or permit which is not described in its approved DPP.  *Id*. § 550.283(b).

25.    Prior to commencing drilling activities, a lessee must also obtain approval of an application for permit to drill ("APD").  30 C.F.R. §§ 250.410-250.418, 550.281(a).  The activities proposed in an APD "must conform to the activities described in detail" in an approved DPP.  *Id.* § 550.281(b).  When a lessee intends to revise its drilling plan or change major drilling equipment, it must submit an application for permit to modify ("APM"), which must include a "detailed statement of the proposed work that would materially change from the approved APM." *Id.* § 250.465(b)(1).

**IV.  ADMINISTRATIVE PROCEDURE ACT**

26.    Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, a reviewing court shall "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedure required by law."  5 U.S.C. § 706.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.    THE PACIFIC OCS AND CALIFORNIA'S INVOLVEMENT WITH FEDERAL OFFSHORE OIL LEASING DECISIONS.**

27.    The Final Programmatic EA purports to evaluate the potential environmental impacts of WSTs at the 22 production platforms located on 43 active leases on the Pacific OCS.  The Pacific OCS includes (1) the Santa Barbara Channel, (2) the Santa Maria Basin located offshore from Santa Barbara County, and (3) offshore Long Beach near the boundary of Los Angeles County and Orange County.  Fifteen of the production platforms are located in the Santa Barbara Channel, four are located in the Santa Maria Basin, and three are located off the coast of Long Beach.  The 22 production platforms range from 3.7 to 10.5 miles offshore.

28.   The rich natural and scenic resources of California's central and southern coastal areas adjacent to the Pacific OCS are a defining feature of the state and the basis for some of its largest economic drivers, including recreation and tourism. For example, the Santa Barbara Channel is an area of the Pacific Ocean that separates the mainland of California from the northern Channel Islands, including Santa Barbara, Anacapa, Santa Cruz, Santa Rosa, and San Miguel Islands, which became Channel Islands National Park in 1980.  The waters of the Santa Barbara Channel include several state and federally-designated Marine Protected Areas, including marine reserves and conservation areas.  The Channel Islands National Marine Sanctuary encompasses the waters six nautical miles around Channel Islands National Park.  The Santa Barbara Channel is home to an extremely rich and diverse array of marine species, making it one of the best places for viewing whales, sea otters, seals, sea lions, and other wildlife.

29.   Defendants began awarding leases for the offshore development and production of oil in 1966, and the first offshore platform became operational in 1967.  In January 1969, the nation's first large offshore oil spill occurred in the Santa Barbara Channel after a blow-out on Platform A in the Dos Cuadras Offshore Oil Field.  Within a ten-day period, an estimated 80,000 to 100,000 barrels of crude oil spilled into the Santa Barbara Channel and onto the beaches of Southern California between Goleta and Ventura, as well as the shores of the four northern Channel Islands.  The spill had a significant impact on marine life in the Channel, killing thousands of sea birds and marine mammals such as dolphins, elephant seals, and sea lions.  The spill was also a factor in the passage of both NEPA and the CZMA.  The spill still ranks as the third largest in U.S. history after the 2010 Deepwater Horizon and 1989 Exxon Valdez oil spills, and remains the largest oil spill to have occurred in the waters off California.

30.   Ever since the passage of NEPA and the CZMA, the California Attorney General and the Commission have been involved in litigation and other efforts to

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

11

1   ensure that these laws are followed with regard to federal offshore oil and gas

2   activities.  For example, in the 1970s, Attorney General Younger sought to block

3   OCS leases based on the federal government's failure to comply with NEPA.  *See*

4   *California ex rel. Younger v. Morton*, 404 F. Supp. 26 (C.D. Cal. 1975).  On behalf

5   of Governor Brown and the Commission, Attorney General Deukmejian sought to

6   block several OCS leases in the 1980s pursuant to the CZMA, NEPA, and other

7   statutes.  *See, e.g., State of California by and through Brown v. Watt*, 520 F. Supp.

8   1359 (C.D. Cal. 1981); *State of California by and through Brown v. Watt*, 668 F.2d

9   1290 (D.C. Cir. 1981).  Attorney General Van de Kamp was part of a lengthy and

10  ultimately successful effort to convince Congress to amend the CZMA to provide

11  states with authority to review OCS leases.  In recent years, Attorney General

12  Lockyer and the Commission have litigated to protect this CZMA authority and to

13  ensure adequate NEPA review for OCS leases.  *See California v. Norton*, 311 F.3d

14  1162 (9th Cir. 2002).

15      31.   On December 13, 2016, Governor Brown sent a letter to President

16  Barack Obama requesting that the President use his authority under Section 12(a) of

17  OCSLA, 43 U.S.C. § 1341(a), "to permanently withdraw federal waters off the

18  coast of California from new offshore oil and gas leasing and guarantee that future

19  oil and gas drilling in these waters is prohibited."  The Governor noted that

20  "California is blessed with hundreds of miles of spectacular coastline; home to

21  scenic state parks, beautiful beaches, abundant wildlife and thriving communities,"

22  and "large new oil and gas reserves would be inconsistent with our overriding

23  imperative to reduce reliance of fossil fuels and combat the devastating impacts of

24  climate change."

25  **II.   THE GROWING USE OF WELL STIMULATION TREATMENTS AND
26  CALIFORNIA SENATE BILL 4.**

27      32.   In recent years, the United States has experienced a boom in oil and gas

28  production through the use of WSTs such as hydraulic fracturing and acidizing.

COMPLAINT FOR DECLARATORY AND                12
INJUNCTIVE RELIEF

1   According to the U.S. Energy Information Administration, these treatments, often

2   used in combination with horizontal drilling, have allowed the United States to

3   increase its oil production faster than at any time in its history.  For example, in

4   2000, approximately 23,000 hydraulically fractured wells produced 102,000 barrels

5   of oil per day, making up less than 2% of the national total.  By 2015, the number

6   of hydraulically fractured wells grew to an estimated 300,000, and production from

7   those wells had grown to more than 4.3 million barrels of oil per day, making up

8   about 50% of the total oil output of the United States.  While typically associated

9   with shale formations, hydraulic fracturing has been successfully used in directional

10  and vertical wells, in tight formations and reservoirs, and in offshore crude oil

11  production.

12      33.   Hydraulic fracturing ("fracking") is a well stimulation treatment that

13  involves injecting a mixture of water, sand (used as a "proppant" to keep an

14  induced fracture open during or following a fracture treatment), and chemicals into

15  a well at extremely high pressures to break apart a hydrocarbon-bearing geologic

16  formation to create fissures and passageways through which oil and gas can flow.

17  Upon release of pressure, much of the fracturing fluid along with subsurface fluids

18  flow back to the surface platform and is commonly referred to as "the flowback

19  fluid."  In the offshore context, this flowback fluid is typically discharged to the

20  marine environment following the separation of oil, gas, and water, or is reinjected

21  into the well.  Fluids that are not discharged into the marine environment or

22  reinjected may be transported to the shore for disposal by underground injection.

23      34.   Acid well stimulation ("acidizing") is a well stimulation treatment that

24  uses the application of one or more acids, typically hydrofluoric acid and/or

25  hydrochloric acid, into a well and the underlying geological formation to enhance

26  the production of oil or gas.  Acidizing may be done at high pressures and may be

27  used in combination with fracking and other well stimulation treatments.

28

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                           13

35.   According to the Final Programmatic EA, there are two primary forms of acidizing used in California:  acid fracturing and acid matrix stimulation.  Acid fracturing is similar to hydraulic fracturing except that instead of using a proppant to keep fractures open, an acid solution is used to etch channels into the rock walls of the fracture, thereby creating pathways for oil and gas to flow to the well.  Acid matrix stimulation (or matrix acidizing) is similar to acid fracturing except that it is performed below fracture pressure and the acid is used to dissolve sediment and mud soils to increase the permeability of the rock and facilitate the flow of oil and gas.  Similar to fracking, in the offshore context, acidizing generates flowback fluids that are discharged to the marine environment, reinjected into the well, or transported to shore for disposal by underground injection.

36.   In response to growing concern about the increased use of these WSTs, California enacted Senate Bill 4 ("SB 4") in 2013.  SB 4, 2013-2014 Leg. Sess. (Chapter 313, Statutes of 2013).  In SB 4, the California Legislature declared that "[p]roviding transparency and accountability to the public regarding well stimulation treatments, including, but not limited to, hydraulic fracturing, associated emissions to the environment, and the handling, processing, and disposal of well stimulation and related wastes, including from hydraulic fracturing, is of paramount concern."  *Id*., Section 1(c).

37.   SB 4 set up a regulatory process for WSTs in onshore and offshore areas subject to regulation by the State of California.  *See* Cal. Pub. Res. Code §§ 3160-61; 14 Cal. Code Regs. §§ 1750-89.  SB 4 also required the California Division of Oil, Gas, and Geothermal Resources ("DOGGR"), which regulates the development of oil and gas resources in the state, to conduct an environmental review under the California Environmental Quality Act, Cal. Pub. Res. Code section 21000 *et seq*., to "provide the public with detailed information regarding any potential environmental impacts of well stimulation in the state."  Cal. Pub. Res. Code § 3161(b)(3).  On July 1, 2015, DOGGR issued and certified an environmental impact report which

1   found that WSTs have the potential to cause significant and unavoidable impacts to

2   aesthetics, air quality, biological resources (terrestrial environment), cultural

3   resources, geology, soils and mineral resources, greenhouse gas emissions, land use

4   and planning, public and worker safety, and transportation and traffic.

5       38.   SB 4 further mandated an independent scientific study on WSTs,

6   including, but not limited to, hydraulic fracturing and acidizing, to "evaluate the

7   hazards and risks and potential hazards and risks that well stimulation treatments

8   pose to natural resources and public, occupational, and environmental health and

9   safety." Cal. Pub. Res. Code § 3160(a). This study, which was conducted by the

10  California Council on Science and Technology ("CCST"), was released in July

11  2015 ("CCST Study"). The CCST Study found that "[c]urrent record-keeping

12  practice on stimulations in federal waters (from platforms more than three nautical

13  miles offshore) does not meet the standards set by the pending SB 4 well treatment

14  regulations and does not allow an assessment of the level of activity or composition

15  of hydraulic fracturing chemicals being discharged in the ocean." CCST Study,

16  Executive Summary at 3. The CCST Study also identified several direct and

17  indirect impacts from well stimulation treatments, including threats to public health

18  and the environment from the unrestricted use of "a large number of hazardous

19  chemicals during hydraulic fracturing and acid treatments." CCST Study,

20  Executive Summary at 5-6.

21  **III.  LITIGATION CHALLENGING OFFSHORE WELL STIMULATION**
22  **TREATMENTS ON THE PACIFIC OCS.**

23      39.   Based on records obtained under the Freedom of Information Act in

24  2013, it was revealed that WSTs, including fracking and acidizing, had been

25  authorized by Defendants on several Pacific OCS offshore oil platforms. On June

26  16, 2014, the Commission sent a letter to BSEE and BOEM requesting coordination

27  under the CZMA for hydraulic fracturing and other WSTs on the Pacific OCS.

28

COMPLAINT FOR DECLARATORY AND                    15
INJUNCTIVE RELIEF

1    40.  In late 2014 and early 2015, the Environmental Defense Center and the

2    Center for Biological Diversity filed two separate lawsuits against Defendants in

3    U.S. District Court for the Central District of California.  *Environmental Defense*

4    *Center v. Bureau of Safety and Environmental Enforcement, et al*., Case No. 2:14-

5    cv-09281 (C.D. Cal., complaint filed Dec. 2, 2014); *Center for Biological Diversity*

6    *v. Bureau of Ocean Energy Management, et al*., Case No. 2:15-cv-01189 (C.D.

7    Cal., complaint filed Feb. 19, 2015).  The lawsuits alleged, among other claims, that

8    Defendants had failed to conduct any environmental review pursuant to NEPA prior

9    to authorizing WSTs, including fracking and acidizing, in Federal waters off

10   California's coastline.

11   41.  On January 29, 2016, the parties filed a settlement agreement in both

12   cases which required Defendants to develop a programmatic EA under NEPA "to

13   analyze the potential environmental impacts of certain well-stimulation practices on

14   the Pacific OCS, including hydraulic fracturing and acid well stimulation."  The

15   purpose of the Programmatic EA was to allow Defendants to determine whether

16   they would be required to prepare an environmental impact statement ("EIS") or

17   whether a FONSI would be appropriate.  Defendants were required to issue a final

18   programmatic EA by May 28, 2016.  Prior to completion of the EA, Defendants

19   agreed to withhold all approvals of WSTs on the Pacific OCS.

20   **IV.  DEVELOPMENT OF THE PROGRAMMATIC EA.**

21   42.  Defendants released the Draft Programmatic EA on February 22, 2016.

22   The Draft Programmatic EA considered four alternatives:  (1) Alternative 1:

23   Proposed Action—Allow use of WSTs at 22 production platforms located on 43

24   leases on the Pacific OCS; (2) Alternative 2: Allow use of WSTs at the 22

25   production platforms, but only at depths greater than 2,000 feet below the seafloor

26   surface; (3) Alternative 3: Allow use of WSTs at the 22 production platforms, but

27   no open water discharge of WST waste fluids; and (4) Alternative 4: No Action—

28   Allow no use of WSTs at the production platforms.  According to the Draft

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                16

1   Programmatic EA, "[t]he purpose of the proposed action is to allow the use of

2   certain WSTs (e.g., hydraulic fracturing) in support of oil production at platforms

3   on the Pacific OCS."  The Draft Programmatic EA found that the Proposed Action

4   of allowing the unrestricted use of WSTs would not result in any significant

5   impacts.

6       43.   During the 30-day comment period, Defendants received comments from

7   approximately 22 governmental agencies, 102 non-governmental organizations, and

8   thousands of individuals.  These included comments from two state agencies, the

9   Commission and DOGGR, as well as from members of the California Legislature,

10  that were critical of the Draft Programmatic EA.

11      44.   The Commission challenged the assumption in the Draft Programmatic

12  EA that the use of WSTs would remain at low historical rates (21 fracking

13  treatments and 3 acidizing treatments since 1982), as well as the finding that

14  impacts to water quality and marine life would be insignificant due to dilution.  The

15  Commission was also critical of the lack of evidence regarding the composition of

16  WST chemicals and the absence of sampling data.  The Commission recommended

17  that Defendants select a less environmentally damaging alternative such as No

18  Action, prohibiting ocean discharge, or other restrictions until further studies on the

19  effects of WSTs could be conducted.  The Commission also re-emphasized the need

20  for Defendants to engage in consistency review pursuant to the CZMA regarding

21  offshore WSTs.

22      45.   In its comment letter, DOGGR disagreed with the stated Purpose and

23  Need of the Draft Programmatic EA ("to allow certain WSTs") given that it was the

24  same as the Proposed Action and restricted the consideration of alternatives.

25  DOGGR also recommended that Defendants consider additional alternatives, such

26  as disclosure of WST fluid constituents, notification to state agencies prior to WSTs

27  or waste discharges, and testing of waters following WSTs to address data gaps.

28  Until toxicity testing is conducted and the effects of waste fluids on marine life are

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                            17

1    better understood, DOGGR supported Alternative 3 (no open water discharge) as an

2    appropriate alternative.  DOGGR further noted the CCST Study's conclusion that

3    record keeping for WSTs in federal waters does not meet state standards, and

4    recommended that "[a]dditional assessment of the impacts of ocean discharge

5    should be conducted."

6         46.   A letter from 11 members of the California Legislature stated that the

7    Draft Programmatic EA "inadequately analyzes impacts to California's ocean and

8    coastline," and found Defendants' conclusions to be "troubling."  The members

9    cited the CCST Study's recommendation that the contents of fracking effluent be

10   disclosed, that fracking and acidizing effluent be chemically evaluated, and that

11   waters be protected from such waste discharges.  The members urged a

12   continuation of the moratorium on offshore WSTs "until a more comprehensive

13   evaluation focused on impacts to marine life, ecosystems, and coastal communities

14   is completed."

15        47.   Defendants released the Final Programmatic EA on May 27, 2016,

16   making only minor changes and clarifications from the earlier draft.  For example,

17   Defendants redrafted the purpose and need statement to provide that "[t]he purpose

18   of the proposed action (use of certain WSTs, such as hydraulic fracturing) is to

19   enhance the recovery of petroleum and gas from new and existing wells on the

20   POCS, beyond that which could be recovered with conventional methods (i.e.,

21   without the use of WSTs)."  Defendants determined that Alternative 1, the

22   Proposed Action, would not cause any significant impacts.

23        48.   On the same date, Defendants issued a FONSI stating their determination

24   that "the Proposed Action would not cause any significant impacts," and that

25   "implementing the Proposed Action does not constitute a major federal action

26   significantly affecting the quality of the human environment within the meaning of

27   Section 102(2)(c)" of NEPA.

28

COMPLAINT FOR DECLARATORY AND              18
INJUNCTIVE RELIEF

**FIRST CAUSE OF ACTION**

**(Violations of NEPA and the APA:  Unlawful Reliance on a FONSI and Failure to Prepare an Environmental Impact Statement**

**42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3; 5 U.S.C. § 706)**

49.   Paragraphs 1 through 48 are re-alleged and incorporated herein by reference.

50.   NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed activity before taking action. *See* 42 U.S.C. § 4332.  To achieve this purpose, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." *Id*. § 4332(2)(C); 40 C.F.R. § 1502.3.  To determine whether a federal action will result in significant environmental impacts, the federal agency may first conduct an EA.  40 C.F.R. §§ 1501.4, 1508.9.  An EA must include a discussion of the need for the proposal, alternatives to the proposed action, the environmental impacts of the proposed action and alternatives, and must provide "sufficient evidence and analysis for determining whether to prepare" an EIS or a FONSI. *Id*. § 1508.9.

51.   NEPA's implementing regulations specify several factors that an agency must consider in determining whether an action may significantly affect the environment, thus warranting the preparation of an EIS.  40 C.F.R. § 1508.27.  The presence of any single significance factor can require the preparation of an EIS.  The presence of several significance factors, when considered cumulatively, can also require the preparation of an EIS.  "The agency must prepare an EIS if substantial questions are raised as to whether a project may cause significant environmental impacts." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014).

52.   As the comment letters from the Commission, DOGGR, and others on the Draft Programmatic EA demonstrate, there are substantial questions, if not

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

19

1   certainties, as to whether the proposed action may have significant environmental

2   impacts.  The Final Programmatic EA and FONSI authorize activities that may

3   have a significant effect on the environment under several of the NEPA

4   significance factors.  40 C.F.R. § 1508.27(b).  In particular, the Proposed Action:

5   (1) has the potential to result in significant adverse impacts such as water pollution,

6   air pollution, increased seismic activity, and climate change impacts; (2) will

7   impact an area with "unique characteristics" and "ecologically critical areas," as the

8   coastal waters of the Pacific OCS contain some of the most highly diverse marine

9   environments in the world and are home to dozens of state and federally-listed

10  species; (3) is "highly controversial" as evidenced by the numerous organizations,

11  state agencies, legislators, and individuals who submitted comments that were

12  highly critical of the Draft Programmatic EA, as well as state legislation (Senate

13  Bill 1132) that has been introduced to prohibit offshore WSTs until the impacts of

14  such activities are properly understood; (4) involves "possible effects on the human

15  environment" that are "highly uncertain or involve unique or unknown risks"; and

16  (5) establishes a negative precedent for future approval of WSTs on the Pacific

17  OCS without additional environmental review.

18      53.   Defendants' determination that the Proposed Action would result in no

19  significant impacts, and its reliance on a FONSI and failure to prepare an EIS,

20  constitutes agency action unlawfully or unreasonably withheld or delayed, in

21  violation of the requirements of NEPA.  5 U.S.C. § 706(1).  Alternatively,

22  Defendants' determination that the Proposed Action would result in no significant

23  impacts, and its reliance on a FONSI and failure to prepare an EIS, is arbitrary and

24  capricious, an abuse of discretion, and contrary to the requirements of NEPA.  5

25  U.S.C. § 706(2).

26  / / /

27  / / /

28  / / /

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                    20

**SECOND CAUSE OF ACTION**

**(Violations of NEPA and the APA:**

**Failure to Properly Consider Environmental Impacts**

**42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1, 1508.9; 5 U.S.C. § 706)**

54.   Paragraphs 1 through 53 are re-alleged and incorporated herein by reference.

55.   An EA must discuss the "environmental impacts of the proposed action" and "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)–(b); *see id.* § 1500.1(b).  NEPA requires that an agency disclose and consider the direct, indirect, and cumulative impacts of its decision on the environment. *Id.* §§ 1502.16, 1508.7, 1508.8, 1508.25(c).  Moreover, "[t]he information must be of high quality.  Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

56.   Here, Defendants' findings in the Final Programmatic EA that WSTs on the Pacific OCS will result in no significant impacts are based on several unfounded assumptions, rather than sufficient evidence or analysis.  For example, Defendants assume that WSTs will occur only infrequently in the future, despite the fact that many of the state's offshore wells are nearing the end of their useful life using traditional methods, and WSTs are expanding in use nationwide.  Defendants also assume that compliance with existing regulations will address environmental concerns, such as water quality issues, even though an agency cannot excuse itself from conducting the required "hard look" under NEPA because an activity is conducted pursuant to another permit or because impacts have been discussed in a "non-NEPA document." *See South Fork Band Council of Western Shoshone v. U.S. Dept. of Interior*, 588 F.3d 718, 726 (9th Cir. 2009).  Furthermore, Defendants assert that the dilution of chemicals and other WST waste fluids in ocean waters

1    will render any impacts insignificant, without any evidence or analysis to support

2    such an assertion.  Finally, the Final Programmatic EA improperly relies on the

3    lack of information regarding the impacts of offshore WSTs to find that there will

4    be no significant impacts from the Proposed Action, rather than conducting the

5    necessary analysis in order to obtain such knowledge.  *Nat'l Parks & Conservation*

6    *Ass'n*, 241 F.3d at 733.  Each of these assumptions is unsupported by the record and

7    does not constitute the "hard look" required by NEPA.

8        57.   Defendants' failure to take the required "hard look" at the impacts of the

9    Proposed Action in the Final Programmatic EA is arbitrary and capricious, an abuse

10    of discretion, and contrary to the requirements of NEPA.  5 U.S.C. § 706(2).

11                        **THIRD CAUSE OF ACTION**

12                  **(Violations of NEPA and the APA:**

13              **Improper Purpose and Need Statement**

14            **40 C.F.R. § 1508.9; 5 U.S.C. § 706)**

15        58.   Paragraphs 1 through 57 are re-alleged and incorporated herein by

16    reference.

17        59.   NEPA requires federal agencies to "briefly specify the underlying

18    purpose and need to which the agency is responding in proposing the alternative

19    including the proposed action."  40 C.F.R. § 1508.9(b).  Since "[t]he stated goal of

20    a project necessarily dictates the range of reasonable alternatives … an agency

21    cannot define its objectives in unreasonably narrow terms."  *City of Carmel-by-the-*

22    *Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).  Rather, an

23    action agency must consider its "statutory authorization to act" in relation to the

24    proposed project.  *Citizens Against Burlington v. Busey*, 938 F.2d 190, 196 (D.C.

25    Cir. 1991).

26        60.   Here, the Final Programmatic EA's stated purpose and need is unduly

27    narrow and, in effect, is the same as the Proposed Action.  In particular, the stated

28    purpose and need is "to enhance the recovery of petroleum and gas from new and

1    existing wells on the [Pacific] OCS, beyond that which could be recovered with

2    conventional methods (i.e., without the use of WSTs)." The Proposed Action itself

3    is to "allow use" of offshore WSTs. Nowhere does the purpose and need statement

4    reflect the requirements of OCSLA to ensure that "environmental safeguards" are in

5    place for offshore oil development or "to balance orderly energy resource

6    development with protection of the human, marine, and coastal environments." 43

7    U.S.C. §§ 1332(3), 1802(2)(B). This unduly narrow purpose and need statement

8    also improperly constrained the consideration of reasonable alternatives.

9        61.   Defendants' failure to properly define its purpose and need statement for

10   the Proposed Action in the Final Programmatic EA is arbitrary and capricious, an

11   abuse of discretion, and contrary to the requirements of NEPA. 5 U.S.C. § 706(2).

12                       **FOURTH CAUSE OF ACTION**

13                    **(Violations of NEPA and the APA:**

14              **Failure to Consider Reasonable Alternatives**

15          **42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9; 5 U.S.C. § 706)**

16       62.   Paragraphs 1 through 61 are re-alleged and incorporated herein by

17   reference.

18       63.   NEPA requires that a federal agency "rigorously explore and objectively

19   evaluate all reasonable alternatives" to a proposed action. 42 U.S.C. § 4332(2)(C);

20   40 C.F.R. §§ 1502.14(a); 1508.9(b). The requirement to consider reasonable

21   alternatives "lies at the heart of any NEPA analysis." *California ex rel. Lockyer v.*

22   *U.S. Dept. of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006).

23       64.   Here, while Defendants developed two alternatives that would place

24   some restrictions on the use of offshore WSTs (Alternatives 2 and 3), they failed to

25   consider other reasonable alternatives suggested by the Commission, DOGGR, and

26   other commenters. These reasonable alternatives included prohibiting the use of

27   WSTs in specific locations or at particular times of the year; requiring the

28

COMPLAINT FOR DECLARATORY AND              23
INJUNCTIVE RELIEF

1   disclosure of WST fluid constituents and additives; requiring notice to state

2   agencies and the public prior to conducting WSTs or waste discharges; or limiting

3   the number of WSTs in a given year.  The Final Programmatic EA failed to

4   adequately explain why such alternatives were not reasonable.

5      65.   Defendants' failure to consider reasonable alternatives to the Proposed

6   Action in the Final Programmatic EA is arbitrary and capricious, an abuse of

7   discretion, and contrary to the requirements of NEPA.  5 U.S.C. § 706(2).

8                          **FIFTH CAUSE OF ACTION**

9                      **(Violations of the CZMA and APA:**

10   **Failure to Prepare A Consistency Determination for the Proposed Action**

11      **16 U.S.C. § 1456(c)(1)(A); 15 C.F.R. § 930.36; 5 U.S.C. § 706)**

12      66.   Paragraphs 1 through 65 are re-alleged and incorporated herein by

13   reference.

14      67.   Defendants have violated and continue to violate 16 U.S.C. §

15   1456(c)(1)(A) and 15 C.F.R. § 930.36 by failing to prepare a determination as to

16   whether the Proposed Action is consistent to the maximum extent practicable with

17   the enforceable policies in California's coastal management program.  The

18   Commission has not received such a determination from Defendants.

19      68.   It is reasonably foreseeable that the Proposed Action will have coastal

20   effects that are inconsistent with enforceable policies in California's coastal

21   management program pertaining to marine resources, biological productivity and

22   quality of coastal waters, and the prevention of oil and hazardous substance spills,

23   among other policies.  Cal. Pub. Res. Code §§ 30230-32.  The Proposed Action, for

24   instance, relies on an NPDES General Permit for discharges from the production

25   platforms, but the NPDES General Permit contains no limitations on the discharge

26   of specific WST chemicals (other than perhaps discharge limits on oil and grease,

27   to the extent those may constitute WST chemicals).  The Proposed Action also

28   contains no limitations on the volume or type of chemicals used in WSTs.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                          24

1   Moreover, the Proposed Action adds new environmental impacts by extending the

2   life of aging oil infrastructure, allowing for the recovery of additional oil, and

3   requiring the transport of chemicals and equipment to and from production

4   platforms.

5       69.   Defendants' failure to prepare a consistency determination pursuant to the

6   CZMA for the Proposed Action is arbitrary and capricious, an abuse of discretion,

7   and is contrary to the requirements of the CZMA.  5 U.S.C. § 706(2).

8                               **PRAYER FOR RELIEF**

9       WHEREFORE, Plaintiffs respectfully request that this Court:

10      1.    Issue a declaratory judgment that Defendants acted arbitrarily,

11  capriciously, contrary to law, abused their discretion, and failed to follow the

12  procedure required by law in their approval of the Final Programmatic EA and

13  FONSI, in violation of NEPA and the APA;

14      2.    Issue a declaratory judgment that Defendants acted unlawfully and

15  unreasonably, and failed to follow the procedure required by law, by failing to

16  prepare a consistency determination for the Proposed Action, in violation of the

17  CZMA and the APA;

18      3.    Issue a mandatory injunction compelling Defendants to set aside their

19  approvals of the Final Programmatic EA and FONSI unless and until they comply

20  with NEPA, the CZMA, and the APA by preparing an EIS for the Proposed Action

21  and submitting a consistency determination to the Commission for review;

22      4.    Issue a mandatory injunction prohibiting Defendants from issuing

23  approvals for offshore WSTs on the Pacific OCS unless and until Defendants

24  comply with NEPA, the CZMA, and the APA by preparing an EIS for the Proposed

25  Action and submitting a consistency determination to the Commission for review;

26      5.    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees;

27  and

28      6.    Award such other relief as this Court deems just and proper.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                              25

1    Dated:  December 19, 2016                    Respectfully submitted,

2                                                 KAMALA D. HARRIS
                                                  Attorney General of California
3                                                 JAMEE JORDAN PATTERSON
                                                  DAVID A. ZONANA
4                                                 Supervising Deputy Attorneys General

5

6                                                 /s/ George Torgun
                                                  GEORGE TORGUN
7                                                 DAVID ALDERSON
                                                  Deputy Attorneys General
8                                                 *Attorneys for Plaintiffs People of the*
                                                  *State of California, ex rel. Kamala D.*
9                                                 *Harris, Attorney General, and*
                                                  *California Coastal Commission*
10

11   OK2016950020
     90737624.doc
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     COMPLAINT FOR DECLARATORY AND          26
     INJUNCTIVE RELIEF

Kristen Monsell (CA Bar No. 304793)
Email:  kmonsell@biologicaldiversity.org
Jean Su (CA Bar No. 285167)
Email:  jsu@biologicaldiversity.org
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
Phone:  (510) 844-7137
Facsimile:  (510) 844-7150

*Attorneys for Plaintiffs*

*Additional Counsel Listed On Next Page*

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, WISHTOYO FOUNDATION, <br><br>        Plaintiffs, <br>    v. <br><br> BUREAU OF OCEAN ENERGY MANAGEMENT; BUREAU OF SAFETYAND ENVIRONMENTAL ENFORCEMENT; U.S. DEPARTMENT OF THE INTERIOR; SALLY JEWELL, Secretary of the Interior; JOAN BARMINSKI, Pacific Region Director, Bureau of Ocean Energy Management; MARK FESMIRE, Pacific Region Director, Bureau of Safety and Environmental Enforcement, <br><br>       Defendants. | Case No. 2:16-cv-8473 <br><br> **COMPLAINT FOR DECLARATORY AND OTHER RELIEF** <br><br> **(National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq*.; Endangered Species Act, 16 U.S.C. §§ 1531, *et seq.*; Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq*.)** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Additional Counsel for Plaintiff Wishtoyo Foundation*:

Jason A. Weiner (Ca. Bar No. 259264)
Email: jweiner.venturacoastkeeper@wishtoyo.org
9452 Telephone Rd. #432
Ventura, CA 93004
Telephone: (805) 823-3301
Facsimile: (805) 258-5107

Complaint for Declaratory and Other Relief          2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this action arises pursuant to the laws of the United States. An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 701-706, and 16 U.S.C. § 1540(g).

2.      Venue is proper in this Court under 28 U.S.C. § 1391(e) because some of the Defendants reside in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**INTRODUCTION**

3.      In this case, Plaintiffs Center for Biological Diversity and Wishtoyo Foundation (collectively, "Plaintiffs") challenge the actions and omissions of Defendants the Secretary of the U.S. Department of the Interior, the U.S. Department of the Interior, the Bureau of Ocean Energy Management, the Bureau of Safety and Environmental Enforcement, and the Directors of the Pacific Regional Offices (collectively, the "Bureaus") in authorizing offshore hydraulic fracturing ("fracking") and other forms of well stimulation in federal waters off the California coast. Specifically, Plaintiffs challenge the Bureaus' decision to authorize the use of offshore fracking and other forms of well stimulation on the Pacific Outer Continental Shelf ("OCS") without first analyzing the impacts of these activities through a comprehensive Environmental Impact Statement ("EIS"), in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq*. Plaintiffs also challenge the Bureaus' decision to authorize offshore fracking and other well stimulation practices on the Pacific OCS without first consulting with the expert wildlife agencies about the impacts of that decision on threatened and endangered species or their critical habitats, in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq*.

Complaint for Declaratory and Other Relief                3

4.     Fracking—an unconventional well stimulation technique that involves blasting huge volumes of water, sand, and toxic chemicals into the earth at enormous pressure to crack rock formations and release oil and natural gas—is inherently dangerous and has no place in fragile ocean ecosystems. While there are many unknowns regarding the impact of offshore fracking on the marine environment, what *is* known is cause for alarm. Offshore fracking results in significantly worse impacts to the environment and public health than conventional offshore oil and gas development.

5.     The harmful impacts associated with offshore fracking include the discharge of toxic wastewater; the emission of hazardous air pollutants; increased risk of earthquakes and oil spills; threats to cultural resources important to Chumash Native Americans, such as submerged village and sacred sites filled with ancestral burials and other remains; and threats to a variety of marine species, including imperiled blue whales, sea turtles, sea otters, dolphins, and black abalone, many of which are cultural resources vital to the maintenance of Chumash ways of life. Offshore fracking and other forms of well stimulation also prolong oil and gas activities in the Pacific Ocean and extend the life of aging offshore platforms, pipelines, and other infrastructure which otherwise face retirement.

6.     Nevertheless, the Bureaus issued a decision authorizing the use of offshore fracking and other forms of well stimulation on the Pacific OCS. The Bureaus stated that the decision was needed for oil companies to recover oil that would be unrecoverable using conventional methods.

7.     Despite the substantial questions regarding the impacts of offshore fracking and other well stimulation on the marine environment; the known harmful impacts; the controversial nature of the practices; and their potentially devastating impacts on threatened and endangered species and Chumash Native American

1    cultural resources, the Bureaus did not prepare an EIS analyzing and disclosing the

2    impacts of its decision as required by NEPA.

3         8.     Instead, the Bureaus issued a grossly inadequate, illogical, and

4    uniformed programmatic environmental assessment ("PEA") and finding of no

5    significant impact ("FONSI"). The PEA and FONSI fail to take the legally

6    required "hard look" at the direct, indirect, and cumulative impacts of the Bureaus'

7    decision to authorize offshore fracking and other well stimulation on the Pacific

8    OCS, and fail to analyze a reasonable range of alternatives to that decision.

9         9.     A valid environmental assessment would have shown that the

10   Bureaus' decision to authorize offshore fracking and other forms of well

11   stimulation could have a significant effect on the environment, requiring the

12   preparation of an EIS.

13        10.    In addition, despite acknowledging that their decision to authorize

14   offshore fracking and other well stimulation practices could impact several

15   threatened and endangered species, the Bureaus issued their decision without

16   engaging in consultation under Section 7 of the ESA. Such failure violates both the

17   Bureaus' procedural duties and their substantive duty to ensure their actions do not

18   jeopardize the continued existence of any threatened or endangered species or

19   harm their critical habitat.

20        11.    Accordingly, Plaintiffs request an order from the Court declaring that

21   the Bureaus are in violation of NEPA and the ESA and prohibiting them from

22   authorizing offshore fracking and other well stimulation practices on the Pacific

23   OCS unless and until the Bureaus comply with NEPA and the ESA.

### PARTIES

#### Plaintiffs

26        12.    Plaintiff the Center for Biological Diversity (the "Center") is a

27   nonprofit corporation that advocates for the protection of threatened and

28

Complaint for Declaratory and Other Relief          5

1  endangered species and their habitats through science, policy, and environmental
2  law. The Center's mission also includes protecting air quality, water quality, and
3  public health. The Center's Oceans Program focuses specifically on conserving
4  marine ecosystems, and seeks to ensure that imperiled species such as marine
5  mammals, sea turtles, and fish are properly protected from destructive practices in
6  our oceans. The Oceans Program also works to protect coastal communities from
7  the air pollution, water pollution, and other impacts that result from such practices.
8  In pursuit of this mission, the Center has been actively involved in protecting the
9  California coastal environment from offshore fracking. The Center brings this
10 action on behalf of itself and its members. The Center has more than 48,500
11 members, more than 7,000 of which live in California.

12      13.    Plaintiff Wishtoyo Foundation ("Wishtoyo") is a California nonprofit
13 public interest organization with over 700 members primarily composed of
14 Chumash Native Americans, and Santa Barbara, Ventura, and Los Angeles County
15 residents. Wishtoyo's mission is to preserve, protect, and restore Chumash culture,
16 the culture of indigenous peoples, and the environment all peoples depend upon
17 through education, outreach, cultural programs, scientific study, restoration
18 projects, advocacy, and legal action. Chumash tribes, bands, and clans have a long
19 history of interaction with the marine waters of the Pacific Ocean and the Santa
20 Barbara Channel from Point Conception to Malibu and out to and around the
21 Channel Islands, and rely upon these waters and their natural cultural resources to
22 support and maintain Chumash traditional practices, ways of life, and ancestral
23 connections. The Chumash Peoples and members of Wishtoyo have a strong
24 cultural interest in the protection of the Santa Barbara Channel's cultural and
25 natural cultural resources. Members of Wishtoyo use the Santa Barbara Channel
26 for ceremonial purposes, to connect with and celebrate their ancestors and cultural
27 heritage, to gather natural cultural resources, and for educational purposes.

28

Complaint for Declaratory and Other Relief                    6

14.    The ecological health of the Santa Barbara Channel is essential for maintenance of Chumash heritage and ways of life. As passed down from generation to generation of Chumash through oral history, the Chumash Creation Story describes the origin of the Chumash Peoples on the Channel Islands and their journey to the mainland, and explains an importance of the Santa Barbara Channel to the Chumash Peoples. As told by the Creation Story, when resources became scarce, the creator of the Chumash Peoples promised the Chumash a bounty of land and natural resources and provided a rainbow bridge from the Channel Islands to what is now California's mainland. In order to successfully cross over, the Chumash were told to not look down or else they would fall into the ocean. For those who did look down while walking across the bridge, the creator was able to turn them into dolphins, thus sparing their lives. To this day, dolphins are considered ancestors of the Chumash Peoples, and are honored through songs and ceremonies. Dolphins guide Chumash Peoples to bountiful fishing areas, protect women when giving birth near or in the ocean, and overall, are the protectors of the Chumash Peoples.

15.    The Chumash are a maritime people, whose identity and maintenance of cultural practices is intrinsically connected to the marine waters of the Santa Barbara Channel. Chumash Peoples since time immemorial have been and continue to: visit the Channel Islands by crossing the Channel in tomols (Chumash canoes); fish in the Santa Barbara Channel; gather abalone, seaweed, and other marine life for food, cultural practices, and for ceremonial use; and use shells, including abalone shells, gathered in the Santa Barbara Channel for trade, fishing hooks, jewelry, as part of ceremonies, and as ornaments for traditional and ceremonial dress. The ancestors of Chumash Peoples resided in villages and utilized sacred sites for ceremonies that are now submerged within the Santa Barbara Channel. Destruction of and harm to submerged Chumash villages and

1   sacred sites will harm the Chumash Peoples by preventing their use and access to
2   these cultural resources, which maintain and provide a connection to their pre-
3   colonial traditions and ways of life.

4        16.   Chumash members of Wishtoyo desire to maintain their cultural and
5   religious practices, and spiritual connection with their ancestors, by being able to
6   experience, enjoy, utilize, and interact with the Santa Barbara Channel, its wildlife,
7   its cultural resources, and its submerged sacred cultural sites.

8        17.   In addition, Plaintiffs' members and staff regularly visit California
9   beaches, as well as the Santa Barbara Channel, its islands, and the waters near
10  offshore platforms for swimming, surfing, kayaking, hiking, camping, viewing and
11  studying wildlife, photography, and other vocational and recreational activities.
12  Plaintiffs' members and staff derive recreational, spiritual, professional, scientific,
13  educational, and aesthetic benefit from their activities in these areas. Plaintiffs'
14  members and staff intend to continue to use and enjoy these areas frequently and
15  on an ongoing basis in the future.

16       18.   Offshore fracking and other forms of well stimulation degrade these
17  habitats and threaten wildlife and the coastal environment. Offshore fracking and
18  other well stimulation practices also threaten submerged Chumash village sites,
19  burial sites, sacred sites, and sunk tomols, as well as sacred Chumash cultural
20  marine resources such as dolphins and abalone.

21       19.   For example, offshore fracking contaminates the ocean with
22  wastewater and pollutants that are toxic to marine species. It also requires the
23  shipment of fracking chemicals and equipment to oil platforms, thereby increasing
24  port traffic, ship traffic, and the attendant ocean noise and risk of ship strikes.

25       20. Offshore fracking and other well stimulation activities allow oil
26  companies to recover oil that would otherwise be unrecoverable. These activities
27  prolong offshore oil and gas drilling and the life of aging offshore infrastructure

28

1  which otherwise face retirement. This means that the Bureaus' decision to allow

2  offshore fracking not only adds new environmental risks, but it also extends the

3  harm from conventional oil and gas development, including air and water

4  pollution, ocean noise, and increased risk of ship strikes and oil spills.

5      21.   Offshore fracking and other well stimulation activities degrade

6  Plaintiffs staff and members' recreational, spiritual, scientific, cultural, and

7  aesthetic enjoyment of the Santa Barbara Channel and other waters and coastal

8  areas near where offshore drilling occurs by harming water quality and wildlife

9  that they study and observe there, and decreasing their ability to view species that

10 are harmed by the practices or leave the area. Additionally, Plaintiffs' members

11 and staff reasonably fear that the Bureaus' decision fails to adequately protect

12 California's already imperiled wildlife and air and water quality, and exposes them

13 and the coastal environment to increased risk of harm. Such risks include, but are

14 not limited to, increased emissions of hazardous air pollutants such as benzene, a

15 scientifically-proven carcinogen, as well as increased risk of earthquakes and oil

16 spills, both of which could have devastating environmental and economic

17 consequences, and devastating impacts to resources of cultural significance to the

18 Chumash Peoples and their ancestral lands. Such reasonable fears negatively

19 impact Plaintiffs members and staff's use and enjoyment of these areas.

20     22.   The above-described aesthetic, recreational, economic, professional,

21 cultural, and other interests have been, are being, and will continue to be adversely

22 affected and irreparably injured by the Bureaus' decision to authorize offshore

23 fracking and other forms of well stimulation on the Pacific OCS without

24 complying with NEPA and the ESA.

25     23.   In addition, Plaintiffs and their members regularly comment on

26 agency actions that affect California's coastal environment, including the Santa

27 Barbara Channel, and regularly comment on and participate in the Bureaus'

28

---

Complaint for Declaratory and Other Relief          9

1    decisions and their environmental analyses under NEPA and decisions affecting
2    threatened and endangered species. The Bureaus' failure to comply with NEPA
3    and the ESA deprives them of these rights, and causes them procedural and
4    informational injuries.

5         24.    Plaintiffs and their members have no adequate remedy at law and the
6    requested relief is proper. Relief in this case would ensure comprehensive
7    environmental review of offshore well stimulation practices that would inform the
8    public and decisionmakers about the environmental impacts of these practices, and
9    would provide a statutorily-mandated opportunity for public participation in the
10   decisionmaking process. Relief in this case would also ensure the Bureaus engage
11   in consultation under Section 7 of the ESA to analyze the impacts of offshore well
12   stimulation practices and ensure any decision to authorize such practices does not
13   jeopardize any threatened or endangered species or adversely modify their critical
14   habitat. The requested relief could result in additional mitigation and oversight of
15   offshore drilling that would better protect the ocean, imperiled wildlife, and
16   important cultural resources, and alleviate the injuries of Plaintiffs and their
17   members. An order prohibiting the Bureaus from authorizing offshore well
18   stimulation unless and until the Bureaus comply with NEPA and the ESA would
19   redress the injuries of Plaintiffs and their members.

20                                    **Defendants**

21        25.    Defendant Bureau of Ocean Energy Management ("BOEM") is a
22   federal agency within the U.S. Department of the Interior. BOEM is charged with
23   managing the development of offshore resources, including oil exploration,
24   development, and production in federal waters.

25        26.    Defendant Bureau of Safety and Environmental Enforcement
26   ("BSEE") is a federal agency within the U.S. Department of the Interior. BSEE is
27   charged with permitting offshore drilling operations in federal waters and ensuring

28

Complaint for Declaratory and Other Relief                10

1   such activities comply with safety and environmental regulations.

2        27.   Defendant U.S. Department of the Interior is a United States agency

3   within the executive branch. The Department is responsible for managing and

4   overseeing the development of oil resources on the Outer Continental Shelf in

5   accordance with NEPA and the ESA.

6        28.   Defendant Sally Jewell is the Secretary of the U.S. Department of the

7   Interior, and is sued in her official capacity. Ms. Jewell is the official ultimately

8   responsible under federal law for ensuring that the actions and management

9   decisions of the Bureaus comply with all applicable laws and regulations,

10  including NEPA and the ESA.

11       29.   Defendant Joan Barminski is the Pacific Region Director of BOEM,

12  and is sued in her official capacity. Ms. Barminski has responsibility for

13  implementing and fulfilling BOEM's duties under NEPA and the ESA.

14       30.   Defendant Mark Fesmire is the Pacific Region Director of BSEE, and

15  is sued in his official capacity. Mr. Fesmire has responsibility for implementing

16  and fulfilling BSEE's duties under NEPA and the ESA.

17                    **STATUTORY BACKGROUND**

18                  **National Environmental Policy Act**

19       31.   NEPA, the nation's "basic national charter for protection of the

20  environment," seeks to "insure that environmental information is available to

21  public officials and citizens before decisions are made and before actions are

22  taken," and to "help public officials make decisions that are based on

23  understanding of environmental consequences, and take actions that protect,

24  restore, and enhance the environment." 40 C.F.R. § 1500.1(a)-(c).

25       32.   To reach these goals, federal agencies must prepare an Environmental

26  Impact Statement ("EIS") for all "major Federal actions significantly affecting the

27  quality of the human environment." 42 U.S.C. § 4332(2)(C). The Council on

28

1    Environmental Quality has promulgated regulations implementing NEPA, which

2    are binding on all federal agencies. 40 C.F.R. § 1507.1.

3         33.    The regulations specify the factors an agency must consider in

4    determining whether an action may significantly affect the environment warranting

5    an EIS. *Id*. § 1508.27. Specifically, whether an action may have "significant"

6    impacts on the environment is determined by considering the "context" and

7    "intensity" of the action. *Id*. In considering the "context" of the action, the

8    significance of the project "must be analyzed in several contexts such as society as

9    a whole (human, national), the affected region, the affected interests, and the

10   locality." *Id*. § 1508.27(a).

11        34.    The "intensity" of the action is determined by considering the ten

12   factors enumerated in the regulations, which are: (1) impacts that may be both

13   beneficial and adverse; (2) the degree to which the proposed action affects public

14   health or safety; (3) unique characteristics of the geographic area such as proximity

15   to historic or cultural resources, park lands, or ecologically critical areas; (4) the

16   degree to which the effects on the human environment are likely to be highly

17   controversial; (5) the degree to which the possible effects on the human

18   environment are highly uncertain or involve unique or unknown risks; (6) the

19   degree to which the action may establish a precedent for future actions with

20   significant effects; (7) whether the action is related to other actions with

21   individually insignificant but cumulatively significant impacts; (8) the degree to

22   which the action may cause loss or destruction of significant scientific, cultural, or

23   historical resources; (9) the degree to which the action may adversely affect a

24   species listed under the Endangered Species Act or its designated critical habitat;

25   and (10) whether the action threatens a violation of federal, state, or local

26   environmental laws. *Id.* § 1508.27(b)(1)-(10). The presence of even just one of

27   these factors may be sufficient to require preparation of an EIS.

28

Complaint for Declaratory and Other Relief              12

35.    NEPA's regulations provide that an agency may first prepare an Environmental Assessment ("EA") aimed at determining whether the environmental impact of a proposed action is "significant," warranting preparation of an EIS. 40 C.F.R. § 1501.3. If, pursuant to the EA, an agency determines that an EIS is not required, it must issue a "Finding of No Significant Impact" ("FONSI") that presents the reasons why the proposed agency action will not have a significant impact on the human environment. *Id*. §§ 1501.4(e), 1508.13. The EA must "provide sufficient evidence and analysis for determining whether" a FONSI is sufficient to satisfy NEPA. *Id*. § 1508.9(a)(1).

36.    An agency may only issue a FONSI for actions with no significant impact on the human environment. *Id*. § 1508.13. If an action may have a significant effect on the environment, or if there are substantial questions as to whether it may, an EIS must be prepared.

37.    Both EAs and EISs must specify the underlying purpose and need to which the agency is responding in proposing the action. *Id.* §§ 1502.13, 1508.9(b).

38.    Both EAs and EISs must also "describe the environment of the areas to be affected or created by the alternatives under consideration." *Id.* § 1502.15.

39.    Additionally, EAs and EISs must discuss a proposed action's direct, indirect, and cumulative effects. 40 C.F.R. §§ 1502.16, 1508.9(b). Direct effects are "caused by the action and occur at the same time and place," whereas indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8. Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id*. § 1508.7.

40.    Effects, in turn, include "ecological…, aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id.* § 1508.8.

41.     EAs and EISs must also include a reasonable range of alternatives, 42 U.S.C. § 4332(2)(C)(iii), (E), 40 C.F.R. § 1508.9(b), and provide "a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

42.     "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id*. § 1500.1(b).

**Endangered Species Act**

43.     Congress enacted the ESA, in part, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b).

44.     The ESA vests primary responsibility for administering and enforcing the statute with the Secretaries of Commerce and Interior. The Secretaries of Commerce and Interior have delegated this responsibility to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service, respectively (collectively, the "Services").

45.     When a species has been listed as threatened or endangered under the ESA, all federal agencies—including the Bureaus—must ensure that their programs and activities are in compliance with the ESA.

46.     To this end, Section 7(a)(2) of the ESA requires the Bureaus, in consultation with the Services, to "insure that any action authorized, funded, or carried out by" the Bureaus "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the critical habitat of such species. 16 U.S.C. § 1536(a)(2).

47.     Actions subject to Section 7 are broadly defined to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part" by federal agencies and include granting permits and licenses, as well as

Complaint for Declaratory and Other Relief                14

1    actions that may directly or indirectly cause modifications to the land, water, or air.

2    50 C.F.R. § 402.02. An agency is required to review its actions "at the earliest

3    possible time" to determine whether the action may affect listed species or critical

4    habitat. *Id.* § 402.14(a).

5        48.    For each agency action, the Bureaus must request from the Services a

6    list of any threatened or endangered species that may be present in the area of the

7    agency action. 16 U.S.C. § 1536(c)(1), 50 C.F.R. § 402.12. If listed species may be

8    present, the Bureaus must prepare a "biological assessment" or engage in

9    "informal consultation" with the Services to determine whether the listed species is

10   likely to be adversely affected by the proposed action. 16 U.S.C. § 1536(c)(1); 50

11   C.F.R. § 402.13.

12       49.    If the Bureaus determine that a proposed action may affect any listed

13   species or critical habitat, the agency must engage in formal consultation with the

14   Services, unless the biological assessment or informal consultation concludes that

15   the action is not likely to adversely affect any listed species or critical habitat and

16   the Services concur with that finding. 50 C.F.R. § 402.14(a), (b). The "may affect"

17   standard broadly includes "[a]ny possible effect, whether beneficial, benign,

18   adverse, or of an undetermined character." 51 Fed. Reg. 19,926 (June 3, 1986).

19       50.    To complete formal consultation, the Services must provide the

20   Bureaus with a "biological opinion," explaining how the proposed action will

21   affect the listed species or habitat. 16 U.S.C. § 1536(b), 50 C.F.R. § 402.14. If the

22   Services conclude that the proposed action "will jeopardize the continued

23   existence" of a listed species or result in the destruction or adverse modification of

24   critical habitat, the biological opinion must outline "reasonable and prudent

25   alternatives" to avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A), 50 C.F.R. §

26   402.14(h)(3).

27

28

Complaint for Declaratory and Other Relief                    15

51.     If the Services conclude that the action or the alternatives will not cause jeopardy, but will result in take of listed species, the Services must issue an incidental take statement ("ITS") as part of the biological opinion that specifies "the impact, i.e., the amount or extent, of . . . incidental taking" that may occur, and any measures necessary or appropriate to minimize such impact on the listed species. 50 C.F.R. § 402.14(h)(3), (i). When those listed species are marine mammals, the take must first be authorized pursuant to the Marine Mammal Protection Act ("MMPA"), and the ITS must include any additional measures necessary to comply with the MMPA take authorization. *Id.* § 402.14(i)(1)(iii).

52.     The Bureaus' consultation duties do not end with the issuance of a biological opinion. Instead, the Bureaus must reinitiate consultation on agency actions over which they retain, or are authorized to exercise, discretionary involvement or control when: (1) the amount of take specified in an ITS is exceeded; (2) new information reveals that the action may have effects not previously considered; (3) the action is modified in a way not previously considered; or (4) new species are listed or critical habitat designated that may be impacted by the agency's action. 50 C.F.R. § 402.16.

**Administrative Procedure Act**

53.     Judicial review of federal agency action is governed by the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701-706.

54.     Under the APA, a person may seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed . . ." *Id.* § 706(1).

55.     Also under the APA, courts "shall. . . hold unlawful and set aside agency action, findings, or conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." *Id.* § 706(2)(A), (D).

E.R. 1048

**FACTUAL BACKGROUND**

**Oil and Gas Drilling in Federal Waters off California**

56. The Pacific OCS region is home to 43 active oil and gas leases. Oil and gas companies conduct drilling and extraction activities under these leases from 23 oil and gas platforms off the coast of Southern California. Oil companies installed the platforms between 1967 and 1989, and the first production began in 1969. When leasing and drilling began on the Pacific OCS, oil companies and regulators anticipated that drilling would last for roughly 50 years. Oil companies have been drilling the Pacific OCS for close to 50 years.

57. The platforms range from approximately four to ten miles from shore.

Fifteen of these platforms are located in the Santa Barbara Channel, four are located off Long Beach, and four are located in the Santa Maria Basin.

58. The platforms are located in one of the most significant and diverse seascapes in the world that supports a vast array of habitats and coastal and marine species. For example, endangered blue whales have important foraging grounds in the Santa Barbara Channel—where most of the Pacific OCS platforms are located—such that the area now hosts the world's densest summer seasonal congregation of blue whales. Another endangered whale, the humpback whale, congregates in the area from March to September to feed. The Channel is also home to hundreds of fish and invertebrate species; giant kelp forests; and several other species listed under the Endangered Species Act, including sea turtles, southern sea otters, and black abalone, as well as critical habitat for western snowy plovers and black abalone.

59. The Santa Barbara Channel includes the Channel Islands Marine Sanctuary and Channel Islands National Park. The Park was established, in part, to protect nationally significant cultural resources, including "archaeological evidence of substantial populations of Native Americans." 16 U.S.C. § 410ff.

60.     Since time immemorial, the Chumash Peoples have depended upon the cultural resources within marine waters of the Santa Barbara Channel, from Point Conception to Malibu and out to an around the Channel Islands, to maintain their ways of life, cultural practices, and ancestral connections.

61.     The Bureaus' decision authorizes offshore fracking and other forms of well stimulation at all 23 platforms off Southern California, including in the Santa Barbara Channel.

62.     Offshore fracking and other forms of well stimulation have unique environmental impacts. The practices increase environmental damages beyond those of conventional oil and gas development, and prolong the life of offshore oil and gas drilling.

63.     The use of fracking and other well stimulation techniques, both onshore and offshore, have substantially increased in recent years due to advances in technology such as horizontal drilling.

**Offshore Fracking and Other Forms of Well Simulation**

64.     Offshore fracking is a form of unconventional well stimulation. It involves injecting a mixture of water, a proppant (typically sand or man-made ceramic materials), and chemicals into a well at extremely high pressure to artificially fracture a rock layer below the seafloor and create passages through which oil and gas can flow. The practice allows oil companies to recover oil and gas that would otherwise be unrecoverable. According to the industry, offshore fracking can significantly improve the life and productivity of a well, as well as the amount of oil and gas recovered.

65.     Acidizing is another form of unconventional well stimulation. Acid fracturing is similar to hydraulic fracturing except that instead of using a proppant to keep fractures open, an acid solution is used to etch channels in the rock walls, thereby creating pathways for oil and gas to flow. Matrix acidizing is a process in

which a combination of hydrochloric acid and other acids are mixed with brine and other chemicals and injected underground to dissolve oil bearing rock to enhance production of oil and gas. The practice allows oil companies to recover oil and gas that would otherwise be unrecoverable.

66.     There are crucial information gaps concerning the impacts of offshore fracking and acidizing on the marine environment. But what is known raises several significant environmental and public health concerns.

67.     On land, fracking and acidizing have been linked to chemical and oil spills, air and water pollution, earthquakes, and property damage. The damages to public health and the environment have often been severe. Offshore fracking and acidizing raise similar concerns and add further risks due to the unpredictable nature of the ocean environment.

68.     Water contamination is a particular hazard of offshore fracking because toxic chemicals are used in fracking fluids. The water pollution permit for the oil platforms in federal waters off California allows more than nine billion gallons of produced water, including fracking chemicals, to be dumped into the Pacific Ocean each year. The permit has no limits on the amount of fracking chemicals that can be discharged when combined with produced water. Roughly half the platforms in the Santa Barbara Channel use this wastewater disposal method. This disposal method can result in wastewater plumes. These plumes can rise to the surface of the sea or become trapped below the surface.

69.     When wastewater is not dumped into the ocean, it is reinjected into the seafloor or transported to shore for underground injection. This disposal method can result in leaks during transport or after injection that contaminate ground and surface waters. Loss of well casing integrity is another pathway for contamination. A recent study found that older wells can lead to fluid migration,

1  and that the high injection pressures used in fracking can increase this risk

2  significantly. For this same reason, fracking can also increase the risk of oil spills.

3      70.   Offshore fracking can contribute to earthquakes. Wastewater injection

4  used in fracking has been scientifically linked to earthquakes of magnitude three

5  and greater in seven states, including California. At least thirty of California's

6  offshore injection wells are located within three miles of a fault. The practice of

7  fracking itself has been found to contribute to seismic events.

8      71.   The chemicals used in fracking fluids can cause adverse public health

9  effects. For example, more than 75 percent of the chemicals used can affect the

10  skin, eyes, and other sensory organs, as well as respiratory and gastrointestinal

11  systems; approximately 40 to 50 percent can affect the brain/nervous system,

12  immune system, cardiovascular system, and the kidneys; 37 percent can affect the

13  endocrine system; and 25 percent can cause cancer and mutations.

14      72.   Oil companies also use dozens of extremely hazardous chemicals to

15  acidize wells in California. These chemicals include hazardous chemicals known to

16  be carcinogens, mutagens, reproductive toxins, developmental toxins, endocrine

17  disruptors, or have highly acute toxicity. Acidizing chemicals can make up as

18  much as 18 percent of the fluid used in these procedures. And each acidization can

19  use as much as hundreds of thousands of pounds of some chemicals.

20      73.   Air pollution from well stimulation is also well documented.

21  Pollutants released during offshore fracking and acidizing pose serious health risks,

22  including carcinogenicity and endocrine disruption. Volatile organic compounds

23  ("VOCs") emitted during offshore fracking include the "BTEX compounds"—

24  benzene, toluene, ethyl benzene, and xylene—which are designated as hazardous

25  air pollutants. *See* 42 U.S.C. § 7412(b). Many of these VOCs are associated with

26  serious short-term and long-term effects to the respiratory, nervous, and circulatory

27  systems. Additionally, VOCs create ground-level ozone, or smog, which can

28

1   contribute to asthma, premature death, stroke, heart attack, and low birth weight.

2   Benzene is also a known carcinogen, and has been documented in people living

3   within a 10-mile radius of fracked wells.

4        74.    In addition, offshore fracking can harm a variety of marine life.

5   Scientific research has indicated that 40 percent of the chemicals used in fracking

6   fluids can harm aquatic animals and other wildlife. In fact, California scientists

7   have found that chemicals frequently used in fracking in California are among the

8   most toxic in the entire world with respect to aquatic life.

9        75.    Transportation of well stimulation chemicals to offshore platforms can

10   result in vessel collisions with imperiled whales, dolphins, and sea turtles that can

11   kill or injure them.

12        76.    Offshore fracking and acidizing also threaten Chumash Native

13   Americans' cultural resources and ancestral lands. The drilling of fracking wells

14   that disturb the ocean floor threatens to destroy submerged Chumash village sites,

15   burial sites, sacred sites, and sunk tomols on or just below the ocean floor. Harm to

16   dolphins from offshore well stimulation activities could impact Chumash natural

17   cultural resources because the sightings and interactions with dolphins are essential

18   to Chumash ceremony, ancestral connections, traditional practices, and ways of

19   life. Harm to abalone could impact Chumash natural cultural resources because

20   abalone shells are used as fishhooks, jewelry, and ornaments for traditional and

21   ceremonial dress. Offshore fracking and other well simulation could impact other

22   marine life used by the Chumash to maintain their heritage, cultural practices, and

23   connection to their ancestors, including Chumash subsistence fishing and the

24   Chumash Peoples' connection to their pre-colonial ways of life.

25        77.    Offshore fracking and acidizing also prolong offshore oil drilling and

26   extraction. Thus, in addition to the unique impacts from the unconventional drilling

27   practices themselves, they can also cause environmental and cultural harms

28

associated with conventional oil and gas development. These impacts are widespread and well-documented.

78.     The harms associated with conventional oil and gas activities include noise pollution that can interfere with important biological functions of marine mammals like feeding, mating, and rearing young; increased vessel traffic, which increases the risk of ship strikes that can kill or injure endangered whales and sea turtles; exhaustion and mortality of seabirds that are attracted to artificial light on offshore vessels and platforms; increased risk of oil spills which can kill or harm a wide variety of marine life, including threatened and endangered blue and humpback whales, sea otters, sea turtles, black abalone, and birds, as well as dolphins and fish; increased air pollution that can harm public health and welfare; and increased risk of oil spills and oil clean up practices which can destroy submerged and onshore Chumash cultural resources.

79.     Furthermore, the oil and gas extraction enabled by offshore fracking and other well stimulations can contribute to land subsidence at and in the area of the drilling site, which can sink and collapse the ocean floor. This is because the removal of oil and gas from underground reserves can cause the overlying terrain to collapse into the emptied underground reserves.

80.     Offshore oil and gas extraction enabled by offshore fracking and other well stimulations can thus cause land subsidence that destroys Chumash cultural resources, including village sites, burial sites, sacred sites, and sunk tomols present on the surface of, or just beneath the surface of, the ocean floor of the Santa Barbara Channel.

81.     For these reasons, and others, offshore fracking and other forms of unconventional well stimulation are controversial practices.

**The Challenged Decision**

82.     On February 22, 2016, the Bureaus issued a proposed decision to

1    authorize four forms of well stimulations from all 23 offshore platforms on the

2    Pacific OCS; and announced the availability of a draft programmatic

3    environmental assessment that purported to analyze the environmental impacts of

4    the proposal. *See* 81 Fed. Reg. 8,743 (Feb. 22, 2016). The four types of well

5    stimulation included hydraulic fracturing, acid fracturing, matrix acidizing, and

6    diagnostic fracture injection testing. Diagnostic fracture injection testing is used to

7    estimate certain reservoir properties needed to optimize a main fracture job.

8         83.   During the thirty-day public comment period on the proposal and draft

9    assessment, the Bureaus received thousands of comments urging the agency to

10   conduct an EIS on the impacts of offshore fracking and other well stimulation. For

11   example, a letter signed by more than thirty scientists urged the Bureaus to conduct

12   a comprehensive EIS given scientific studies documenting that fracking and

13   acidizing pose a wide range of risks to public health and ecosystems. The

14   comments also noted critical data gaps regarding the impacts of offshore fracking

15   and acidizing on the marine environment. The scientists urged the Bureaus not to

16   authorize any offshore fracking or acidizing unless and until a comprehensive

17   environmental analysis finds it safe.

18        84.   Elected officials, including local, state, and federal representatives,

19   also commented on the draft assessment. The officials urged the Bureaus to

20   prohibit offshore fracking and acidizing given the significant risks or to complete a

21   full EIS to better understand the potential impacts. Comments from California state

22   legislators explained how the Bureaus' proposal would compromise the state's

23   ability to protect its coastal resources and public health.

24        85.   The Division of Oil, Gas and Geothermal Resources—an agency that

25   regulates oil and gas activities on state and private lands in California—also

26   submitted comments. The comments stated that the Bureaus should adopt an

27   alternative that would prohibit the dumping of well stimulation wastewaters into

28

1    the ocean. The comments also suggested several mitigation measures the Bureaus
2    could adopt, including a requirement to publically disclose the chemicals used in
3    well stimulation and to notify the public before well stimulation will be used.

4         86.    The Center also submitted comments urging the Bureaus to prohibit
5    offshore well stimulation and conduct a full EIS. The Center's comments also
6    highlighted several deficiencies in the Bureaus' draft assessment.

7         87.    Wishtoyo also submitted comments urging the Bureaus to prohibit
8    offshore well stimulation. Wishtoyo's comments explained how the Bureaus'
9    decision to authorize offshore fracking and other well stimulation practices
10   threatens cultural resources important to Chumash Native Americans, including
11   sacred dolphins, abalone, and submerged Chumash remains.

12        88.    But on May 27, 2016, the Bureaus issued a final decision to authorize
13   the use of offshore fracking and acidizing at all 23 platforms on the Pacific OCS.

14        89.    The Bureaus did not issue an EIS on their decision. Instead, the
15   Bureaus issued a Final Programmatic Environmental Assessment ("PEA") and
16   Finding of No Significant Impact ("FONSI"). The PEA and FONSI do not adopt
17   any mitigation measures for the use of well stimulation.

18        90.    The Bureaus state in the PEA and FONSI that the purpose of their
19   decision is to enhance the recovery of oil and gas from new and existing wells on
20   the Pacific OCS beyond that which can be recovered with conventional methods.
21   The Bureaus' stated need for their decision is the efficient recovery of oil and gas
22   resources on the Pacific OCS.

23        91.    The Bureaus acknowledge that their decision to authorize the use of
24   well stimulation may allow oil companies to recover oil that would otherwise not
25   be recovered. The Bureaus also acknowledge that drilling activities off the coast of
26   California could end sooner without the use of well stimulation.

27

28

Complaint for Declaratory and Other Relief          24

1    92.    The Bureaus evaluated four alternatives: (1) authorizing well
2    stimulation (the proposed alternative); (2) authorizing well stimulation at depths of
3    more than 2,000 feet below the seafloor only; (3) authorizing well stimulation but
4    prohibiting the dumping of wastewater from well stimulation into the ocean; and
5    (4) prohibiting the use of well stimulation (the no-action alternative).

6    93.    The Bureaus acknowledge that there are data gaps—critical in
7    nature—regarding the impacts of offshore fracking and acidizing on the marine
8    environment. For example, in discussing the impacts of the discharge of chemicals
9    used in fracking and acidizing into the ocean, the PEA notes the lack of toxicity
10   data for 31 of the 48 chemicals previously used in California, and the lack of
11   available data on chronic impacts of these chemicals in the marine environment.
12   The Bureaus acknowledge that California scientists identified these issues as
13   critical data gaps in the analysis of potential impacts of discharges of well
14   stimulation waste fluids to sensitive marine species.

15   94.    The Bureaus also admit that offshore fracking and acidizing will cause
16   water and air pollution. But the PEA and FONSI dismiss the impacts to water
17   quality, marine life, and public health that could result from such pollution.

18   95.    The Bureaus also acknowledge that offshore fracking and other well
19   stimulation could impact marine life, including threatened and endangered whales,
20   sea turtles, birds, sea otters, and fish. For example, the PEA acknowledges that
21   wastewater discharges from well stimulations may impact benthic organisms,
22   which include ESA-listed white and black abalone; marine and coastal fish, which
23   include ESA-listed southern California steelheads, scalloped hammerhead sharks,
24   tidewater goby, and green sturgeon; and marine mammals which include ESA-
25   listed blue whales, humpback whales, sei whales, fin whales, Guadalupe fur seals,
26   and southern sea otters. The PEA also acknowledges that well stimulation could
27   impact ESA-listed marine mammals through noise from platform service vessels
28

Complaint for Declaratory and Other Relief          25

1   delivering well stimulation equipment and materials and the potential for marine

2   mammals to be struck by such vessels. According to the PEA, marine and coastal

3   birds, which include ESA-listed western snowy plovers, marbled murrelets, and

4   California least terns, might be impacted by these vessels, as well as the accidental

5   release of well stimulation chemicals. The PEA also acknowledges that ESA-listed

6   sea turtles could be impacted by wastewater discharges from well stimulations, by

7   the accidental release of well stimulation chemicals, be disturbed by the noise from

8   service vessels, or be struck by such vessels.[1] But the PEA and FONSI dismiss the

9   significance of these impacts.

_____

10   [1] The endangered and threatened species at issue in this case, their listing status,

11   and the dates when they were listed under the ESA are as follows: blue whale --

12   endangered, 35 Fed. Reg. 18,319 (Dec. 2, 1970); fin whale -- endangered, id.; sei

13   whale -- endangered, id; North Pacific right whale -- endangered, id., 73 Fed. Reg.

14   12,024 (Mar. 6, 2008); humpback whale -- originally listed as endangered in 1970,

35 Fed. Reg. 18,319 (Dec. 2, 1970), global population recently reclassified and

15   Central America DPS listed as endangered and Mexico DPS  listed as threatened,

16   81 Fed. Reg. 62,260 (Sept. 8, 2016); sperm whale -- endangered, 35 Fed. Reg.

18,319 (Dec. 2, 1970); Western North Pacific gray whale -- endangered, id.;

17   Guadalupe fur seal -- threatened, 50 Fed. Reg. 51,252 (Dec. 16, 1985); Southern

18   sea otter -- threatened, 42 Fed. Reg. 2,965 (Jan. 14, 1977); loggerhead turtle, North

Pacific DPS -- endangered, 76 Fed. Reg. 58,868 (Sept. 22, 2011); leatherback

19   turtle -- endangered, 35 Fed. Reg. 8,491 (June 2, 1970); green turtle, East Pacific

20   DPS -- threatened, 81 Fed. Reg. 20,058 (Apr. 6, 2016); olive ridley turtle --

threatened, 43 Fed. Reg. 32,800 (July 28, 1978); black abalone -- endangered, 74

21   Fed. Reg. 1,937 (Jan. 14, 2009); white abalone -- endangered in Pacific Coast

22   range, 66 Fed. Reg. 29,046 (May 29, 2001); Southern California steelhead --

endangered, 71 Fed. Reg. 834 (Jan. 5, 2006); scalloped hammerhead shark, Eastern

23   Pacific DPS -- endangered, 79 Fed. Reg. 38,214 (July 3, 2014); green sturgeon,

Southern DPS -- threatened, 71 Fed. Reg. 17,757 (Apr. 7, 2005); tidewater goby --

24   endangered, 59 Fed. Reg. 5,494 (Feb. 4, 1994); Hawaiian petrel -- endangered, 32

25   Fed. Reg. 4,001 (Mar. 11, 1967); California Ridgway's rail -- endangered, 35 Fed.

Reg. 16,047 (Oct. 13, 1970); Short-tailed albatross -- endangered, 65 Fed. Reg.

26   46,643 (July 31, 2000); California least tern -- endangered, 35 Fed. Reg. 8,491

27   (June 2, 1970); Light-footed Ridgway's rail -- endangered, 35 Fed. Reg. 16,047

28   (Oct. 13, 1970); western snowy plover, Pacific DPS -- threatened, 58 Fed. Reg.

1    96.    The PEA's purported cumulative impacts analysis contains general
2    statements and a list of activities in and around offshore platforms that affect the
3    environment.

4    97.    The PEA and FONSI do not analyze the direct, indirect, or cumulative
5    impacts from prolonged offshore oil and gas drilling on the Pacific OCS.

6    98.    The PEA and FONSI do not analyze the direct, indirect, or cumulative
7    impacts of offshore fracking, other well stimulation, or prolonged offshore oil and
8    gas drilling on the Pacific OCS on Chumash cultural resources or the heritage,
9    ways of life, and cultural and religious practices of the Chumash Peoples.

10   99.    The Bureaus did not engage in consultation under Section 7 of the
11   ESA prior to issuing their decision authorizing offshore fracking and other well
12   stimulation practices on the Pacific OCS. The Bureaus have never engaged in
13   consultation under Section 7 of the ESA on the impacts of offshore fracking and
14   other well stimulation practices on the Pacific OCS on all the threatened and
15   endangered species or their designated critical habitat that may be affected by the
16   practices.

17   100.   For example, the biological opinions for offshore oil and gas drilling
18   activities from Platforms Gilda, Hidaldo, and Gail were issued by the Services in
19   1979, 1984, and 1986, respectively, and do not mention offshore fracking.
20   Moreover, these consultations were completed before many species were even
21   listed under the ESA, including white and black abalone, hammerhead sharks,

22

23   12,864 (Mar. 5, 1993); marbled murrelet -- threatened, 57 Fed. Reg. 45,328 (Oct.
     1, 1992). The critical habitats at issue in this case, and the dates they were
24   designated by the federal government are as follows: black abalone critical habitat,
25   76 Fed. Reg. 66,805 (Oct. 27, 2011); leatherback sea turtle critical habitat, 77 Fed.
     Reg. 4,170 (Jan. 26, 2012); western snowy plover, Pacific DPS critical habitat, 77
26   Fed. Reg. 36,728 (June 19, 2012); tidewater goby critical habitat, 78 Fed. Reg.
27   8,746 (Feb. 6, 2013); Southern California steelhead critical habitat, 70 Fed. Reg.
     52,488 (Sept. 2, 2005).
28

green sturgeon, and tidewater goby, among others. The consultations therefore do not consider the impacts of any offshore oil and gas activities on these species. The impacts of offshore oil and gas activities on these species include increased toxicity of their habitat, oil spills, increased vessel traffic, and increased ocean noise, among others. Moreover, the biological opinions do not consider impacts to critical habitat for black abalone, green sturgeon, leatherback sea turtles, western snowy plovers, or Southern California steelhead. These biological opinions are outdated and are not based on the best available science.

101.   Pursuant to 16 U.S.C. § 1540(g), the Center provided the Bureaus with notice of their ESA violations more than 60 days prior to the commencement of the Third Claim for Relief.

102.   The Bureaus have approved at least two drilling permits involving the use of acidizing since issuance of the PEA and FONSI.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Failure to Prepare an Environmental Impact Statement
### in Violation of NEPA

103.   Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

104.   NEPA requires a federal agency to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA's implementing regulations specify factors that must be considered in determining whether an action may significantly affect the environment warranting an EIS. 40 C.F.R. § 1508.27(b)(1)-(10).

105.   The Bureaus' programmatic decision to authorize offshore fracking and other well stimulation on the Pacific OCS is a major federal action within the meaning of NEPA.

106.   The Bureaus' decision implicates nearly every NEPA significance factor for when an EIS is required: it may have adverse impacts; it may affect public health or safety; it may affect geographically unique areas; it is highly controversial; it involves highly uncertain or unique or unknown risks; it may establish a precedent for future actions with significant effects; it has cumulatively significant impacts; it may cause loss or destruction of significant scientific, cultural, or historical resources, including those of significant importance to the Chumash Peoples; and it may adversely affect threatened or endangered species or their or critical habitat. *See id*. But the Bureaus did not prepare an EIS analyzing the impacts of offshore fracking or other well stimulation on the Pacific OCS.

107.   The Bureaus' failure to prepare an EIS before issuing its decision to authorize offshore fracking and other well stimulation off the coast of California constitutes an agency action unlawfully withheld or unreasonably delayed, in violation of the APA. 5 U.S.C. § 706(1). Alternatively, the Bureaus' PEA, FONSI, and decision to authorize offshore fracking and other well stimulation on the Pacific OCS without first preparing an EIS are arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA or its implementing regulations, in violation of the APA. *Id.* § 706(2).

## Second Claim for Relief

### Issuance of an Inadequate Environmental Assessment and Finding of No Significant Impact in Violation of NEPA

108.   Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

109.   An EA must take a "hard look" at the environmental impacts of an agency's decision before an agency acts, *see* 40 C.F.R. § 1500.1, and include a discussion of the need for the proposal, alternatives to the proposal, and the environmental impacts of the proposal and the alternatives. *Id.* §§ 1502.16, 1508.9(b). An EA must "provide sufficient evidence and analysis for determining

Complaint for Declaratory and Other Relief                    29

1   whether" a finding of no significant impact is sufficient. *Id*. § 1508.9(a)(1).

2   110. The Bureaus' PEA and FONSI fail to comply with NEPA and its
3   implementing regulations in multiple respects, including but not limited to:

4   a) failure to properly define the purpose and need of the action;

5   b) failure to properly define the environmental baseline by failing to
6   consider ocean acidification and harmful algae blooms;

7   c) failure to properly identify cultural resources essential to the
8   maintenance of the heritage, ways of life, cultural practices, and religious practices
9   of the Chumash Native American Peoples;

10   d) failure to consider a reasonable range of alternatives, including, but
11   not limited to: prohibiting offshore well stimulation during certain times of year,
12   such as when endangered whales are feeding or migrating off the coast of
13   California; or requiring public disclosure of where and when well stimulation will
14   be employed and what chemicals will be used;

15   e) failure to properly consider the impacts of the alternatives actually
16   considered, such as the illogical and unfounded assumption that the no-action
17   alternative would increase negative environmental and societal impacts; and

18   f) failure to adequately consider the direct, indirect, and cumulative
19   impacts of the decision to authorize offshore fracking and other well stimulation
20   on: air quality; water quality; public health and welfare; threatened and endangered
21   species and their critical habitats; unique and culturally and ecologically important
22   areas, such as the Santa Barbara Channel and Chumash ancestral lands; cultural
23   resources, including natural cultural resources essential to the maintenance of the
24   heritage, ways of life, cultural practices, and religious practices of the Chumash
25   Native American Peoples; increased risk of oil spills; increased risk of
26   earthquakes; increased risk of land subsidence; and the impacts of continued and
27   prolonged offshore oil and gas drilling, and reliance on aging infrastructure.

28

111.   Further, the Bureaus' PEA and FONSI fail to comply with NEPA and its implementing regulations because they are internally inconsistent, based on inadequate and absent information, and otherwise fail to produce a convincing statement of reasons establishing why the impacts of the decision to authorize offshore fracking and other well stimulation are insignificant, on their own or cumulatively.

112.   The Bureaus' PEA and FONSI are therefore arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2).

**Third Claim for Relief**
**Failure to Consult or Reinitiate Consultation in violation of the ESA**

113.   Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

114.   The Bureaus retain ongoing discretionary control and involvement over offshore drilling on the Pacific OCS. The Bureaus' decision to authorize offshore fracking and other well stimulation practices on the Pacific OCS constitutes an "agency action" subject to consultation under Section 7 of the ESA. 16 U.S.C. § 1536, 50 C.F.R. §§ 402.02, 402.03.

115.   Ongoing offshore drilling and offshore fracking and other well stimulation practices "may affect" ESA-listed species and designated critical habitat, and the standards for reinitiating consultation exist. Therefore, the Bureaus are required to initiate and/or reinitiate consultation with the Services. 50 C.F.R. §§ 402.14(a), 402.16.

116.   The Bureaus have not initiated or reinitiated consultation with the Services on all endangered and threatened species and critical habitats that may be affected by offshore fracking and other well stimulation practices on the Pacific OCS.

E.R. 1063

117.   The Bureaus are violating Section 7 of the ESA and its implementing regulations by: failing to request from the Services a list of threatened and endangered species or critical habitat that may be impacted by their decision to authorize offshore fracking and other well stimulation on the Pacific OCS; failing to prepare a biological assessment or informally consult with the Services on the impacts of their decision to authorize offshore fracking and other well stimulation on the Pacific OCS; failing to initiate and/or reinitiate formal consultation with the Services on the impacts of their decision to authorize offshore fracking and other well stimulation on the Pacific OCS; and by failing to ensure that their decision to authorize offshore fracking and other well stimulation practices on the Pacific OCS does not jeopardize the continued existence of any endangered or threatened species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536, 50 C.F.R. Part 402. To the extent the Bureaus are relying on the findings in the PEA and/or FONSI to satisfy their ESA obligations, such reliance is arbitrary, capricious, and not in accordance with the ESA. 16 U.S.C. § 1536, 50 C.F.R. Part 402.

118.   To the extent the Bureaus are relying on existing biological opinions or other documents to authorize offshore fracking and other well stimulation treatments on the Pacific OCS, those biological opinions and other documents are outdated, are not based on the best available science, and do not satisfy the Bureaus' Section 7 obligations. The Bureaus' failure to reinitiate consultation on the effects of its management and permitting of offshore oil and gas drilling activities on the Pacific OCS violates their procedural and substantive duties under Section 7. 16 U.S.C. § 1536, 50 C.F.R. § 402.16.

## **PRAYER FOR RELIEF**

For the reasons stated above, Plaintiffs respectfully request that this Court:

1. Declare that the Bureaus' decision to authorize offshore fracking and other forms of well stimulation on the Pacific OCS without first preparing an EIS violates NEPA and the APA, and order the Bureaus to comply with NEPA by preparing an EIS on its decision to authorize offshore fracking and other forms of well stimulation on the Pacific OCS;

2. Declare that the Bureaus' PEA and FONSI are inadequate and fail to take a hard look at the impacts of offshore fracking and other forms of well stimulation on the Pacific OCS in violation of NEPA and the APA, and set aside the Bureaus' PEA and FONSI;

3. Declare that the Bureaus' actions and inactions regarding their decision to authorize offshore fracking and other well stimulation practices on the Pacific OCS violate the procedural and substantive provisions of Section 7 of the ESA, and order the Bureaus to initiate or reinitiate consultation pursuant to Section 7 of the ESA on the effects of continued offshore oil and gas drilling, including offshore fracking and other well stimulation practices, on the Pacific OCS on endangered and threatened species and their designated critical habitats;

4. Prohibit the Bureaus from authorizing offshore fracking and other well stimulation practices unless and until the Bureaus comply with NEPA and the ESA;

5. Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

6. Grant such other relief as the Court deems just and proper.


Dated: November 15, 2016

1

2          Respectfully submitted,

3

4          /s/ Kristen Monsell

5          Kristen Monsell (CA Bar No. 304793)
           Email: kmonsell@biologicaldiversity.org
6          Center for Biological Diversity
7          1212 Broadway, Suite 800
           Oakland, CA 94612
8          Phone: (510) 844-7137
           Facsimile: (510) 844-7150
9

10         Jean Su (CA Bar No. 285167)
11         Email: jsu@biologicaldiversity.org
           Center for Biological Diversity
12         1212 Broadway, Suite 800
13         Oakland, CA 94612
           Phone: (510) 844-7139
14         Facsimile: (510) 844-7150

15

16         *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Other Relief          34