Nos. 19-55526, 19-55707, 19-55708, 19-55718, 19-55725, 19-55727, 19-55728

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ENVIRONMENTAL DEFENSE CENTER,
a California non-profit corporation, et al.,
*Plaintiffs/Appellees/Cross-Appellants*,

v.

BUREAU OF OCEAN ENERGY MANAGEMENT, et al.,
*Defendants/Appellants/Cross-Appellees*,

and

AMERICAN PETROLEUM INSTITUTE, et al.,
*Intervenor-Defendants/Appellants/Cross-Appellees*.

Appeal from the United States District Court
for the Central District of California
Nos. 2:16-cv-08418, 2:16-cv-08473, 2:16-cv-09352 (Hon. Philip S. Gutierrez)

**FEDERAL APPELLANTS' EXCERPTS OF RECORD ON CROSS-APPEAL**

**VOLUME 6**

JEFFREY BOSSERT CLARK
*Assistant Attorney General*
ERIC GRANT
*Deputy Assistant Attorney General*
MICHAEL T. GRAY
JOSEPH H. KIM
JAMES A. MAYSONETT
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0216
james.a.maysonett@usdoj.gov

<table>
<tr><td colspan="4" align="center"><b>Joint Excerpts of Record for First Cross-Appeal Briefs<br>Table of Contents</b></td></tr>
<tr><td><b>Vol.</b></td><td><b>Document</b></td><td><b>Date</b></td><td><b>Pages</b></td></tr>
<tr><td colspan="4"><b>District court documents</b></td></tr>
<tr><td>1</td><td>Order Denying DCOR LLC's Motion for Reconsideration, Docket No. 153, <i>Environmental Defense Center v. Bureau of Ocean Energy Management</i>, No. 2:16-cv-8418 (C.D. Cal. Apr. 23, 2019)</td><td>4/23/2019</td><td>1–6</td></tr>
<tr><td>1</td><td>Judgment, Docket No. 132, <i>Environmental Defense Center v. Bureau of Ocean Energy Management</i>, No. 2:16-cv-8418 (C.D. Cal. Dec. 13, 2018)</td><td>12/13/2018</td><td>7–9</td></tr>
<tr><td>1</td><td>Order Granting in Part and Denying in Part the Cross-Motions for Summary Judgment, Docket No. 126, <i>Environmental Defense Center v. Bureau of Ocean Energy Management</i>, No. 2:16-cv-8418 (C.D. Cal. Nov. 9, 2018)</td><td>11/9/2018</td><td>10–50</td></tr>
<tr><td>1</td><td>Transcript of Hearing before Honorable Philip S. Gutierrez, Docket 124, <i>Environmental Defense Center v. BOEM</i>, No. 2-16-cv-8418 (Nov. 5, 2018)</td><td>11/5/2018</td><td>51–76</td></tr>
<tr><td>1</td><td>Order Denying Defendants' Motion to Dismiss, Docket No. 74, <i>Environmental Defense Center v. BOEM</i>, No. 2:16-cv-8418 (C.D. Cal. July 14, 2017)</td><td>7/14/2017</td><td>77–91</td></tr>
<tr><td>1</td><td>Order re: Stipulation to Consolidate, Docket No. 22, <i>Environmental Defense Center v. BOEM</i>, No. 2:16-cv-8418 (C.D. Cal. Feb. 17, 2017).</td><td>2/17/2017</td><td>92–93</td></tr>
</table>

i

| **Additional district court documents** | | | |
|---|---|---|---|
| 2 | People of the State of California's Notice of Appeal, Docket No. 167, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 24, 2019) | 6/24/2019 | 94 |
| 2 | Center for Biological Diversity's Notice of Appeal, Docket No. 168, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 24, 2019) | 6/24/2019 | 95 |
| 2 | Federal Defendants' Notice of Appeal, Docket No. 163, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 21, 2019) | 6/21/2019 | 96–104 |
| 2 | Intervenor-Defendant DCOR, LLC's Notice of Appeal, Docket No. 162, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 20, 2019) | 6/20/2019 | 105–111 |
| 2 | Intervenor-Defendant Exxon Mobil Corporation's Notice of Appeal, Docket No. 161, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 19, 2019) | 6/19/2019 | 112–119 |
| 2 | Environmental Defense Center's Notice of Appeal, Docket No. 160, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. June 18, 2019) | 6/18/2019 | 120 |
| 2 | Intervenor-Defendant American Petroleum Institute's Notice of Appeal, Docket No. 155, *Environmental Defense Center v. Bureau of Ocean Energy Management*, No. 2:16-cv-8418 (C.D. Cal. May 7, 2019) | 5/7/2019 | 121–128 |

| | | | |
|---|---|---|---|
| 2 | DCOR's Motion for Partial Amendment of Judgment or Partial Relief from Order and Supporting Declaration, Docket No. 133, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Jan. 10, 2019) | 1/10/2019 | 129–152 |
| 2 | Declaration of David Cohen in Support of DCOR LLC's Motion for Partial Amendment of Judgment or Partial Relief from Order, Docket No. 133-1, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Jan. 10, 2019) | 1/10/2019 | 153–156 |
| 2 | Declaration of Alan C. Templeton in Support of DCOR LLC's Motion for Partial Amendment of Judgment of Partial Relief from Order, Docket No. 133-2, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Jan. 10, 2019) | 1/10/2019 | 157–160 |
| 2 | DCOR's Proposed Order on Motion for Partial Amendment of Judgment, Docket No. 133-1, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Jan. 10, 2019) | 1/10/2019 | 161–164 |
| 2 | Environmental Defense Center's Reply in Support of Notice of Motion and Motion for Summary Judgment, Docket No. 111, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (June 13, 2018) | 6/13/2018 | 165–197 |
| 2 | Environmental Defense Center's Memorandum in Opposition to Cross Notice of Motion and Motion for Summary Judgment, Docket No. 112, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (June 13, 2018) | 6/13/2018 | 198–230 |

iii

| 2 | People of the State of California's Memorandum in Opposition to Cross Notice of Motion and Motion for Summary Judgment as to Plaintiffs' Complaints, Docket No. 113, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (June 13, 2018) | 6/13/2018 | 231–258 |
|---|---|---|---|
| 2 | Memorandum in Opposition to Cross Notice of Motion and Motion for Summary Judgment as to Plaintiffs' Complaints and Opposition to Plaintiffs' Motions for Summary Judgment, Docket No. 109, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (June 12, 2018) | 6/12/2018 | 259–291 |
| 2 | Center for Biological Diversity's Reply in Support of Notice of Motion and Motion for Summary Judgment, Docket No. 110, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (June 12, 2018) | 6/12/2018 | 292–324 |
| 2 | Notice of Motion and Motion for Summary Judgment filed by Plaintiff, People of State of California, Docket No. 95, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Feb. 12, 2018) | 2/12/2018 | 325–357 |
| 3 | Notice of Motion and Motion of Summary Judgment filed by Plaintiff, Environmental Defense Center, Docket No. 96, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Feb. 12, 2018) | 2/12/2018 | 358–391 |
| 3 | Notice of Motion and Motion for Summary Judgment filed by Plaintiffs Center For Biological Diversity, Wishtoyo Foundation, Docket No. 97, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Feb. 12, 2018) | 2/12/2018 | 392–427 |

| 3 | Federal Defendants' Answer to Environmental Defense Center's Complaint, Docket No. 87, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. August 28, 2017) | 8/28/2017 | 428–480 |
|---|---|---|---|
| 3 | Federal Defendants' Answer to Center for Biological Diversity's Complaint, Docket No. 88, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. August 28, 2017) | 8/28/2017 | 481–505 |
| 3 | Federal Defendants' Answer to People of the State of California's Complaint, Docket No. 89, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. August 28, 2017) | 8/28/2017 | 506–523 |
| 3 | Defendant-Intervenor DCOR, LLC's Answer to Environmental Defense Center's Complaint, Docket No. 83, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 31, 2017) | 7/31/2017 | 524–538 |
| 3 | Defendant-Intervenor DCOR, LLC's Answer to Center for Biological Diversity's Complaint, Docket No. 84, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 31, 2017) | 7/31/2017 | 539–546 |
| 3 | Defendant-Intervenor DCOR, LLC's Answer to State of California's Complaint, Docket No. 85, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 31, 2017) | 7/31/2017 | 547–553 |
| 3 | Defendant-Intervenor Exxon Mobil Corporation's Answer to Environmental Defense Center's Complaint, Docket No. 77, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 554–615 |

| 4 | Defendant-Intervenor Exxon Mobil Corporation's Answer to Center for Biological Diversity's Complaint, Docket No. 78, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 616–644 |
|---|---|---|---|
| 4 | Defendant-Intervenor Exxon Mobil Corporation's Answer to People of the State of California's Complaint, Docket No. 79, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 645–663 |
| 4 | Defendant-Intervenor American Petroleum Institute's Answer to Environmental Defense Center's Complaint, Docket No. 80, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 664–732 |
| 4 | Defendant-Intervenor American Petroleum Institute's Answer to Center for Biological Diversity's Complaint, Docket No. 81, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 733–760 |
| 4 | Defendant-Intervenor American Petroleum Institute's Answer to People of the State of California's Complaint, Docket No. 82, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. July 28, 2017) | 7/28/2017 | 761–781 |
| 4 | Declaration of Alan C. Templeton in Support of DCOR LLC's Consolidated Motion for Leave to Intervene, Docket No. 45-4, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Apr. 25, 2017) | 4/25/2017 | 782–790 |
| 4 | Declaration of David Cohen in Support of DCOR LLC's Consolidated Motion for Leave to Intervene, Docket No. 45-5 (Apr. 25, 2017) | 4/25/2017 | 791–798 |

| 4 | Declaration of Michael Mitchell in Support of Defendants' Motion to Dismiss, Exhibit 1 to Defendants' Motion to Dismiss, Docket No. 43-1, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Apr. 3, 2017) | 4/3/2017 | 799– 842 |
|---|---|---|---|
| 5 | Biological Assessment to NMFS, Exhibit 2 to Defendants' Motion to Dismiss, Docket No. 43-2, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Apr. 3, 2017) | 4/3/2017 | 843– 903 |
| 5 | Transmittal Letter to NMFS, Exhibit 3 to Defendants' Motion to Dismiss, Docket No. 43-3, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Apr. 3, 2017) | 4/3/2017 | 904– 906 |
| 5 | Transmittal Letter to FWS, Exhibit 4 to Defendants' Motion to Dismiss, Docket No. 43-4, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Apr. 3, 2017) | 4/3/2017 | 907– 909 |
| 5 | Biological Assessment to FWS, Exhibit 5 to Defendants' Motion to Dismiss, Docket No. 43-5, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (Apr. 3, 2017) | 4/3/2017 | 910– 1000 |
| 5 | Declaration of Ken Dowd in Support of Exxon Mobil Corporation's Motion for Leave to Intervene, Docket No. 20-3, *Environmental Defense Center v. BOEM*, No. 2-16-cv-8418 (Feb. 8, 2017) | 2/8/2017 | 1001– 1006 |
| 5 | People of the State of California's Complaint for Declaratory and Injunctive Relief, Docket No. 1, *People of the State of California v. United States Department of the Interior*, No. 2:16-cv-9352 (C.D. Cal. Dec. 19, 2016) | 12/19/2016 | 1007– 1032 |

| 5 | Center for Biological Diversity's Complaint for Declaratory and Other Relief, Docket No. 1, *Center for Biological Diversity v. BOEM*, No. 2:16-cv-8473 (C.D. Cal. Nov. 15, 2016) | 11/15/2016 | 1033–1066 |
|---|---|---|---|
| 6 | Environmental Defense Center's Complaint for Declaratory and Injunctive Relief, Docket No. 1, *Environmental Defense Center v. BOEM*, No. 2:16-cv-8418 (C.D. Cal. Nov. 11, 2016) | 11/11/2016 | 1067–1138 |
| **Administrative Record documents** | | | |
| 6 | Letter from Barry A. Thom, NMFS, to Joan R. Barminski (Dec. 4, 2017) (DOI 106301–26) | 12/4/2017 | 1139–1164 |
| 6 | Letter from Collette M. Thogerson, USFWS, to Joan R. Barminski, BOEM (July 28, 2017) (DOI 106294–98) | 7/28/2017 | 1165–1169 |
| 6 | Letter from Douglas P. Boren, BOEM, to Dave Cohen, DCOR, LLC (Jan. 19, 2017) (DOI 52272–73) | 1/19/2017 | 1170–1171 |
| 6 | BOEM & BSEE, Finding of No Significant Impact: Use of Well Stimulation Treatments on the Pacific Outer Continental Shelf (May 2016) (DOI 106901–106908) | 5/27/2016 | 1172–1179 |
| 6 | Press Release, BSEE and BOEM Publish Joint Environmental Assessment on Use of Well Stimulation Treatments in Federal Waters off California (May 27, 2016) (DOI 16576) | 5/27/2016 | 1180 |
| 7 | BOEM & BSEE, Final Programmatic Environmental Assessment of the Use of Well Stimulation Treatments on the Pacific Outer Continental Shelf (May 2016) (DOI 106599–106900) | 5/1/2016 | 1181–1432 |

| 8 | Final Programmatic EA, *continued* | | 1433–1482 |
|---|---|---|---|
| 8 | Recent Studies from BOEM, EPA, SCCWRP and CA SLC Produced-Water Discharge Contamination Studies in Shell Mound and Platform-Associated Fish (Jan. 23, 2014) (DOI 1805–6) | 1/23/2014 | 1483–1484 |
| 8 | Addendum to Fact Sheet, Final National Pollutant Discharge Elimination System General Permit No. CAG280000 for Offshore Oil and Gas Exploration, Development and Production Operations off Southern California (Dec. 17, 2013) (DOI 35131–35201) | 12/17/2013 | 1485–1555 |
| 8 | Letter from Ellen Aronson, BOEM, to Mike Fris, USFWS (Sept. 1, 2011) (DOI 105951–53) | 9/1/2011 | 1556–1558 |
| 8 | California Coastal Commission Consistency Determination Materials (DOI 49357–69) | 12/21/1987 | 1559–1571 |
| 8 | Excerpts from California Coastal Commission Final Staff Recommendation on Consistency Certification (Mar. 12, 1985) (DOI 50433–35) | 3/12/1985 | 1572–1574 |
| 8 | Excerpts from Secretary of Commerce Findings on Consistency Appeal (Feb. 20, 1984) (DOI 51480–83) | 2/20/1984 | 1575–1578 |
| 8 | Historic California Coastal Commission Consistency Determination Materials (DOI 48637–92) | 11/17/1982 | 1579–1634 |
| 8 | Notification of Commission Action on Consistency Review (Jan. 20, 1981) (DOI 48635–36) | 1/20/1981 | 1635–1636 |

| 8 | Historic California Coastal Commission Consistency Determination Materials (DOI 49394–434) | 3/5/1980 | 1637–1677 |
|---|---|---|---|
| **Published documents** | | | |
| 8 | Order No. 3299, Secretary of the Interior (Aug. 29, 2011) | 8/29/2011 | 1678–1679 |
| 9 | National Oceanic and Atmospheric Administration, Coastal Zone Management Act Federal Consistency Regulations, 71 Fed. Reg. 788–831 (Jan. 5, 2006) | 1/5/2006 | 1680–1724 |
| 9 | National Oceanic and Atmospheric Administration, Coastal Zone Management Act Federal Consistency Regulations, 65 Fed. Reg. 77124–77175 (Dec. 8, 2000) | 12/8/2000 | 1725–1777 |
| 9 | Excerpts from Sen. Rep. 101-445 (Aug. 30, 1990): Report of the Senate Committee on Commerce, Science, and Transportation on S. 2782 | 8/30/1990 | 1778–1781 |
| 9 | Excerpts from Committee on Commerce and National Ocean Policy Study, 94th Cong., Legislative History of the Coastal Zone Management Act of 1972, as Amended in 1974 and 1976 (Dec. 1976) | 12/1/1976 | 1782–1938 |
| 10 | Excerpts from Sen. Rep. No. 94-987 (June 24, 1976): Report of the Committee of Conference on S. 586 To Improve Coastal Zone Management in the United States, and for Other Purposes | 6/24/1976 | 1939–1944 |

| 10 | Excerpts from the Congressional Record:  (a) Senate Proceedings of July 16, 1975, (b) House Proceedings of March 11, 1976, (c) Senate Proceedings of June 29, 1976, and (d) House Proceedings of June 30, 1976 | 7/16/1975 | 1945–1959 |
|---|---|---|---|
| 10 | Staff of S. Comm. on Commerce, 93d Cong., Outer Continental Shelf Oil and Gas Leasing Off Southern California: Analysis of Issues, at vii (Comm. Print 1974) | 11/12/1974 | 1960–2018 |
| 10 | Excerpts from the Congressional Record: (a) Senate Proceedings of April 25, 1972, and (b) House Proceedings of August 2, 1972 | 4/25/1972 | 2019–2024 |
| **Other documents** | | | |
| 10 | Trial court docket sheets | | 2025–2062 |

xi

Margaret Morgan Hall (Bar No. 293699)
Email: mhall@environmentaldefensecenter.org
Linda Krop (Bar No. 118773)
Email: lkrop@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, California 93101
Telephone:  (805) 963-1622
Facsimile:  (805) 962-3152

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; SANTA BARBARA CHANNELKEEPER, a California non-profit corporation; <br><br> Plaintiffs, <br><br> vs. <br><br> BUREAU OF OCEAN ENERGY MANAGEMENT; RICHARD YARDE, Regional Supervisor, Office of Environment, Bureau of Ocean Energy Management; DAVID FISH, Bureau of Safety and Environmental Enforcement; ABIGAIL ROSS HOPPER, Director, Bureau of Ocean Energy Management; BRIAN SALERNO, Director, Bureau of Safety and Environmental Enforcement; BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT; JOAN BARMINSKI, Pacific Region Director, Bureau of Ocean Energy Management; MARK FESMIRE, Acting Pacific Region Director, Bureau of Safety and Environmental Enforcement; UNITED STATES DEPARTMENT OF THE INTERIOR; SALLY JEWELL, Secretary of | Civil Case No. 2:16-CV-8418 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br><br> **(National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*.; Endangered Species Act, 16 U.S.C. § 1531 *et seq*., Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.)** |

Complaint for Declaratory and Injunctive Relief                                        Page 1

the Interior,

Defendants.

Complaint for Declaratory and Injunctive Relief                                        Page 2

E.R. 1068

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (federal officer action), the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g) (citizen suit provision), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201–2202 (declaratory order).  The claims comprising this action arise under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the ESA, and the APA.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Defendant Bureau of Safety and Environmental Enforcement's ("BSEE") Pacific Region Office and Bureau of Ocean Energy Management's ("BOEM") Pacific Region Office are both located in Camarillo, California.

## INTRODUCTION

3.      Plaintiffs Environmental Defense Center ("EDC") and Santa Barbara Channelkeeper ("Channelkeeper") bring this civil action for declaratory and injunctive relief against the United States Department of the Interior ("DOI" or "Interior"), its component agencies BSEE and BOEM, and individual agency officials sued in their official capacity (collectively, "Federal Defendants" or "Defendants"), for violations of NEPA in relation to Defendants BSEE's and BOEM's May 27, 2016, Finding of No Significant Impact ("FONSI") decision approving the agencies' *Programmatic Environmental Assessment of the Use of Well Stimulation Treatments on the Southern California Outer Continental Shelf* ("PEA").  Under that decision, the agencies ended a moratorium on permit approvals involving the use of well stimulation treatments ("WSTs"), including acid well stimulation ("acidizing") and hydraulic fracturing ("fracking"), and

approved a proposed action allowing the use of WSTs throughout the Southern California Outer Continental Shelf ("OCS") waters without conditions, mitigations, or other specific limitations, in order to facilitate oil and gas development and production on the forty-three current leases and twenty-three operating offshore platforms located within federal waters off California's coastline.

4.     The PEA was one of Federal Defendants' primary settlement obligations arising out of prior litigation brought by Plaintiff EDC in the case *Environmental Defense Center v. Bureau of Safety and Environmental Enforcement, et al.* (C.D. Cal. Case No. 2:14-cv-09281-PSG-FFM).  The PEA is the first environmental analysis Federal Defendants have conducted regarding the impacts of offshore well stimulation, even though Defendants have periodically permitted the use of offshore fracking, acid well stimulation, and related "routine" acid treatments or "acid washes," since the 1980s.  In the prior case, Plaintiff EDC alleged BSEE's decisions to approve fifty-one Applications for Permits to Drill ("APDs") and Applications for Permits to Modify ("APMs") authorizing WSTs, without allowing for any public participation or conducting adequate environmental review, violated NEPA.

5.     Offshore well stimulation methods including acid well stimulation and hydraulic fracturing, as well as similar practices including "routine" acidizing or "acid washes," pose numerous known environmental risks to coastal and marine natural resources.  In addition, many risks are unknown or poorly understood due to significant data gaps.  These risks include impacts to water quality associated with discharges of toxic chemicals found in well stimulation fluids, air quality impacts including greenhouse gas emissions, impacts to many threatened and endangered species, including the blue whale, fin whale, humpback whale, and the southern sea otter, and risks to other fish, birds, and aquatic organisms including invertebrate species that comprise the base of the food chain.  The use of offshore

Complaint for Declaratory and Injunctive Relief                                   Page 4

well stimulation also presents the potential for spills related to accidental release of chemicals during transport to and from oil and gas platforms, from chemicals stored on platforms, and from the disposal of such chemicals through underground injection or direct discharge to the marine environment. Moreover, there are geologic hazards associated with purposely fracturing the geologic formation and injecting additional fluids in seismically active areas. Finally, there are significant risks regarding whether well casings have been designed to safely accommodate the increased pressures associated with offshore well stimulation activities, and whether offshore platforms and wells have been designed for the extended life associated with well stimulation activities.

6. Despite these impacts, BSEE and BOEM concluded in the PEA that the use of fracking and acidizing off California's shores will have *no* environmental impact in nearly every respect, including air quality, water quality, induced seismicity, benthic resources, commercial and recreational fisheries, areas of special concern (such as Channel Islands National Marine Sanctuary), recreation, and tourism. In reaching these unsupported conclusions, Defendants have failed to take the "hard look" at the potential environmental impacts of offshore well stimulation, and the cumulative impact of similar "routine" acid treatments, or "acid washes," that NEPA requires.

7. In addition to Federal Defendants' overarching failure to provide the hard look required by NEPA, the PEA is legally deficient in numerous additional fundamental respects. These deficiencies include a failure to properly define the action's purpose and need, failure to consider a reasonable range of alternatives, failure to adequately acknowledge and address incomplete or unavailable information, and numerous deficiencies in the document's analysis of direct, indirect, and cumulative environmental impacts. All of these failings render the agencies' FONSI inadequate and unlawful. Federal Defendants were instead legally required to prepare an Environmental Impact Statement ("EIS") to analyze

Complaint for Declaratory and Injunctive Relief                    Page 5

the numerous environmental impacts and risks caused by the use of WSTs offshore California. *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006) ("[An EIS] must be prepared if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor.").

8.      In addition, BSEE's and BOEM's approval of the PEA and FONSI is unlawful because the agencies failed to initiate consultation under section 7 of the ESA with respect to the twenty-five species listed as threatened or endangered that may be affected by the action.  In the alternative, to the extent BSEE and BOEM assert that they have conducted consultation and concluded that the action will have no effect on the listed species, that no effect determination is unlawful under the ESA.

9.      Plaintiffs bring this case seeking declaratory relief that BSEE's and BOEM's decision to authorize the use of WSTs offshore California in reliance upon the PEA and FONSI is unlawful under NEPA, and that Defendants' failure to conduct consultation and/or their finding of no effect on threatened and endangered species is unlawful under the ESA.  Plaintiffs seek to enjoin the use of WSTs until Defendants prepare an EIS in compliance with NEPA and its regulations, and conduct a lawful consultation process under the ESA and its regulations.

### PARTIES

10.      Plaintiff EDC is a California public benefit, non-profit corporation, headquartered in Santa Barbara.  Founded in response to the 1969 Santa Barbara oil spill, EDC has approximately 3,000 members and protects and enhances the local environment through education, advocacy, and legal action on behalf of itself and other non-profit, environmental organizations.  Since its founding nearly forty years ago, EDC has worked to protect the Santa Barbara Channel, other local coastal waters, the Channel Islands, and the terrestrial coastal environment of Santa Barbara and Ventura Counties, from the risks and impacts of offshore oil drilling.

The large majority of offshore oil and gas platforms off California's coast continue to be located in the Santa Barbara Channel.  The issue of offshore oil drilling directly impacts all four of EDC's primary organizational priorities: the Santa Barbara Channel, clean water, open spaces and wildlife, and climate and energy.

11.     Plaintiff Channelkeeper is a non-profit public benefit corporation with its principal place of business located in Santa Barbara.  Channelkeeper's mission is to protect and enhance the water quality of the Santa Barbara Channel and its tributaries for the benefit of its ecosystems and the surrounding human communities.  Channelkeeper accomplishes its mission through science-based advocacy, education, field work, and enforcement of environmental laws.  Specifically, Channelkeeper and its members monitor and participate in the activities of the Regional and State Water Boards, and other local, state, and federal agencies.  Channelkeeper and its members also create and collaborate on the development of policies and programs affecting pollution issues in the Santa Barbara Channel and its tributaries, including pollution from oil and gas exploration and development, and pipeline oil spills such as the May 2015 spill near Refugio State Beach.  Channelkeeper and its members play an important role in contributing to the health of the Santa Barbara Channel through a variety of programs, including river and coastal monitoring and scientific data collection.  Channelkeeper has approximately 800 members who live, recreate, and work in and around waters of the State of California, including communities in Santa Barbara, Ventura, Los Angeles, and Orange Counties that are at risk or are otherwise impacted by oil exploration, production, development, and transportation, including the offshore oil platforms and related oil infrastructure at issue in this case.

12.     The majority of Plaintiffs' members live, work and recreate within coastal communities in Santa Barbara and Ventura Counties that are impacted by offshore oil drilling on a daily basis, and that are at risk from the impacts of an

Complaint for Declaratory and Injunctive Relief                                                    Page 7

offshore oil drilling disaster, as illustrated by the 1969 oil spill and other smaller spills that have occurred since that time.  Plaintiffs' members not only utilize the area that is impacted by offshore drilling and threatened by potential offshore oil drilling disasters—including the waters of the Santa Barbara Channel, the beaches of Santa Barbara and Ventura Counties, and the Channel Islands National Park and Channel Islands National Marine Sanctuary—it is their home.

13.     Plaintiffs' members also live, work or recreate within coastal communities in Los Angeles and Orange Counties that are impacted by offshore oil drilling on a daily basis, and that are at risk from the impacts of an offshore oil drilling disaster, as illustrated by the 1969 oil spill and other smaller spills that have occurred since that time.  Plaintiffs' members utilize areas in San Pedro Bay that are impacted by offshore drilling.

14.     Plaintiffs' members suffer particularized injuries within specific areas of the Santa Barbara Channel and San Pedro Bay affected by Defendants' programmatic decision to authorize the use of well stimulation offshore California without conditions, mitigations, or other specific limitations.

15.     Many of the offshore oil and gas platforms from which offshore well stimulation has been conducted in the past, and from which offshore well stimulation is expected to be conducted in the future, are located in the Santa Barbara Channel, and include Platforms Gail, Gilda, Harmony, Heritage, Hondo, and Irene.  Offshore well stimulation, including "frac pacs," are routinely utilized from offshore well platforms located in San Pedro Bay, including Platforms Ellen and Eureka.

16.     Plaintiffs' members regularly utilize the Santa Barbara Channel, including the waters surrounding Platforms Gail, Gilda, Harmony, Heritage, Hondo, and Irene for a variety of pursuits.  For example, Plaintiffs' members have a broad range of recreational interests in the Santa Barbara Channel and its

Complaint for Declaratory and Injunctive Relief                    Page 8

beaches, including swimming, surfing, kayaking, sailing, fishing, SCUBA diving, and other activities.

17. Plaintiffs' members utilize the Santa Barbara Channel, its islands, and its beaches for wildlife viewing opportunities including whale watching, bird observation, and simple enjoyment of the predominantly unspoiled and clean environment, and for scientific, educational, and professional purposes.

18. Plaintiffs' members have been involved in, and personally invested in, environmental education, study, and conservation efforts in and around the Santa Barbara Channel; and Plaintiffs' members have economic interests that depend upon a clean, natural environment and in particular, a Santa Barbara Channel free from oil spills and other offshore drilling mishaps. Plaintiffs' staff represent the community on the Channel Islands National Marine Sanctuary Advisory Council.

19. Plaintiffs' members regularly utilize San Pedro Bay, including the waters surrounding Platforms Ellen and Eureka, for a variety of pursuits. For example, Plaintiffs' members have a broad range of recreational interests in the San Pedro Bay and its beaches, including swimming, surfing, kayaking, sailing, fishing, SCUBA diving, and other activities.

20. All of these interests are harmed by Defendants' failure to comply with NEPA with respect to the approval of the PEA and FONSI authorizing the continued use of offshore well stimulation methods.

21. All of these interests are harmed by Defendants' failure to comply with the ESA with respect to the approval of the PEA and FONSI authorizing the continued use of offshore well stimulation methods.

22. The legal violations alleged in this complaint cause direct injury to the aesthetic, economic, conservation, recreational, scientific, educational, and wildlife preservation and conservation interests of Plaintiffs and their members.

23. The above-described aesthetic, economic, conservation, recreational, scientific, educational, wildlife preservation and conservation, and other interests

Complaint for Declaratory and Injunctive Relief                                Page 9

of Plaintiffs and their members have been, are being, and will continue to be irreparably harmed by Defendants' violations of law. The harm to these interests would be remedied by an Order of this Court declaring Defendants' actions as unlawful under NEPA and the ESA and enjoining future approval of offshore well stimulation pending full compliance with NEPA and the ESA. Plaintiffs have no adequate remedy at law, and thus the requested relief is appropriate under the APA.

24. Defendants BSEE's and BOEM's failure to comply with NEPA's and the ESA's mandates has also resulted in informational, procedural, and organizational harm to Plaintiffs and their members. Defendants are the cause of these injuries, and the requested relief would redress these injuries, at least in part.

25. Defendant BOEM is one of two agencies charged with managing offshore resources in federal waters, including regulation of oil and gas exploration, development, and production on the OCS. 30 C.F.R. § 550.101 (2011). BOEM is an agency of DOI, and is responsible for environmental analysis under NEPA and the ESA.

26. Defendant RICHARD YARDE is the Regional Supervisor for the Office of the Environment of BOEM and is sued in his official capacity as one of the agency staff who approved the PEA FONSI on May 27, 2016.

27. CHARLES B. BARBEE was the Regional Environmental Officer for BSEE who approved the PEA FONSI on May 27, 2016 but based on available information appears to no longer work at BSEE.

28. Defendant DAVID FISH is the Acting Chief for the Environmental Compliance Division at BSEE is sued in his official capacity as a responsible officer in the federal agency responsible for the violations of NEPA and the ESA alleged herein.

29.    Defendant ABIGAIL ROSS HOPPER is the Director of BOEM and is sued in her official capacity as the head of the federal agency responsible for the violations of NEPA and the ESA alleged herein.

30.    Defendant BSEE is one of two agencies charged with managing offshore resources in federal waters, including regulation of oil and gas exploration, development, and production on the OCS.  30 C.F.R. § 250.101 (2012).  BSEE is an agency of DOI.  BSEE is responsible for permitting offshore drilling operations and ensuring they comply with safety regulations.

31.    Defendant BRIAN SALERNO is the Director of BSEE and is sued in his official capacity as the head of the federal agency responsible for the violations of NEPA and the ESA alleged herein.

32.    Defendant JOAN BARMINSKI is the Pacific Region Director of BOEM and is sued in her official capacity as a responsible officer in the federal agency responsible for the violations of NEPA and the ESA alleged herein.

33.    Defendant MARK FESMIRE is the Acting Pacific Region Director of BSEE and is sued in his official capacity as the head of the federal agency responsible for the violations of NEPA and the ESA alleged herein.

34.    Defendant DOI is a United States agency in the executive branch, and is responsible for managing the resources under its jurisdiction in accordance with all applicable laws and regulations, including NEPA and the ESA.

35.    Defendant SALLY JEWELL is the DOI Secretary and is sued in her official capacity as the head of the federal agency responsible for the violations of NEPA and the ESA alleged herein.

36.    BSEE and BOEM were created in October 2011, as part of a DOI reorganization of the former Minerals Management Service ("MMS").  The reorganization was prompted by the 2010 *Deepwater Horizon* explosion and resulting oil spill in the Gulf of Mexico, and was part of a larger reform effort

described by the Obama Administration as the most aggressive and comprehensive reform to offshore oil and gas regulation in United States history.

## LEGAL BACKGROUND

### A.   Administrative Procedure Act

37.   Under the APA, reviewing courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

38.   The APA provides for judicial review of "final agency action."  5 U.S.C. § 704.

39.   Agency actions subject to judicial review include the "whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).

40.   A license subject to judicial review includes "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."  5 U.S.C. § 551(8).

41.   Congress intended the definition of agency action under the APA to be expansive.  S. Doc. No. 248, 79th Cong.,  2d Sess., at 255 (1946) ("The term 'agency action' brings together previously defined terms in order to simplify the language of the judicial-review provisions of section 10 and to assure the complete coverage of every form of agency power, proceeding, action, or inaction."); *see also Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 478 (2001) (interpreting the APA definition of agency action as "meant to cover comprehensively every manner in which an agency may exercise its power").

### B.   The Outer Continental Shelf Lands Act

42.   Originally enacted in 1953, the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356b, reaffirmed federal control over resources on the OCS, located beyond three nautical miles from a state's coast.  OCSLA

requires that oil exploration and production be "balanced with 'protection of the human, marine, and coastal environments.'" *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 292 (D.C. Cir. 1988) (quoting 43 U.S.C. § 1802(1)–(2)).

43.   Under OCSLA, oil and gas exploration and production in the OCS involves four stages: 1) Interior's development of a five-year leasing program, 43 U.S.C. § 1344; 2) lease sales, *id.* § 1337; 3) exploration, *id.* § 1340; and 4) development and production, *id.* §1351.

44.   The fourth and final OCSLA stage, development and production, consists of two separate and distinct discretionary agency actions that must occur prior to the commencement of drilling operations: 1) approval of a development and production plan (or, as previously called, a plan of development) (collectively referred to hereafter as "DPP"); and 2) issuance of drilling permits or modification to drilling permits (APDs or APMs) that are consistent with the DPP. *See* 43 U.S.C. §1351; 30 C.F.R. §§ 250.410–250.418 (2012).

45.   OCSLA establishes detailed statutory requirements for the contents of DPPs. *See* 43 U.S.C. § 1351.  Among other mandates, the DPP must set forth the specific work to be performed, the location and size of facilities and operation, and the land, labor, material, and energy requirements associated with such facilities and operations, the environmental safeguards to be implemented, and all safety standards. *Id*. § 1351(c)(1)–(6).

46.   These statutory requirements are supplemented by additional detailed regulatory requirements, which have been recently revised and updated in the wake of the 2010 *Deepwater Horizon* disaster in the Gulf of Mexico. *See* 30 C.F.R. §§ 550.241–550.262 (2011).

47.   OCSLA affirmatively requires that DOI "shall, from time to time," review approved DPPs in order to determine if plan revisions are necessary, and shall include "changes in available information and other onshore or offshore

Case 2:16-cv-08418-PSG-FFM   Document 1   Filed 11/11/16   Page 14 of 72   Page ID #:14

conditions affecting or impacted by the development and production pursuant to such plan." 43 U.S.C. § 1351(h)(3).

48.    OCSLA further directs that if such periodic review "indicates that the plan should be revised to meet" statutory requirements, "the Secretary shall require such revision." 43 U.S.C. § 1351(h)(3). OCSLA regulations provide additional specific detail regarding post-approval requirements for DPPs, including specific triggers establishing when DPPs must be revised or supplemented. *See* 30 C.F.R. §§ 550.280–550.285 (2011).

49.    Before drilling any well, or before sidetracking, bypassing or deepening a well, a lessee must obtain approval of an APD. 30 C.F.R. §§ 250.410–250.418 (2012).

50.    An operator must apply for an APM if it intends to revise its drilling plan, change major drilling equipment, or plugback. 30 C.F.R. § 250.465(a) (2012). APMs must include a "detailed statement of the proposed work that would materially change from the approved APD." 30 C.F.R. § 250.465(b)(1) (2012).

51.    APDs and APMs authorizing development and production may only be issued when consistent with an approved DPP. *See* 30 C.F.R. § 250.410(b) (2012).

**C.    National Environmental Policy Act**

52.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1 (1978). NEPA establishes two overarching purposes: 1) to create an open, informed and public decision making process by insuring that environmental information is available to public officials and citizens before decisions are made and before actions are taken; and 2) to require that the federal government integrate environmental considerations into all of its actions by helping public officials make decisions that are based on an understanding of environmental consequences, and that protect, restore, and enhance the environment. 40 C.F.R. §§ 1500.1(b), (c) (1978).

Complaint for Declaratory and Injunctive Relief                    Page 14

53.     The Council on Environmental Quality ("CEQ") was created to administer NEPA and has promulgated NEPA regulations, which are binding on all federal agencies.  *See* 42 U.S.C. §§ 4342, 4344; *see also* 40 C.F.R. §§ 1500–1518 (1978).

54.     The CEQ regulations affirm that public scrutiny is an "essential" part of the NEPA process, and that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b) (1978).

55.     NEPA requires each federal agency to prepare, and circulate for public review and comment, a detailed EIS prior to undertaking any major federal action significantly affecting the quality of the human environment.  42 U.S.C. § 4332(C).  When a federal agency is not certain whether an EIS is required, it must prepare an EA.  40 C.F.R. § 1508.9 (1978).  If the agency concludes in an EA that a project may have significant impacts on the environment, then an EIS must be prepared.  40 C.F.R. § 1501.4 (1978).  If an EA concludes that there are no significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a FONSI.  40 C.F.R § 1508.13 (1978).

56.     NEPA requires federal agencies proposing actions to "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."  40 C.F.R. §§ 1502.13, 1508(9)(b) (1978); 43 Fed. Reg. 45,983 (1979).   The purpose and need statement "is an obvious place for the court to start when analyzing the adequacy of an environmental impact statement [or environmental assessment]," as "[i]t is from this statement that the agency, public, and ultimately, the court may begin to judge whether the agency has fully analyzed the possible impacts of the action and reviewed a reasonable range of alternatives to that action."  *Soda Mountain Wilderness Council v. Norton*, 424 F. Supp. 2d 1241, 1261 (E.D. Cal. 2006).

57.     Using the purpose and need statement as a foundation, federal agencies are directed under NEPA to "study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. . . ." 42 U.S.C. § 4332(2)(E).  The discussion of alternatives is "the heart" of the NEPA process, and is intended to provide a "clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14 (1978); *Idaho Sporting Congress v. Alexander*, 222 F. 3d 562, 567 (9th Cir. 2000) (compliance with NEPA's procedures "is not an end in itself . . . [but] it is through NEPA's action forcing procedures that the sweeping policy goals announced in § 101 of NEPA are realized.").

58.     As purpose and need statements are one of the main engines driving the alternatives analysis within a NEPA document, failure to properly define a project's purpose and need will, in turn, preclude proper consideration of a reasonable range of alternatives.  *National Parks Conservation Ass'n v. Bureau of Land Management*, 606 F. 3d 1058, 1072 (9th Cir. 2010) ("As a result of this unreasonably narrow purpose and need statement, the BLM necessarily considered an unreasonably narrow range of alternatives.").

59.     The scope of NEPA is quite broad, mandating disclosure and consideration of direct, indirect, and cumulative environmental effects.  40 C.F.R. §§1502.14(a), 1508(b) (1978).

60.     Direct effects are caused by the action and occur at the same time and place as the proposed project.  40 C.F.R. § 1508.8(a) (1978).  Indirect effects are caused by the action and are later in time or farther removed in distances, but are still reasonably foreseeable.  *Id*. § 1508.8(b).  Both direct and indirect impacts include "effects on natural resources, structures, and functioning of affected ecosystems."  *Id*. § 1508.7.

61.    In addition to direct environmental impacts, NEPA also mandates disclosure and consideration of "connected," "cumulative," and "similar" environmental effects.  40 C.F.R. §§1502.14(a), 1508(b) (1978).

62.    A cumulative impact is defined as: "the impact on the environment which results from the incremental impact of the action when added to the other past, present, and reasonably foreseeable future actions regardless of which agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7 (1978).

63.    The CEQ regulations define "similar" actions as those "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography."  40 C.F.R. § 1508.25(a)(3) (1978).

64.    In determining whether a proposed action may significantly affect the environment, NEPA requires that both the context and intensity of that action be considered.  40 C.F.R. § 1508.27 (1978).  In considering context, "[s]ignificance varies with the setting of the proposed action."  *Id.* § 1508.27 (a).   Consideration of intensity, on the other hand, "refers to the severity of the impact," including impacts on "[u]nique characteristics of the geographic area such as proximity to park lands . . . wetlands . . . or ecologically critical areas,"  "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  *Id.* § 1508.27 (b).

65.    CEQ regulations provide for a limited exception to the requirement to prepare an EIS or EA under "categorical exclusions," where an agency has made a prior determination, through rulemaking, that certain categories of activities do not

have a significant impact on the human environment, either individually or cumulatively.  *See* 40 C.F.R. §§ 1501.4(a)(2), 1508.4 (1978).

66.     NEPA obligates the agency to make available to the public high quality information, including accurate scientific analysis, expert agency comments, and public comments, before decisions are made.  40 C.F.R. § 1500.1(b) (1978) (NEPA analysis "must be of a high quality" and "[a]ccurate scientific analysis . . . [is] . . . essential to implementing NEPA.").

67.     NEPA's implementing regulations place specific obligations on agencies considering a proposed action with incomplete or unavailable information.  Under those regulations, when there is incomplete or unavailable information regarding potential environmental impacts, the agency shall always make clear that such information is lacking.  40 C.F.R. § 1502.22 (1978).  In addition, an "agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain . . . [and] where uncertainty may be resolved by further collection of data, or where the collection of data may prevent speculation on potential effects."  *National Parks & Conservation Ass'n v. Babbitt*, 241 F. 3d 722, 731 (9th Cir. 2001).

68.     Underlying all of NEPA's procedural requirements is the mandate that agencies take a 'hard look' at all of the environmental impacts and risks of a proposed action.  As stated by the Ninth Circuit, "general statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (internal citations omitted).

69.     NEPA and its implementing regulations embody a precautionary approach under which an agency must prepare an EIS when there is a substantial question whether there may be any significant impacts.  *Klamath Siskiyou*, 468 F.3d at 562 (EIS "must be prepared if substantial questions are raised as to whether

Complaint for Declaratory and Injunctive Relief                    Page 18

a project may cause significant degradation of some human environmental factor."); *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998) ("[A] plaintiff need not show that significant effects will in fact occur, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared."). In considering the threshold for preparing an EIS, the Ninth Circuit has repeatedly emphasized that "[t]his is a low standard." *Klamath Siskiyou*, 468 F.3d at 562.

### D.  Endangered Species Act

70.  The ESA, 16 U.S.C. §§ 1531–1544, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 180 (1978). Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b).

71.  To achieve these objectives, the ESA directs the U.S. Fish and Wildlife Service ("FWS") or National Marine Fisheries Service ("NMFS") to determine which species of plants and animals are "threatened" and "endangered" and place them on the list of protected species. 16 U.S.C. § 1533. An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range," or "likely to become endangered in the near future throughout all or a significant portion of its range," respectively. *Id*. § 1532(6), (20).

72.  Once a species is listed, the ESA provides a variety of procedural and substantive protections to ensure not only the species' continued survival, but its ultimate recovery. One central protection, Section 7(a)(2), mandates that all federal agencies avoid actions that: (1) jeopardize listed species; or (2) destroy or adversely modify designated critical habitat. *Id*. § 1536(a)(2). Federal agency actions include those projects "authorized, funded, or carried out by such agency."

Complaint for Declaratory and Injunctive Relief                    Page 19

50 C.F.R. § 402.02 (1986).  To comply with these Section 7(a)(2) safeguards, the federal agency taking action and FWS or NMFS take part in a cooperative analysis of potential impacts to listed species and their designated critical habitat known as the consultation process.

73.     First, the agency must obtain "a list of any listed or proposed species or designated or proposed critical habitat that *may be present* in the action area" from NMFS or FWS. 50 C.F.R. § 402.12(c) (1986) (emphasis added); *see also* 16 U.S.C. § 1536(c)(1).

74.     If a species or critical habitat may be present, the agency must prepare a biological assessment "for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action."  16 U.S.C. § 1536(c)(1); *see also* 50 C.F.R. §§ 402.12(f), 402.14(a), (b)(1) (1986).  If the agency determines, with the concurrence of the wildlife agency, that the action is not likely to adversely affect a listed species, formal consultation is not required. *Id.* § 402.14(b)(1) (1986).  Such a determination must be set aside, however, if it is "arbitrary and capricious," meaning it failed to consider relevant factors or "articulate a rational connection between the facts found and the choice made." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 498 (9th Cir. 2011).

75.     Federal agencies must initiate formal consultation with FWS or NMFS when their actions "may affect" a listed species or designated critical habitat.  50 C.F.R. § 402.14(a) (1986).  The standard for consultation is low: "'[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement.'" *W. Watersheds Project*, 632 F.3d at 496 (quoting 51 Fed. Reg. 19,949).

76.     Effects that must be considered as part of this inquiry include "direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02 (1986).

Indirect effects are "those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.*  Through the formal consultation process, FWS or NMFS prepares a "biological opinion" as to whether the action jeopardizes the species or destroys or adversely modifies critical habitat and, if so, suggests "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A).  During the consultation process, both agencies must "use the best scientific and commercial data available."  *Id*. § 1536(a)(2); 50 CFR § 402.14(d) (1986).

77.     Section 9 of the ESA prohibits the "taking" of any endangered species.  16 U.S.C. §1538(a).  The ESA defines the term "take" broadly to include "harass, *harm*, pursue, hunt, shoot, wound, *kill*, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id*. § 1532(19) (emphasis added).  "Take" includes indirect as well as direct harm and need not be purposeful.  *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995).  The ESA provides a limited exception to the prohibition on take under Section 9 for taking that is in compliance with an incidental take statement ("ITS"). *See* 16 U.S.C. § 1536 (o)(2).  After consultation pursuant to Section 7, if NMFS and FWS conclude jeopardy is not likely or offer reasonable and prudent alternatives to avoid jeopardy, NMFS and FWS may issue an ITS, which authorizes limited take of a species. *Id*. § 1536 (b)(4)(iv).  Such a statement specifies the impacts of "incidental taking" on listed species and measures to minimize impacts. *Id*. § 1536 (o)(2).  Any take of a listed species that is not in compliance with an ITS violates Section 9.  *See Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt*., 273 F.3d 1229, 1239 (9th Cir. 2001).

### FACTUAL BACKGROUND

**A.     Offshore Oil Drilling and the Santa Barbara Channel**

78.     The Santa Barbara Channel has long been the epicenter of California's offshore oil drilling, yet the controversy surrounding that drilling has always been

Complaint for Declaratory and Injunctive Relief                    Page 21

intensive and shows no signs of abating.  As stated by the Ninth Circuit Court of Appeals, "[t]hat there has been continuous and significant public controversy over the environmental effects of offshore activities in California for the past thirty years, and there is significant public controversy over these lease extensions in particular is beyond debate." *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002).

79.     The Santa Barbara Channel is an arm of the Pacific Ocean separating Santa Barbara, Ventura, and other coastal communities from the northern Channel Islands (including Santa Barbara, Anacapa, Santa Cruz, Santa Rosa, and San Miguel Islands).  In 1980, these islands were designated as Channel Islands National Park.

80.     Reflecting the environmental importance of the Channel's marine environment, the Channel Islands National Marine Sanctuary was created, encompassing the waters that surround Channel Islands National Park from the mean high tide line to six nautical miles offshore, around each of the five islands. In addition, a network of state and federally-designated Marine Protected Areas ("MPAs") has been established in the Santa Barbara Channel.

81.     Numerous threatened and endangered species reside in the Santa Barbara Channel on a seasonal or residence basis, including blue, fin, and humpback whales, and the southern sea otter.  Minke and killer whales, porpoises, dolphins, seals and sea lions, and hundreds of species of birds, fishes, and invertebrates also frequent and depend on the habitat of the Santa Barbara Channel and Channel Islands.

82.     The Channel's scenic beauty and rich natural resources in large part define the quality of life along California's south-central coast and are the foundation for its largest economic drivers, including fishing, recreation and tourism.

---

Complaint for Declaratory and Injunctive Relief                                    Page 22

83.    Over the objections of local residents and officials, as well as the state of California, the federal government began awarding the first federal leases for oil in California in 1963 and in the Santa Barbara Channel in 1967.

84.    Offshore oil drilling in the Santa Barbara Channel has been accompanied by spills and other accidents since its first days.  During 1968, the first year of intensive drilling in the Santa Barbara Channel, several oil spills occurred, including a spill of more than 2,000 gallons of crude oil from newly-installed Platform Hogan off Carpinteria.  Robert Sollen, *An Ocean of Oil: A Century of Political Struggle Over Petroleum off the California Coast,* DENALI PRESS, at 41–42 (1998).

85.    On January 29, 1969, the nation's first major offshore oil spill occurred at Platform "A" in the Santa Barbara Channel.  *See Norton*, 311 F.3d at 1165–67 (describing factual background prior to spill).  The blow out is attributed to federal regulators' waiver of safety requirements.  *Id.* at 1166 (noting that the spill "might have been avoided but for a failure of federal oversight").

86.    "As President Nixon aptly observed, the Santa Barbara spill changed the nation's attitudes towards the environment.  Some would trace the current framework of environmental protections in substantial measure directly to the Santa Barbara oil spill."  *Norton*, 311 F.3d at 1167 (internal citations omitted).

87.    Despite continued intensive opposition from local residents and officials, DOI continued its leasing program in the Santa Barbara Channel, as well as San Pedro Bay, after the 1969 oil spill, conducting lease sales in 1975, 1979, and 1981 through 1984.  In total, between 1961 and 1984, the federal government held eleven lease sales for the Pacific OCS, resulting in nearly 2,000,000 acres of OCS oil and gas lease areas off the California coast.  BOEM, *Status of Leases and Qualified Company Report*, at 25 (June 2016) *available at* http://www.boem.gov/pacific-status-of-leases/.

---

Complaint for Declaratory and Injunctive Relief                                           Page 23

88.     Since 1969, twenty-four city and county governments in California have passed measures opposing OCS oil and gas activities, and the State has enacted a permanent ban on new offshore leasing in state waters.  The longtime opposition of area residents, and the public generally, to offshore oil drilling in California and other areas was also eventually reflected by both federal legislation and Presidential action.

89.     From 1982 through the end of Fiscal Year 2008, Congress enacted annual moratoria restricting spending of appropriated funds for OCS oil and gas leasing and drilling activities, although the restrictions varied in the amount of acreage, specific location, and activities impacted.  Curry L. Hagerty, *Outer Continental Shelf Moratoria on Oil and Gas Development*, Cong. Research Serv., R41132 (Mar. 23, 2011).

90.     The President also has executive powers to authorize OCS leasing moratoria under OCSLA and the Antiquities Act of 1906.  In 1990, President George H.W. Bush issued a Presidential Directive establishing a moratorium on leasing throughout much of the OCS, which in 1998 was extended by President Clinton until 2012.  In 2008, President George W. Bush lifted the Executive Withdrawal.

91.     Accordingly, all areas in the Pacific OCS, including the Santa Barbara Channel, could be considered for leasing for the first time in more than thirty years, though none have yet been issued.

92.     Today, offshore oil drilling in the Southern California OCS is conducted from twenty-three operating platforms on forty-three active leases stemming from sales in 1966 (one lease); 1968 (twenty-five leases); 1975 (four leases); 1979 (five leases); 1981 (seven leases); and 1982 (one lease).

93.     The forty active leases encompass eight units: Beta (San Pedro Bay) (four leases) (current operator Beta Offshore); Pitas Point (Santa Barbara Channel) (two leases) (current operator DCOR); Point Arguello (two leases) (current

Complaint for Declaratory and Injunctive Relief                              Page 24

operator FMOGLLC); Point Hueneme (two leases) (current operator DCOR); Point Pedernales (four leases) (current operator FMOGLLC); Santa Clara (seven leases) (current operator Venoco); Santa Ynez (seventeen leases) (current operator ExxonMobil); Tranquillon Ridge (two leases) (FMOGLLC current operator). BOEM, Status of Leases and Qualified Company Report.

94.	During the time period in which federal leases were being issued and DPPs being developed in the Southern California OCS, the federal government prepared EISs under the newly enacted NEPA. *See, e.g., Get Oil Out, Inc. v. Andrus*, 477 F. Supp. 40, 44–45 (C.D. Cal. 1979) (listing early EISs including the 1974 EIS for Proposed Plan of Development of the Santa Ynez Unit and the 1976 EIS "Oil and Gas Development in the Santa Barbara Channel").

95.	However, it has now been decades—in some cases more than forty years—since the federal government prepared these EISs. The technologies utilized in oil gas drilling and production, and the potential impacts therefrom, are significantly different today. *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 937 F. Supp. 2d 1140, 1157 (N.D. Cal. 2013) ("The evidence before BLM showed that the scale of fracking in shale-area drilling today involves risks and concerns that were not addressed by the [prior programmatic environmental analyses] of oil and drilling development in the area. Because the [prior analysis] does not address these concerns that are specific to these 'new and significant environmental impacts,' further environmental analysis was necessary.").

96.	The aging oil platforms located off the Southern California coastline within the Santa Barbara Channel and San Pedro Bay are in many cases already operating beyond their original estimated life spans.

97.	For example, in 1980 DOI estimated that Platforms Gilda and Gina, located off the City of Oxnard's coastline, would together produce fifty-two million barrels of crude oil and forty-two billion cubic feet of natural gas over a period of approximately twenty years. *See* Platform Gilda and Platform Gina

Complaint for Declaratory and Injunctive Relief	Page 25

Project Environmental Impact Report/Environmental Assessment, Volume I (May 1980) (prepared by City of Oxnard and U.S.G.S.), at 3.1-2; *id*. at Figure 3.5-1 (anticipated production schedule for Platform Gina); *id*. at Figure 3.5-2 (anticipated Production Schedule for Platform Gina—Repetto Formation). Platform Gina's estimated lifespan was even briefer, at only eighteen years. *Id*. at 4.3-9. The analysis contained no consideration of the use of offshore fracking and acidizing, but did estimate that development of the Monterey Foundation could extend the life of Platform Gilda by an additional five years.

98. Platform Gina was installed in 1980, thirty-six years ago, while Platform Gail was installed in 1987, twenty-nine years ago. Final PEA, at Table 3-1. Thus, both are already operating well beyond the estimated life span and the twenty year environmental analysis associated with that assumption.

99. The use of WSTs, similar "routine" acid treatments and "acid washes," and other enhanced oil recovery techniques is allowing the recovery of oil that would otherwise not be recoverable from existing and new wells, thereby further extending the operating life of aging platforms well beyond their intended lifespan.

### B. Well Stimulation, Including Hydraulic Fracturing and Acid Well Stimulation, Offshore California

100. Fracking is a well stimulation method that involves pumping a mixture of water, sand (known as "proppant"), and chemicals down a well at extremely high pressures to break apart a hydrocarbon-bearing geologic formation and improve rates of oil or natural gas production.

101. DOI recently defined hydraulic fracturing (*aka* 'fracking') as:

> involv[ing] the injection of fluid under high pressure to create or enlarge fractures in the reservoir rocks. The fluid that is used in hydraulic fracturing is usually accompanied by proppants, such as particles of sand, which are carried into the newly fractured rock and help keep the fractures open once the fracturing operation is completed. The proppant-filled fractures become conduits for fluid migration from the reservoir rock to the wellbore and the fluid is subsequently brought to the surface. In

Complaint for Declaratory and Injunctive Relief                    Page 26

addition to the water and sand (which together typically make up 98 to 99 percent of the materials pumped into a well during a fracturing operation), chemical additives are also frequently used. These chemicals can serve many functions in hydraulic fracturing, including limiting the growth of bacteria and preventing corrosion of the well casing. The exact formulation of the chemicals used varies depending on the rock formations, the well, and the requirements of the operator.

Department of the Interior, Bureau of Land Management Final Rule: Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands, 80 Fed. Reg. 16,128 (Mar. 26, 2015).

102.   Advancements in the technologies utilized in fracking, together with other developments in horizontal drilling technologies, have served to vastly increase oil and gas production from the dense sedimentary rock known as shale. In 2000, shale gas comprised one percent of domestic supplies; today, that figure exceeds thirty-five percent and is expected to grow further.

103.   California's Monterey Shale, encompassing large portions of the central and southern portion of the state, both on and offshore, has been identified as a potential source of significant oil that could be accessed by fracking.

104.   Acidizing is a WST that uses the application of one or more acids, typically hydrofluoric acid and hydrochloric acid, to the well or underground geologic formation.  Acidizing may be done at high pressures, and may be used in combination with fracking and other WSTs.

105.   In California, two primary forms of acidizing are utilized: acid fracturing and acid matrix stimulation treatment.

106.   Acid fracturing involves the pressured injection of acid into an underground geologic formation in order to fracture the formation, thereby enhancing the production of oil or gas.  Acid fracturing is similar to fracking in that pressures are done at the fracture gradient of the hydrocarbon bearing formation to create the fractures, but differs in that proppants are not used.

Complaint for Declaratory and Injunctive Relief                                    Page 27

107.   Acid matrix stimulation, or "matrix acidizing," is similar to acid fracturing except it is performed below fracture pressure and is used to dissolve chemicals to create wormholes near the wellbore.  Acid matrix stimulation dissolves sediment and mud solids, thereby increasing the permeability of the rock and enlarging the natural pores, facilitating the flow of oil and gas.

108.   Today's acidizing relies on drilling fluids containing extensive amounts of chemicals.  Like fracking, the exact formula used in these acid fluids varies by company, and is often treated as proprietary information undisclosed under "trade secret" and other business confidentiality laws.

109.   Hydrofluoric acid can corrode glass, steel, and rock.  Due to its corrosive nature, operators mix it with other substances, many of which are also utilized in fracking operations.  Hydrofluoric acid is often created on site by mixing hydrochloric acid and ammonium fluoride, and then injecting the mixture into the well.

110.   After the acid treatment, the used acid, chemicals, oil, and sediments are pumped out in a process called backflush.  This backflush, like frac flowback, is either re-injected or discharged directly to the marine environment.

111.   Hydrofluoric acid is one of the most dangerous fluids utilized in any industrial process.  Hydrofluoric acid can damage lungs and cause severe burns.  It is listed by the National Fire Protection Association in the most dangerous category of hazardous materials, and is recognized on the Superfund list as an "extremely hazardous substance."  Above sixty-seven degrees, hydrofluoric acid can form a poisonous vapor cloud that stays near the ground.

112.   In addition to treatments relying on acid that are characterized as acid well stimulation, offshore oil operators commonly use a similar technology that they characterize as "routine acidizing" or "acid washes."  These treatments rely upon similar types and concentration of acids that pose similar environmental and

Complaint for Declaratory and Injunctive Relief                                    Page 28

public health impacts, but that rely upon less volume of acid solution than acidizing technically considered to be well stimulation.

113.   Historically, well stimulation operations typically utilized concentrations of hydrofluoric acid of less than nine percent.  Oil companies have publicly stated that they are now experimenting with higher concentrations of hydrofluoric acid in California, as well as experimenting with higher pressures.

114.   Although rudimentary forms of well stimulation techniques have existed for decades, today's technologies bear little resemblance to past practice, and exacerbate the environmental and public health risks of conventional oil and gas production.  Oil and gas development, whether conventional or utilizing well stimulation, poses inherent environmental and public health risks, but the extent of those risks associated modern with well stimulation methods are largely unknown and unstudied.

115.   For example, a 2014 independent scientific study addressing the environmental and public health impacts of fracking and acidizing prepared by the nonpartisan California Council on Science and Technology ("CCST")  concluded that  "only incomplete information and data exist," and that "[f]ew scientific studies of the health and environmental impacts of well stimulation have been conducted to date, and the ones that have been done focus on other parts of the country."  CCST, *An Independent Scientific Assessment of Well Stimulation in California: Volume II.  Potential Environmental Impacts of Hydraulic Fracturing and Acid Stimulations*, at 6 (July 2015) ("CCST Volume II Study").  The numerous gaps in information include the "concentration of well stimulation chemicals, their degradation products, and natural constituents mobilized" by fracking and acidizing. *Id*. at 336.

116.   The CCST Volume II Study, which addresses potential environmental impacts, uses the word "unknown" eighty-seven times.  The study further notes that as many as 100 chemicals used in WST have "completely unknown

Complaint for Declaratory and Injunctive Relief                           Page 29

materials." CCST Volume II Study, at 81. Other fundamental information gaps noted in the study include the amount of frack fluid that returns to the surface and how much remains underground. In addition, as the CCST Study notes, "discharges are not monitored for constituents specific to or indicative of hydraulic fracturing, and the timing of sampling is unlikely to coincide with or measure any potential impacts from well stimulation treatments." *Id*. at 103.

117. The deficiency of information concerning offshore fracking and acidizing is even more pronounced than for onshore use. Unlike onshore fracking, DOI has not initiated a rulemaking or other public process to address the use of offshore fracking and other well stimulation techniques, including requiring oil companies to disclose the chemicals used in well stimulation, nor provided the public with any estimates of the prevalence of well stimulation, or the extent of its expected use in the future.

118. Prior to the *EDC v. BSEE* settlement and the PEA at issue in this lawsuit, Defendants BSEE and BOEM had not prepared any prior environmental analysis of the potential environmental and public health risks and impacts associated with the use of modern well stimulation techniques off the California coastline.

119. In fact, despite periodic use since the 1980s, the use of fracking and acidizing off southern California's shores was largely unknown to the general public, local elected officials, and cooperating state agencies including the California Coastal Commission and the California State Lands Commission, until 2013, when investigative reporters with Associated Press and Truthout, discovered its use through records obtained under the Freedom Of Information Act ("FOIA"), 5 U.S.C. § 552. *See* Jason Dearen and Alicia Chang, *Oil companies frack in coastal waters off California*, ASSOCIATED PRESS, (Aug. 3, 2013) ("California coastal regulators said they were unaware until recently that offshore fracking was even occurring.").

---

Complaint for Declaratory and Injunctive Relief                    Page 30

Case 2:16-cv-08418-PSG-FFM Document 1 Filed 11/11/16 Page 31 of 72 Page ID #:31

120. In 2012 and 2013, Plaintiff EDC had also submitted FOIA requests to BSEE in order to investigate whether there had been any instances of fracking from offshore platforms located in federal waters off the California coast, and through review of those FOIA responses, EDC determined that at least fifteen instances of fracking off California's shores had occurred over the last twenty years as of that date. In September 2013, EDC published its analysis, along with several policy recommendations directed at Defendants, in a report entitled DIRTY WATER: FRACKING OFFSHORE CALIFORNIA.[1] One of the key findings of the report was that Federal Defendants had never conducted any environmental analysis of offshore fracking and acidizing under NEPA, despite the fact that oil companies had periodically utilized those techniques for more than two decades.

121. Subsequent to the publication of the report, Plaintiff EDC wrote to Federal Defendants, outlining alleged violations of NEPA and other environmental laws in relation to the use of fracking and acidizing offshore California, in hopes that the agencies would voluntarily take action to remedy these violations without the need for court intervention. The agencies never responded to Plaintiff EDC's correspondence, although EDC staff did meet with BSEE and BOEM personnel on one occasion.

**C.    Prior Litigation and Settlement in *Environmental Defense Center v. Bureau of Safety and Environmental Enforcement***

122. Due to the agencies' lack of prior consideration or analysis of offshore fracking and acidizing, combined with a complete lack of transparency, EDC filed litigation in U.S. District Court for the Central District of California on December 3, 2014, alleging that BSEE had violated NEPA in relation to its approval of fifty-one APDs or APMs authorizing offshore well stimulation issued between February 2013 and the filing date of that case.

---

[1] *Available at* http://www.environmentaldefensecenter.org/wp-content/uploads/2015/03/DirtyWater.pdf.

Complaint for Declaratory and Injunctive Relief                                      Page 31

123.   Specifically, Plaintiff EDC challenged BSEE's routine approval of APDs authorizing the use of well stimulation pursuant to NEPA categorical exclusions.  Unlike an EIS or EA, categorical exclusions are cursory, checklist type documents that do not contain detailed analysis of potential environmental impacts. EDC's action challenged BSEE's 1) failure to provide for public participation as required by NEPA; 2) unlawful reliance on categorical exclusions despite evidence of significant and cumulative environmental effects; 3) unlawful reliance on categorical exclusions despite extraordinary circumstances; 4) unlawful reliance on categorical exclusions to approve APDs despite lack of applicability; 5) failure to conduct any NEPA analysis for APMs; and 6) unlawful reliance on categorical exclusions for APMs.

124.   Plaintiff EDC also challenged BSEE's routine approval of APMs authorizing the use of well stimulation with no additional NEPA analysis.  Instead, BSEE "tiers" its NEPA analysis for these APMs to the NEPA analysis conducted for the underlying APD.  As noted above, however, BSEE has without exception approved APDs in the Pacific Region with categorical exclusions, the bare minimum of NEPA analysis.

125.   BSEE never provided the public with any notice or opportunity to comment on or otherwise participate in its decisions to approve the APDs and APMs at issue in *EDC v. BSEE*.  Indeed, BSEE has refused to even provide NEPA documentation for its decisions to authorize APDs and APMs upon direct request, instead requiring Plaintiff EDC and other members of the public to submit formal requests for such documents under FOIA.

126.   With one exception, Plaintiff EDC limited its challenges in *EDC v. BSEE* to APDs or APMs authorizing offshore well stimulation that had been issued in the eighteen months preceding the initiation of that lawsuit, as well as APDs which had been issued more than a eighteen months prior, but which had been

Complaint for Declaratory and Injunctive Relief                                    Page 32

modified by an APM in the eighteen months preceding the initiation of that lawsuit.

127.   The individual permits challenged in *EDC v. BSEE* authorized well stimulation operations from seven offshore oil platforms, located in different regions of the Santa Barbara Channel: Platforms Gail and Gilda off the Ventura County coastline near the City of Oxnard and the Channel Islands National Marine Sanctuary, and Platforms Harmony, Heritage, Hondo, and Irene off the Santa Barbara County coastline.

128.   Platform Gail was installed in 1987, is part of the Sockeye Field/Santa Clara Unit, and is located at 739 feet depth.  Venoco, Inc., pursuant to Lease OCS-P-0205, currently operates platform Gail.  The DPP for Platform Gail was approved on November 14, 1986.

129.   Platform Gilda was installed in 1981, is part of the Santa Clara Field/Santa Clara Unit, and is located at 205 feet depth.  Dos Cuadras Offshores Resources, Inc., pursuant to Lease OCS-P-216, currently operates platform Gilda. The Plan of Development for Platform Gilda was approved in 1980.

130.   Platform Harmony is the largest and deepest platform offshore southern California.  Platform Harmony was installed in 1989, is part of the Hondo Field/Santa Ynez Unit, and is located at 1,198 feet depth.  ExxonMobil Corp. pursuant to Lease OCS-P-0190 currently operates platform Harmony.  The DPP for Platform Harmony was approved on September 20, 2985, and a revision to the DPP was approved on April 4, 1988.

131.   Platform Heritage was installed in 1989, is part of the Pescado and Sacate Fields/Santa Ynez Unit, and is located at 1,075 feet depth.  ExxonMobil Corp. pursuant to Lease OCS-P-0182 currently operates platform Harmony.  The DPP for Platform Heritage was approved on September 20, 1985, and a revised DPP was approved on April 4, 1988.

Complaint for Declaratory and Injunctive Relief                              Page 33

132.   Platform Irene was installed in 1985, is part of the Point Pedernales & Tranquillon Ridge Fields/Point Pedernales Unit, and is located at 242 feet depth. Freeport McMoran Oil & Gas LLC pursuant to Lease OCS-P-0441 currently operates platform Irene.  The DPP for Platform Irene was approved in 1985.

133.   In addition to the general environmental significance of the Santa Barbara Channel in which all of the above offshore oil platforms are located, the individual platforms from which well stimulation is known to have been conducted are located in specific areas of the Channel with high ecological value and environmental importance.  Platforms Gail and Gilda, for example, are the closest of all Channel platforms to the Channel Islands National Marine Sanctuary, as well as in close proximity to Anacapa Island within Channel Islands National Park, and the Marine Reserve Area extending off that Island's northern shores.  Platforms Harmony, Heritage and Hondo are located off the Gaviota coast in Santa Barbara County, one of the most environmentally valuable and unique areas along the entire west coast.

134.   The offshore oil platforms from which known well stimulation has been conducted, like all of the platforms in the Santa Barbara Channel and San Pedro Bay, do not operate in isolation, but rely upon an extensive network of service barges, oil, gas, and water pipelines, processing facilities, and other infrastructure to service and assist operations at the platforms, and to move the recovered crude oil and natural gas to refineries and the consumer market.  This supporting infrastructure, like operations at the platforms themselves, are subject to accidents caused by human error, weather events, mechanical failure and other equipment failures, and other incidents that can result in spills of oil and other hazardous substances to the surrounding marine and terrestrial environment.

135.   For example, the May 19, 2015, failure of the Plains All American Pipeline, L.P.'s Line 901 pipeline ("Line 901"), which released approximately 2,934 barrels of heavy crude oil onto Refugio State Beach, with much of the oil

making its way into the Pacific Ocean, illustrates the connected risks associated with well stimulation and general oil production from the offshore oil platforms in the Southern California OCS.  Line 901 is an onshore twenty-four-inch diameter buried, insulated pipeline approximately ten-and-seven-tenths miles in length, that transports heated crude oil originating from offshore oil platforms located in federal outer continental shelf waters and state waters off the coast of Santa Barbara to other pipelines, which eventually convey the oil and gas to refineries.  These platforms include Platforms Harmony, Heritage and Hondo, currently operated by ExxonMobil, and from which some of the largest well stimulation operations conducted to date off California's shores have occurred.  Other major onshore pipelines convey the oil produced from the platforms located off Ventura County.

136.   Before reaching Line 901 and other onshore oil pipelines, oil, gas, and water must be conveyed to those onshore processing facilities and pipelines. BSEE currently regulates 213 miles of offshore pipeline in the Pacific OCS Region.  Onshore facilities located in Lompoc, Gaviota, Goleta, Carpinteria, La Conchita, Ventura, Oxnard, San Pedro, Long Beach, and Huntington Beach then process the conveyed liquids, before oil and gas is then conveyed by onshore pipelines to refineries.  Many of these onshore facilities are located in close proximity to densely populated areas, environmentally significant habitat, or specially designated areas such as Refugio, El Capitan, and McGrath State Beaches.

137.   On February 2, 2015, Defendants filed their answer to Plaintiff EDC's complaint in *EDC v. BSEE.*  Defendants' answer "admit[ed] that BSEE had granted nineteen APDs authorizing offshore well stimulation, as BSEE understands that term, pursuant to categorical exclusions."  Docket No. 13, at ¶ 141.

Complaint for Declaratory and Injunctive Relief                          Page 35

138.   On February 2, 2015, American Petroleum Institute ("API") moved to intervene as a defendant.  On February 18, 2015, ExxonMobil moved to intervene as a defendant.  Judge Gutierrez approved both of these motions on April 2, 2015, on which dates the answers from both parties were entered.  In alleging their right to intervene, both groups characterized their "protectable interest" in the ability to continue to conduct offshore well stimulation.  *See, e.g.*, API Intervention Brief, Docket No. 15, at 9 ("API members broadly rely on occasion on well stimulation technologies, including hydraulic fracturing and acidizing, to facilitate oil and gas exploration, development, and production throughout the federal OCS.").  ExxonMobil, which operates in the Santa Ynez Unit from Platforms Heritage, Harmony, and Hondo, noted that it holds twenty-nine of the fifty-one permits challenged in the action, stating that the company "has future exploration and development plans for its substantial investments in offshore leases in the Pacific region that potentially involve well stimulation."  ExxonMobil Brief, Docket No. 19, at 1.

139.   On June 11, 2015, Federal Defendants manually filed the administrative record for the case.  However, the case would never proceed to summary judgment briefing on the merits.  On August 17, 2015, Plaintiff EDC and Federal Defendants filed a stipulation asking to modify the briefing schedule in light of the fact that the parties had made significant progress in settlement negotiations.  After three additional continuances (October 8 and November 17, 2015, and January 12, 2016), Plaintiff and Federal Defendants submitted their joint motion to dismiss the case based on the lodged settlement agreement on January 29, 2016.

140.   Under the settlement agreement, Federal Defendants agreed to prepare a PEA addressing environmental impacts of offshore well stimulation in federal waters off California, and issue the final environmental review document by May 28, 2016, after a public comment period of at least thirty days.  *EDC v. BSEE*

Complaint for Declaratory and Injunctive Relief                                    Page 36

Case 2:16-cv-08418-PSG-FFM   Document 1   Filed 11/11/16   Page 37 of 72   Page ID #:37

Settlement Agreement, Docket No. 79-1, lodged Jan. 29, 2016.   The PEA was to "result in a determination that either an [EIS] and Record of Decision ("ROD") is required or a Finding of No Significant Impact ("FONSI") is appropriate." *Id.* at 2. Accordingly, if the agencies determined during the PEA process that well stimulation may have significant environmental impacts, they were required to prepare an EIS.  In accordance with NEPA, the settlement agreement specified that Federal Defendants "will not pre-determine the outcome of this assessment to require one product or the other (*i.e.* an EIS/ROD or EA/FONSI) before the analysis in the programmatic EA is complete."  *Id.* at 3.

141.   The settlement agreement further required the agencies to withhold approval of drilling permits authorizing well stimulation pending completion of the PEA.

142.   The settlement agreement also required BSEE to "pursu[e] avenues for increasing transparency of the permit review and approval process." Specifically, BSEE committed to "receive future permit applications through the eWell system . . . and . . . build a web-based search engine similar to that used in the Gulf of Mexico Region . . . or expand that search engine to include permit applications received in the Pacific Region." *Id*.  Until that system is operational, BSEE obligated itself to "provide notice of newly submitted complete applications for [WST] to EDC," including "posting of publicly releasable information associated with newly submitted complete applications within five working days of receipt." *Id*.

**D.     The Draft Programmatic Environmental Assessment**

143.   On February 22, 2016, BSEE and BOEM issued a *Notice of Availability of Draft Programmatic Environmental Assessment to Evaluate Potential Environmental Effects of Well Stimulation Treatments on the Pacific Outer Continental Shelf*, 81 Fed. Reg. 8743.  The Notice announced the availability of the Draft PEA, and defined well stimulation treatments to include

Complaint for Declaratory and Injunctive Relief                                      Page 37

fracturing (diagnostic fracture test, frac pac, and acid fracturing) and non-fracturing (matrix acidizing and polymer/surfactant injection). *Id*. The Notice provided for a public comment period of thirty days, until March 23, 2016. *Id*.

144. Although BSEE and BOEM have never previously conducted any NEPA analysis of offshore fracking and acidizing, the Draft PEA predetermines that the practices will be allowed, stating in the very first sentence that the agencies "propose to allow the use of selected well stimulation treatments on the 43 current active leases and 23 operating platforms on the Southern California Outer Continental Shelf." Draft PEA, at ES-1.

145. Similarly, the Draft PEA defines the purpose and need for the proposed action as "to allow the use of certain WSTs (e.g. hydraulic fracturing) in support of oil production at platforms on the Pacific OCS [and] to carry out BSEE and BOEM's responsibilities under the Outer Continental Shelf Lands Act (OCSLA) for effectively managing resources on the Federal OCS." *Id*.

146. The Draft PEA considers four alternatives: Alternative 1: proposed action—allow use of WSTs; Alternative 2: allow use of WSTs with subsurface seafloor depth stipulations; Alternative 3: allow use of WSTs but no open water discharge of WST waste fluids; and Alternative 4: no action—allow no use of WSTs. Draft PEA, at ES-4.

147. The Draft PEA defines the affected environment as the forty-three lease areas in southern California. Draft PEA, at ES-4–ES-5. As previously described, these lease areas are concentrated in two primary regions:  the Santa Barbara Channel, in Santa Barbara and Ventura Counties, and the San Pedro Bay area off the northern Orange County/southern Los Angeles County coastline.

148. The Draft PEA evaluates the potential effects from offshore well stimulation treatments on the following categories of impacts: air quality; water quality; geologic resources/seismicity; benthic resources; marine and coastal fish and essential fish habitat; marine and coast birds; marine mammals; sea turtles;

Complaint for Declaratory and Injunctive Relief                    Page 38

commercial and recreational fisheries; areas of special concern; recreation and tourism; environmental justice; and archeological resources.  Draft PEA, at ES-6–ES-7.

149.   Nearly without exception, BSEE and BOEM conclude in the Draft PEA that offshore fracking and acidizing will have *no* environmental impacts. In its consideration of air quality, water quality, benthic resources, commercial and recreational fisheries, areas of special concern, and recreation and tourism, the Draft PEA states that "no WST [well-stimulation techniques]-related impacts [are] expected."  Draft PEA, at ES-11–ES-12.  The Draft PEA only recognizes one category of potential impacts—induced seismicity—concluding that the potential is "low".  *Id*. at ES-11.

150.   BSEE and BOEM  provide slight qualifications for their no impact determinations with respect to three categories of impacts:  air quality ("negligible emissions of greenhouse gasses"); water quality ("slight localized reduction in water quality at surface water discharge location"); and wildlife (marine and coastal fish, sea turtles, marine and coastal birds, marine mammals) ("potential for some toxic effects in some species from some WST chemicals occurring within the NPDES mixing zone from discharges of WST waste fluids to surface water").  Draft PEA, at ES-11.

151.   BSEE and BOEM in fact predict in the Draft PEA that *prohibiting* the use of offshore well stimulation [Alternative 4] will have greater environmental impact than allowing it without restraint.  Draft PEA, at 4-67 ("Implementation of Alternative 4 may necessitate the drilling and production of new wells offshore and/or onshore, increase WST use at onshore wells, and/or increase the need to import more gas and oil.  These would all increase environmental and societal cumulative impacts.").

152.   The Draft PEA states that offshore fracking and acidizing have only been used infrequently in the southern California OCS.  Draft PEA, at ES-8

Complaint for Declaratory and Injunctive Relief                                    Page 39

(stating that there have been twenty-one fracking operations conducted from four platforms, and three acidizing operations conducted from two platforms, during the time period 1985-2011).  Despite the fact that BSEE had previously acknowledged in the *EDC v. BSEE* litigation that the permits challenged in that case qualified as well stimulation, these treatments were not listed in the PEA.

153.   BSEE and BOEM also predicted that offshore fracking and acidizing will have "limited applicability" and their use "is expected to be incidental rather than fundamental to the development" of the OCS basins.  Draft PEA, at 3-8; *id.* at 3-12 (fracking has "been attempted . . . and was not deemed economically successful.").

154.   BSEE and BOEM rely upon the predicted infrequency of WST use as one of the primary justifications for their overall conclusions that the practices will have no environmental impacts. Draft PEA, at 4-67 ("Given the type and the expected frequency of use of WST activities that are reasonably foreseeable for the Federal OCS, none of the three action alternatives are expected to result in adverse impacts on the environment."); *see, e.g.*, Draft PEA, at ES-9 (accidental release of WST chemicals "under the expected infrequent use of WSTs . . .is considered to be very unlikely"); *id.* at 4-43 (benthic resources); *id.* at 4-45 (fish and essential fish habitat); *id.* at 4-48 (marine mammals); *id.* at 4-54 (recreational and commercial fisheries).

155.   BSEE and BOEM also rely upon the prediction of infrequent use of WSTs to conclude that the proposed authorization of WSTs will not have any cumulative impact. Draft PEA, at ES-10 ("Given the consistently small estimate impacts of future WST activities on resources in the Pacific OCS off southern California, incremental contributions to impacts from the proposed action are not expected to result in any noticeable or material cumulative effects on resources potentially impacted by the proposed action when added to past, current, and foreseeable future impacts on these resources from other sources.").

Complaint for Declaratory and Injunctive Relief                                    Page 40

156.   The Draft PEA excludes "[r]outine well cleaning operations includ[ing] the use of acid or solvent treatments, water blasting, and casing scrape/surge" from the scope of its environmental analysis. Draft PEA, at 4-64.  Of these, "acid washes" are utilized most frequently, on average once every other year for *all* wells located on offshore oil platforms in the Southern California OCS.  *Id.* These treatments use "similar type and concentration" of acids as the "acidizing" treatments that, unlike acid washes, are included within the scope of environmental analysis.  *Id.* The main difference between acid washes and acidizing is that acid washes use less volume of acid solution than WST acidizing, typically ranging from 5,000 to 10,000 gallons as opposed to as many as 240,000 gallons.  *Id.*

157.   BSEE's and BOEM's acknowledgment of the close similarity of these treatments and their environmental impacts to the acid treatments formally considered as well stimulation, and their frequent use at every well on every offshore platform in the Southern California OCS, undermines the Draft PEA's conclusion that offshore well stimulation will not have significant environmental effects due to its presumed infrequent use.

158.   The Draft PEA also appears to contradict itself, stating that "[t]he use of WSTs may support the continued recovery of oil as primary oil recovery declines with the 43 active lease areas."  Draft PEA, at 1-4. Implementation of Alternative 4 [barring offshore well stimulation] may necessitate the drilling and production of new wells offshore and/or onshore, increase [well stimulation technology] use at onshore wells, and/or increase the need to import more gas and oil.  These would all increase environmental and societal cumulative impacts."

**E.     Elected Officials and Agency Comments on the Draft Programmatic Environmental Assessment**

159.   During the thirty-day public comment period, BSEE and BOEM received numerous comments opposing the use of offshore WST, and/or critiquing

Complaint for Declaratory and Injunctive Relief                                    Page 41

the environmental analysis contained within the Draft PEA, from elected officials and state and federal agencies.

160.   For example, U.S. Representative Lois Capps, whose District encompasses offshore drilling in the Santa Barbara Channel, wrote a letter with Representative Sam Farr and Representative Jared Huffman that the Draft PEA "is in no way a complete analysis" and "provides insufficient evidence to support the finding that well stimulation poses negligible risks in offshore waters or the proposal to resume permitting wells using these techniques."  Letter from Lois Capps, Sam Farr & Jared Huffman, Letter Regarding Draft PEA, 1 (March 31, 2016).  The three Congressional representatives thus requested that BSEE and BOEM prepare an EIS. *Id.* at 1–2.

161.   Eleven members of the California State Legislature, including local Senator Hannah-Beth Jackson and Assemblymember Das Williams, wrote a letter "regarding [their] concern over troubling shortcomings" in the Draft PEA, and stating that "[w]e believe the assessment inadequately analyzes impacts to California's ocean and coastline . . . ." Letter From Hannah-Beth Jackson, et al., Comment Letter Regarding the PEA of the Use of WSTs on the Southern California OCS, 1 (March 17, 2016).  The letter further noted that, unlike California state law, "federal standards do not require fracking and acidizing fluid composition disclosure, and we are left only to assume that the same types of chemicals are being used and produced," including "known carcinogens, toxic chemicals with known impacts, and chemicals of unknown toxicity, all of which pose serious risks to marine and human life."  *Id.* at 2.

162.   The U.S. Environmental Protection Agency ("EPA") submitted comments recommending that the analysis needed to be improved to "provide additional analyses, include supporting documentation, and identify specific minimization or mitigation measures, as necessary, to support the finding of no significant impacts for this project." Letter From EPA, US EPA Detailed

Complaint for Declaratory and Injunctive Relief                    Page 42

Comments on the February 2016 PEA of the Use of WSTs on the OCS, Southern California Planning Area, 1 (March 23, 2016).  In addition, EPA critiqued the Draft PEA's purpose and need statement, finding that "[s]uch a narrow and prescriptive statement identifies a solution, rather than the underlying need, and may unduly constrain the range of alternatives that would be responsive to the underlying need." *Id*. at 4.

163.   The California Coastal Commission submitted comments that noted past correspondence with the agency and the Commission's focus "on the need for additional analysis and transparency, additional inter-agency coordination, and the need for improved disclosure of applications employed and analysis of the effects of chemicals used in the various well stimulation treatments." Letter From Coastal Commission Staff Comments on the Draft PEA for WSTs, 1 (March 23, 2016). The Commission expressed that it was "disappointed that the Draft PEA does not reflect a greater level of responsiveness to either the procedural or substantive concerns" raised in the agency's prior correspondence. *Id.*

164.   The Commission letter goes on to assert that the Draft PEA "does not appreciably increase the knowledge base concerning the many unknowns and uncertainties surrounding WST use on the OCS." *Id.* at 2.  The letter states that "[i]n conclusion, at least until much more is known concerning potential impacts on the marine environment, we reiterate our concern regarding the need for BSEE/BOEM to assume, at this time, that use of these chemicals and treatments would affect coastal uses and resources . . .." *Id.*

165.   The California Division of Oil, Gas, and Geothermal Resources ("DOGGR") wrote and disagreed with the conclusion in the Draft PEA regarding waste fluids, noting that "even though discharge of WST waste fluid is an activity permitted by the U.S. EPA, it does not mean impacts are absent." Letter From DOGGR, Comments on the Draft PEA for the use of WSTs on the Southern California OCS 2 (March 23, 2016).  In addition, DOGGR requested closer

Complaint for Declaratory and Injunctive Relief                        Page 43

consideration of Alternative 3 (no dumping of WST fluids) and stated that BSEE and BOEM should conduct toxicity testing of permitted discharge containing WST fluids. *Id.*

### F.   Industry Comments on the Draft Programmatic Environmental Assessment

166.   Major oil drilling organizations American Petroleum Institute, Offshore Operators Committee, California Independent Petroleum Association, and National Oceanic Industries Association, representing "member companies who are significant stakeholders in offshore oil and natural gas production, and who are experts in well stimulation treatments," wrote in support of the conclusions of the Draft PEA.  Letter from API, et al., Joint Trade Association Comments on the PEA of the Use of WSTs on the Southern California OCS (March 23, 2016) ("industry letter").

167.   The industry letter states that "well stimulation treatments, and associated discharge of WST-related fluids, is a long-standing practice within the oil and natural gas production industry in the Southern California Outer Continental Shelf, as well as other producing regions around the world." *Id.* at 1.

168.   Contradicting the Draft PEA's claim that offshore WST has and will continue to be used infrequently, the industry letter clams "the risks from WST-related operations are well understood and manageable," and thus "[a]llowing the use of WSTs is the only feasible and logical recommendation." *Id.* at 1.  Finally, the industry letter notes confusion and conflicting definitions regarding what type of acid use qualifies as a well stimulation treatment, but notes that "nearly all relevant wells require acid treatments (HCl and/or HCl-HF) to get appreciable production rates." *Id.* at 3.

### G.   Plaintiffs' Comments on the Draft Programmatic Environmental Assessment

Complaint for Declaratory and Injunctive Relief                    Page 44

169.   Plaintiffs EDC and Channelkeeper each submitted detailed comments on the Draft PEA.  In its comment letter, Plaintiff EDC disagreed with the Draft PEA conclusion that offshore WST from the twenty-three southern California offshore oil platforms will have no significant impact and asserted that the document is legally insufficient under NEPA in numerous requests.  Letter from EDC on the Draft PEA for WSTs on the Pacific OCS (March 23, 2016).  EDC urged BSEE and BOEM to initiate preparation of an EIS that acknowledges the significant environmental impacts and risks associated with offshore fracking and acidizing, and that provides a more detailed and thorough analysis of those impacts and risks.

170.   Among its specific comments, EDC critiqued the Draft PEA's purpose and need statement as "driven entirely by the desire of oil company lessees to conduct offshore fracking and acidizing" because "BOEM and BSEE incorrectly define the purpose and need statement as 'to allow the use of certain WSTs (e.g. hydraulic fracturing) in support of oil production at platforms on the Pacific OCS.'" *Id.* at 5.

171.   In its comment letter on the Draft PEA, EDC also asserted that by impermissibly narrowing the scope of the purpose and need statement, BSEE and BOEM in turn "unlawfully constrained their consideration of alternatives and rendered the Draft PEA an empty formality." *Id.* at 7.

172.   EDC's letter further critiqued the alternatives analysis, noting that although the agencies developed two alternatives that would place some restrictions on the use of offshore fracking and acidizing, (by prohibiting the use of fracturing WSTs at depths less than 2,000 feet and prohibiting open water discharge of WST waste fluids, respectively) the agencies inexplicably failed to consider the restrictions together in one alternative, or to otherwise craft a comprehensive alternative that would best preserve the environment in the event that future WSTs are allowed by the agencies.  EDC's letter asserted that such

Complaint for Declaratory and Injunctive Relief                                    Page 45

approach is unlawful and that "[a]dditional alternatives would be reasonably related to the project's proper purpose, which should be whether offshore WST can safely occur, in light of OCSLA's requirement to balance resource extraction with environmental protection." *Id.*

173. NEPA's implementing regulations place specific obligations on agencies considering a proposed action with incomplete or unavailable information. EDC's letter noted that the Draft PEA suffers from missing information and numerous data gaps, many pertaining to the most concerning and contentious aspects of offshore well stimulation, including the toxicity of chemicals utilized in the process, as well as the impact of those chemicals on the natural environment, including water quality, threatened and endangered species, and human health. *Id.* at 8–10. However, as detailed in the EDC letter, BSEE and BOEM failed to adequately acknowledge these numerous and fundamental data gaps and missing information, and consequent uncertainty regarding environmental impacts, and that in any event, these gaps are so significant as to compel preparation of an EIS.

174. EDC's letter detailed numerous areas in which BSEE and BOEM failed to adequately address direct environmental impacts. *Id.* at 10–17. Almost without exception, BSEE and BOEM concluded that the proposed action, Alternative 1, to allow use of offshore fracking and acidizing, will result in "no WST-related impacts expected." Draft PEA at ES-11 and ES-12 (Table ES-1). Only with respect to water quality ("slight localized reduction in water quality at surface water discharge location"), induced seismicity ("low potential"), and marine fish and wildlife ("potential for subtle toxic effects in some species from some WST chemicals occurring within the NPDES discharge mixing zone from discharges of WST waste fluids to surface water") do BSEE and BOEM acknowledge *any* potential environmental impacts from offshore fracking and acidizing.

Complaint for Declaratory and Injunctive Relief                    Page 46

175.   EDC's letter identified several issues to illustrate how the Draft PEA analyses are inadequate under NEPA, and lack scientific and analytical integrity, and concluded that because the direct, indirect, and cumulative impacts of offshore well stimulation within the Southern California OCS plainly may result in significant environmental impacts, BSEE and BOEM were required to prepare an EIS.  For example, EDC's letter explained that the Draft PEA improperly relies on unsupported and inconsistent assumptions of infrequent use of WSTs.  It also asserted that the analysis unlawfully relies on the EPA National Pollution Discharge Elimination System ("NPDES") Permit revision for no impact conclusions, which does not excuse the agencies from NEPA requirements. Moreover, EDC's letter noted potential significant impacts and risks to the environment, including to water quality, the Santa Barbara Channel, protected lands and waters, and endangered species. Finally, EDC's letter demonstrated that WSTs have inspired public controversy among the environmental community as well as elected officials.

176.   EDC's letter also critiqued the analysis of indirect effects, connected effects and cumulative and similar effects analysis as inadequate under NEPA. EDC Comment Letter, at 17–20.  Examples of such insufficient analysis highlighted in this section of EDC's letter include the failure to consider the impact of "routine" or "acid washes", as well as the environmental impacts from related infrastructure, as illustrated by the Plains Line 901 oil spill, or impacts from the continued operation of oil infrastructure due to extending the life of offshore oil platforms. *Id.*

177.   Finally, EDC's letter concluded that BSEE and BOEM had failed to meet the overarching NEPA requirement to provide a "hard look" at the environmental impacts of WST in the Pacific OCS, and that the agencies were required to instead prepare an EIS.

178.  EDC's letter was prepared with the assistance of Blue Tomorrow, LLC ("Blue Tomorrow"), an environmental consulting company that specializes in assessing environmental impacts from oil and gas operations.  This expert consultant prepared written comments that EDC attached to its comment letter.

179.  In its letter, Blue Tomorrow identified specific data gaps in the Draft PEA that render a realistic assessment of impacts impossible without more data and analysis.  Specifically, Blue Tomorrow concluded that the Draft PEA's discharge toxicity analysis is inadequate because it contains a significant data gap regarding the composition of flowback fluids.  Blue Tomorrow Expert Letter 1 (March 22, 2016) ("During WSTs additional constituents are being mobilized from the formation and their chemistry and toxicity are unknown. Quantifying the risk from discharging these fluids is not possible without this information.").  In addition, the Draft PEA completely lacks direct evidence on the impacts of discharges of WST flowback fluids on the marine environment.  *Id.* at 2 ("As a result of the absence of scientific studies of impacts to the marine environment from WST waste discharges, the EA evaluation is insufficient to support the conclusion that no WST-related impacts to ecological resources are expected to occur.").  Moreover, as noted by Blue Tomorrow, "only a fraction of chemicals had toxicity data for marine organisms (twenty-six of the thirty-three chemicals screened in the hydraulic fracturing fluid; and five of the seventeen chemicals screened in the acidizing case study)." *Id.* at 3.

180.  The Blue Tomorrow expert letter also asserted that the Draft PEA failed to adequately assess the impacts of WST discharges on water quality because it failed to acknowledge that the composition of flowback fluid is distinct from injection fluid.  Blue Tomorrow Expert Letter at 1–2 ("WST fluids prior to injection likely have substantially different chemistry and constituent concentrations than flowback fluids after a WST.  During these treatments heavy metals, organics, and radioactive material can be mobilized from the formation, by

Complaint for Declaratory and Injunctive Relief                    Page 48

chemicals in the injection fluid or by the fracturing of the target formation, and mixed with the flowback fluids."). Specifically, flowback fluids are likely to contain additional pollutants and pose additional impacts, especially in the acidizing context, whether considered WST or "routine." *Id.* at 2 ("[A]cid treatments (matrix acidizing, acid fracturing, and acid maintenance) use high concentrations of very strong acids such as HCL and HF acids to dissolve scaling and clogging of the well bore, and to dissolve the formation rock itself to increase connectivity and permeability within the formation to increase production. After the acid treatment fluids return to the surface, they can contain very high levels of dissolved solids and heavy metals and have been reported to have pH in the range of 0 to 3."). The Blue Tomorrow letter concludes that since these pollutants are "not present in injection fluids," the agencies' analysis of impacts of WST discharges based on injection fluids is inadequate.

181. The Blue Tomorrow letter also notes that BSEE and BOEM provide no direct evidence to conclude that WST discharges have no impacts on ecological resources, and that the agencies' reliance on the CCST study is insufficient, as that study itself acknowledges a lack of data.

182. Finally, the Blue Tomorrow letter critiques the Draft PEA's failure to sufficiently address whole effluent toxicity ("WET"). As Blue Tomorrow explains, while some analysis was conducted as to "individual toxic effects" of WST fluids, "[t]here are both cumulative and interaction (or synergistic) effects that should be considered in assessing the toxic effects of a fluid with multiple toxic constituents." *Id*. The Draft PEA simply fails to conduct this analysis.

183. Finally, EDC's letter concluded by addressing violations of other environmental laws, including the ESA and Coastal Zone Management Act. In particular, EDC critiqued the Draft PEA's apparent conclusion that the agencies would not abide by legal requirements under the ESA, including section 7 consultation requirements, instead deferring such action to future authorizations.

Complaint for Declaratory and Injunctive Relief                                    Page 49

184. Plaintiff Channelkeeper also submitted comments on the Draft PEA. In its letter, Channelkeeper emphasized the fact that "due to lack of monitoring requirements for specific WST constituents, the unknown toxicity of WST fluid constituents, and the lack of coordination between existing monitoring and WST activities," BSEE's and BOEM's proposed reliance on the EPA NPDES permit "fails to adequately monitor impacts from WST fluids."

185. Like the Blue Tomorrow letter, the Channelkeeper letter also further critiqued the Draft PEA reliance on the WET test under the NPDES permit, concluding that "due to limited sampling frequency, the required WET testing is inadequate to verify that WST fluids are not contributing to chronic toxicity."

186. Given these gaps, the Channelkeeper letter concludes that BSEE and BOEM cannot rely on the NPDES permit to justify a no significant impact determination, and thus more thorough environmental review (*i.e.* an EIS) should be prepared.

**H.    The Final Programmatic Environmental Assessment and Finding of No Significant Impact**

187. BSEE and BOEM did not prepare an EIS but instead issued a Final Programmatic Environmental Analysis ("Final PEA" or "PEA") and FONSI. As proposed in the Draft PEA, BSEE and BOEM approved the proposed action, Alternative 1 ("Allow use of WSTs"). Under this final agency action, BSEE and BOEM have approved the use of WSTs at the twenty-three production platforms located on the forty-three active leases on the Southern California OCS without conditions, mitigations, or other specific limitations.

188. The FONSI states that BSEE and BOEM received more than 10,000 public comments on the Draft PEA, including an estimated seventy-five unique comments (not submitted via standardized email from outreach campaign). Despite this extensive public input, including the detailed comments described in detail in this complaint, the Final PEA differs in only minor respects from the Draft

Complaint for Declaratory and Injunctive Relief                                    Page 50

PEA.  As stated by BSEE and BOEM in the Final PEA's "summary of the changes made to the Draft PEA," these revisions include "factual or editorial errors," clarification of text to "address areas of confusion," and clarification or expansion to provide additional information in "a number of areas, including the purpose and need, the proposed action and alternatives, and the discharge of WST-chemicals." Final PEA, at A-3.

189.   Among the changes, the Final PEA slightly modifies its conclusions regarding potential environmental effects.  For example, several categories of impacts (air quality; water quality; benthic resources; marine and coastal fish and essential fish habitat, sea turtles, marine and coastal birds, marine mammals; and commercial and recreational fisheries) are described as having "no discernible WST-related impacts" rather than simply "no WST-related impacts."  Final PEA, at Table ES-1, ES-12-ES-13.  The Final PEA continues to conclude that there will be "no WST-related impacts" to areas of resource concern (*e.g.* Channel Islands National Marine Sanctuary and Channel Islands National Park), recreation and tourism, archaeological resources, and environmental justice.

190.   With respect to the purpose and need, the Final PEA modifies the statement to make it even more aligned with the interests of the oil company lessees operating on the OCS, now describing the purpose of the proposed action as "to enhance the recovery of petroleum and gas from new and existing wells on the POCS, beyond that which could be recovered with conventional methods (*i.e.* without the use of WSTs)." Final PEA, at 1-3.

191.   The Final PEA provides more detailed descriptions regarding alternatives than the Draft PEA.  For example, the Final PEA includes additional language clarifying that "for purposes of this programmatic analysis, the Bureaus are analyzing up to five WST approvals per year, and their potential impacts, in this PEA." Final PEA, at 2-6.  However, the alternatives themselves remain unchanged.  Both the Draft PEA and Final PEA include analysis of four

Complaint for Declaratory and Injunctive Relief                          Page 51

alternatives: allow use of WSTs (the approved agency final action); allow use of WSTs with subsurface seafloor depth stipulations; allow use of WSTs but no open water discharge of WST waste fluids; and no action (allow no use of WSTs).

192.   Based on the analysis in the Draft PEA and minor changes in the Final PEA, BSEE and BOEM issued their May 27, 2016, FONSI.  That FONSI includes brief descriptions of the agencies' conclusions that its approval of WST without conditions, mitigations, or other restrictions on the Southern California OCS will not have significant impacts on Physical Resources including air quality, water quality, and geologic resources/seismicity; Biological Resources including benthic resources, marine and coastal fish, birds, mammals, and reptiles; and Socioeconomic Considerations.  Despite the numerous gaps in information addressing numerous potential impacts from the use of WST in the Southern California OCS, BSEE and BOEM confidently declare in the FONSI that "[a]lthough some questions were raised during the public comment period as to the availability of adequate information, there is no question as to the overall consequences." FONSI at 6.

**I.      Subsequent Drilling Authorizations Issued Since the Final PEA**

193.   Programmatic decisions such as BSEE's and BOEM's May 27, 2016, FONSI authorizing the use of WST without conditions, mitigations, or other restrictions from twenty-three producing platforms within the Southern California OCS have immediate and important consequences.  Authorizing practices such as offshore WST, even at a broad or programmatic level, has great significance because such a decision "will influence subsequent site-specific actions." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1088 (9th Cir. 2003).   Stated slightly differently, a preferred alternative set out and chosen in a programmatic NEPA decision "will determine the scope of future site-specific proposals." *Id*. at 1089. CEQ regulations define this practice as "tiering."  40 C.F.R. § 1502.20 (1978) ("Whenever a broad environmental impact statement has been prepared . . . and  a

subsequent statement or environmental assessment is then prepared on an action included within the . . . program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement . . . ."); FONSI at 4 (deciding that BSEE "will approve the use of fracturing and non-fracturing WSTs at the 22 production platforms located on the 43 active leases" if deemed compliant with regulatory performance standards).

194.   The settlement agreement in *EDC v. BSEE* established May 28, 2016, as the date in which BSEE's moratorium on consideration or approval of WST permits ended.

195.   BSEE has yet to fulfill its duty under the *EDC v. BSEE* settlement agreement to permanently increase the public transparency of permit issuance within the Pacific Region by expanding its existing "eWell system" currently used in the Gulf of Mexico to the Pacific Region, or by establishing an equivalent system for the Pacific Region.

196.   Pending completion of that system becoming operational, the settlement agreement provides that BSEE shall provide interim notice of such permit applications directly to plaintiff EDC.  BSEE is currently providing that interim notice through a website.[2]

197.   According to BSEE's interim website, two applications for WST have been submitted and approved since the May 27, 2016, issuance of the FONSI programmatically authorizing the use of WST offshore in the Southern California OCS.

198.   The first permit was issued to the company DCOR, and approved as an Application for Permit to Modify at Well S-55.  The permit was issued under Lease No. 216.  Lease No. 216 was one of twenty-six leases totaling 129,708 acres

---

[2] *See* http://www.bsee.gov/About-BSEE/BSEE-Regions/Pacific-Region/BSEE-Pacific-Region-Completed-Applications-for-Permit-to-Modify-APM/.

Complaint for Declaratory and Injunctive Relief                    Page 53

sold by the government on December 15, 1966, and February 2, 1968.  Lease 216 is within the Santa Clara Unit and is accessed from Platform Gilda.

199.  DCOR's APM for Well S-55 was submitted on BSEE Form-0124. For Item 16 ("Proposed or Completed Work") DCOR selected "enhance production," and in particular "acidize" and "artificial lift."  BSEE appears to have redacted key information provided by DCOR on Form-0124, including Item 17 ("Briefly Describe Proposed Operations") and the attachments submitted with Item 18 ("Attach complete well prognosis" as required by BSEE regulations).  Although the attachments are not included, DCOR's response indicates that it submitted five attachments, including a workover procedure and acid schedule.  DCOR states on the Form the estimated duration of the operation to be eleven days, with a proposed start date of August 15, 2016.

200.  Prior to approving the APM for Well S-55, BSEE was required to conduct NEPA analysis.  However, to the best of Plaintiffs' knowledge, no NEPA documents accompanying this APM are publicly available.  Accordingly, on July 19, 2016, Plaintiff EDC submitted a FOIA request to the BSEE Pacific Region office for all APMs and APDs submitted and deemed complete from January 1, 2016, to the present.  The request includes all accompanying NEPA documentation, such as categorical exclusions reviews, decision memos or other analyses or decision documents.  Plaintiffs are awaiting BSEE's response to this FOIA request.

201.  The second permit was issued to the company DCOR, and approved as an Application for Permit to Modify at Well B-35.  The permit was issued under Lease No. 241.  Lease No. 241 was one of twenty-six leases totaling 129,708 acres sold by the government on December 15, 1966, and February 2, 1968.  Lease No. 241 is accessed from Platforms A, B, and C.

202.  DCOR's APM for Well B-35 was submitted on BSEE Form-0124. Under "Permit Primary Type" DCOR selected "Enhance Production" and under

Complaint for Declaratory and Injunctive Relief                          Page 54

"Permit Subtype(s)" DCOR selected "Acidize."  Under "Operation Description" DCOR selected "perform acid cleanout."  BSEE appears to have redacted key information provided by DCOR on Form-0124, including the attached Procedure and Well Information referenced under "Operation Description."  DCOR states on the Form the estimated duration of the operation to be seven days, with a proposed start date of September 1, 2016.

203.   Plaintiffs have likewise been unable to identify any NEPA documentation associated with the APM for Well B-35.

**J.     Violations of the Endangered Species Act**

204.   BSEE and BOEM have also failed to engage in consultation to ensure their action does not jeopardize listed species or result in the destruction or adverse modification of their critical habitat, as required by Section 7(a)(2) of the ESA, *id.* 16 U.S.C. § 1536 (a)(2).

205.   On August 10, 2016, Plaintiffs provided notice to BSEE, BOEM, and DOI Secretary Jewell, pursuant to Section 11(g) of the ESA, 16 U.S.C. § 1540(g), that BSEE and BOEM are in violation of Sections 7 and 9 of the ESA, due to their programmatic approval of offshore well stimulation treatments.

206.   There are at least twenty-five species listed as endangered or threatened pursuant to the ESA that may be present in the Southern California OCS and that may be affected by the action.  These species include the endangered black abalone, with critical habitat designated on portions of the shoreline of the Channel Islands, 74 Fed. Reg. 1937 (January 14, 2009); the endangered white abalone in its pacific coast range, 66 Fed. Reg. 29054 (May 29, 2001); the endangered southern California steelhead, with designated critical habitat on multiple waterways between the Santa Maria River and San Mateo Creek, 71 Fed. Reg. 834 (Jan 5, 2006), 50 C.F.R. §§ 224.101, 266 (2016); the endangered scalloped hammerhead shark, Eastern Pacific DPS, 79 Fed. Reg. 38214 (July 3, 2014); the threatened green sturgeon (southern DPS), 71 Fed. Reg. 17757 (April 6,

2005); the endangered tidewater goby, proposed to be reclassified as threatened, 59 Fed. Reg. 5494 (Feb. 4, 1994), with critical habitat in waterways along Santa Barbara, Ventura, and Los Angeles Counties, 78 Fed. Reg. 8746 (Feb. 6, 2013); the endangered sei whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); the endangered blue whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); the endangered fin whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); the endangered North Pacific right whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); 73 Fed. Reg. 12024 (March 6, 2008); the endangered humpback whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); the endangered sperm whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); the threatened Guadalupe fur seal, 50 Fed. Reg. 51252 (December 16, 1985); the threatened southern sea otter, 42 Fed. Reg. 2965 (January 14, 1977); the endangered Hawaiian petrel, 32 Fed. Reg. 4001 (March 11, 1967); the endangered California Ridgway's rail, 35 Fed. Reg. 16047 (Oct. 13, 1970); the endangered short-tailed albatross, 65 Fed. Reg. 46643 (July 25, 2000); the endangered California least tern, 35 Fed. Reg. 16047 (October 13, 1970); the endangered light-footed Ridgway's rail, 35 Fed. Reg. 16047 (October 13, 1970); the threatened western snowy plover (Pacific DPS), 58 Fed. Reg. 12864 (March 5, 1993); the threatened marbled murrelet, 57 Fed. Reg., 45328 (Sep 28, 1992); the endangered loggerhead turtle North Pacific DPS, 76 Fed. Reg. 58868 (Sep. 22, 2011); the endangered leatherback turtle, 35 Fed. Reg. 8491 (June 2, 1970); the threatened green turtle East Pacific DPS, 81 Fed. Reg. 20057 (April 6, 2016); and the threatened olive ridley turtle. 43 Fed. Reg. 32800 (July 28, 1978). All of these species may be affected by WSTs.

207.   Plaintiffs' notice letter alleged that BOEM and BSEE are in violation of the ESA for failing to lawfully consult with the FWS and NMFS regarding impacts on the listed species identified in paragraph 206 above; failing to "use the best scientific and commercial data available," and failing to insure that the project will not jeopardize the continued existence of listed species or result in the destruction or adverse modification of their designated critical habitat.  Plaintiffs

also provided notice that to the extent BSEE and BOEM concluded that the programmatic approval would have "no effect" on listed species, such conclusions were unlawful and in violation of Sections 7 and 9 of the ESA.

208.   The best available scientific information demonstrates that offshore well stimulation, including fracking and acid well stimulation, as well as similar practices including "routine" acid treatments or "acid washes," may impact threatened and endangered marine and coastal species in numerous respects: toxic chemicals used in the process risk being spilled during transportation and delivery, and WST-related wastes risk being spilled during handling, processing, and disposal. Impacts of these toxic discharges on the marine environment have never been meaningfully analyzed.  In addition, the action threatens many of these species with noise disturbance or being struck by platform supply vessels delivering WST equipment and supplies, and by the risk of accidental seafloor surface expressions or produced water pipeline leaks.  Well stimulation also extends the life of existing oil platforms thereby prolonging the occurrence and impacts of offshore drilling.  Such impacts include the risk of oil spills on a sensitive marine environment suffering from a history of devastating spills, including the May 19, 2015, rupture of the Plains All-American Pipeline, which delivered crude that originates from offshore platforms where WSTs have occurred.  The spill harmed hundreds of coastal birds and other marine wildlife. The Ninth Circuit Court of Appeals has already specifically recognized the potential for adverse impacts on listed species in relation to OCS oil and gas production offshore California.  *Norton*, 311 F.3d at 1176–77  (finding potential adverse impacts on threatened and endangered species including the southern sea otter; the potential adverse effects on ecologically significant or critical areas including the Channel Islands National Marine Sanctuary).

209.   During the programmatic WST NEPA process, BSEE and BOEM specifically acknowledged the potential for impacts to listed species.  The Final

Complaint for Declaratory and Injunctive Relief                              Page 57

PEA identifies potential impacts to benthic organisms, which includes black abalone and white abalone.  For example, it states there are "minimal effects on benthic organisms" regarding the discharge of flowback fluids. Final PEA, at 4-52.

210.   The Final PEA identifies potential impacts to marine and coastal fish, which includes the southern California steelhead, the scalloped hammerhead shark, and the tidewater goby.  For example, it recognizes the potential for fish to be "temporarily exposed to highly diluted concentrations of WST-related chemicals" in platform discharges.  Final PEA, at 4-54.

211.   The Final PEA identifies potential impacts to marine mammals, which includes the sei whale, the blue whale, the fin whale, the humpback whale, the sperm whale, the Guadalupe fur seal, and the southern sea otter.  For example, it acknowledges potential impacts "associated with the discharge from platforms of WST-related fluids and chemicals," Final PEA, at 4-54, from "noise" and being "struck by PSVs," Final PEA, at 4-55, from a surface spill of WST chemicals, *id.* at 4-56, and from "disturbance in behavior and/or distribution of some individuals." *Id.*

212.   The Final PEA identifies potential impacts to birds, which includes the western snowy plover, the marbled murrelet, the light-footed Ridgway's rail, and the California least tern.  For example, the Final PEA states that marine and coastal birds may be affected by "noise or the presence of PSVs" and the "accidental release of WST chemicals." *Id.* at 4-59–60.

213.   The Final PEA identifies potential impacts to sea turtles, which includes the loggerhead turtle, the leatherback turtle, the green turtle, and the olive ridley turtle.  For example, sea turtles could be impacted by the "accidental release of WST fluids and crude oil," resulting in "decreased health, reproductive fitness, and longevity," Final PEA, at 4-61, "affected during spill containment and cleanup activities.," *id.* at 4-62, "struck by PSVs," disturbed by noise associated with PSVs, and "expos[ed] [to WST chemicals] through direct contact and through ingestion

Complaint for Declaratory and Injunctive Relief                           Page 58

of contaminated food," *id.* at. 4-60.

214.   These potential impacts, even if characterized as minimal, trigger Federal Defendants' duty to initiate consultation, because the action "may affect" these listed species.  50 C.F.R. § 402.14(a) (1986); 51 Fed. Reg. 19926 (June 3, 1986) (this standard includes "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character"); *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012); *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1079 (D. Mont. 2013) ("While the 'disturbance effects' may be discountable or insignificant . . . 'any possible effect' requires the [agency] to obtain the concurrence of the Wildlife Service in order to avoid consultation.").  Federal Defendants' own analysis identifies such potential effects, triggering the consultation requirement.

215.   In addition to the potential impacts identified above, Federal Defendants have also failed to address indirect and cumulative impacts, for example, the impacts to threatened and endangered species and their critical habitat from extending the life of oil platforms and infrastructure, such as oil pipelines that may rupture and harm wildlife.

216.   If Federal Defendants are implicitly making a "no effect" or "not likely to adversely affect" determination with respect to any of the species, such a determination is invalid because it is arbitrary and capricious.  BSEE and BOEM rely on cursory analysis and unfounded assumptions about the frequency of WSTs to reach the conclusion that impacts are "minimal" or "negligible."  There is no rational connection between recognizing these potential impacts and any conclusion of "no effect," and the agencies overlook many important aspects of the problem such as extending the life of existing platforms.  *See Native Ecosystems Council*, 946 F. Supp. 2d at 1079 ("To recognize that the Project will result in 'disturbance effects' and then conclude that the Project will have 'no effect' on grizzly bears is arbitrary and capricious.").

Complaint for Declaratory and Injunctive Relief                               Page 59

217.   Federal Defendants have also concluded the action will have "no effect" on certain listed species:  the North Pacific right whale, short-tailed albatross, Hawaiian petrel, southern green sturgeon, and California Ridgway's rail. However, in the analysis for all such species, BSEE and BOEM summarily reach conclusions that the species will not occur in the area with any regularity as a basis for concluding that the action will have "no effect" on the species.  Their own analysis, however, fails to use the best scientific information available, and recognizes that species may be present, yet fails to explain how despite their presence, the species will not be impacted.

218.   For example, with respect to the North Pacific right whale, the Final PEA states that there are "very few sightings of individuals off southern California and any individuals that may enter the project area would likely spend a very limited amount of time in the vicinity of any of the offshore platforms."  Final PEA, at 4-55.  However, because this species has a migration range that includes the action area, individuals are subject to all of the same threats to which the other whales assessed in the Final PEA are subject, including collisions with vessels.

219.   With regard to the short-tailed albatross, the Final PEA reaches a "no effect" conclusion because of irregular occurrence and "lack of recorded sightings in the vicinity of the project area."  Final PEA, at 3-60.  However, it also notes that nine of the records of sightings have occurred in the action area, including around the Channel Islands.  *Id.* at 3-59.  Therefore, the short-tailed albatross is likewise subject to the same potential impacts to which the other marine and coastal birds are subject.  BSEE's and BOEM's analysis of the Hawaiian petrel and the California Ridgway's rail follow similar unsupported conclusions.

220.   With respect to the southern green sturgeon, Federal Defendants overlook that the species may be present, as it occurs up and down the west coast, including near Point Conception. *See* NMFS, Green Sturgeon Range Map (December 2007).

Complaint for Declaratory and Injunctive Relief                                                Page 60

221.   Federal Defendants had sixty days (or until October 9, 2016) to remedy these alleged violations before Plaintiffs could bring suit in Federal District Court.  Based on available information, Defendants have failed to remedy any of their violations of the ESA.

### CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of NEPA**
**Approval of Unlawful EA and FONSI**

222.   Each and every allegation set forth in the Complaint above is incorporated herein, by reference.

223.   Pursuant to NEPA, Defendants must take a "hard look" at the consequences, environmental impacts, and adverse effects of the proposed actions. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9 (1978).  Defendants have failed to abide by this overarching requirement in numerous respects.

224.   NEPA requires federal agencies proposing actions to "briefly specify the underlying purpose and need to which the agency is responding to in proposing the alternatives including the proposed action." 40 C.F.R. §§ 1502.13, 1508(9)(b) (1978); 43 Fed. Reg. 45,983 (1979).   A purpose and need statement that states a purpose to enact or adopt a private party applicant's proposal is unlawfully narrow. *National Parks Conservation Ass'n*, 606 F.3d at 1069–72.  The PEA fails to meet these legal requirements by including a purpose and need statement that is driven entirely by the desire of oil company lessees to conduct offshore well stimulation.

225.   The legal settlement in *EDC v. BSEE* further undermines the notion that the underlying purpose of the PEA was simply to facilitate offshore well stimulation.  As stated in the settlement, the PEA is a central obligation agreed to by the agencies in order to resolve Plaintiffs' numerous alleged claims that the agencies have routinely violated NEPA in their issuances of categorical exclusions for offshore fracking and acidizing.  Under the settlement, the purpose of the PEA is for the agencies, *for the first time*, to consider the potential environmental

Complaint for Declaratory and Injunctive Relief                    Page 61

impacts of offshore well stimulation, and then based on that analysis, determine *whether* further offshore well stimulation should be permitted or otherwise authorized.  Indeed, BSEE and BOEM agreed that they "will not pre-determine the outcome of this assessment."  The purpose and need statement runs directly afoul of this binding settlement commitment, as well as NEPA's underlying requirements, by not only presuming that offshore fracking and acidizing can be done safely and in conformance with governing laws, but that BSEE and BOEM have an obligation to promote their use.

226.  Using the purpose and need statement as a foundation, federal agencies must rigorously explore and objectively evaluate a reasonable range of alternatives and their associated impact on the environment.  42 U.S.C. §4332(C); 40 C.F.R. 1502.14 (1978).  As purpose and need statements are one of the main engines driving the alternatives analysis within a NEPA document, failure to properly define a project's purpose and need will, in turn, preclude proper consideration of a reasonable range of alternatives.  *National Parks Conservation Ass'n,* 606 F. 3d at 1072 ("As a result of this unreasonably narrow purpose and need statement, the BLM necessarily considered an unreasonably narrow range of alternatives.").

227.  BSEE and BOEM unlawfully narrowed the scope of the purpose and need statement, and in turn unlawfully constrained their consideration of alternatives and rendered the PEA an empty formality.  Although the agencies developed two alternatives that would place some restrictions on the use of offshore fracking and acidizing, by prohibiting the use of fracturing WSTs at depths less than 2,000 feet and prohibiting open water discharge of WST waste fluids, respectively, the agencies inexplicably failed to consider the restrictions together in one alternative, or to otherwise craft a comprehensive alternative that would best preserve the environment in the event that future WST treatments are allowed by the agencies.

Complaint for Declaratory and Injunctive Relief                                    Page 62

228.   BSEE and BOEM also failed to adequately consider a reasonable range of alternatives due to their unsupported conclusions that offshore fracking and acidizing will essentially cause no environmental impacts.

229.   Specifically, in the PEA BSEE and BOEM analyze the following categories of potential environmental impacts:  air quality (including greenhouse gas emissions); water quality; geologic resources/seismicity; benthic resources; marine and coastal fish and essential fish habitat; marine and coastal birds; marine mammals; sea turtles; commercial and recreational fisheries; areas of special concern; recreation and tourism; environmental justice; and archeological resources.  Final PEA at ES-5, ES-7.  Almost without exception, BSEE and BOEM conclude that the proposed action Alternative 1 to allow use of offshore fracking and acidizing will result in "no" or "negligible" impacts.  Final PEA at ES-11–ES-13 (Table ES-1).  Only with respect to air quality ("negligible emissions of greenhouse gases"); water quality ("slight localized reduction in water quality at surface water discharge location");  benthic resources ("potential for some individuals to be temporarily exposed to highly diluted concentrations of WST-related chemicals within the NPDES discharge mixing zone"); and marine and coastal fish and essential fish habitat, sea turtles, marine and coastal birds, and marine mammals ("potential for some individuals to be temporarily exposed to highly diluted concentrations of WST-related chemicals within the NPDES discharge mixing zone. Short-term and localized disturbance in behavior and/or distribution of individuals during WST implementation possible but effects negligible") do BSEE and BOEM acknowledge *any* potential environmental impacts from offshore fracking and acidizing.  These conclusions are unlawful under NEPA, and lack scientific and analytic integrity.

230.   BSEE and BOEM's conclusion of no environmental impacts is driven by several fundamental assumptions and other significant errors, including: 1) unsupported and inconsistent assumption of infrequent use of well stimulation

Complaint for Declaratory and Injunctive Relief                              Page 63

treatments; 2) unlawful reliance on U.S. EPA's NPDES General Permit, which authorizes wastewater discharges from offshore platforms located in the Southern California OCS; 3) failure to adequately assess the impacts of well stimulation treatments on water quality; and 4) failure to adequately consider the environmental context of the Santa Barbara Channel, protected lands and waters (including Channel Islands National Park and Channel Islands National Marine Sanctuary), and threatened and endangered species in its programmatic analysis of offshore well stimulation in the Southern California OCS.  In addition, BSEE and BOEM failed to adequately assess the increased risk of environmental impacts associated with the use of well stimulation extending the life of aging offshore oil platforms beyond their estimated life span.

231.   BSEE and BOEM were required in the PEA to consider "whether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.7 (1978).  A cumulative impact on the environment "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable actions regardless of what agency . . . or person undertakes such actions."  *Id*.  In addition, BSEE and BOEM should have considered "similar" actions, most notably "routine" acid use or "acid washes."  40 C.F.R. § 1508.25(a)(3) (1978).

232.   BSEE and BOEM have failed to conduct a lawful cumulative effects analysis in the PEA.  For example, the PEA fails to analyze impacts associated with oil infrastructure, including pipelines and processing plants.   The Refugio Oil Spill is an example of the extent of such potential impacts.  On May 19, 2015, the Plains All-American Pipeline 901 suffered a massive leak, due to external corrosion, resulting in approximately 2,934 barrels (over 140,000 gallons) of crude oil spilling from onshore Gaviota Coast, onto the beach and into the ocean. Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report* (May 19, 2015).  The spill resulted in hundreds of dead birds and mammals

and many more injured, 150 miles of coastline contaminated, two State parks closed, and 138 square miles of fishing grounds closed. Pipeline 901 delivers crude that originates from seven offshore oil platforms in the Channel, including from Platforms Heritage, Harmony and Hondo (operated by ExxonMobil); Hidalgo, Harvest and Hermosa (operated by Freeport McMoran); and Holly (operated by Venoco). Offshore WST is known to occur on at least three of these platforms. Offshore WST enhances production and extends the life of offshore oil platforms, necessitating continued operation of oil infrastructure, and posing additional threats. The PEA fails to analyze the cumulative impacts of existing and future oil infrastructure or assess the incremental impacts of WSTs.

233. In addition, the PEA does not contain a lawful analysis regarding the cumulative and similar impacts of "routine" acidizing or "acid washes", and the estimated impacts on the environment this practice may have. BSEE and BOEM apparently consider essentially all treatments using acid to be "routine," as the PEA states that only two matrix acidizing treatments meeting the SB 4 definition were conducted on the California OCS between 1985 and 2011, and that "the rest would be currently classified as routine well maintenance treatments." Final PEA, at 4-3; *see also id.* at ES-8. This information appears to conflict with information EDC has compiled through its own review of BSEE records obtained through FOIA, including specific permits that were challenged in the previous *EDC v. BSEE* lawsuit. *See*, *e.g.,* Jan. 3, 2011, APM at Platform Harmony (authorizing "acid stimulate" with 17,000 gallons 15% HCL and 26,000 gallons 12-3 mud acid (12% HCL + 3% HF); March 22, 2013, APM at Platform Harmony (authorizing "acid stimulate" with 75,000 gallons 15% HCL); December 2, 2013, APM at Platform Gilda (authorizing "acid stimulation"). Whatever label is ascribed to the practices authorized under these permits, the failure to consider their cumulative impacts was unlawful.

Complaint for Declaratory and Injunctive Relief                    Page 65

234.   BSEE's and BOEM's May 27, 2016, FONSI  authorizes the use of WST without conditions, mitigations, or other restrictions from twenty-three producing platforms within the Southern California OCS.  According to Plaintiffs' information and belief, at least two applications for WST have been submitted and approved since that authorization, including an APM for Well S-55 (Platform Gilda)(operations including "enhance production," and "acidize" and "artificial lift" and an APM for Well B-35 (Platforms A, B, or C) (operations include "enhance production" and acidize).

235.   BSEE and BOEM will continue to issue implementing decisions approving APMs and/or APMs that include WST operations in reliance upon the May 27, 2016, FONSI.

236.   The APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary and capricious, an abuse of discretion, not in accordance with law," or "without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (D).  For each of the above reasons, and others, BSEE's and BOEM's adoption of an inadequate PEA and FONSI to authorize the use of offshore well stimulation in the Southern California OCS without qualification or restriction is arbitrary, capricious, and not in accordance with law as required by NEPA and its implementing regulations, and is subject to judicial review under the APA.

**SECOND CLAIM FOR RELIEF**
**Violation of NEPA**
**Failure to Prepare an EIS**

237.   Each and every allegation set forth in the Complaint above is incorporated herein, by reference.

238.   NEPA requires all federal agencies to prepare an EIS for all major federal actions significantly affecting the quality of the human environment.  42 U.S.C. § 4332(C).  BSEE and BOEM violated NEPA in approving the PEA and FONSI authorizing the use of well stimulation techniques, including hydraulic

Complaint for Declaratory and Injunctive Relief                    Page 66

fracturing and acid well stimulation, from the twenty-three production platforms located in the Southern California OCS, without conditions, mitigations, or other restrictions without preparing an EIS.  BSEE's and BOEM's conclusion that preparation of an EIS was not required prior to the programmatic authorization of offshore well stimulation within the Southern California OCS is unlawful.

239.   In determining whether a proposed action may significantly affect the environment, NEPA requires that both the context and intensity of that action be considered.  40 C.F.R. § 1508.27 (1978).  In considering context, "[s]ignificance varies with the setting of the proposed action."  *Id.* § 1508.27 (a).   Consideration of intensity, on the other hand, "refers to the severity of the impact," which is guided by consideration of ten specific factors.  Many of these factors requiring the preparation of an EIS are triggered by BSEE's and BOEM's approving the PEA and FONSI authorizing the use of well stimulation techniques, including hydraulic fracturing and acid well stimulation, from the twenty-three production platforms located in the Southern California OCS, without conditions, mitigations, or other restrictions, including  "[u]nique characteristics of the geographic area such as proximity to park lands . . . wetlands . . . or ecologically critical areas,"  "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  *Id.* § 1508.27(b).  "The presence of one such factor may be sufficient to deem the action significant." *National Parks*, 241 F. 3d at 731; *Norton*, 311 F.3d at 1162.

240.   In addition to NEPA's overarching significance regulations, NEPA's implementing regulations place specific obligations on agencies considering a proposed action with incomplete or unavailable information.  Under those regulations, when there is incomplete or unavailable information regarding potential environmental impacts, the agency shall always make clear that such

Complaint for Declaratory and Injunctive Relief                                    Page 67

information is lacking.  40 C.F.R. § 1502.22 (1978).   An "agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain . . . [and] where uncertainty may be resolved by further collection of data, or where the collection of data may prevent speculation on potential effects." *National Parks*, 241 F. 3d at 731.

241.   The APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions" that "are therefore arbitrary and capricious, an abuse of discretion, not in accordance with law," or "without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (D).  For each of the above reasons, and others, BSEE's and BOEM's May 27, 2016, FONSI authorizing of the use of offshore well stimulation in the Southern California OCS without qualification or restriction and without first preparing an EIS is arbitrary, capricious, and not in accordance with law as required by NEPA and its implementing regulations, and is subject to judicial review under the APA.

### THIRD CLAIM FOR RELIEF
#### Violation of ESA
#### Failure to Initiate Consultation and Unlawful No Effect Determinations in Violation of Sections 7 and 9

242.   Each and every allegation set forth in the Complaint above is incorporated herein, by reference.

243.   The ESA requires all federal agencies to initiate consultation with the appropriate wildlife agency (NMFS or FWS) before undertaking an action that "may affect" a listed species or critical habitat.  50 C.F.R. § 402.14(a) (1986); 16 U.S.C. § 1536 (a)(2).  This standard triggers consultation if an action has "any chance of affecting listed species or critical habitat," even if effects are "benign" or of an "undetermined character." *Karuk Tribe*, 681 F.3d at 1027 (internal citations omitted).  BSEE and BOEM violated the ESA in approving the PEA and FONSI authorizing the use of well stimulation techniques, including hydraulic fracturing

Complaint for Declaratory and Injunctive Relief                                    Page 68

and acid well stimulation, from the twenty-three production platforms located in the Southern California OCS, without initiating consultation.  BSEE's and BOEM's failure to initiate consultation, despite the potential for impacts on listed species, prior to the programmatic authorization of offshore well stimulation within the Southern California OCS, and the agencies' determination that the use of WSTs on the Southern California OCS will have no effect on listed species, violated Sections 7 and 9 of the ESA, 16 U.S.C. §§ 1536(a)(1)–(2), 1538.

244.   Federal Defendants' decision to approve the FONSI and PEA authorizing the use of offshore well stimulation in the Southern California OCS is a project "authorized, funded, or carried out by such agency" and therefore within the definition of agency action subject to the ESA under 50 C.F.R. § 402.02.50 (1986).

245.   Under ESA Section 7, BSEE and BOEM were required to request from both NMFS and FWS "a list of any listed or proposed species or designated or proposed critical habitat that *may be present* in the action area." 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c)–(d) (2016) (emphasis added). To the best of Plaintiffs' knowledge, BSEE and BOEM have not created a species list and received concurrence from NMFS and FWS, nor have they requested the preparation of the list, in violation of Section 7(a)(2).

246.   The action may affect at least twenty-five species listed as endangered or threatened under the ESA, and identified above in paragraph 206; however, Federal Defendants have not initiated consultation with respect to any of these species.

247.   BSEE and BOEM acknowledge the presence of, and potential impacts on at least twenty listed species, as described in paragraphs 204–221 above, and generally recognize that the action may affect listed species. FONSI, at 4 (concluding that the action "is expected to have negligible to minor effects on biological resources"); Final PEA, at 3-37 (emphasis added) ("[O]perational

Complaint for Declaratory and Injunctive Relief                              Page 69

discharges to the ocean from the platforms and support vessel traffic may affect ecological resources in the project area."). While BSEE's and BOEM's analysis dismisses these impacts, even negligible or minor potential impacts trigger the consultation requirement. *See Karuk Tribe*, 681 F.3d at 1027 ("[A]ctions that have *any chance* of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA.").

248.   Federal Defendants have also concluded that the action will have "no effect" on certain species. For the reasons explained in paragraphs 204–221 above, BSEE's and BOEM's "no effect" conclusions with respect to the North Pacific right whale, the southern green sturgeon, the short-tailed albatross, the Hawaiian petrel, and the California Ridgway's rail are arbitrary and capricious and fail to use the best scientific information available, in violation of Sections 7 and 9 of the ESA, 16 U.S.C. §§ 1536(a)(1)–(2), 1538.

249.   As a result of failing to engage in consultation under Section 7, BSEE and BOEM have likewise failed to establish an ITS that would account for impacts from "incidental take" associated with offshore WSTs, and thus face liability under Section 9. *See* 16 U.S.C. § 1536 (o)(2) (establishing that taking that is "in compliance with the terms and conditions specified" in the ITS is "not considered a prohibited taking" under Section 9). Potential impacts that could constitute take are described above, and include, for example, impacts from exposure to toxic chemicals or collisions with PSVs. *See* Final PEA Section 3.5 (Ecological Resources), 4.5.1.4 (Environmental Consequences- Ecological Resources). However, in the absence of an ITS that sets limits on take and is designed to ensure against jeopardy, impacts from offshore WSTs that cause take with respect to all twenty-five listed species that may be affected, likewise violates Section 9. BSEE's and BOEM's authorization of offshore WST pursuant to the FONSI and

Complaint for Declaratory and Injunctive Relief                                    Page 70

PEA violates Section 9's prohibition on "taking" of any threatened or endangered species. *See* 16 U.S.C. §1538(a).

250. The ESA provides that "any person" may bring suit "to enjoin any person, including the United States . . . who is alleged to be in violation" of the ESA. 16 U.S.C. § 1540(g)(1)(A). Federal Defendants have failed to engage in consultation to ensure the action does not jeopardize these listed species or result in the destruction or adverse modification of their critical habitat, as required by Section 7(a)(2) of the ESA, 16 U.S.C. § 1536 (a)(2).

251. For each of the reasons above, and others, BOEM's and BSEE's failure to initiate consultation with FWS (in relation to the southern sea otter, the Guadalupe Fur Seal, the light-footed Ridgway's rail, western snowy plover, marbled murrelet, California least tern, short-tailed albatross, Hawaiian petrel, and California Ridgway's rail) and NMFS (in relation to the black abalone, white abalone, sei whale, blue whale, fin whale, North Pacific right whale, humpback whale, sperm whale, southern California steelhead, scalloped hammerhead shark, southern green sturgeon, tidewater goby, loggerhead turtle, leatherback turtle, green turtle, and olive ridley turtle) with respect to the May 27, 2016, FONSI and PEA violates Sections 7 and 9 of the ESA, 16 U.S.C. §§ 1536(a)(1)–(2), 1538, and is subject to judicial review under the ESA.

## RELIEF REQUESTED

For the foregoing reasons, Plaintiffs respectfully request that the Court:

A. Declare that Defendants have violated NEPA, its implementing regulations, and the APA as described above by failing to take a "hard look" at the potential environmental impacts of offshore well stimulation and failing to prepare an EIS before authorizing the use of WST, without condition, mitigation, or other restriction, from twenty-three production platforms located in the Southern California OCS;

B.  Vacate the Final PEA and FONSI;

C.  Enjoin Defendants from issuing Permits (to Drill or to Modify) for well stimulation treatments, until and unless Defendants comply with NEPA and all other applicable laws;

D.  Remand the Final PEA and FONSI to Defendants for preparation of an EIS that addresses the potential environmental impacts of WST in the Southern California OCS;

E.  Declare that Defendants have violated the ESA, and its implementing regulations, by failing to initiate consultation with respect to all listed species that may be present;

F.  Declare that Defendants have violated the ESA, and its implementing regulations, by making unlawful "no effect" determinations;

G.  Enjoin Defendants from issuing Permits (to Drill or to Modify) for well stimulation treatments, until and unless Defendants comply with the ESA and all other applicable laws;

H.  Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees and costs, pursuant to the ESA and the Equal Access to Justice Act, 28 U.S.C. § 2412, or other authority; and

I.  Grant such additional relief as the Court deems just and proper.

Respectfully submitted this November 11th, 2016

/s/ _____

Margaret Morgan Hall (Bar No. 293699)
Email: mhall@environmentaldefensecenter.org
906 Garden Street
Santa Barbara, California 93101
Phone:  (805) 963-1622
Facsimile:  (805) 962-3152

*Attorneys for Plaintiffs*
ENVIRONMENTAL DEFENSE CENTER and
SANTA BARBARA CHANNELKEEPER

Complaint for Declaratory and Injunctive Relief                    Page 72

E.R. 1138



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
West Coast Region
501 West Ocean Boulevard, Suite 4200
Long Beach, California 90802-4213

December 4, 2017

In response, refer to:
2017-8143

Joan R. Barminski
Pacific OCS Region
Bureau of Ocean Energy Management
760 Paseo Camarillo, Suite 102
Camarillo, California 93010-6064

Re: Endangered Species Act Section 7(a)(2) Concurrence Letter for the Proposed
Continuation of Offshore Oil and Gas Development and Production Activities in the
Southern California Planning Area

Dear Ms. Barminski:

On March 27, 2017, NOAA's National Marine Fisheries Service (NMFS) received your request
via electronic mail for written concurrence that the Bureau of Ocean Energy Management's
(BOEM) (and on behalf of the Bureau of Safety and Environmental Enforcement (BSEE))
proposed continuation of offshore oil and gas development and production activities in the
Southern California Planning Area (SCPA) is not likely to adversely affect species listed as
threatened or endangered or critical habitats designated under the Endangered Species Act
(ESA). This response to your request was prepared by NMFS pursuant to section 7(a)(2) of the
ESA, implementing regulations at 50 CFR 402, and agency guidance for preparation of letters of
concurrence. BOEM stated that, at a later date, they would request concurrence regarding
essential fish habitat, as required under the Magnuson-Stevens Fishery Conservation and
Management Reauthorization Act, as amended.

This letter underwent pre-dissemination review using standards for utility, integrity, and
objectivity in compliance with applicable guidelines issued under the Data Quality Act (section
515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001, Public
Law 106-554). The concurrence letter will be available through NMFS' Public Consultation
Tracking System [https://pcts.nmfs.noaa.gov/pcts-web/homepage.pcts]. A complete record of
this consultation is on file at NMFS' West Coast Regional Office in Long Beach, California.

**Proposed Action and Action Area**

According to the biological assessment (BA), this consultation would focus on the effects of
existing outer continental shelf oil and gas development and production plan activities in the



DOI0106301
E.R. 1139

DOI0106302

E.R. 1140

2

SCPA, which extends from the Monterey/San Luis Obispo County line southward to the Mexican border and includes waters 3-200 nautical miles from shore. The SCPA is the action area for this consultation.

Currently, 23 federally regulated oil and gas platforms produce approximately 50,000 barrels of oil per day, although production was temporarily reduced to about 17,000 barrels per day as the result of an onshore pipeline failure. There are fewer than 400 active development wells at any given time, with approximately 260 million barrels of oil estimated to remain in oil and gas fields within reach of existing platforms in the SCPA.

Approval of oil and gas development and production plans and plan revisions (BOEM)

According to the BA, all major construction activities under approved development and production plans in the SCPA have either been completed or are no longer being considered. In addition, BOEM does not anticipate new development and production plans to be submitted in the absence of a leasing program. While revisions to plans may be made in the foreseeable future (e.g., change in the type of drilling, production facility, or oil/gas transportation mode, change in the location of a drilling or production facility), currently, the BA includes a description and analysis of the effects of the *ongoing* discharges, emissions, vessel and aircraft use taking place under existing development and production activities, and will therefore be considered as part of the proposed action.

*Discharges and emissions*: The National Pollution Discharge Elimination System permit from the Environmental Protection Agency authorizes 22 types of discharges from all Federal offshore platforms in southern California, including drilling muds and cuttings, produced water, well treatment, completion and workover fluids, etc. BOEM concluded that any discharges associated from oil and gas development and production plans would have no effect on listed species; therefore, we will not consider the effects of discharges on endangered and threatened species and/or their critical habitat.

*Support vessel and operator aircraft activity*: Day-to-day offshore oil and gas development and production operations require routine personnel and equipment transfers, with crew and supply vessels departing the coast approximately 30 times per day (nearly 11,000 round trips per year) along pre-determined routes from: Seal Beach Pier (public pier, Orange County), Terminal Island (port of Los Angeles), Port Hueneme, Carpinteria Pier (private pier, Santa Barbara County) and Ellwood Pier (private pier, Santa Barbara County) to nearby offshore platforms. According to BOEM, vessels range in size between 80-100 feet and travel at speeds between 10-20 knots, during both daytime and nighttime hours (G. Sanders, personal communication, April 13, 2017). All vessel operators (and platform crews) are required to complete wildlife and fisheries awareness training. Vessel operators are also expected to report adverse wildlife encounters, although there is no formal monitoring program in place. Approximately 3-4 helicopter trips per day (~1,100-1,500 trips per year) are used to transport personnel from the Santa Maria Airport to platforms north of Point Conception.

3

Approval of applications for permit to drill and applications for permit to modify (BSEE)
An Application for Permit to Drill (APD) is used to approve drilling specifications for new wells (on existing platforms), new sidetrack wells, and bypasses or deepening of existing wells. Drilling of new wells may also include the installation of conductors which establish a conduit from the deck of the platform to the sea floor; however, if well conductors are proposed to be installed and sound is expected to affect marine mammals, BSEE will conduct a separate ESA consultation. An Application for Permit to Modify (APM) is required when an approved APD is revised or materially changed. Well completion and workover operations, for example, are conducted to establish, maintain, or restore production of a well and are generally approved with an APM. BSEE may authorize several types of well simulation treatments through their approval of an APD or APM. These operations may include hydraulic fracture treatments and other well stimulation techniques (e.g., acidization) that are designed to enhance recovery of oil and gas resources. Several types of well stimulation treatments, include diagnostic fracture injection tests, hydraulic fracturing, acid fracturing, and matrix acidizing. BSEE expects to review and approve approximately 1-2 new and 5-7 sidetrack wells (APDs) and 2-4 well workovers and up to 5 well stimulation treatments (APMs) per year in the Southern California Planning Area. Staff from BOEM clarified that a "no effect" determination was made for any activities associated with well stimulation (G. Sanders, BOEM, personal communication, June 29, 2017).

Platform inspection program (BSEE)
Departing from Camarillo Airport, helicopters are used to inspect platforms offshore. The average flight usage over the most recent five years has been 45,000 to 50,000 miles per year, and helicopters typically maintain altitudes greater than 500 feet when transiting between land and the platforms and between platforms.

Oil spill response equipment exercises (BSEE)
BSEE requires offshore operators to have oil spill response plans and that operators periodically deploy industry-owned oil spill response equipment through an oil spill response exercise. Equipment deployed may include oil spill boom, mechanical skimmers, response vessels, oil storage equipment, aircraft and marker buoys. Booms are floating, physical barriers to oil, with between 18 and 48 inches of material ("skirt") that hangs beneath the surface. Containment boom comes in lengths of 500 feet or more and can be connected together into lengths reaching 1,500 feet. Mechanical skimmers remove free floating or corralled oil from the surface of the water. For offshore oil cleanup, skimmers are generally deployed and maneuvered by vessels through an oil slick to actively collect the oil. Towable temporary oil storage devices are designed to hold and transport recovered oil from a spill site and can have capacity that ranges from a few gallons to more than 300,000 gallons. There are three types of storage devices. The first is a towable, rectangular-shaped pillow tank with special tow rigging, while the second is a towable flexible tank ("bladder") which is long and cylindrical which, when full is largely submerged. The third type is a towable open tank, an inflatable barge-type vessel with an open-top storage bag suspended inside the main structure. In addition to these temporary oil storage devices, metal or inflatable barges designed for temporary oil storage can be towed or pushed by a vessel during an exercise (generally maximum storage capacity of 250 barrels, or approximately 10,000 gallons of crude oil).

DOI0106304

4

Response vessels are used to deploy and maneuver boom and mechanical skimmers, ferry equipment and personnel, conduct spill surveillance, and to two oil storage devices and barges. Vessels range in size from 12-foot skiffs to 207-foot vessels. Some vessels used for oil spill response can achieve speeds up to 30 knots, particularly when dispatched to the oil spill exercise area. Once on scene, vessels generally transit at very low speeds (0 to 5 knots) to conduct oil spill response operations. In addition, both helicopter and fixed wing aircraft may be deployed for oil spill response activities, discharging water (simulated dispersant) and overseeing response activities.

Based on the number of oil spill response plans currently overseen by BSEE in the Pacific Region, normally three oil spill response exercises are conducted annually, but as described in the BA, there could be more during any particular year if an owner/operator needs to be retested or if new oil spill response plans are approved in the region. Equipment deployments during an exercise generally occur for a few hours and rarely longer than a day.

*Mitigation*

According to BOEM (G. Sanders, personal communication, August 2, 2017 and as contained in the August 14, 2017 letter), if any large whales enter the oil spill response drill area, any deployed booms and anchors will be immediately recovered.

**Action Agency's Effects Determination**

In its March 27, 2017, letter and based on the analysis conducted in the BA, BOEM and BSEE determined that noise, collisions, and oil spills[1] were the only associated activities that may affect but are not likely to adversely affect[2]: blue whales (*Balaenoptera musculus*), fin whales (*B. physalus*), humpback whales (*Megaptera novaeangliae*), north Pacific right whales (*Eubalaena japonica*), sei whales (*B. borealis*), sperm whales (*Physeter macrocephalus*), western north Pacific gray whales (*Eschrichtiius robustus*), Guadalupe fur seals (*Arctocephalus townsendi*), leatherback sea turtles (*Dermochelys coriacea*), north Pacific loggerheads (*Caretta caretta*), East Pacific green turtles (*Chelonia mydas*), olive ridley sea turtles (*Lepidochelys olivacea*), green sturgeon (*Acipenser medirostris*), steelhead trout (*Oncorhynchus mykiss*), white abalone (*Haliotis sorenseni*) and black abalone (*H. cracherodii*).

The following listed species and critical habitat that may be affected by the action include:

| Species | ESA listing | Citation(s) for listing determinations | Critical Habitat |
|---|---|---|---|
| Blue whale | Endangered | 35 FR 18319; December 2, 1970 | N/A |

---

[1] BOEM did not consider oil spills to be a *direct* effect of the action, given that they are neither authorized nor intended to occur. BOEM did, however consider that certain smaller oil spills could have an *indirect* effect of the action as a result of normal day-to-day platform operations, where small accidental discharges of hydrocarbons would be reasonably foreseeable. BOEM estimated that the maximum most likely spill volume for the Pacific Region would be 200 barrels.

[2] Not all of these activities were determined to adversely affect all listed species found within the action area.

5

| Fin whale | Endangered | 35 FR 8491; June 2, 1970 | N/A |
|---|---|---|---|
| Humpback whale – Central America distinct population segment (DPS) | Endangered | 81 FR 62260; September 8, 2016 | N/A |
| Humpback whale – Mexico DPS | Threatened | 81 FR 62260; September 8, 2016 | N/A |
| North Pacific right whale | Endangered | 35 FR 18319; December 2, 1970 | 73 FR 19000; April 8, 2008 [50 CFR 226.215] |
| Sei whale | Endangered | 35 FR 12024; December 2, 1970 | N/A |
| Sperm whale | Endangered | 35 FR 18319; December 2, 1970 | N/A |
| Western North Pacific gray whale | Endangered | 59 FR 31094; June 16, 1994 | N/A |
| Guadalupe fur seal | Threatened | 50 FR 51252; December 16, 1985 | N/A |
| Leatherback sea turtle | Endangered | 35 FR 8491 June 2, 1970 | 77 FR 4170 January 26, 2012 |
| North Pacific loggerhead sea turtle DPS | Endangered | 76 FR 58868 September 22, 2011 | N/A |
| East Pacific green sea turtle | Threatened | 81 FR 20058 April 6, 2016 | N/A |
| Olive ridley sea turtle | Threatened/ Endangered | 43 FR 32800 July 28, 1978 | N/A |
| White abalone | Endangered | 66 FR 29046; May 29, 2001 | N/A |
| Black abalone | Endangered | 74 FR 1937; January 14, 2009 | 76 FR 66806; October 27, 2011 [50 CFR 226.221] |
| Green sturgeon – southern DPS | Threatened | 71 FR 17757 April 7, 2006 | 74 FR 52300 October 9, 2009 |
| Steelhead – South Central California coastal evolutionary significant unit (ESU) | Threatened | 62 FR 43937 August 18, 1997  Amended 71 FR 834 January 5, 2006 | 70 FR 52488 September 2, 2005 |
| Steelhead – Southern California ESU | Endangered | 71 FR 43937 August 18, 1997 | 70 FR 52488 September 2, 2005 |

DOI0106306

E.R. 1144

6

## Consultation History

According to your staff, the Bureau of Ocean Energy Management (BOEM, formerly known as the Minerals Management Service (MMS) and more recently, the Bureau of Ocean and Energy Management, Regulation, and Enforcement (BOEMRE)) last engaged with NMFS through formal ESA consultation on the effects of these activities in the mid-1980s. Since that time, some species have been delisted under the ESA, and new species have been listed. In addition, critical habitat for some species has been designated and may overlap with the action area (the SCPA, which extends from the Monterey/San Luis Obispo County line southward to the U.S.-Mexico border and includes waters 3-200 nautical miles from shore). In 2011, staff from BOEMRE and NMFS met in person to discuss BOEMRE's proposal to engage in programmatic consultation, for which NMFS offered staff expertise on species (and their designated critical habitat) under our jurisdiction. In our October 14, 2011, response, we stated that during the ESA reinitiation process, BOEMRE may continue oil and gas drilling and production activities under existing and previously approved development and production plans in the Southern California Planning Area. In addition, BOEMRE stated that they would continue to comply with all existing terms and conditions identified in the original biological opinions.

Through a review of the 7 biological opinions resulting from consultations conducted between MMS and NMFS in the 1980s (August 9, 1983 through May 12, 1986), we found that two opinions issued by NMFS authorized the incidental take of 6 sea turtles (no species identified, with one mortality and 5 takes through harassment). There were no terms and conditions associated with the incidental take statement other than a requirement that MMS report any takes of sea turtles that might initiate discussions regarding mitigation and monitoring. The rest of the biological opinions contained conservation recommendations (e.g., initiation of research, etc.), which are discretionary.

Since we received your March 2017 letter and the associated BA, staff from BOEM and NMFS' West Coast Region (WCR) have engaged in numerous pre-consultation calls and e-mails, primarily in order for NMFS to clearly understand the proposed action activities, the ESA determination made by BOEM and BSEE, mitigation, and the routes used by transit vessels in association with personnel deployment to platforms, oil spill response activities, etc. Consultation on this proposed action began on July 5, 2017, following the last significant phone call between BOEM and NMFS staff, which served to provide further clarification on elements of the proposed action.

On August 14, 2017, BSEE requested that, because BSEE has been deferring oil spill response equipment exercises pending the completion of informal consultation with NMFS, NMFS accelerate our review of this component of their proposed action. Following a discussion with Mr. Greg Sanders (BOEM) on August 28, 2017, NMFS explained to BOEM and BSEE via e-mail on August 30, 2017 that, under the ESA, we cannot "piecemeal" out portions of the proposed activities for concurrence. Furthermore, ESA regulations require NMFS to assess the effects of the entire action, including any interrelated and interdependent actions. We also reminded BOEM/BSEE that, as we expressed in our October 14, 2011, letter to BOEMRE, activities/operations could proceed while the consultation was in process because BOEMRE had made their required ESA section 7(d) finding.

7

## ENDANGERED SPECIES ACT

### Effects of the Action

Under the ESA, "effects of the action" means the direct and indirect effects of an action on the listed species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action (50 CFR 402.02). The applicable standard to find that a proposed action is not likely to adversely affect listed species or critical habitat is that all of the effects of the action are expected to be discountable, insignificant, or completely beneficial. Beneficial effects are contemporaneous positive effects without any adverse effects to the species or critical habitat. Insignificant effects relate to the size of the impact and should never reach the scale where take occurs. Discountable effects are those extremely unlikely to occur.

The effects of the proposed action could include: vessel strikes, noise associated with oil and gas production, and oil spills to blue whales, humpback whales, fin whales, Guadalupe fur seals, leatherback sea turtles, loggerhead sea turtles, green turtles, olive ridley turtles, and oil spills to white abalone and black abalone and its critical habitat, steelhead, and green sturgeon.

Some elements of the proposed action may result in oil spills (greater than 200 barrels (bbl)), although oil spills are neither authorized nor intended to occur. In the course of normal, day-to-day platform operations, small accidental discharges of hydrocarbons may be reasonably foreseeable. Based on historic spill data summarized in the BA, BOEM anticipates that the maximum most likely spill volume for the Pacific Region in the foreseeable future is 200 bbl (equivalent to ~8,400 gallons). All operators must report any spill that is 1 bbl or greater in the SCPA. The development of more stringent regulations, implementation of rigorous inspection programs, etc. have all contributed to a safer environment. BOEM calculated oil spill rates for the Pacific Region using oil spill data from 1963-2014 and cumulative production from the area. In the 50-1,000 bbl size range, they estimate that there may be 1.86 spills with an 84.4% probability of occurrence for the remaining oil that could be economically produced from the SCPA. In the event of an unexpected large oil spill in marine waters, the U.S. Coast Guard would be responsible for the response event, depending on location, and would therefore need to consult with NMFS and the U.S. Fish and Wildlife Service on this emergency federal response.

### Effects to Large Whales

Large whales that may be commonly found within the action area include blue whales, fin whales, and humpback whales. Both blue whales and fin whales are listed globally as endangered under the ESA, while both the endangered Central America distinct population segment (DPS) and the threatened Mexico DPS of humpbacks forage in the area, generally in the spring and summer before they migrate south to their breeding grounds.

The Eastern North Pacific Stock of blue whales ranges from the northern Gulf of Alaska to the eastern tropical Pacific (Carretta et al. 2016). Nine biologically important areas for blue whale feeding are identified off the California coast (Calambokidis et al. 2016). Most of this stock is believed to migrate south to spend the winter and spring in high productivity areas off Baja California, in the Gulf of California, and on the Costa Rica Dome. Therefore, we would

DOI0106308

E.R. 1146

8

anticipate that during the late spring, summer, and early fall, blue whales may be found within the action area. Blue whales occur primarily in offshore deep waters (but sometimes near shore, e.g. the deep waters in Monterey Canyon, CA) and feed almost exclusively on euphausiids.

The best estimate of blue whale abundance in the U.S. West Coast feeding stock component of the Eastern North Pacific stock is 1,647 for 2008 to 2011 (Calambokidis and Barlow 2013, Carretta et al. 2016). Barlow and Forney (2007) estimated the density of blue whales off California, Oregon, and Washington at 1.36 whales/1000 km$^2$. The minimum population size is approximately 1,551 blue whales with a calculated potential biological removal (PBR[3]) allocation for U.S. waters of 2.3 whales per year (Carretta et al. 2016).

The North Pacific population of fin whales summers from the Chukchi Sea to California, and winters from California southward. Fin whales occur year-round off California, Oregon, and Washington in the California Current, with aggregations in southern and central California (Carretta et al. 2017). Association with the continental slope is common (Schorr et al. 2010). Fin whales feed on planktonic crustaceans, including *Thysanoessa* sp. euphausiids and *Calanus* sp. copepods, and schooling fish, including herring, capelin and mackerel (Aguilar 2009).

The best estimate of fin whale abundance in California, Oregon, and Washington waters out to 300 nm is 9,029 whales for 2014, based on trend-model analysis of line-transect data from 1991 through 2014. The minimum population estimate is 8,127 fin whales with a calculated PBR of 81 whales per year and the population off the U.S. west coast is increasing an average of 7.5 percent per year (Carretta et al. 2017).

Humpback whales are found in all oceans of the world and migrate from high latitude feeding grounds to low latitude calving areas. They are typically found in coastal or shelf waters in summer and close to islands and reef systems in winter (Clapham 2009). Humpbacks primarily occur near the edge of the continental slope and deep submarine canyons, where upwelling concentrates zooplankton near the surface for feeding. They often feed in shipping lanes which makes them susceptible to mortality or injury from large ship strikes (Douglas et al. 2008).

As mentioned above, the two DPSs that forage off California include the endangered Central America DPS and the threatened Mexico DPS. There is still some mixing between these populations although they are still considered distinct populations. The most recent abundance estimates using a multi-strata model for these two populations is 3,264 animals in the Mexico population and 411 animals in the Central American population (Wade et al. 2016). Abundance estimates for the summer feeding area off California and Oregon was 3,734 whales, which includes animals from Central America and Mexico. These two DPSs are currently delineated into the same "stock," as defined under the MMPA. The current stock assessment report for the CA/OR/WA stock provided a PBR of 11 whales, with an increasing trend of approximately 6-7 percent (although recent trends have been more variable (Carretta et al. 2017)).

---

[3] As defined under section 3 of the Marine Mammal Protection Act, the "potential biological removal" level is the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population.

DOI0106309

9

North Pacific right whales are extremely rare in the action area, and only a handful have been seen off California since the early 1900s, so we do not anticipate any effects to that species. In addition, available information on movements of Southern resident killer whales suggest that they have not been sighted or tracked south of Monterey Bay. Therefore, we do not anticipate any effects to Southern residents. Sei whales are rarely seen during NMFS ship-board surveys and there has only been one stranding (ship strike) in the action area over the last 30 years; therefore, we do not anticipate there to be an effect to this species. Sperm whales are typically found foraging in deep water, canyons and escarpments and would therefore rarely be found in the action area (particularly within the routes used to transport personnel from the mainland to the platforms); therefore we do not anticipate there to be an effect of this action on sperm whales. The endangered Western North Pacific gray whale forages primarily off northeastern Sakhalan Island (Russia) with a distribution extending south along Japan, the Koreas, and China and number less than 200. The Western North Pacific gray whale is generally considered isolated from the Eastern North Pacific gray whale, which was de-listed in 1994. In recent years, a few whales have migrated along the eastern basin of the Pacific, and south to the Mexican breeding grounds; however, due to the rarity of this endangered population in the area, we conclude that there is no effect to Western North Pacific gray whales.

Vessel Strikes
There are on average 11,000 trips per year (30 trips per day) to/from the mainland of southern California to the offshore platforms to transport personnel and equipment. The amount of trips has decreased since the early-to-mid 1990s which represented the peak of vessel traffic when more platforms were producing oil. The lower production is due to the fact that 9 out of 23 platforms are not producing oil. Vessels vary in size and speed, and trips may occur during the daytime or night-time. According to BOEM staff (G. Sanders, personal communication, June 29, 2017), vessels associated with BSEE-directed oil response equipment exercises would vary (1-5 vessels/day) and would not change the annual vessel use estimates given that there are not expected to be more than 3 equipment deployment exercise days in any given year.

Large whales are at risk of vessel strikes. Based on documented reports over the last 30 years (1986-2016), within the action area (San Luis Obispo County south to San Diego County), a total of 52 large whales have been struck by vessels and stranded (1.7/year). Of this total, there were 13 blue whales, 16 fin whales, 6 humpback whales, 25 gray whales, and 17 unidentified whales, some of which were likely gray whales, given that 25 ship-struck whales within the defined action area were identified as gray whales. Apportioning the unidentified ship-struck whales to a particular ESA-listed whale species based on the stranding records, a total of 16 blue whales (0.5/year), 20 fin whales (0.7/year) and 7 humpbacks (0.3/year) may have been struck by vessels over the last 30 years. In most cases, we have little to no information on the size, speed, and/or location of the vessel strikes, particularly since large oil tankers and cargo vessels have entered into ports carrying a dead whale on their bow with no knowledge of a strike.

The southern California Bight has been identified as an important foraging area for blue, fin, and humpback whales (Redfern et al. 2013; Calambokidis et al. 2015) and they can be found year-round, particularly humpback whales (Becker et al. 2017). Feeding hotspots for blue and humpback whales have been found in waters near the port of Los Angeles/Long Beach, where

DOI0106310

E.R. 1148

10

they may intersect with vessels transiting to and from the port, which could increase their vulnerability to being struck by a vessel.

Over the past 30 years, our known (and considered minimum) estimate of vessel strikes of these three whale species is considered low. However, using a novel application of a naval encounter model, researchers recently estimated ship strike mortality of humpbacks, fin whales, and blue whales to be considerably higher than the minimum estimates available from stranding records (Rockwood et al. 2017). Whale carcasses can sink and ships may not detect a whale strike, although this is more likely to be the case with large container vessels and tankers.

According to BOEM, there has never been a ship strike reported in the history of vessel traffic associated with offshore oil and gas development and production activities in the Southern California Planning Area (> 30 years). We reviewed the seven biological opinions issued in the 1980s, and at the time, based on their historical records (i.e., no reported vessel strikes) and the presumed rarity of any such event, NMFS assumed the risk of a ship strike to be extremely low and therefore an incidental take statement was not issued for large whales.

In order to assess the contribution of vessel traffic associated with the proposed action to the wider range of vessels not associated with the proposed action, we recently (summer/fall of 2017) assessed the number vessels outfitted with Automatic Identification Systems (AIS) within the action area in near real-time and determined that there were an average of 300-400 vessels (with AIS) transiting through the area during any given day. According to U.S. Coast Guard regulations (30 CFR § 164.01-.53), vessels of 65 feet or more engaged in commercial service are required to carry AIS, with some exceptions, so the actual average number of vessels that may be found within the action area is likely much higher, but unknown. We have received reports of smaller watercraft, even sailboats, striking large whales, so it is difficult to assess the risk of vessels to large whales in the action area. There have been no reports of vessel strikes associated with oil and gas development and production in over 30 years. In addition, vessel (and platform) operators are required to complete wildlife and fisheries awareness training, which should help minimize the risk of a whale strike. Given the number of vessel transits to/from offshore oil platforms (30 trips per day) associated with the proposed action compared to the minimum average of 300-400 vessels transiting in the action area in any given day, and the low percentage of blue whales, fin whales, and humpback whales (less than one per year) that are reported struck by vessels in the area, we conclude that the likelihood of a large whale (i.e., fin whales, blue whales, the Mexico humpback whale DPS, and the Central America humpback whale DPS) to be struck by vessels to be extremely low, and therefore discountable.

Noise

The threat to large whales due to underwater noise is difficult to quantify; however, there is a growing concern that the increasing levels of anthropogenic noise in the ocean may be a habitat concern for whales, particularly for whales that use low frequency sound to communicate, such as baleen whales. Whales use sound to communicate, navigate, locate prey, and sense their environment; therefore, noise may disrupt communication, navigational ability and social patterns. Noise associated with oil spill production and transportation may affect large whales in the area; however, it is difficult to quantify any degree of disturbance or effect to their natural behavior. The continuation of existing vessel trips associated with this action are not likely to

DOI0106311

11

contribute a significant amount of noise into the marine environment than large whales would already be exposed to with existing traffic levels. In addition, according to the most recent stock assessment reports, humpback whales have been increasing off the U.S. west coast at a rate of 6-7%, blue whales are estimated to be at 97% carrying capacity, and fin whales have been increasing at a rate of 7.5% between 1991 and 2008 and appear to be stabilizing (Carretta et al. 2017). Therefore, increasing noise in the marine environment does not appear to be limiting large whale populations off the U.S. west coast and in the action area. Therefore, we conclude that the effect of noise associated with the oil and gas development and production activities is insignificant.

Small Oil spills

Oil spills may affect large whales directly and indirectly, through impacts to prey resources such as krill and small schooling fish. However, large whales are highly maneuverable and should be able to evade or swim through a small oil spill with little effort, avoiding any short or long-term consequences. In addition, the likelihood that a small spill up to 200 bbl would make contact with a large whale is extremely low, and therefore discountable.

**Effects to Guadalupe fur seals**

Guadalupe fur seals, an otariid species designated as threatened in 1985, may be found in the action area, although they are generally considered rare, particularly compared to the vast abundance of non-listed pinnipeds found in the area. Guadalupe fur seals pup and breed primarily at Guadalupe Island, Mexico. In 1997, a second rookery was discovered at Isla Benito del Este, Baja California, and a pup was born at San Miguel Island, California (Melin and DeLong 1999). Since 2008, individual adult females, subadult males, and between one and three pups have been observed annually on San Miguel Island and an adult male has regularly been found at San Nicolas Island (NMFS-AKFSC unpublished data).

Researchers know little about the whereabouts of Guadalupe fur seals during the non-breeding season, from September through May, but they are presumably solitary when at sea. Guadalupe fur seals may primarily extend their range approximately 20 km from the breeding areas to account for the main haulout and foraging areas. While distribution at sea is relatively unknown until recently, Guadalupe fur seals may migrate at least 600 km from the rookery sites, based on observations of individuals. Indeed, strandings of Guadalupe fur seals have occurred along the entire U.S. west coast, particularly in recent years, suggesting that the seal may be expanding its range (Hanni *et al.* 1997; NMFS-West Coast Region-stranding program unpublished data).

Commercial sealing during the 19th century reduced the once-abundant Guadalupe fur seal to near extinction in 1894. The size of the population prior to the commercial harvests of the 19th century is not known, but estimates range from 20,000 to 100,000 animals (Fleischer 1987). Counts of Guadalupe fur seals have been made sporadically since 1954. These data indicate that the population of Guadalupe fur seals is increasing exponentially at an average annual growth rate of 10.3 percent. Direct counts of animals at Guadalupe Island and the Benito Islands during 2010 resulted in a minimum population estimate in Mexico at 15,830 animals, with a potential biological removal level of 542 Guadalupe fur seals (Carretta et al. 2017).

12

### Vessel Strikes

Like all otariids, Guadalupe fur seals are fast and nimble swimmers and are very likely to move out of the way of vessels. Based on our review of 30 years of stranding records (1986-2016), there have been no reports of vessel strikes of Guadalupe fur seals. Therefore, the likelihood that a Guadalupe fur seal would be struck as a result of vessel activity associated with the proposed action is extremely low, and discountable.

### Noise

The threat to Guadalupe fur seals due to underwater noise are difficult to quantify; however, they do use sound to communicate and sense their environment; therefore, noise may disrupt communication, navigational ability and social patterns. Noise associated with oil production and transportation may affect Guadalupe fur seals in the area; however, it is difficult to quantify any degree of disturbance or effect to their natural behavior. Similar to our conclusion for vessel strike risk, the vessel trips associated with this action are not likely to contribute a significant amount of noise into the marine environment than Guadalupe fur seals would already be exposed to without this additional sound. In addition, according to the most recent stock assessment reports, Guadalupe fur seals have been increasing at a rate of over 10% per year (Carretta et al. 2017). Therefore, increasing noise in the marine environment does not appear to be limiting Guadalupe fur seals found off the U.S. west coast and in the action area. Therefore, we conclude that the effect of noise associated with the oil and gas development and production activities is insignificant.

### Small Oil Spills

All fur seals are vulnerable to oil spills, given that they rely on their thick pelage for their principal insulation from the cold marine environment through thermoregulation. Kooyman et al. (1976) found that a light oiling of about 30 percent of the fur seal's pelt surface could result in a 1.5-fold increase in their metabolic rate in water. Therefore, contact with oil either at sea or on a haulout could adversely affect individual fur seals, although the authors could not predict a mortality rate. Guadalupe fur seals rarely strand in southern California, and as mentioned above, only recently have we received reports of stranded yearlings, with most of them emaciated or dead. Based on a review of our stranding reports over the last 30 years, there have been no reports of Guadalupe fur seals that have ingested oil or have an oiled pelage. Given the low likelihood of an oil spill occurring in the action area (up to 200 bbl), and the relative rarity of Guadalupe fur seals in the action area, we conclude that the risk of an oil spill associated with the proposed action to be extremely low, and discountable.

### Effects on Sea Turtles

The most common sea turtles that may be found in the action area are green turtles, which generally forage in nearshore areas (bays and estuaries) off southern California, unless they are migrating to/from their breeding areas of Mexico. Green turtle strandings in the area are much more frequent than the other sea turtle species, and existence of a resident foraging population of juveniles and adults in neighboring nearshore and estuarine areas has recently been established through multiple avenues of study (Eguchi et al. 2010; Lawson et al. 2011; Crear et al. 2016). Based on directed research efforts, stranding reports (1958-present, NMFS-WCR stranding program, unpublished), and sightings, green sea turtles are found primarily in south San Diego

13

Bay and Los Alamitos Bay/San Gabriel River, in Long Beach, California, where resident foraging populations are found year-round. San Diego Bay is one of the northern-most foraging areas for green turtles along the U.S. west coast, with the shallow waters of San Diego Bay providing valuable food resources such as marine algae and seagrass. While some of the Long Beach and San Diego Bay green turtles are year-round residents, others migrate seasonally in order to reach their southern breeding grounds, located in the southern state of Michoacán, Mexico, and at the Revillagigedos Islands, offshore central Mexico. Green turtles are rarely seen offshore in the action area, and NMFS has observed only one green turtle captured in its California drift gillnet fishery since 1990.

Based on our stranding records (1958-present), observer program reports (1990-present), and sightings, leatherbacks, loggerheads, and olive ridleys are occasional, albeit rare, visitors to southern California.

Leatherback turtles lead a completely pelagic existence, foraging widely in temperate and tropical waters except during the nesting season, when gravid females return to tropical beaches to lay eggs. Leatherbacks are highly migratory, exploiting convergence zones and upwelling areas for foraging in the open ocean, along continental margins, and in archipelagic waters. Satellite tracking of post-nesting females and foraging males and females, as well as genetic analyses of leatherback turtles caught in U.S. Pacific fisheries or stranded on the U.S. west coast indicate that leatherbacks found off the California are from the western Pacific nesting population (Benson et al. 2007, 2011), which is declining at an alarming rate (Talipatu et al. 2013). Leatherbacks rarely strand in southern California, although recently, a subadult leatherback stranded in Sunset Beach (October, 2017). Leatherbacks are also rarely captured in the California drift gillnet fishery in southern California, as their primary foraging grounds are found off central California and areas off the Pacific Northwest. Leatherback critical habitat was designated in 2012 and is located within the northern part of the action area, specifically from Point Arena to Point Arguello east of the 3,000 meter depth contour. The primary constituent element considered essential for the conservation of leatherbacks is "the occurrence of prey species, primarily scyphomedusae of the order Semaeostomeae (Chrysaora, Aurelia, Phacellophora, and Cynea, of sufficient condition, distribution, diversity, and density necessary to support individual as well as population growth, reproduction, and development of leatherbacks."

The endangered north Pacific loggerhead DPS documented off the U.S. west coast are primarily found south of Point Conception, California in the Southern California Bight (Bight), which is within the action area. These turtles originate from nesting beaches in Japan, where the number of females returning to deposit their nests have been increasing in recent years. Loggerheads have been captured in the California drift gillnet fishery (1990-present; NMFS observer program), although their presence appears to be closely correlated with anomalously warm sea surface temperatures, such as during El Niño conditions. In order to reduce loggerhead interactions with this fishery, NMFS implemented a time/area closure in 2003, which closed the Bight (east of 120°W longitude) in the summer months during a forecast or declared El Niño. NMFS conducted aerial surveys of the Bight in 2015 (a year when the sea surface temperatures were anomalously warm, and an El Niño was occurring) and documented thousands of

DOI0106314

E.R. 1152

14

loggerheads throughout the area (T. Eguchi, NMFS, personal communication, 2017), likely feeding on pelagic red crabs and pyrosomes, their preferred prey.

Like leatherback turtles, most olive ridley turtles lead a primarily pelagic existence, migrating throughout the Pacific, from their nesting grounds in Mexico and Central America to the deep waters of the Pacific that are used as foraging areas. The eastern Pacific population is thought to be increasing, while there is inadequate information to suggest trends for other populations. Since reduction or cessation of egg and turtle harvest in both Mexico and Central America in the early 1990s, annual nest totals have increased substantially. On the Mexican coast alone, in 2004-2006, the annual total was estimated at 1,021,500 – 1,206,000 nests annually (NMFS and USFWS 2007). Eguchi et al. (2007) analyzed sightings of olive ridleys at sea, leading to an estimate of 1,150,000 – 1,620,000 turtles in the eastern tropical Pacific in 1998-2006. Olive ridleys rarely strand in southern California, and there has been only one documented interaction with the California drift gillnet fishery (in 1999) since 1990.

Vessel Strikes
Although no vessels associated with transport and oil spill response activities have ever documented striking a sea turtle, several mid-to-late 1980s biological opinions authorized take of one turtle (unidentified) mortality due to a vessel strike with 5 authorized takes of sea turtles (unidentified) due to harassment.

Our west coast stranding program has collected records of vessel strikes and other human interaction-related (or undetermined) strandings of sea turtles since the late 1950s, although recorded strandings increased in the early 1980s. Our review of vessel strikes since that time and within the action area showed that green turtles were struck by vessels (likely) most often, and primarily in San Diego Bay or other estuaries, which is not surprising given that there is a resident foraging population year-round in south San Diego Bay. From 1958 through February, 2017, 22 green turtles were considered struck by vessels in San Diego County (primarily in San Diego Bay), while in the Los Angeles/Long Beach area, 6 green turtles were reported struck by vessels, and 2 were struck by vessels in Orange County (30 total, or approximately 0.5/year). Given that transport vessels and vessels involved in oil spill response exercises primarily are transporting personnel and equipment into offshore waters, we consider the probability of a vessel striking a green turtle to be extremely low, and discountable.

Leatherbacks, loggerheads and olive ridleys have rarely been reported as likely struck by vessels in the action area, with 4 leatherbacks (0.1/year), 1 loggerhead (0.02/year) and 3 olive ridleys (0.06/year) reported over the last 58 years. Given the rarity of these events reported, we consider the probability of vessels associated with transport of personnel and equipment and participating in oil spill exercises to be extremely low, and discountable.

Small Oil Spills
Since 1958 through February 2017, NMFS has received no reports of sea turtles stranded that appeared impacted by oil spills (621 records, including areas north of the action area). Sea turtles are highly maneuverable and should be able to evade or swim through a small oil spill with little effort, avoiding any short or long-term consequences. In addition, the likelihood that a small spill up to 200 bbl would make contact with a sea turtle is extremely low, and therefore discountable.

DOI0106315

E.R. 1153

15

The leatherback critical habitat review team identified oil spills and oil spill response as an activity that may require special management considerations or protection. Since oil spill response would be covered under a separate ESA consultation with the U.S. Coast Guard, we did not consider the effects of the use of dispersants, or in-situ burning, for example, on leatherback prey. The effects of oil on jellyfish is largely unknown; in fact, a review of literature on anthropogenic effects (e.g., Purcell et al. 2007) on jellyfish yielded no information compared to impacts of, fisheries, power plants, etc. We do know that leatherbacks migrate to central California from across the Pacific Ocean to access very large plumes of jellyfish in the summer and fall months. Given the thousands of miles of area available to foraging leatherbacks, we assume that a 200 bbl spill, if it were to come in contact with their prey, would not significantly affect the availability of prey resources to leatherbacks. Therefore, we conclude that any effects of a small oil spill to leatherback critical habitat to be insignicant.

**White abalone**

White abalone occur within the action area, off the U.S. west coast along offshore islands and banks (particularly Santa Catalina and San Clemente Islands) and along the mainland coast from Point Conception, California, south to Punta Abreojos, Baja California, Mexico. NMFS published a final rule listing the white abalone as an endangered species on May 29, 2001 (66 FR 29046). On October 2008, NMFS published a final recovery plan for the white abalone (73 FR 62257), and recently NMFS also released a Spotlight Species 5-year Action Plan for white abalone to promote recovery actions and highlight the high level of extinction risk that currently exists for this species.

Adults occupy open, low relief rocky reefs or boulder habitat surrounded by sand (Hobday and Tegner 2000). Because suitable habitat is patchy, the distribution of white abalone is also patchy. White abalone are the deepest living abalone species on the U.S. West Coast, occupying depths from 5-60 m (Cox 1960), although current remnant populations are most common between 30-60 m depth and recent surveys by Butler et al. (2006) and Stierhoff et al. (2012) found the highest densities at depths of 40-50 m. Low population densities resulting from historical overfishing has been identified as the primary threat to white abalone in California. Abundance estimates for the 1960s to 1970s ranged from about 600,000 to 1.7 million white abalone, whereas estimates for the 1990s were around 2,000 white abalone, or about 0.1% of estimated pre-exploitation abundance (Hobday et al. 2001).

Small Oil spills
White abalone are generally found in deep water (40-50 meters). Therefore, any oil spills up to 200 bbl will generally not affect these bottom dwellers. A review of the recovery plan for white abalone found no mention of oil spills as a potential threat; therefore, we conclude that the likelihood of a small oil spill adversely affecting white abalone to be extremely low, and therefore discountable.

16

### Black abalone

In contrast to white abalone, black abalone occupy rocky intertidal habitats from the upper intertidal to 6 meters depth. Historically, black abalone occurred from Crescent City (Del Norte County, California) to southern Baja California (Geiger 2004), but the current range is from Point Arena, California, to Bahia Tortugas, Mexico, including offshore islands (74 FR 1937). On January 14, 2009, the species was listed as endangered under the ESA (74 FR 1937). Critical habitat was designated on October 27, 2011 (76 FR 66806).

Black abalone are most commonly observed in the middle and lower intertidal, in habitats with complex surfaces and deep crevices that provide shelter for juvenile recruitment and adult survival (see Leighton 2005 for review). They are able to withstand extreme variations in temperature, salinity, moisture, and wave action, and are usually strongly aggregated, with some individuals stacking two or three on top of each other (Cox 1960). Genetic studies indicate limited larval dispersal, with populations composed predominately of individuals spawned locally (Gruenthal and Burton 2008). Overall, populations throughout southern California and as far north as Cayucos have declined in abundance by more than 80%; populations south of Point Conception have declined by more than 90% (Neuman et al. 2010).

NMFS designated critical habitat for black abalone in 2011 (76 FR 66806), with portions of it falling within the action area. The designation encompasses rocky intertidal and subtidal habitat (from the mean higher high water, MHHW, line to a depth of -6 meters relative to the mean lower low water, MLLW, line) within five segments of the California coast between Del Mar Landing Ecological Reserve to the Palos Verdes Peninsula, as well as on the offshore islands. Essential habitat features include rocky substrate (e.g., rocky benches formed from consolidated rock or large boulders that provide complex crevice habitat); food resources (e.g., macroalgae); juvenile settlement habitat (rocky substrates with crustose coralline algae and crevices or cryptic biogenic structures); suitable water quality (e.g., temperature, salinity, pH) for normal survival, settlement, growth, and behavior; and suitable nearshore circulation patterns to support successful fertilization and larval settlement within appropriate habitat.

### Small Oil spills

The black abalone critical habitat review team identified oil spills and oil spill response as an activity that may require special management considerations or protection. Since oil spill response would be covered under a separate ESA consultation with the U.S. Coast Guard, we did not consider the effects of the use of dispersants, or in-situ burning, for example, on the primary constituent elements identified for black abalone. However, any response to an oil spill located near or within black abalone critical habitat would likely prioritize protecting these areas to the maximum extent possible, given that they are essential to the conservation of the species.

Oil spills may affect grazing black abalone in rocky intertidal areas, food resources (i.e., algae), and water quality, three of the primary constituent elements identified in the final rule. Habitat impacts include destruction of other intertidal organisms that black abalone rely upon for settlement cues (e.g., coralline algae), food (e.g., diatoms, macroalgae), and shelter, Oil spills may also affect black abalone though direct contact, impeding their ability to feed and/or causing mortality, depending on the type of oil and extent of the spill. The magnitude of impacts may

DOI0106317

E.R. 1155

17

vary widely, depending on the type of material involved in the spill and local habitat features and conditions. For example, most black abalone intertidal habitat is characterized by high wave energy, so some materials may be washed out naturally through wave action, whereas other materials might persist in cracks and crevices, prolonging exposure and effects to their habitat as well as to individuals.

According to staff at NMFS-WCR, before now, there has never been an ESA consultation on the effects of oil spills on black abalone. However, the Refugio State Beach oil spill, which occurred in Santa Barbara County on March 19, 2015, did adversely affect some black abalone and their habitat (S. Wang, NMFS, personal communication, 2017). During that spill, 142,800 gallons of oil were spilled, nearly two orders of magnitude greater than that anticipated to be the maximum amount of oil that may be spilled as a result of oil and gas development and production. Most of the oil and gas production is located east of the Channel Islands, which lessens the likelihood of any spill affecting black abalone and critical habitat in those areas. In addition, any spill that does occur is likely to be offshore, near the oil platforms, or between the coastline and the platforms, with a minimum chance to be spilled adjacent to black abalone and their critical habitat. Lastly, given the existence of black abalone critical habitat, special management measures should be in place in area contingency plans to protect that habitat during a response effort, which would minimize any effects of a 200 bbl oil spill. For those reasons, we conclude that the likelihood of oil spills adversely affecting black abalone and their critical habitat to be extremely low, and discountable.

**Green sturgeon – southern DPS**

The green sturgeon is an anadromous, long-lived, and bottom-oriented (demersal) fish species in the family Acipenseridae. NMFS listed the Southern DPS of green sturgeon as threatened under the ESA in 2006 (71 FR 17757, April 7, 2006) and originates from coastal watersheds south of the Eel River, with spawning confirmed in the Sacramento River system. Critical habitat was designated in 2009 and included coastal marine areas (to a depth of 60 fathoms) and specified riverine, estuarine, and areas from Monterey Bay, California to the U.S.-Canadian border (outside of the SCPA). After migrating out of their natal rivers, subadult green sturgeon move between coastal waters and various estuaries along the U.S. West Coast. Relatively little is known about how green sturgeon use habitats in the coastal ocean and in estuaries, or the purpose of their episodic aggregations there at certain times (Lindley et al. 2011). While in the ocean, archival tagging indicates that green sturgeon occur between 0 and 200 m depths, but spend most of their time between 20–80 m in water temperatures of 9.5–16.0°C (Nelson et al. 2010, Huff et al. 2011). They are generally demersal but make occasional forays to surface waters, perhaps to assist their migration (Kelly et al. 2007).

<u>Small oil spills</u>
Little is known of the southern DPS of green sturgeon's presence within the action area, but they are rarely found south of Monterey Bay, where incidental take of the southern DPS has been documented in bottom-set trawl fishery targeting halibut. Given their preference for deeper coastal habitat, and their rare documented presence in the action area, the likelihood that a small oil spill would affect the southern DPS of green sturgeon is extremely low, and discountable.

18

**Steelhead trout – South-Central and Southern California coastal ESUs**

The South-Central California Coast steelhead ESU is listed as threatened and is comprised of a suite of steelhead populations that inhabit coastal stream networks from the Pajaro River (within Monterey Bay) south to, but not including the Santa Maria River (within the northern extent of the SCPA (action area). Critical habitat designated for this steelhead ESU is located outside of the SPCA and therefore, we will not further consider any effects to critical habitat. NMFS conducted its most recent five-year status review for this ESU in 2016 (NMFS 2016a) and concluded that little had changed since the last status review in 2011, with declines attributed to agriculture, mining and urbanization activities that have resulted in the loss, degradation and fragmentation of riverine habitat. Little is known of the oceanic distribution of this ESU, although NMFS (2016a) noted that ocean harvest of steelhead is extremely rare (and prohibited by California Department of Fish and Wildlife and is therefore likely an insignificant impact, although past exploitation rates likely contributed to its decline.

The Southern California Coast steelhead ESU is listed as endangered and is comprised of a suite of steelhead populations that inhabit coastal stream networks from the Santa Maria River system south to the U.S.-Mexico border. NMFS recently conducted a five-year status review for this ESU (NMFS 2016b). As with most U.S. west coast salmon and steelhead stocks, this ESU has declined substantially from their historic numbers. Multiple factors have contributed to the decline of individual populations, including the loss of freshwater and estuarine habitat, periodic poor ocean conditions, and a variety of land-use, flood control, and water management practices, which have impacted many watershed-wide processes. As with the South-Central California Coast steelhead ESU, little is known of threats to steelhead during their oceanic life stage.

Small oil spills

There is no information within the 5-year status reviews on the risk of small oil spills to the two ESUs that may be found within the action area. In addition, recovery plans for both ESUs (completed in 2012) do not mention small oil spills or continuation of oil production and development as a risk to the South-Central California Coast ESU and the Southern California ESU, as confirmed recently by NMFS (M. Capelli, NMFS-WCR, personal communication, 2017). Furthermore, in past consultations with BOEM/BSEE regarding this threat, NMFS has concluded that the likelihood all small oil spills contacting steelhead trout is extremely low, and discountable, particularly given the relatively low number of individuals within the SCPA (action area). With both ESUs continuing to decline due to threats found primarily in their spawning/rearing habitat (outside the action area), we conclude that the risk of small oil spills affecting these two steelhead trout ESUs to be extremely low, and discountable.

**Conclusion**

NMFS concurs with BOEM's (and BSEE's) determination that the proposed oil and gas development and production activities in the SCPA may affect, but are not likely to adversely affect, blue whale, fin whale, Central America humpback whale DPS, Mexico humpback whale DPS, north Pacific right whale, sei whale, sperm whale, western north Pacific gray whale, Guadalupe fur seal, leatherback sea turtle (including critical habitat), north Pacific loggerhead DPS, East Pacific green turtle DPS, olive ridley sea turtle, white abalone and black abalone

19

(including critical habitat), southern DPS of green sturgeon, and the South-Central and Southern California ESUs of steelhead trout. In the unlikely event that a listed species is injured or killed as a result of any oil and gas development and production activities, BOEM and/or BSEE should immediately cease operations and contact our regional stranding coordinator, Justin Viezbicke, at (562) 980-3230. This event would also trigger initiation of a formal consultation under section 7(a)(2) of the ESA for the project activity that has resulted in the injury or death of a listed species.

**Reinitiation of Consultation**

Reinitiation of consultation is required and shall be requested by BOEM or BSEE or by NMFS, where discretionary Federal involvement or control over the action has been retained or is authorized by law and: (1) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (2) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in this concurrence letter; or if (3) a new species is listed or critical habitat designated that may be affected by the identified action (50 CFR 402.16).

**Marine Mammal Protection Act Comments**

Common marine mammal species that may be found in the Southern California Planning Area and within the vicinity of project activities covered under the oil spill response activities associated with offshore oil and gas production include four species of pinnipeds and eighteen species/species of cetaceans. Marine mammals are protected under the Marine Mammal Protection Act (MMPA) (16 U.S.C. § 1361 et. seq.). Under the MMPA, it is generally illegal to "take" a marine mammal without prior authorization from NMFS. "Take" is defined as harassing, hunting, capturing, or killing, or attempting to harass, hunt, capture, or kill any marine mammal. Except with respect to military readiness activities and certain scientific research conducted by, or on behalf of, the Federal Government, "harassment" is defined as any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal in the wild, or has the potential to disturb a marine mammal in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering.

During the monitoring associated with oil spill response exercises, BSEE should be watching for marine mammal presence and behaviors indicative of potential harassment. Any such incidental harassment would require authorization through an Incidental Harassment Authorization (IHA) issued by NMFS Office of Protected Resources. The mitigation procedures for large whales described earlier should help minimize the potential for marine mammal harassment or injury under the MMPA resulting from the proposed oil spill response activities. If marine mammal disturbance appears to be occurring during any exercise, BSEE should cease activity and contact NMFS before proceeding further. In the unlikely event of an injury or mortality of a marine mammal due to these activities, please immediately contact our regional stranding coordinator, Justin Viezbicke, at (562) 980-3230.

Thank you for consulting with NMFS and consideration of our MMPA comments. If you have any questions pursuant to this letter or other ESA or MMPA issues, please contact Tina Fahy at (562) 980-4023 or via electronic mail at Christina.Fahy@noaa.gov.

20

Sincerely,

Barry A. Thom
Regional Administrator

cc: Administrative File:151422WCR2017PR00226

## References

Aguillar, A. 2009. Fin whale Balaenoptera physalus. Pages 433-437, in W.F. Perrin, B. Würsig, and H.G.M. Thewissen (eds.), Encyclopedia of Marine Mammals, Academic Press, San Diego, CA. 1316 pages.

Barlow, J. and K.A. Forney. 2007. Abundance and population density of cetaceans in the California Current ecosystem. Fishery Bulletin 105:509-526.

Becker, E.A., K.A. Forney, B.J. Thayre, A.J. Debich, G.S. Campbell, K. Whitaker, A.B. Doublas, A. Gilles, R. Hoopes, and J.A. Hildebrand. 2017. Habitat-based density models for three cetacean species off southern California illustrate pronounced seasonal differences. Frontiers in Marine Science. May 2017; 4:121.

Benson, S.R., Forney, K.A., Harvey, J.T., Carretta, J.V., and Dutton, P.H. 2007. Abundance, distribution, and habitat of leatherback turtles (*Dermochelys coriacea*) off California 1990-2003. Fisheries Bulletin 105:337-347.

Benson, S.R., T. Eguchi, D.G. Foley, K. A. Forney, H. Bailey, C. Hitipeuw, B.P. Samber, R.F. Tapilatu, V. Rei, P. Ramohia, J. Pita, and P.H. Dutton. 2011. Large-scale movements and high-use areas of western Pacific leatherback turtles, *Dermochelys coriacea*. Ecosphere. Volume 27. Article 84.

Butler, J., M. Neuman, D. Pinkard, R. Kvitek, and G. Cochrane. 2006. The use of multibeam sonar mapping techniques to refine populations estimates of the endangered white abalone (*Haliotis sorenseni*). Fish. Bull. 104:521-532.

Calambokidis, J. and J. Barlow. 2013. Updated abundance estimates of blue and humpback whales off the US west coast incorporating photo-identifications from 2010 and 2011. Document PSRG-201313 presented to the Pacific Scientific Review Group, April 2013. 7 p.

DOI0106321

E.R. 1159

21

Calambokidis, J., S.H. Steiger, C. Curtice, J. Harrison, M.C. Ferguson, E. Becker, M. DeAngelis, and S.M. Van Parijs. 2015. Biologically important areas for selected cetaceans within U.S. waters – West Coast Region. Aquatic Mammals 41(1),39-53, DOI 10.1578/AM.41.1.2015.39.

Carretta, J. V., E. M. Oleson, J. Baker, D. W. Weller, A. R. Lang, K. A. Forney, M. M. Muto, B. Hanson, A. J. Orr, H. Huber, M. S. Lowry, J. Barlow, J. E. Moore, D. Lynch, L. Carswell, and R. L. Brownell Jr. 2016. U. S. Pacific Marine Mammal Stock Assessments: 2015. NOAA Technical Memorandum. NMFS. NOAA-TM-NMFS-SWFSC-561.

Carretta, J.W., K.A. Forney, E.M. Olson, D.W. Weller, A.R. Lang, J. Baker, M.M. Muto, B. Hanson, A.J. Orr, H. Huber, M.S. Lowry, J. Barlow, J.E. Moore, D. Lynch, L. Carswell, and R.L. Brownell. 2017. U.S. Pacific draft marine mammal stock assessments: 2016. NOAA-TM-NMFS-SWFSC-577.

Clapham, P.J. 2009. Humpback whale Megaptera novaeangliae. Pages 582-585, in W.F. Perrin, B. Würsig, and H.G.M. Thewissen (eds.), Encyclopedia of Marine Mammals, Academic Press, San Diego, CA. 1316 pages.

Cox, K.W. 1960. Review of the abalone of California. California Department of Fish and Game, Marine Resources Operations.

Crear, D.P., D.D. Lawson, J.A. Seminoff, T. Eguchi, R.A. LeRoux, C.G. Lowe. 2016 Seasonal shifts in the movement and distribution of green sea turtles Chelonia mydas in response to anthropogenically altered water temperatures. Marine Ecology Progress Series; 548: 219–232.

Crowe, T. P., R. C. Thompson, S. Bray, and S. J. Hawkins. 2000. Impacts of anthropogenic stress on rocky intertidal communities. Journal of Aquatic Ecosystem Stress and Recovery 7:273-297.

Douglas, A.B., J. Calambokidis, S. Raverty, S.J. Jeffries, D.M. Lambourn, and S.A. Norman. 2008. Incidence of ship strikes of large whales in Washington State. Journal of the Marine Biological Association of the United Kingdom pp1-12. doi:10.1017/S00025315408000295.

Eguchi, T., T. Gerrodette, R.L. Pitman, J.A. Seminoff, and P.H. Dutton. 2007. At-sea density and abundance estimates of the olive ridley turtle Lepidochelys olivacea in the eastern tropical Pacific. Endangered Species Research 3:191-203.

DOI0106322

22

Eguchi, T., J. A. Seminoff, R. A. LeRoux, P. H. Dutton, and D. L. Dutton. 2010. Abundance and survival rates of green turtles in an urban environment: coexistence of humans and an endangered species. Marine Biology. Volume 157, pages 1869 to 1877.

Fleischer, L.A. 1987. Guadalupe fur seal, *Arctocephalus townsendi*. In: J.P. Croxall and R.L. Gentry (eds), *Status, biology, and ecology of fur seals, pp. 43-48*, pp. 43-48. NOAA Technical Report NMFS 51.

Gruenthal, K.M. and R.S. Burton. 2008. Genetic structure of natural populations of the California black abalone (*Haliotis cracherodii* Leach, 1814), a candidate for endangered species status. J. Exp. Mar. Biol. Ecol. 355:47-58.

Hanni, K.D., S.A. D.J. Long, R.E. Jones, P. Pyle, and L.E. Morgan. 1997. Sightings and strandings of Guadalupe fur seals in central and northern California, 1988-1995. Journal of Mammology. 78:684:690.

Hobday, A.J. and M.J. Tegner. 2000. Status review of white abalone (*Haliotis sorenseni*) throughout its range in California and Mexico. NOAA-TM-NMFS-SWR-035, U.S. Dep. of Commer., NOAA, NMFS, Silver Spring, MD.

Hobday, A.J., M.J. Tegner, and P.L. Haaker. 2001. Over-exploitation of a broadcast spawning marine invertebrate: Decline of the white abalone. Reviews in Fish Biology and Fisheries 10:493-514.

Huff, D.D., S.T. Lindley, P.S. Rankin, and E.A. Mora. 2011. Green sturgeon physical habitat use in the coastal Pacific Ocean. PLoS One 6(9):e25156. DOI: 10.1371/journal.pone.0025156.

Kelly, J. T., A. P. Klimley, and C. E. Crocker. 2007. Movements of green sturgeon, *Acipenser medirostris*, in the San Francisco Bay Estuary, California. Environmental Biology of Fishes 79:281-295.

Kooyman, G.L., R.L. Gentry, and W.B. McAlister. 1976. Physiological impact of oil on pinnipeds. NMFS, Northwest and Alaska Fisheries Center Processed Report. 23p.

Lawson, D., C. Fahy, J. Seminoff, T. Eguchi, R LeRoux, P. Ryono, L. Adams, and M. Henderson. 2011. A report on recent green sea turtle presence and activity in the San Gabriel River and vicinity of Long Beach, California. Poster presentation at the 31st Annual Symposium on Sea Turtle Biology and Conservation in San Diego, California.

Leighton, D.L. 2005. Status review for the black abalone, *Haliotis cracherodii* Leach 1814. Unpublished document produced for the Black Abalone Status Review Team, Office of Protected Resources, Southwest Region, National Marine Fisheries Service, Long Beach, CA, USA.

DOI0106323

E.R. 1161

23

Lindley, S.T., D.L. Erickson, M.L. Moser, G. Williams, O.P. Langness, B.W. McCovey, M. Belchik, D. Vogel, W. Pinnix, J.T. Kelly, J.C. Heublein, and A.P. Klimley. 2011. Electronic tagging of green sturgeon reveals population structure and movement among estuaries. Transactions of the American Fisheries Society 140:108-122.

Melin, S.R. and R.L. DeLong. 1999. Observations of a Guadalupe fur seal (*Arctocephalus townsendi*) female and pup at San Miguel Island, California. Marine Mammal Science, 15(3): 885-888) (July 1999).

Nelson, T.C., P. Doukakis, S.T. Lindley, A.D. Schreier, J.E. Hightower, L.R. Hildebrand, R.E. Whitlock, and M.A.H. Webb. 2010. Modern technologies for an ancient fish: tools to inform management of migratory sturgeon stocks. A report for the Pacific Ocean Shelf Tracking (POST) Project.

Neuman, M., B.N. Tissot, and G. VanBlaricom. 2010. Overall status and threats assessment of black abalone (*Haliotis cracherodii* Leach, 1814) populations in California. Journal of Shellfish Research 29:577-586.

NMFS and USFWS. 2007. Olive Ridley Sea Turtle *(Lepidochelys olivacea). 5*-Year Review: Summary and Evaluation. 67 p.

NMFS. 2016a. 5-year review: summary and evaluation of South-Central California Coast Steelhead Distinct Population Segment. National Marine Fisheries Service. West Coast Region. California Coastal Office, Santa Rosa, California.

NMFS. 2016b. 5-year review: summary and evaluation of Southern California Coast Steelhead Distinct Population Segment. National Marine Fisheries Service. West Coast Region. California Coastal Office. Long Beach, California.

Purcell, J.E., S. Uye, and W. Lo. 2007. Anthropogenic causes of jellyfish blooms and their direct consequences for humans: a review. Marine Ecology Progress Series. Vol. 350:153-174.

Redfern, J., M. McKenna, T. Moore, J. Calambokidis, M.L. DeAngelis, E.A. Becker, J. Barlow, K.A. Forney, P. Fiedler, and S.J. Chivers. 2013. Assessing the risk of ships striking large whales in marine spatial planning. Conservation Biology 27:292–302.

Seagars, D.J. 1984. The Guadalupe fur seal: a status review. NMFS-Southwest Region, Administrative Report SWR-84-6.

Schorr, G.S., E.A. Falcone, J. Calambokidis, and R.D. Andrews. 2010. Satellite tagging of fin whales off California and Washington in 2010 to identify movement patterns, habitat use, and possible stock boundaries. Report prepared under Order No. JG133F09SE4477 to Cascadia Research Collective, Olympia, WA from the Southwest Fisheries Science Center, National Marine Fisheries Service La Jolla, CA 92037 USA 9pp.

24

Stierhoff, K.L., M. Neuman, and J. Butler. 2012. On the road to extinction? Population declines of the endangered white abalone, *Haliotis sorenseni*. Biological Conservation 152:46-52.

Tapilatu. R.F., P.H. Dutton, T. Wibbels, H.V. Fedinandus, W.G. lwanggin, and B.H. Nugroho. 2013. Long-term decline of the western Pacific leatherback, *Dermochelys coriacea;* a globally important sea turtle population. Ecosphere 4(2):25.

Wade, P.R., T. J. Quinn II, J. Barlow, C. S. Baker, A. M. Burdin, J. Calambokidis, P. J. Clapham, E. Falcone, J. K. B. Ford, C. M. Gabriele, R. Leduc, D. K. Mattila, L. Rojas-Bracho, J. Straley, B. L. Taylor, J. Urbán R., D. Weller, B. H. Witteveen, and M. Yamaguchi. 2016. Estimates of abundance and migratory destination for North Pacific humpback whales in both summer feeding areas and winter mating and calving areas. Paper SC/66b/IA21 submitted to the Scientific Committee of the International Whaling Commission, June 2016, Bled, Slovenia.

DOI0106325

E.R. 1163

DOI0106326

E.R. 1164

 

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Ventura Fish and Wildlife Office
2493 Portola Road, Suite B
Ventura, California 93003
**RECEIVED**

IN REPLY REFER TO:
08EVEN00-2017-F-0325

**AUG 1 4 2017**

JULY 28, 2017

Joan R. Barminski, Regional Director
Bureau of Ocean Energy Management
760 Paseo Camarillo Suite 102
Camarillo, California 93010-6064

**BUREAU OF OCEAN ENERGY MANAGEMENT**

Subject: Acknowledgement Letter and Request for Additional Information for Formal Consultation
on Proposed Outer Continental Shelf Oil and Gas Development and Production Activities in
the Southern California Planning Area, Santa Barbara, Ventura, and Los Angeles Counties,
California.

Dear Ms. Barminski:

We are acknowledging receipt of your letter, dated March 27, 2017 and received in our office on
March, 28, 2017, requesting formal consultation on Outer Continental Shelf (OCS) oil and gas
development and production activities in the Southern California Planning Area. The Bureau of
Ocean Energy Management (BOEM) is proposing regulatory actions related to existing and future oil
and gas development and production such as reviewing development and production plans,
applications for permits to drill or modify wells, and oil spill response exercises; implementing their
inspection program; and approving infrastructure repairs, structural improvements, and geological
surveys. Actions and projects beyond the scope of these routine activities would require additional
consultation. The proposed oil and gas development and production activities would occur in the
BOEM's Southern California Planning Area in Santa Barbara, Ventura, and Los Angeles Counties,
California.

We have reviewed the biological assessment included with your March 27, 2017, request for formal
consultation. In coordination with the Carlsbad Fish and Wildlife Office, we are requesting the
following information before initiating formal consultation on the proposed actions:

BOEM/BSEE actions and activities

Activities not under consideration for formal consultation, pages 2 through 12: We would like
confirmation that the following activities are not anticipated under the current program and
associated consultation: new lease sales or issuance, exploratory plan or drilling approvals,
geological or geophysical permits, approval of pipeline applications, approval of new development
and production plans, and decommissioning of any currently operating rigs. Should BOEM/BSEE
consider pursuing any of these activities, they should consult with the Service on the specific
activities in question at that time.

5 b(4)

DOI0106294
E.R. 1165

Joan R. Barminski 2

Activities under consideration for formal consultation, pages 2 through 12: We would like confirmation that the activities you are consulting on are limited to: the effects of the ongoing discharges, emissions, vessel use, aircraft use, and platform lighting taking place under existing development and production plans in this assessment. The consultation would also include the review and approval of approximately 1 to 2 new wells, 5 to 7 sidetrack wells, and a limited number of conductor installations (through Applications for Permits to Drill or APD) and 2 to 4 well workovers, up to 5 well stimulation treatments (through Applications for Permits to Modify or APM) per year in the Southern California Planning Area. In addition to frequency, please provide an estimate of the longevity of these activities given the information available regarding production and remaining reserves.

BSEE Inspection Program, page 7: In addition to the typical miles flown in conducting facility inspections, please provide a typical frequency of visits to the rigs as well. If different areas of the OCS received different frequencies of inspections, please provide that information as well. Frequencies of landings/takeoffs would likely provide a better metric of potential impacts to listed species, especially if some facilities receive more frequent inspections. In the context of aging platform/pipeline infrastructure, what specific inspection programs and/or safety and environmental management systems has BSEE put in place to minimize the risk of a pipeline rupture, the event most likely to impact listed species in the area (page 41)? Is it possible to further minimize the risk of a pipeline rupture?

Avoidance and minimizations measures

Artificial lighting, pages 26 through 27: Please provide us with a copy of the Reitherman and Gaede 2010 reference. We are particularly interested in how the observations in that report relate to the earlier discussion of mass attraction/collisions of seabirds resulting from artificial night lighting provided in the BA. Are 20 observation periods adequately representative of the conditions occurring at the rigs in the Planning Area and the range of the birds' responses? Are there other studies that have been completed that speak to the issue, and can the reports be made available to the Service? The BA discusses mitigation measures to reduce impacts of night lighting. Please describe the specific measures that would be implemented as part of the program (i.e., what measures will be required). Could the analysis be refined to provide a conclusion that is more specific than the project could have an "adverse effect" on sensitive birds?

Noise effects, pages 28-29: Would leaseholders be **required** to ramp up underwater noise gradually to give wildlife in the vicinity a chance to leave the area before the noise becomes damaging? We recognize that it would be beneficial to do this, but it was not clear from the text whether this is required as part of the permitting process.

Effects on Marbled Murrelet, page 56: The minimization measures described for light and noise only accrue benefits if they are implemented. Are these measures required for OCS operations? If so, that should be clear from the program description.

DOI0106295
E.R. 1166

Joan R. Barminski                                                                                    3

Oil spill response requirements, page 37: The BA indicates that BSEE requires that companies be able to respond to a worst case spill scenario. It would help to frame our analysis if we understood what the worst case scenario is for each of these facilities and what compliance with the response time and equipment requirements would mean in terms of the resultant maximum anticipated distribution of the oil on the water around the rigs in that scenario. What are these measures designed to achieve in a response? Please identify which measures are over and above the requirements of the Area Contingency Plan process managed by the U.S. Coast Guard. If we are to rely on those minimization measures to limit the likelihood of impacts to listed species, it is important to confirm that these measures can be implemented efficiently and effectively. How often does BSEE drill and inspect these facilities to ensure compliance? How and how quickly are shortfalls addressed? The descriptions provided in the BA do not provide a sense of the effectiveness of these measures.

Please provide a list of any other avoidance and minimization measures that will be required as part of any permits or authorizations under this program including but not limited to measures associated with spills of hazardous chemicals, transportation of hazardous materials to and from rigs, moving produced oil to shore, and any other activities associated with moving people and/or materials to and from the OCS rigs.

Mixing zones for chemical discharges and spills

Well Stimulation Treatments, Acid Fracturing, page 6: How are the stimulation chemicals, especially hydrochloric and hydrofluoric acids, handled, transported, and transferred to the drilling rigs? In what volumes are these chemicals handled? What is the spill history for these chemicals in the Planning Area? Based on those patterns of use, what would be the mixing zone where potential effects could occur prior to these hazardous materials becoming diluted/neutralized beyond the point of causing harm?

Produced water and effluent discharge, pages 30 through 31: Has any sampling been done to assess whether acids are neutralized by produced water as suggested in the BA? How large is the effluent mixing zone related to other constituents in the permitted discharges? The likelihood of marine mammals or seabirds being exposed to these constituents at concentrations of concern depends in part on how large that mixing zone is around the well. Did the Environmental Protection Agency consider impacts to seabirds in their approval of the permit for the discharges for these facilities?

How large is the mixing zone for a spill of water soluble chemicals used on drilling rigs in the program? What measures make it unlikely that the entire contents of a shipping container of hazardous materials would be released in the event of a spill? We are interested in identifying the area around the well that is likely to have water quality characteristics that could impact listed species and thus the likelihood of any risk. Also, please explain why an accident involving a seafloor expression from a fracturing well stimulation treatment is not foreseeable for any of the treatments mentioned nor a risk in matrix acidizing. That conclusion is not supported in the discussion.

Joan R. Barminski                                                                                    4

## Models and trajectories

Oil trajectory analysis, page 36: Please provide GNOME (General NOAA Operational Modeling Environment) analyses for the southern wells, as the shoreline in this area is important for California least terns and western snowy plovers. Having more specific information as to time it takes the oil to reach the shore under different conditions would be very helpful in knowing what specific response resources are required for a spill in this area.

BOEM OSRA (Oil Spill Risk Assessment) Model, page A-18: Why would OSRA use annual average for all 4 seasons? Could the models be run to reflect the likely trajectory in different seasons? Would averaging cancel out the potential range of the spill if different seasons have currents and/or winds in different directions? It would be very helpful to know if the bird-nesting season is a more or less vulnerable time based on trajectories designed to fit the seasonal conditions more specifically.

The areas addressed in the BA are known to be sources of natural seepage in addition to the production from the facilities that are the subject of the BA. It would be helpful to understand the baseline rate of oil release in these areas (to the extent it is known) and the frequency with which marine mammals and seabirds become oiled from these sources. Please provide a review of the information that is currently available. The California Department of Fish and Wildlife Office of Spill Prevention and Response and the Oiled Wildlife Care Network are likely to be good sources for this information.

## Maximum most likely spill volume of 200 barrels

Oil spill risk assessment, pages 33 and A-1 through A-6: We were not able to duplicate the calculations for the maximum most likely spill (200 barrels) based on the information provided in the appendix. Please provide adequate additional details so that we may understand how this figure was derived. Also, does the 200 barrel size include the effects of the addition of secondary or tertiary treatment fluids during well stimulation? The estimated size is of particular concern given six of the wells have daily flow rates without pumping that meet or exceed 200 barrels per day. Thirteen of the 23 facilities have more than 200 barrels in their pipelines to shore, and 22 of 23 rigs have storage exceeding the 200 barrels. These facilities are also aging, which may affect where and how spills occur.

Please describe what controls are in place to ensure that well control is likely to be achieved in time for a total spill volume of less than 200 barrels in the case of those wells that are under pressure, pipeline contents would not be likely to all be released in the event of a spill associated with the pipelines, and the full volume in storage associated with the rig would not be likely to be released in the event of a spill associated with those storage facilities.

Oil Spill assessment in San Pedro Bay, page A-4: Please provide records for spills in San Pedro Bay since the 1969 event as was done for the Santa Maria Basin and the Santa Barbara Channel.

DOI0106297

E.R. 1168

Joan R. Barminski                                                                                    5

It is the responsibility of the Federal agency requesting formal consultation to provide the Service with the best available scientific and commercial data available [50 CFR 402.14(d)]. Requests for initiation of consultation must include a complete description of the action, action area, affected listed species and critical habitat, the effects of the proposed action (i.e., the manner in which the action may affect listed species and any designated critical habitat and an analysis of cumulative effects), and other relevant information [(50 CFR 402.14(c )(1-6)]. The materials submitted with your request lack sufficient detail regarding the information outlined above to enable us to determine the effects of the proposed action on listed species.

Formal section 7 consultation will not begin until we receive the requested information, or a statement from you explaining why that information cannot be made available. When we receive the aforementioned information, we will notify you that consultation has been initiated and will also outline the dates within which formal consultation should be completed and the biological opinion delivered on the proposed action.

As a reminder, section 7(d) of the Act requires that after initiation of consultation, the Federal action agency and any applicant may not make any irreversible or irretrievable commitment of resources that has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives which would avoid jeopardizing the continued existence of any endangered or threatened species.

If you have any questions regarding this letter or the consultation process for the Project, please contact Dou-Shuan Yang of my staff at (805) 677-3302 or by electronic mail at Dou-Shuan_Yang@fws.gov.

Sincerely,

Collette M. Thogerson, PhD
Assistant Field Supervisor

DOI0106298
E.R. 1169



# United States Department of the Interior

BUREAU OF OCEAN ENERGY MANAGEMENT
Pacific OCS Region
760 Paseo Camarillo, Suite 102
Camarillo, CA 93010-6064

## JAN 1 9 2017

Mr. Dave Cohen
VP Production
DCOR, LLC
290 Maple Court, Suite 290
Ventura, CA 93003

Re:   DCOR, LLC Well
Stimulation Proposal, Application
for Permit to Modify - Well S-
62ST02BP00 Platform Gilda

Dear Mr. Cohen:

On January 3, 2017, the Bureau of Ocean Energy Management (BOEM) received from the Bureau of Safety and Environmental Enforcement (BSEE) DCOR's Application for Permit to Modify (APM) for Platform Gilda well S-62ST02BP00 (API 043112063902). BSEE requested BOEM to review the APM and determine if the activities proposed in the APM are described in the current Development and Production Plan (DPP) for Platform Gilda.

BOEM has reviewed the APM information which outlines a proposal for a hydraulic fracturing stimulation treatment and we have determined the proposed activities have not been previously described in the existing DCOR Santa Clara Field DPPs. Therefore, DCOR must supplement the Santa Clara Field approved DPP for Platform Gilda to include the activities proposed in the APM.

The federal regulations prescribing the qualifying conditions and process for supplementing Outer Continental Shelf plans are at 30 CFR 550.283 through 550.285. Pursuant to 30 CFR 550.285(b), your supplemental DPP need include only information related to or affected by the proposed activities (i.e., hydraulic fracturing well stimulation treatment), including information on changes in expected environmental impacts. Your supplemental DPP will be subject to all of the procedures under 30 CFR 550.266 through 550.273.

BOEM has informed BSEE of our determination that prior to their approval of the APM, an approved supplemental DPP is required. BOEM will not commence the review process until your supplemental DPP is deemed submitted per 30 CFR 550.266(a).

We would be happy to discuss this with you should you need further clarification. If you would like to schedule a meeting, or if you have any questions, please contact Mr. Chima Ojukwu, Chief, Lease Management Section, at (805) 384-6362 or chima.ojukwu@boem.gov.

DOI0052272

Sincerely,

Douglas P. Boren
Regional Supervisor
Office of Strategic Resources

cc:   Alison Dettmer
     Deputy Director
     California Coastal Commission
     45 Fremont Street, Suite 2000
     San Francisco, California 94105

DOI0052273
E.R. 1171

**FINDING OF NO SIGNIFICANT IMPACT**

**Use of Well Stimulation Treatments on the**
**Pacific Outer Continental Shelf**
**Pacific Outer Continental Shelf Region**

## Introduction

In accordance with the National Environmental Policy Act (NEPA), 42 USC 4261, *et seq.*, the Council on Environmental Quality regulations at 40 CFR 1501, *et seq.*, Department of the Interior (DOI) regulations implementing NEPA at 43 CFR Part 46, Bureau of Ocean Energy Management (BOEM) and Bureau of Safety and Environmental Enforcement (BSEE) policy, BOEM and BSEE prepared a programmatic environmental assessment (PEA) of the potential effects of the use of Well Stimulation Treatments (WSTs) on the Pacific Outer Continental Shelf (POCS).

A Notice of Availability describing a public review and comment process was published in the Federal Register on February 22, 2016 (Document # 81-FR-8743). The notice was also forwarded to stakeholders, and posted on the project website: http://pocswellstim.evs.anl.gov/. The public comment period was held from February 22 to March 23, 2016. Over 10,000 comments were received, the vast majority of which were of the standardized format of outreach campaigns. The Bureaus found that approximately 75 of the comments were unique. All comments received were reviewed and considered; an issue summary document including comment categories and the government responses has been appended to the PEA. In some cases, the text of the Draft PEA was modified as a result of the comments received, primarily to provide clarification and in some cases to provide additional requested information.

BOEM and BSEE prepared the PEA to determine whether the Proposed Action may result in significant effects (40 CFR 1508.27) triggering additional mitigation to reduce such effects or the need to prepare an environmental impact statement. The PEA analyzes the potential for significant adverse effects from the Proposed Action on the human environment, which is interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment (40 CFR 1508.13 and 1508.14). The PEA was also prepared to assist with BOEM and BSEE planning and decision-making (40 CFR 1501.3b), namely, to help inform a determination as to whether the Proposed Action would cause undue or serious harm or damage to the human, marine, or coastal environment.

## Purpose of the Proposed Action

The purpose of the proposed action (use of certain WSTs, such as hydraulic fracturing) is to enhance the recovery of petroleum and gas from new and existing wells on the POCS, beyond that which could be recovered with conventional methods (i.e., without the use of WSTs). The use of WSTs may improve resource extraction from some existing wells, and in some future new wells, on the POCS. The need for the proposed action is the efficient recovery of oil and gas reserves from the POCS.

DOI0106901

E.R. 1172

**Description of the Proposed Action**

The WSTs evaluated in the PEA include fracturing and non-fracturing treatments which may be used for enhancing production from existing wells or accessing oil that is not accessible relying only on natural reservoir pressure. The PEA adopts the definitions that are found in State of California Senate Bill No. 4 (SB-4) Oil and Gas: Well Stimulation. The SB-4 definitions are applied to WST activities that are occurring in State waters and accessing the same formations as those being accessed by offshore platforms on the 43 active Federal leases, as well as being widely used on land in California. Adopting the SB-4 definitions allows for straightforward comparisons of WST applications in Federal and State offshore operations and in the analysis of the cumulative effects of all offshore operations.

Under the SB-4 definitions, *Well Stimulation Treatment* means any treatment of a well designed to enhance oil and gas production or recovery by increasing the permeability of the formation. WSTs include, but are not limited to, hydraulic fracturing treatments and acid well stimulations. Routine well cleanout work, routine well maintenance, routine removal of formation damage due to drilling, bottom hole pressure surveys, and routine activities that do not affect the integrity of the well or the formation are not considered WSTs.

The PEA distinguishes between "fracturing WSTs," in which WST fluids are injected at pressures required to fracture the formation (i.e., greater than the formation fracture pressure), and "non-fracturing WSTs," in which the WST fluid is injected at less than the pressure required to hydraulically fracture the formation. Diagnostic fracture injection tests (DFITs), hydraulic fracturing, and acid fracturing are the fracturing WSTs analyzed in the PEA. Matrix acidizing is the only non-fracturing WST analyzed. The four WSTs analyzed in the PEA are described as follows:

- **Diagnostic Fracture Injection Test (DFIT).** The DFIT is used to estimate key reservoir properties and parameters that are needed to optimize a main fracture job. It is a short duration procedure that involves the injection of typically less than 100 barrels of fracturing fluid at pressures high enough to initiate a fracture. Key parameters are estimated from the fluid volume injected and the pressure dissipation profile. The fluid used in a DFIT is typically the fluid that would be used in the main fracture treatment but with no proppant[1] added, thus allowing the fracture to close naturally as pressure is released.

- **Hydraulic Fracturing.** Hydraulic fracturing involves the injection of a fracturing fluid at a pressure (as typically determined by a DFIT) needed to induce fractures within the producing formation. The process generally proceeds in three sequential steps: (1) injection of a fracturing fluid without proppant to create fractures which extend out from the well; (2) injection of a slurry of fracturing fluid and proppant; and (3) injection of breakers, chemicals added to reduce the viscosity of the fracturing fluid. Upon release of pressure, the fracturing fluid is allowed to flow back (the flowback fluid) to the surface platform. Key fluid additives include polymer gels which increase the viscosity of the fluid and allow it to more easily carry proppant into the fractures, cross-linked compounds that

---

[1] A proppant is a solid material, typically sand, treated sand, or man-made ceramic materials, designed to keep an induced fracture open during or following a fracture treatment.

DOI0106902

E.R. 1173

help further increase the fluid viscosity, and breaker chemicals which break down the cross-linked polymers and allow them to return more readily to the surface after fracturing is completed. Other important additives may include pH buffers, clay control additives, microbial biocides and surfactants to aid in fluid recovery. In offshore applications, the base fracturing fluid is filtered seawater.

- **Acid Fracturing.** Acid fracturing is similar to hydraulic fracturing except that instead of using a proppant to keep fractures open, an acid solution is used to etch channels in the rock walls of the fractures, thereby creating pathways for oil and gas to flow to the well. As with a hydraulic fracturing WST, a pad fluid is first injected to induce fractures in the formation. Next, the acid fracturing fluid is injected at pressures above the formation fracture pressure and allowed to etch the fracture walls. The acid fracturing fluid is typically gelled, cross-linked, or emulsified to maintain full contact with the fracture walls. Fifteen percent hydrochloric acid (15% HCl) solutions are typically used in carbonate formations such as limestone and dolomite, while hydrofluoric acid (HF) solutions and HCl/HF mixtures are used in sandstone and Monterey shale formations and in other more heterogeneous geologic formations, typically at levels of 12% and 3%, respectively. The fracturing fluid typically also includes a variety of additives at a combined concentration on the order of 1% or less, such as inhibitors to prevent corrosion of the steel well casing, and sequestering agents to prevent formation of gels or iron precipitation which may clog the pores.

- **Matrix Acidizing.** In matrix acidizing, a non-fracturing treatment, an acid solution, is injected into a formation where it penetrates pores in the rock to dissolve sediments and muds. By dissolving these materials, existing channels or pathways are opened and new ones are created, allowing formation fluids (oil, gas and water) to move more freely to the well. Matrix acidizing also removes formation damage around a wellbore, which also aids oil flow into the well. The acid solution is injected at pressures below the formation fracture pressure and is thus a non-fracturing treatment. Three distinct fluids are commonly used sequentially: (1) an HCl acid preflush fluid; (2) a main acidizing fluid generated from mixing HCL and ammonium bifluoride to produce an HCl/HF mud acid at typically 12% and 3%, respectively (some operations use mud acid, for example sandstone and Monterrey shale while some operations primarily use 15% HCl); and (3) an ammonium chloride overflush fluid. The acidizing fluid also includes a variety of additives at a combined concentration of on the order of 1% or less, similar to those used in acid fracturing.

**Environmental Assessment and Socioeconomic Considerations**

BOEM and BSEE evaluated the Proposed Action (allow use of WSTs) and three alternatives: allow use of WSTs with subsurface seafloor depth stipulations, allow use of WSTs but no open water discharge of WST waste fluids, and a No Action Alternative (allow no use of WSTs). Additional alternatives were considered but ultimately not analyzed in the PEA, often because they were not substantially different, from an environmental perspective, than the alternatives that were analyzed.

DOI0106903

E.R. 1174

**Alternative 1: Proposed Action – Allow use of WSTs**

Under this alternative, BSEE technical staff and subject matter experts will continue to review applications for permit to drill (APDs) and applications for permit to modify (APMs), and, if deemed compliant with performance standards identified in BSEE regulations at Title 30, *Code of Federal Regulations*, Part 250, subpart D (30 CFR Part 250, subpart D), will approve the use of fracturing and non-fracturing WSTs at the 22 production platforms located on the 43 active leases on the POCS. Adverse effects to the environment would occur; the level of these impacts would range from negligible to moderate, depending on the specific environmental resource. Anticipated impacts of the Proposed Action on environmental resources are summarized below.

### Physical Resources

Air quality: Impacts due to elevated photochemical ozone from ozone precursor emissions from diesel pumps and support vessels, visibility degradation from emissions of particulate matter, contributions of greenhouse gas emissions associated with routine WST activities, and temporary effects on air quality from releases of WST fluids and hydrocarbons under potential accidents. The PEA shows that these impacts would be negligible because WSTs are expected to be used so infrequently, and because the incremental contribution of the use of any WSTs to air quality impacts are immeasurable or very small.

Water quality: Potential impacts of routine WST operations on water quality within the 100-m radius mixing zone defined under the U.S. Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) general permit may occur from permitted fluid discharges to the ocean, or from accidental releases of fluids, either before, during, or after WSTs. Compliance with the provisions of the permit would prevent effects outside the mixing zone. Because of the highly-diluted context, and because any impacts on water quality would be temporary and localized, impacts would be minor. Depending on the type of accident, the PEA shows that accidental releases are either so unlikely that they are not reasonably foreseeable, or the impacts would be very minor, temporary and localized.

Geologic resources/seismicity: The potential that WSTs may stimulate seismic activity in seismically active areas such as the Santa Barbara Channel, and thus result in an increase in seismic hazard in the vicinity of the wells where fracturing WSTs are being implemented, was evaluated in the PEA. The analysis shows that due to the nature of the WSTs used and the context of the offshore environment, it is not expected that the Proposed Action would contribute to seismicity.

### Biological Resources

The Proposed Action is expected to have negligible to minor effects on biological resources. Potential lethal, sublethal or displacement impacts on benthic communities, fishes, marine and coastal birds, marine mammals, and sea turtles following ocean disposal of WST waste fluids or accidental release of WST fluids or hydrocarbons from potential accidents may occur but would be minor, short-term and localized.

Benthic resources, marine and coastal fish, birds, mammals and reptiles: The primary concerns with regard to these biological resources is the potential for lethal, sublethal, or displacement impacts following ocean disposal of WST waste fluids or the accidental release of WST fluids or hydrocarbons from potential accidents. The PEA shows that these impacts are negligible because of the infrequency of WSTs, the very small concentration of any WST chemicals in the

DOI0106904

E.R. 1175

discharged water, and because of the highly-diluted context of any discharges.

### Socioeconomic Considerations

There are very few interfaces between the use of WSTs offshore and social or economic factors. Most potential considerations, such as archaeological resources, areas of special concern, and environmental justice, were briefly considered but discounted from further analysis in the PEA because no meaningful impacts could be discerned.

Commercial and recreational fisheries were considered, namely, the potential for preclusion from fishing areas through interference with vessels transporting WST materials and equipment, or from localized closure of fisheries due to accidental release of WST fluids. These instances were discounted, though, because there is not expected to be an increase in vessel traffic due to WSTs, and because the likelihood of accidental releases are so small.

### Alternative 2: Allow Use of WSTs with Subsurface Seafloor Depth Stipulations.

Under this alternative, no use of fracturing WSTs would be approved at depths less than 2,000 ft (610 m) below the seafloor surface. This alternative is intended to reduce the likelihood that a fracturing WST would produce fractures that could intersect an existing fault, fracture or well and potentially create a pathway to the seafloor surface and result in a hydrocarbon release to the ocean. Under any of the action alternatives, the risk of fracturing WST resulting in a surface expression is already exceedingly low and not reasonably foreseeable. Therefore, Alternative 2 would only result in a marginal reduction in this remote risk. The overall impacts to physical, biological and socioeconomic resources would be similar to the Proposed Action.

### Alternative 3: Allow Use of WSTs but No Open Water Discharge of WST Waste Fluids.

Under this alternative, no WSTs would be approved that use open ocean disposal of any WST-related waste fluids (such as the flowback) or of produced water comingled with WST waste fluids. This alternative is intended to eliminate any potential effects of discharges of WST-related chemicals on the marine environment. Currently, permitted open water discharge of produced water could continue when produced water does not contain WST-related chemicals. When WST-related chemicals are present, produced water would need to be disposed by alternative means such as through injection. Additional injection wells could be needed at one or more of the platforms where disposal currently occurs only via permitted open water discharge. The overall impacts to physical, biological and socioeconomic resources would be similar to the Proposed Action. There are additional potential impacts to benthic, fishes, marine mammals, sea turtles and archaeological resources from drilling new injections wells.

### Alternative 4: No Action—Allow No Use of WSTs.

Under this alternative, none of the four WSTs identified for the proposed action would be approved for use in any current or future wells on the 22 platforms associated with active leases on the POCS. This alternative would eliminate all effects of the use of WSTs. Production at some wells may be expected to decline sooner than under the proposed action, as reservoir pressures continue to decline with primary production. Routine well maintenance activities (e.g., wellbore cleanup) and enhanced oil recovery techniques (e.g., water flooding) that fall outside of the SB-4 definitions of WSTs would continue (as they would under any of the other three alternatives). For example, well maintenance conducted with the well tree installed, which may not require specific BSEE approval, would continue, including (1) acid wash (a form of acid treatment), (2) solvent wash (a chemical method of cutting paraffin), (3) casing scrape/surge (a

method of scale or corrosion treatment and swabbing), and (4) pressure/jet wash (a method of bailing sand and a scale or corrosion treatment). In addition, well maintenance operations that require removal of the tree, which are not considered routine and need an approved APM, would also continue.

**Significance Review (40 CFR 1508.27)**

Consistent with 40 CFR 1508.27, significance is evaluated by considering both context and intensity. Context can refer to both the spatial and social settings. For this Proposed Action, the context is the POCS, and the vicinity of offshore oil and gas production in Santa Barbara, Ventura, and Los Angeles Counties. It is within this context that the intensity of potential effects of the Proposed Action is considered.

Intensity refers to the severity of effect. Pursuant to 40 CFR 1508.27(b), the following ten factors have been considered in evaluating the significance of the Proposed Action:

1. **Impacts that may be both beneficial and adverse.** Potential adverse effects of the Proposed Action to the environment are not significant. Overall, most resources will not be impacted or impacts will be negligible. In some cases where impacts are somewhat more pronounced, such as with discharge of produced water, the impacts are minor, short-term and localized.

2. **The degree to which the Proposed Action affects public health or safety.** Within its environmental analysis, BSEE and BOEM considered the distance of the Proposed Action from local communities, potential effects of expected allowable discharges and emissions. Due to the short-term, localized, and infrequent nature of potential impacts arising from the Proposed Action, no effects on public health and safety are expected.

3. **Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.** The Proposed Action would not take place in historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas. Some public comments stated that the Santa Barbara Channel is a unique and ecologically rich area; however, there is no consequence of the Proposed Action that has bearing on any of these noted characteristics.

4. **The degree to which the effects on the quality of the human environment are likely to be highly controversial.** BSEE and BOEM evaluated the degree to which the potential effects of the proposed activities may be highly controversial. In developing the PEA, BSEE and BOEM reviewed relevant studies, scientific literature, past BSEE/BOEM/MMS NEPA analyses, and EPA analyses. BSEE and BOEM reviewed public comments, in part to determine if substantial questions exist on whether the proposed action would cause significant degradation of any environmental factor. Although some questions were raised during the public comment period as to the availability of adequate information, there is no question as to the overall consequences. The analysis of the PEA shows that there is no potential for the Proposed Action to cause significant environmental effects.

5. **The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.** Production of oil and gas, including the use of WSTs, is a highly-regulated and studied activity that has been taking place for many decades. Risks and effects have been identified and evaluated in the PEA. During the public comment period, some issues were raised with respect to the availability of specific information, for example, regarding the composition of produced water discharges. Concerns raised by stakeholders were fully considered and addressed as appropriate in the PEA. Furthermore, the effects analyses in the PEA are based on the best available scientific information. Sufficient information was available to support sound scientific judgments regarding the potential for environmental effects.

6. **The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.** The PEA describes the effects arising from a suite of potential future WSTs. The future treatments will continue to be proposed by operators and undergo further NEPA review prior to approval. Similarly, oil and gas activities that are not described in the Proposed Action and analyzed in the PEA would also require separate review and approval before they could proceed. Thus, the Proposed Action will not serve as a precedent for future actions nor represent a decision in principle about a future consideration. Accordingly, the degree to which the Proposed Action may establish a precedent for future actions or represent a decision in principle about a future consideration does not render the potential impacts significant.

7. **Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.** Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts. The PEA considered the potential cumulative effects of the Proposed Action when combined with other past, present, and reasonably foreseeable activities. The PEA concludes that the Proposed Action is not reasonably anticipated to produce significant impacts or to add to the effects of other activities such that the incremental effects of the action results in significant effects. Further, this PEA evaluated a suite of potential future WSTs

8. **The degree to which the Proposed Action may affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.** Activities associated with the Proposed Action are not anticipated to disturb historic or prehistoric properties, or coastal areas that include these sites. The Proposed Action is not expected to adversely affect, or cause the loss of, any scientific, cultural, or historic resources. Therefore, the degree to which the Proposed Action may adversely affect historic resources does not render the potential impacts significant.

9. **The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.** The PEA, being programmatic in nature, does not immediately authorize any activity with the potential to have impacts on endangered species. During environmental review of proposed future WSTs, any potential impacts to

DOI0106907

E.R. 1178

endangered species or their critical habitat will be contemporaneously evaluated, and consultation initiated where appropriate. Additionally, the potential for the Proposed Action to impact endangered species or critical habitat is included in the overall analysis related to fish and wildlife, and the impacts were found to be negligible.

10. **Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.** The use of WSTs in oil and gas production is a highly-regulated activity, not only by BOEM and BSEE but through a variety of other processes intended to protect the environment. For example, the Clean Water Act NPDES permitting system places limitations on the allowable discharge of waste fluids. No threat of a violation of law exists with regard to the Proposed Action.

### Finding of No Significant Impact

We have considered the evaluation of the potential effects of the Proposed Action and the review of the 40 CFR 1508.27 significance factors. It is our determination that the Proposed Action would not cause any significant impacts. It is our determination that implementing the Proposed Action does not constitute a major federal action significantly affecting the quality of the human environment within the meaning of Section 102(2)(c) of the National Environmental Policy Act of 1969.

_____          27 May 16
Richard Yarde, Regional Supervisor, Office of Environment,          Date
Bureau of Ocean Energy Management


_____          27 May 16
Charles B. Barbee, Regional Environmental Officer,          Date
Bureau of Safety and Environmental Enforcement



BUREAU OF OCEAN ENERGY MANAGEMENT
Home | Newsroom

# BSEE and BOEM Publish Joint Environmental Assessment on Use of Well Stimulation Treatments in Federal Waters off California

## Comprehensive analysis finds no significant environmental impacts from practice

**05-27-2016 WASHINGTON**

**Contacts:** BSEE Guy Hayes 907.334.5333/Cell: 907.301.2473
BOEM John Romero 805.384.6324 /Cell: 805.312.1429

The Bureau of Safety and Environmental Enforcement (BSEE) and Bureau of Ocean Energy Management (BOEM) have completed a comprehensive environmental analysis evaluating the potential impacts from the use of well stimulation treatments on the 23 oil and gas platforms currently in operation on the Outer Continental Shelf offshore California.

Based on the analysis in this joint Programmatic Environmental Assessment (EA), BSEE and BOEM issued a *Finding of No Significant Impact (FONSi)* from the use of specific well stimulation treatments in oil and gas activities on the Pacific Outer Continental Shelf (OCS). The EA and the FONSI are available for viewing http://pocswellstim.evs.anl.gov/.

"Drawing on the best available science, the EA provides information and analysis on the use of well stimulation treatments in federal waters offshore California. The comprehensive analysis shows that these practices, conducted according to permit requirements, have minimal impact," said BOEM Director Abigail Ross Hopper. "As always, coordination with other key agencies, and input from the public and non-governmental organizations, were vitally important as we developed this assessment."

The programmatic EA evaluated several categories of treatments, including hydraulic fracturing, a range of alternatives, and all environmental resources that could potentially be impacted. The analysis indicated no significant environmental impacts associated with any of the alternatives considered. The EA provides valuable information that BSEE's Pacific Region will consider in future processing of permits involving Well Stimulation Treatments.

"BSEE is fully committed to safeguarding the environment," said BSEE Director Brian Salerno. "Anyone familiar with our regulations understands that they not only address worker and operational safety, but also require the industry to function as environmental stewards. We consider vigorous environmental enforcement central to the Bureau's mission."

The EA was conducted as part of settlement agreements to resolve lawsuits regarding the Bureaus' compliance with the National Environmental Policy Act, Outer Continental Shelf Lands Act, and Coastal Zone Management Act. Pending completion of the EA, BSEE agreed to withhold approvals of future Applications for Permit to Drill and Applications for Permit to Modify involving hydraulic fracturing and certain well stimulation treatments on the Pacific Outer Continental Shelf. Under the agreements, BSEE will develop a mechanism to increase transparency in the permit approval process, as well as a method to alert the public of newly submitted complete permit applications for hydraulic fracturing or acid well stimulation

BSEE and BOEM received more than 10,000 comments on the draft assessment during the 30-day public comment period that ended on March 23, 2016. After carefully reviewing those comments, the Bureaus revised the text of the final EA where appropriate, including amending the statement of Purpose and Need, clarifying the descriptions of alternatives, and adding information on greenhouse gases and climate change.

The resource areas evaluated in the offshore environment include water quality impacts from discharges of produced water, and the potential for associated impacts to fish and wildlife. Considering the low expected concentrations of well stimulation treatment chemicals and the protective nature of the EPA's National Pollutant Discharge Elimination System General Permit and required monitoring of aquatic life, the analysis in the EA affirms that wastewater discharges from proposed well stimulation activities will not have a significant impact on the environment. Accidental releases of well stimulation treatment fluids have a relatively higher potential to cause impacts, but the probability of an accident occurring and the reasonably foreseeable size of a resulting release are so small that such accidents would not be expected to cause a significant impact.

There have been 24 well stimulation treatments (21 of which involved hydraulic fracturing) on the OCS offshore California between 1982 and 2014, and these were conducted on four of the 23 platforms. Reservoirs on the OCS off Southern California tend to be much more permeable than onshore reservoirs, and are already highly naturally fractured. Therefore, little permeability enhancement has been required for their development. As described in the scenario evaluated in the EA, the future use of Well Stimulation Treatments is expected to continue to be occasional rather than essential to hydrocarbon production from these platforms.

The Department of the Interior remains committed to safe offshore operations and appropriate environmental reviews of associated activities. BSEE and BOEM continue to fully comply with the terms of the settlement agreements in an effort to enhance the transparency of the permitting process.

DOI0016576

E.R. 1180